**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| NEXTMEDIA GROUP, INC., *et al.*, | § | Case No. 09-_____ (____) |
| | § | |
| Debtors. | § | Joint Administration Pending |

**DECLARATION OF ERIC W. NEUMANN IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     BACKGROUND ................................................................................................2

     A.     Company and Business Overview ...........................................................2

     B.     The Debtors' Corporate and Capital Structure ......................................3

     C.     The Industry ...........................................................................................7

     D.     Restructuring Initiatives and the Bankruptcy Filings ...........................10

III.    FIRST DAY MOTIONS AND ORDERS .........................................................12

     A.     Administrative and Procedural Matters .................................................12

           (i)     Motion for Joint Administration .....................................13
           (ii)    Motion for Extension of Time to File Schedules............14

     B.     Stabilization of Business Operations .....................................................14

           (i)     Motion to Maintain Bank Accounts and Cash
                  Management System ........................................................15
           (ii)    Motion to Pay Prepetition Wages, Compensation
                  and Employee Benefits ...................................................18
                  (a)    Payroll and Withholding...................................19
                  (b)    Benefits and Related.........................................20
                  (c)    Accidental Death and Dismemberment, Long Term
                       and Short Term Disability Life Insurance ...........21
                  (d)    Worker's Compensation and General Liability Insurance ...22
                  (e)    401(k) Plan ......................................................22
                  (f)    Non-Negotiated Expense Reimbursement Checks...............23
                  (g)    Business Expenses............................................23
                  (h)    Severance Payments.........................................24
            (iii)   Motion to Pay Prepetition Sales and Use Taxes .............25
            (iv)   Motion to Enjoin Utility Companies from Altering
                  or Discontinuing Service..................................................27
            (v)    Motion for Authorization to (i) Incur Debtor in
                  Possession Financing, (ii) Use Cash Collateral,
                  (iii) Provide Adequate Protection and (iv) Related Relief..........31
           (vi)   Motion for Authorization to Pay Prepetition Claims
                  of Certain Creditors in the Ordinary Course of Business ............34

     C.     Retention of Professionals and Noticing and Balloting Agent .................38

IV.    CONCLUSION....................................................................................................39

DAL:754540.6

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| NEXTMEDIA GROUP, INC., *et al.*, | § | Case No. 09-_____(____) |
| | § | |
| Debtors. | § | Joint Administration Pending |

### DECLARATION OF ERIC W. NEUMANN IN SUPPORT OF
### CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

ERIC W. NEUMANN declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:[1]

### I.    INTRODUCTION

1.    I am the Vice President and Chief Financial Officer of NextMedia Group, Inc., one of the above-captioned affiliated debtors and debtors in possession (collectively, the "Debtors," "NextMedia" or the "Company").[2]  I have served in that capacity since February 5, 2008.

2.    On this date (the "Petition Date") and concurrently with the filing of this Declaration, each of the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.  In order to enable the Debtors to operate effectively, to smooth the transition into chapter 11, and to avoid any potential adverse effects as a result of the

---

[1]    Capitalized terms used but not defined herein have the meanings ascribed to such terms in the relevant First Day Motion (as defined herein).

[2]    The Debtors in these chapter 11 cases, along with the last four (4) digits of their taxpayer identification numbers, are: NextMedia Group, Inc. (0791), NextMedia Investors LLC (9403), NextMedia Operating, Inc. (5397), NM Licensing LLC (5396), NextMedia Outdoor, Inc. (5398), NM Texas, Inc. (4229), NextMedia Northern Colorado, Inc. (8422), NextMedia Franchising, Inc. (9913) and NextMedia Outdoor, LLC (9700).

DAL:754540.6

commencement of these chapter 11 cases, the Debtors have requested various types of relief in several "first-day" pleadings filed with the Court (the "First Day Motions").

3.      I submit this Declaration in support of the Debtors' First Day Motions.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or my experience with and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## II.      BACKGROUND

### A.      Company and Business Overview

4.      NextMedia Investors LLC ("NM Investors") is an investment limited liability company holding company and the ultimate parent entity to eight (8) NextMedia entities. NextMedia Group, Inc. ("NM Group"), a wholly-owned subsidiary of NM Investors, was formed as a holding company for the NextMedia operating entities.  NextMedia Operating, Inc. ("NM OpCo"), a wholly-owned subsidiary of NM Group, is the principal operating entity that, with its wholly-owned and majority-owned subsidiaries, provides out-of-home media services in two (2) segments: (i) radio broadcasting (through NM OpCo and NM Licensing LLC (collectively, the "Radio Entities")) and (ii) outdoor advertising (through NM OpCo, NextMedia Outdoor, Inc. and NextMedia Northern Colorado, Inc. (collectively, the "Outdoor Entities")).[3]

5.      As of the Petition Date, the Debtors operate an aggregate of thirty six (36) AM and FM radio stations in a total of seven (7) rated and unrated small, mid-sized and suburban markets, including the Greenville-New Bern-Jacksonville, North Carolina area; the Saginaw-Bay City-Midland, Michigan area; Canton, Ohio; Myrtle Beach, South Carolina; San Jose, California;

---

[3]      NM Investors has no liabilities or operations.  Its only asset is its equity interest in NM Group.  Thus, all references to the Debtors' operations and business do not include NM Investors.  NM Texas, Inc., has no assets, liabilities or operations.

suburban Chicago; and suburban Dallas. In the majority of these markets, the Debtors own and operate clusters of radio stations and target diverse demographic groups through a broad range of programming formats, including rock, adult contemporary, oldies, sports/news/talk, and country. In each of the radio markets served, the Debtors also provide radio broadcast advertising services to local, regional and national advertising customers.

6.      The Outdoor Entities operate the outdoor advertising business, which consists of approximately 5,200 display faces in the form of traditional outdoor advertising bulletins and posters affixed to billboard structures, bus stop shelters and building wall displays. While many of the Debtors' outdoor advertising displays are located on leased premises, in certain circumstances a Debtor either owns the premises on which its displays are located, or it relies upon easements to use the property. The Debtors' six (6) outdoor advertising markets consist of the following geographic areas: the surrounding areas of San Francisco, California; Myrtle Beach, South Carolina; Green Bay, Wisconsin; Northern Colorado (including the areas in and around Cheyenne, Wyoming, Western Kansas and Nebraska); and the States of Virginia and North Carolina.

7.      The Debtors are headquartered in Greenwood Village, Colorado, and currently have just under 500 employees (part-time and full-time) in at least thirteen (13) markets across the United States.

**B.      The Debtors' Corporate and Capital Structure**

8.      Certain of the Debtors were founded in late-1999 by Steven Dinetz and Carl E. Hirsch (who collectively had more than 50 years experience acquiring and developing out-of-home media assets) to capitalize on consolidation opportunities in the out-of-home media space. The founders believed an opportunity existed to acquire individual radio stations, radio station clusters and groups in mid-sized and suburban markets because, at the time, the five largest

owners of radio stations accounted for 37% of total radio revenue in the United States.  The founders also believed that the outdoor advertising industry was highly fragmented and, thus, an opportunity for consolidation existed since more than 200,000 advertising displays were owned by more than 1,000 small and mid-sized operators across the United States.  Over time, additional Debtors were formed, and the structure of the Company changed as its business has evolved.

9.     As stated earlier, NM Investors is the ultimate parent company of all of the Debtors.  NM Investors owns 100% of the equity in NM Group.  NM Group owns 100% of the equity in NM OpCo, which in turn owns 100% of the equity in each of NM Licensing LLC, NextMedia Outdoor, Inc. and NM Texas, Inc.  NextMedia Outdoor, Inc. owns 100% of the equity in NextMedia Northern Colorado, Inc. and NextMedia Franchising, Inc., and owns 80% of the equity in NextMedia Outdoor, LLC (the other 20% of NextMedia Outdoor, LLC is held by non-Debtor individuals).  The following chart details the NextMedia corporate structure as of the date hereof:

4

**NextMedia Corporate Structure**



10.     The Debtors do not have any publicly traded debt or securities. Prior to the Petition Date, the Debtors financed their operations through borrowings under two secured credit facilities, as described below.

11.     <u>First Lien Debt</u>. The Debtors' first lien secured debt arises under that certain Credit and Guaranty Agreement dated as of November 15, 2005 (as modified, amended or supplemented from time to time prior to the Petition Date, the "<u>First Lien Credit Agreement</u>"), among NM OpCo as borrower, NM Group and the other Debtors (except NM Investors) as guarantors, the various lenders thereunder (the "<u>First Lien Lenders</u>"), Wilmington Trust FSB as

5

successor administrative agent and collateral agent (the "First Lien Agent"),[4] and the other parties thereto. As of the Petition Date, the Debtors owed the First Lien Lenders approximately $162.3 million (including accrued but unpaid interest) (the "First Lien Debt") under the First Lien Credit Agreement, plus an additional approximately $2.9 million in certain interest rate swap obligations. The First Lien Debt is secured by a lien on substantially all of the Debtors' assets, including a pledge of the capital stock of each of NM Group's direct and indirect subsidiaries (the "Prepetition Collateral").

12.    Second Lien Debt. The Debtors' second lien secured debt arises under that certain Second Lien Credit and Guaranty Agreement dated as of November 15, 2005 (as modified, amended or supplemented from time to time prior to the Petition Date, the "Second Lien Credit Agreement"), among NM OpCo as borrower, NM Group and the other Debtors (except NM Investors) as guarantors, the various lenders thereunder (the "Second Lien Lenders," collectively with the First Lien Lenders, the "Prepetition Lenders"), NexBank, SSB as administrative agent (the "Second Lien Agent"), and the other parties thereto. As of the Petition Date, the Debtors owed the Second Lien Lenders approximately $89.6 million (including accrued but unpaid interest) (the "Second Lien Debt") under the Second Lien Credit Agreement. The Second Lien Debt is secured by a second lien on the Prepetition Collateral.

13.    There is an inter-creditor agreement among the Company, the First Lien Agent and the Second Lien Agent governing the parties' relative rights in the Prepetition Collateral and other related matters vis-à-vis the First Lien Credit Agreement and the Second Lien Credit Agreement, and the First Lien Debt and the Second Lien Debt.

---

[4]    Shortly before the Petition Date, Wilmington Trust FSB replaced General Electric Capital Corporation as the administrative and collateral agent.

14.     Prior to the Petition Date, by letters dated March 23, April 20 and June 5, 2009, the First Lien Agent notified the Debtors of the occurrence of certain events of default under the First Lien Credit Agreement.  By letters dated March 25, April 23, June 12 and July 3, 2009, the Second Lien Agent notified the Debtors of the occurrence of certain events of default under the Second Lien Credit Agreement.  Due to such defaults under the First Lien Credit Agreement, the Debtors have been paying interest to the First Lien Lenders at the default rate under the First Lien Credit Agreement since March 31, 2009.  The Debtors did not make the required interest payment to the Second Lien Lenders on March 31, 2009, and have not made further interest payments to the Second Lien Lenders.

## C.     The Industry

15.     The out-of-home advertising industry is highly competitive.  The Debtors' out-of-home media properties compete for audiences and advertising revenues with other radio stations and outdoor advertising companies, as well as with other forms of media, such as newspapers, magazines, network and cable television, satellite radio, direct mail and Internet-based media, within their respective markets.

16.     The success of each of the Debtors' radio stations depends largely upon audience ratings and their share of the overall advertising revenue within a market.  The Debtors' radio stations compete for listeners and advertising revenue directly with other radio stations within their respective markets.  Radio stations compete for listeners primarily on the basis of programming content that appeals to a particular demographic group.  In addition, each radio station competes on the basis of management experience, the station's local audience share in its market, transmitter power, local program acceptance and the number of other radio stations and other advertising media in the market area.

DAL:754540.6

17.    The radio broadcasting industry is subject to competition from new or developing media technologies.  For example:

- cable television operators provide a service commonly referred to as "cable radio" which provides cable television subscribers with several high-quality channels of music, news and other information;

- direct satellite broadcast television and satellite radio broadcast companies supply subscribers with several high-quality music channels;

- the Internet offers many new and diverse forms of audio content;

- new consumer products, such as portable digital audio players; and

- the introduction of in-band on-channel digital radio and new low-power FM radio that provides radio services in the same bandwidth currently occupied by traditional FM and AM radio services.

18.    In each of the Debtors' outdoor advertising markets, the Debtors face competition from a wide variety of in-home media, including over the air and cable broadcasting, print media and direct mail marketers, as well as other out-of-home media.  The Debtors compete primarily on the basis of the location of their displays and, to a lesser extent, on the cost-per-thousand impressions.    The traditional outdoor advertising industry is highly fragmented and is characterized by several local operators.

19.    On a national level, the Debtors compete with a small number of major outdoor advertising companies such as Clear Channel Communications, CBS Outdoor and Lamar Advertising Co., as well as with other small and mid-sized operators.  In each of their markets, the Debtors compete primarily on the basis of advertising rates, the locations in which they have displays, and the quality of their customer service.

8

20.    The radio industry was severely impacted by the financial crisis of 2008 and the related recession that started in or around December 2007.  The Debtors' radio stations began to feel the effect of the recession in January 2008, and revenue growth remains hampered as radio advertising revenues tend to be tied to the overall health of the U.S. economy.  Although the Debtors have been able to sell advertising on their outdoor advertising structures at levels similar to those that existed before the recession began, the Debtors have had to drop their rates by double digit percentages to retain advertisers.  Although the Debtors were able to outperform many of their industry peers in 2008 and in 2009 (year to date), the Debtors' net revenues are down 12.5% in 2009 (as compared to 2008), and industry revenues are down 21% (as compared to 2008).

21.    The U.S. out-of-home ("OOH") advertising industry is heavily concentrated, with three firms earning 85% of traditional billboard revenues, accounting for 66% of all OOH revenues.  The remaining 15% of the market is highly fragmented.  The recent financial and economic downturn has led to depressed prices and fewer advertising sales on outdoor structures because, as with radio advertising, outdoor advertising revenues tend to be tied to the overall health of the economy.  Because the OOH industry typically uses long term-contracts (six to twelve months), however, it took longer for the depth of the current economic downturn to affect outdoor prices and sales.  Revenues in the OOH industry were down 4% in 2008, and year-to-date through third quarter 2009 industry revenues are down nearly 18%.  By comparison, the Debtors' OOH revenues are down 17% year-to-date.  The OOH industry is expected to show some growth in the second half of 2010, and the Debtors intend to be positioned to take advantage of the potential upswing in the market.

9

**D.    Restructuring Initiatives and the Bankruptcy Filings**

22.    Due to declining revenues in the radio and out-of-home advertising industries and the economic downturn that began in or around December 2007 and escalated during 2008, the Company's profitability has suffered.  As a result, in or around March 2009, the Company hired Alvarez & Marsal Securities, LLC ("A&M") as its financial advisor to advise the Company on potential restructuring initiatives and to assist with examining and evaluating various strategic alternatives to address the Debtors' over-leveraged capital structure.  In connection therewith, the Debtors commenced negotiations with their Prepetition Lenders regarding the terms of a consensual restructuring to de-lever the Company and provide the Debtors with financial flexibility on a go-forward basis.

23.    Extensive discussions with the Prepetition Lenders continued throughout 2009, as did discussions with other potential transaction parties.  Eventually, the Debtors reached an agreement in principle with two of their Second Lien Lenders -- Strategic Value Partners LLC and Angelo, Gordon & Co., L.P. (together, the "Second Lien Lead Investors") -- for a consensual restructuring pursuant to a chapter 11 plan of reorganization (the "Plan") whereby, among other things: (i) the First Lien Debt and general unsecured claims will be unimpaired and paid in full through (a) a $55 million equity investment by the Second Lien Lead Investors (the "Equity Investment"), (b) $127.5 million in debt (exit) financing and (c) cash on hand; (ii) the Second Lien Debt will be converted into 95% of the equity in reorganized NM Group (subject to dilution as set forth in the Restructuring Term Sheet (defined below)); and (iii) common shares representing 66.67% of the equity in Reorganized NM Group will be issued to the Second Lien

10

Lead Investors in exchange for the Equity Investment.[5]  The Second Lien Lead Investors have

agreed to "back stop" the $127.5 million in exit financing such that if the Debtors are unable to

secure such financing in the capital markets, or are unable to secure such financing on terms

equal to or better than the terms of the back-stop, the Second Lien Lead Investors will supply

such financing.

24.     The terms of the above-described consensual restructuring are reflected in a term

sheet (the "Restructuring Term Sheet") which sets forth the specific terms to be contained in the

Plan.[6]  The Restructuring Term Sheet is attached as Exhibit "A" to the Restructuring Support

Agreement (the "RSA"), which is attached hereto as Exhibit "A."  In connection therewith, the

Second Lien Lead Investors have agreed to provide up to $20 million in debtor in possession

financing to the Debtors junior to the First Lien Debt.

25.     To evidence their support of the above, the Second Lien Lead Investors and

certain other Second Lien Lenders have executed the RSA, pursuant to which the parties thereto,

including Second Lien Lenders representing approximately 86% in number and approximately

89% in dollar amount of Second Lien Debt have agreed to support a Plan for the Debtors

embodying the terms contained therein and in the Restructuring Term Sheet.

26.     After careful consideration of all available alternatives, the Debtors determined

that implementing a reorganization pursuant to the terms set forth in the RSA, the Restructuring

Term Sheet and the attachments thereto, and commencement of these chapter 11 cases, was the

---

[5]      The common shares to be issued to the Second Lien Lead Investors shall, *inter alia*, be of a different class than those to be issued to other constituents under the Plan, and enjoy a liquidation preference over such other common shares, all as set forth in the Restructuring Term Sheet and the attachments thereto.

[6]      The above summary of the terms of the Restructuring Term Sheet does not include a description of all of the terms and conditions of the Restructuring Term Sheet or other key provisions to be included in the Plan.  As a result, the summary herein is qualified in its entirety by reference to specifics of the Restructuring Term Sheet.

11

best way to maximize the value of the business and recoveries for all of the Debtors' stakeholders.[7]

27.     The Debtors were originally poised to prepare a chapter 11 plan and solicit acceptances thereof outside of bankruptcy and then file prepackaged chapter 11 cases (a "prepack") with all necessary acceptances in hand.  However, on December 10, 2009, the First Lien Agent swept the vast majority of the Debtors' cash, which precipitated the need to abandon the prepack and file for bankruptcy promptly, on a pre-arranged basis, in order to implement the transactions contemplated by the RSA and the Restructuring Term Sheet.

28.     The Debtors believe that using the chapter 11 process to implement the transactions contemplated by the Restructuring Term Sheet will enable them to deleverage their capital structure and to obtain financial flexibility so that they can engage in strategic transactions that are accretive to the value of the business as a whole.

29.     The Debtors anticipate that they will file their chapter 11 Plan and accompanying disclosure statement shortly after the Petition Date, and expect to confirm their Plan and emerge from bankruptcy in fairly short order.

## III.     FIRST DAY MOTIONS AND ORDERS

30.     Concurrently with the filing of their chapter 11 petitions, the Debtors have filed a number of First Day Motions, seeking the entry of certain orders which the Debtors believe are necessary to enable them to operate in chapter 11 with a minimum of disruption and loss of productivity.  A description of the relief requested in the First Day Motions, and the facts supporting entry of the relief requested therein, are discussed below.

### A.     Administrative and Procedural Matters

---

[7]     It is expected that, as part of the reorganization process, NM Investors will be dissolved.

(i)    **Motion for Joint Administration**

31.    By their respective Motions Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for an Order Directing Joint Administration of Chapter 11 Cases (the "Joint Administration Motions"), each of the Debtors is requesting that their estates be jointly administered pursuant to Bankruptcy Rule 1015 and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

32.    The Debtors are all "affiliates," as that term is defined in section 101(2) of the Bankruptcy Code, by virtue of the fact that, as set forth above, NM Investors own 100% of the equity in NM Group, which in turn either directly or indirectly owns 100% of the equity of each of the other Debtors (except for NextMedia Outdoor, LLC, which is 80% owned by its immediate parent company, NextMedia Outdoor, Inc.).

33.    The finances of the Debtors are also significantly related such that joint administration will expedite and foster each of the Debtors' reorganization efforts. Separate books and record for each of the Debtors are, and will continue to be, kept in the ordinary course of business, and each of the Debtors will file its own schedules and statements of financial affairs.

34.    In order to optimally and economically service these cases, the Debtors request that their cases be jointly administered, for procedural purposes only, under the case number and caption assigned to NextMedia Group, Inc. I believe that joint administration will reduce the costs and fees associated with administering these chapter 11 cases, thus benefiting the Debtors' estates and creditors as, among other things, the need to file duplicative notices, motions, applications and orders will be obviated. To that end, joint administration will also serve to streamline administration of these cases for the Court and the Office of the U.S. Trustee.

35.     Further, as stated in the Joint Administration Motions, I do not believe that jointly administering these cases will adversely affect creditors of the Debtors.  The consolidation sought is administrative only, not substantive, and creditors of the Debtors will still be required to file claims against their respective Debtor.

**(ii)     Motion for Extension of Time to File Schedules**

36.     The Debtors are a large and complex enterprise with operations in multiple locations throughout the United States.  The Debtors are comprised of nine (9) affiliated debtor estates with aggregate debts in excess of $250 million.  In the weeks leading up to the Petition Date, the Debtors' key business personnel have been working diligently to prepare for a successful bankruptcy proceeding.  However, the Debtors were faced with numerous tasks that had to be completed prior to focusing on their Schedules and Statements.  The Debtors were also focused on preparing for a prepackaged chapter 11 case rather than a more "traditional" bankruptcy filing with which they are now faced.

37.     Because of the myriad of important business issues the Debtors have had to address leading up to these bankruptcy filings, the Debtors have not had the necessary resources available to review the volumes of material that are necessary to create meaningful and accurate Schedules and Statements by the dates required by Local Rule 1007-1.  As a result, the Debtors are requesting an additional thirty (30) days beyond the 30 days afforded by the Local Rules within which to file their Schedules and Statements, to and including February 16, 2010.[8]

**B.     Stabilization of Business Operations**

38.     During their stay in chapter 11, the Debtors intend to continue operating as debtors in possession and, as a result, need to stabilize the business and ease the transition into

---

[8]     I am informed that the motion to extend time to file schedules and statements of financial affairs will not be heard at the first day hearings.

chapter 11 for the business and its employees.  The relief requested in the motions set forth below is intended to accomplish this goal and to ensure that value is maintained and preserved pending Plan confirmation.

### (i)    Motion to Maintain Bank Accounts and Cash Management System

39.    By their Motion for Order Pursuant to Sections 345, 363, 1107 and 1108 of the Bankruptcy Code (i) Authorizing Continued Use of Existing (A) Cash Management System and (B) Bank Accounts and Business Forms and (ii) Waiving on an Interim Basis Compliance With Deposit and Investment Guidelines (the "Cash Management Motion"), and subject to any interim and/or final DIP financing and/or cash collateral orders entered in these cases, including any budgets attached thereto, the Debtors request (i) authority to maintain their existing bank accounts and business forms, (ii) authority to maintain their cash management system and (iii) an interim waiver of the Bankruptcy Code's deposit and investment guidelines.

40.    As set forth more fully in the Cash Management Motion, in the ordinary course of business, the Debtors utilize a centralized cash management system (the "Cash Management System") to facilitate the timely and efficient collection, management and disbursement of funds used in the Debtors' business.  The Cash Management System is comprised of approximately sixteen (16) bank accounts (collectively, the "Bank Accounts"), as listed on "Exhibit A" attached to the Cash Management Motion, and has three main components: (i) cash collection, including the collection of payments made to the Debtors by customers, (ii) cash concentration, and (iii) cash disbursements to fund the Debtors' operations, primarily consisting of payments made to vendors and service providers.

41.    The Debtors generate revenue primarily from radio and outdoor advertising sales.  The monies generated from these business segments and services are deposited each day into two main depository accounts (the "Concentration Accounts") maintained with US Bank.  The

15

Debtors accept payments by wire and ACH electronic transfers as well as checks received upon delivery and via mail. The Concentration Accounts are zero balance accounts, with the funds in the Concentration Accounts being swept into a Master Account (defined below) at the end of each day.

42.     On a daily basis, the Debtors calculate the funds required to pay their operating expenses, such as employee benefits, overhead expenses, taxes, and professional fees. Funds in the Concentration Accounts are transferred, as needed, into two (2) controlled disbursement accounts (the "Disbursement Accounts") at US Bank. As checks are presented on each of the Disbursement Accounts, they are funded from the Concentration Accounts and cleared.

43.     The funds that remain in the Concentration Accounts after disbursements are made each day are swept into a master account at US Bank (the "Master Account"), which is an interest bearing account where excess cash is held. Every night the funds in the Master Account are swept into a Euro Sweep Account held by US Bank for overnight investment in European banks that are open during the overnight hours when US Bank is closed. Every morning the funds are returned to the Master Account where they are held or sent downstream to fund expenses being paid out of the Disbursement Accounts.

44.     The Debtors also maintain ten (10) stand-alone petty cash accounts (the "Petty Cash Accounts") with eight (8) different banks in the different markets in which they operate. A list of the Petty Cash Accounts is included in the list of Bank Accounts attached to the Cash Management Motion. The purpose of these accounts is to fund small disbursements that need to be made at the market level.

45.     Due to the nature of the Debtors' business and the disruption to the business that would ensue if they were forced to change the name of, or close and reopen, their existing Bank

DAL:754540.6

Accounts, it is critical that the Cash Management System remain in place.   The Cash Management System constitutes an ordinary course and essential business practice that provides significant benefits to the Debtors, including, among other things, the ability to (i) control corporate funds; (ii) ensure the maximum availability of funds when and where necessary; and (iii) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.   The Debtors believe that their transition into chapter 11 will be smoother and more orderly, with minimum disruption and harm to their operations, if the Bank Accounts are continued following the Petition Date with the same account numbers.   By preserving business continuity and avoiding the disruption and delay to the Debtors' collection and disbursement procedures that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, and customers, will be best served.

46.     I am informed that Local Rule 2015-2(a) provides that the Court may allow a debtor to use existing check stock without the "debtor in possession" designation otherwise required by the Office of the United States Trustee until such check stock runs out, after which time new checks shall be ordered bearing the "debtor in possession" designation along with the case number.   The Debtors thus request such relief in the Cash Management Motion.

47.     To minimize expenses, the Debtors further request that they be authorized to continue to use their existing correspondence and business forms (collectively, the "Business Forms"), substantially in the forms existing immediately before the Petition Date, without reference to their status as debtors in possession.   The Debtors propose that -- similar to their check stock -- in the event they need to purchase new Business Forms during the pendency of

these chapter 11 cases, such forms will include a legend referring to the Debtors' status as debtors in possession

48.     Finally, I am informed that section 345(b) of the Bankruptcy Code requires debtors to conform to certain deposit and investment guidelines.  The Debtors seek an interim waiver of such guidelines on an interim basis for 45 days so that they may seek to comply with section 345.  In the event the Debtors determine to seek a waiver of section 345 on a final basis, they will return to the Court for a final hearing, as provided in the Local Rules.

49.     The entry of an order granting the Cash Management Motion is necessary to avoid immediate and irreparable harm to the Debtors and their respective estates.  I am also informed that Courts in this District routinely grant the type of relief requested in the Cash Management Motion.

### (ii)     Motion to Pay Prepetition Wages, Compensation and Employee Benefits

50.     By their Motion Pursuant to Sections 105(a), 363(b) and 507(a) of the Bankruptcy Code for an Order Authorizing Payment of Prepetition Compensation, Benefits and Employee Reimbursements and Granting Related Relief (the "Employee Wage Motion"), and subject to any interim and/or final DIP financing and/or cash collateral orders entered in these cases, including any budgets attached thereto, the Debtors seek an order of the Court authorizing them to: (i) pay certain prepetition employee wages, salaries, and other compensation earned within the 180 days before the Petition Date, (ii) pay related withholding taxes, (iii) honor all employee reimbursement requests in regard to prepetition business-related expenses incurred, in the manner consistent with prepetition practices, (iv) honor all employee benefit programs and make payments in connection therewith and (v) issue new postpetition checks on account of wage, benefit and reimbursement checks issued prepetition that may be or may have been dishonored. The Debtors further request that US Bank -- the bank at which the Debtors maintain their various

18

Disbursement Accounts -- be directed to honor all checks issued on the applicable account prior to the Petition Date to the extent sufficient funds are on deposit therein.

51.     The Debtors seek such authorization because, absent an order granting the relief requested in the Employee Wage Motion, the Debtors' employees will suffer hardship and, in many instances, financial difficulties, as the amounts in question are needed to enable certain of the Debtors' employees to meet certain of their financial obligations.  Moreover, if any of the employees are not paid in accordance with the Debtors' prepetition practices, the stability of the Debtors' business operations will be undermined -- likely, irreparably -- by the very real possibility that employees otherwise loyal to the Debtors will seek employment elsewhere. Morale would also be severely, if not permanently, undermined.

52.     As of the date hereof, the Debtors employ just under 500 employees across 13 markets in the U.S.  To minimize the personal hardship on such employees, the Debtors seek authority to pay certain prepetition claims for, among other things, wages, salaries, commissions, vacation and other paid leave, federal and state withholding taxes, payroll taxes, payments under employee benefit plans and the 401(k) plan that the Debtors usually pay in the ordinary course of their business, and to continue to pay such obligations as they arise in the ordinary course.

### (a)     Payroll and Withholding

53.     Prior to the Petition Date, and in the ordinary course of business, the Debtors' employees were paid semi-monthly on the 15th and last day of each month.  The Debtors' last payroll was processed and distributed on Tuesday, December 15, 2009, and the next payroll is due on December 31, 2009.  Although some employees receive their pay via direct deposit, a portion of the employees receive paper checks.  As of the Petition Date, the Debtors estimate that their employees are owed, in the aggregate, approximately $282,000, comprised of (i) accrued but unpaid prepetition wages for employees and (ii) checks distributed on December 15, 2009

19

(some of which may still be uncashed).[9]  No employees are owed in excess of $10,950 for unpaid wages for the prior 180 days

54.    I am informed that, pursuant to section 507(a)(4) of the Bankruptcy Code, employees are entitled to a priority claim of up to $10,950 for earned but unpaid wages, salaries and commissions.  Accordingly, it is my understanding that such amounts would ultimately have to be paid to the employees in full under a plan of reorganization in any event (in addition to the fact that the RSA and the Restructuring Term Sheet contemplate payment of unsecured claims in full).  None of the Debtors' employees are owed sums in excess of the $10,950 cap.

55.    In the normal course of their business, the Debtors are required by law to withhold from their employees' paychecks certain federal, state and local income taxes, and social security and Medicare taxes, and remit the same to the appropriate taxing authorities.  In addition, the Debtors are also required to make certain federal contributions based upon an employee's salary (*e.g.*, employer's share of FICA taxes) (collectively, the "Payroll Taxes"). The Debtors estimate that the average amount of Payroll Taxes per month is approximately $581,000.  The Debtors request permission to continue remitting all Payroll Taxes, whether accrued prior to, or after, the Petition Date, as and when due.  As of the Petition Date, the Debtors do not hold any Payroll Taxes to be remitted to the taxing authorities, but approximately $92,000 in Payroll Taxes has accrued for the next pay period.

56.    Overall, as of the Petition Date, the Debtors owe a total of $374,000 for all wages, employee withholding taxes and the employers' portion thereof.

### (b)    Benefits and Related

---

[9]    On December 15, 2009, hourly employees were paid for time accrued through December 5 and salaried employees were paid current through December 15.  As of the Petition date, hourly employees had accrued pay from December 6 through 20, 2009, and salaried employees had accrued pay from December 16 through 20, 2009.

DAL:754540.6

57.     In the ordinary course of business, and as is customary in the industry, the Debtors offer their employees various benefits, including medical and dental coverage, flexible spending accounts, vacation, sick time, workers' compensation, short term disability, and other similar benefits.

58.     The Debtors have a self-funded medical insurance program administered by United Healthcare. The Debtors pay a monthly fee of $30,000 to United Healthcare for the administration of the program.  The next payment to United Healthcare will be due on January 10, 2010.

59.     Each pay period, the Debtors deduct from participating employees' paychecks (or direct deposit) such employees' share of the premiums for benefits, and remit such sums directly to the insurance carriers.  In addition, the Debtors also make other payroll deductions from their employees' paychecks for other voluntary benefits and other items, such as flexible spending accounts, 401K loan repayments and wage garnishments.  Furthermore, the Debtors, in the ordinary course of business, fund a portion of the benefit plans maintained for their employees. The Debtors estimate that, as of the Petition Date, approximately $37,000 is owed or being held on account of these benefit plans, garnishments and 401K loans.

60.     The Debtors request authority to make these payments, in the ordinary course of business, as and when due.[10]

**(c)     Accidental Death and Dismemberment, Long Term and Short Term Disability Life Insurance**

---

[10]     The Debtors typically pay earned but unused vacation pay to their employees upon separation.  In light of the filing of these chapter 11 cases, upon separation, the Debtors will only pay the portion of vacation pay earned within the 180 days prior to bankruptcy, taking the $10,950 cap into effect.  The Debtors do not seek authority to make lump sum payments of vacation amounts at this time.  Rather, the Debtors merely seek authority to pay such amounts – in accordance with the terms of the Bankruptcy Code, and customary business practices – upon separation.

21

61.    The Debtors maintain accidental death and dismemberment, long and short term disability and life insurance policies for their employees, their spouses and dependents with Prudential (the "AD&D Policy").  The next monthly premium payment for the AD&D Policy is due January 1, 2010, in the amount of $8,700.  The Debtors seek authority to make this payment.

### (d)    Worker's Compensation and General Liability Insurance

62.    The Debtors maintain a worker's compensation program for all employees with Hartford Fire Insurance Co. ("Hartford"), the State of Ohio ("Ohio") and the State of Wyoming ("Wyoming" together with Hartford and Ohio, the "Issuers") (Policy Numbers 34WERE9295, 1345224-0 and 003308642, respectively), pursuant to which the Issuers are paid by the Debtors in payments equal to a portion of the remaining estimated premium that was not paid at the time the policy commenced.  There are seven (7) monthly payments remaining to Hartford in the amount of $13,732 per payment, subject to adjustments in the normal course.  The next monthly payment to Hartford is due on January 1, 2010, and the Debtors seek authority to make this payment.  Ohio is paid its premiums semi-annually and the next payment in the amount of approximately $7,000 is due on February 28, 2010.  Wyoming is paid its premiums on a quarterly basis and the next payment in the amount of $167 is due on January 1, 2010.  The Debtors seek authority to make these payments as they become due.

63.    The Debtors also have a general liability insurance policy with Hartford pursuant to which premiums of $65,396 have been paid through December 1, 2009.  The next monthly premium payment is due on January 1, 2010 in the amount of $13,239, and the Debtors seek authority to make this payment.

### (e)    401(k) Plan

64.    The Debtors maintain a 401K plan, pursuant to which the Debtors withhold a portion of an employee's paycheck, based upon the percentage elected by such employee.  These

22

amounts are then remitted to the 401K plan administrator, Principle Financial Group (the "Plan Administrator"), on the day of payroll. All prepetition amounts remitted to the Plan Administrator for employee 401K contributions have cleared the Debtors' bank account. The Debtors do not make a matching contribution to the 401K, but merely deduct from employee paychecks and then remit such deducted amounts to the Plan Administrator.

65. Some employees have taken loans against the amounts in their 401K account. Repayment of these amounts are withheld from the employees paychecks on payday. Currently, the Debtors are not holding any funds that have been withheld in connection with 401K loans.

### (f)    Non-Negotiated Expense Reimbursement Checks

66. The Debtors currently hold approximately $13,000 of medical expense reimbursement checks that have not been negotiated by the Debtors' employees and were issued prior to the Petition Date. These checks are no longer negotiable because of lapse in time. These checks were originally issued by the Debtors' self-funded medical insurance plan administered by United Healthcare. The Debtors seek authority to reissue these checks from the US Bank Disbursement Account to the current employees.

### (g)    Business Expenses

67. The Debtors customarily reimburse their employees who incur a variety of business expenses in the ordinary course of the Debtors' operations. Because employees do not always submit requests for reimbursement promptly, it is difficult for the Debtors to determine the amounts outstanding for such reimbursements at any particular time. However, such reimbursements include amounts related to travel (such as transportation and lodging), car rental, meals and business entertainment. As of the Petition Date, reimbursement requests in the approximate amount of $21,000 were unpaid.

**(h)    Severance Payments**

68.    As of the Petition Date, the Debtors offered discretionary severance payments to employees (the "Severance Payment"). Upon separation from the Company (unless terminated for cause), full time employees have been offered two weeks pay for each year of service with a minimum of two months pay as severance.

69.    The Debtors' Severance Payment obligations arise in the ordinary course of business and are necessary to sustain employee morale during the pendency of these cases. The Debtors believe that continuation of this program is advisable for the time being, but reserve the right to make modifications in the event such becomes necessary or otherwise advisable in the Debtors' business judgment. Although the Debtors seek to honor their Severance Payment obligations in the ordinary course of business operations and at their sole discretion, assumption of any underlying contracts is not sought in the Employee Wage Motion.[11] Further, the Debtors are cognizant of the strictures of section 503(c)(2) of the Bankruptcy Code. Thus, the Severance Payment aspect of the Employee Wage Motion does not apply to any of the Debtors' officers, directors or insiders.

70.    The Debtors cannot reasonably estimate the amount of actual Severance Payment obligations that would arise or be paid in connection with their ongoing business operations and, at the present time, no Severance Payment obligations are owing. During calendar year 2009, the Debtors have to date paid approximately $67,343.65 in Severance Payments. The Debtors thus seek authorization to honor, in their discretion, Severance Payment obligations during the pendency of these chapter 11 cases.

---

[11]    The Debtors do not at this time seek to honor any severance obligations arising pursuant to any written employment agreements and such obligations are not covered by the Employee Wage Motion.

24

71.     Finally, with respect to the prepetition compensation, benefit, and reimbursement amounts that have been paid but remain outstanding, the Debtors request that US Bank be directed to honor such checks.  Because US Bank would normally be prohibited from honoring any prepetition checks, US Bank should be directed to honor checks written specifically for payroll, taxes and benefit payments are made.  All payroll and payroll taxes are typically paid by a third party, Ceridian.  In a few instances where checks are reissued, they are paid from the Debtors' Disbursement Accounts at US Bank

72.     The Debtors respectfully submit that the total amount to be paid to the employees pursuant to the relief requested in the Employee Wage Motion is *de minimis* when compared with the importance and necessity of maintaining employee morale and the loss in value the Debtors (and, by implication, their creditors) will suffer if those amounts are not paid.

73.     Immediate entry of an order approving the relief requested in the Employee Wage Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  I am informed that, in other chapter 11 cases, courts in this District have routinely approved payment of prepetition claims for compensation, benefits, and expense reimbursements similar to those described in the Employee Wage Motion.

**(iii)    Motion to Pay Prepetition Sales and Use Taxes**

74.     By their Motion for an Order (A) Authorizing Payment of Certain Prepetition Sales, Use Franchise Taxes and Similar Assessments and (B) Approving Related Relief (the "Sales and Use Tax Motion"), and subject to any interim and/or final DIP financing and/or cash collateral orders entered in these cases, including any budgets attached thereto, the Debtors seek entry of an order (i) authorizing the Debtors to remit and pay sales, use and franchise taxes, as well as fees, licenses, and other similar charges and assessments, as the Debtors, in their discretion, deem necessary or appropriate, and (ii) authorizing and directing financial institutions

25

to receive, process, honor, and pay all checks issued and electronic payment requests made relating to the foregoing.

75.     The Debtors incur certain taxes and fees (the "Taxes and Fees") from various taxing and licensing authorities (collectively, the "Authorities") for licenses, permits and other assessments required to conduct the Debtors' businesses.[12] The Taxes and Fees are paid either monthly, quarterly or annually to the respective Authorities.  On an annual basis, the Debtors spend $88,000 on sales and use taxes, $56,000 on business licenses and $278,000 on franchise taxes.

76.     The Debtors seek the relief requested in the Sales and Use Tax Motion in the event and to the extent that any Taxes or Fees that accrued prepetition were not in fact paid or processed prepetition, or were paid in an amount that was less than is actually owed, or in the event that any payments made prepetition were rejected, lost, or otherwise not received in full by any Authorities.  Further, there may be Taxes or Fees incurred or collected from sales and services provided prepetition that will come due shortly after the Petition Date.  Finally, to the extent that any checks, drafts, deposits or transfers issued or initiated by the Debtors on account of prepetition Taxes or Fees have not cleared as of the Petition Date, the Debtors also seek an order directing banks and other financial institutions to honor and process such payments.

77.     As of the Petition Date, the Debtors owe approximately $37,030 in unpaid accrued Taxes and Fees ($11,880 in sales and use taxes and $25,150 in franchise taxes).[13]  The Debtors believe that there are no additional Taxes and Fees accrued and outstanding as of the

---

[12]     With regard to sales, use and franchise taxes, the Debtors have a taxable presence in seven (7) states in the United States.

[13]     No business license fees are accrued by the Debtors.

26

Petition Date.[14]   However, to the extent that any accrued Taxes or Fees of the Debtors were unpaid as of the Petition Date, the Debtors request authority to remit and pay the Taxes and Fees. Some, if not all, of the Authorities may cause the Debtors to be audited if the Taxes and Fees are not paid immediately. Such audits will unnecessarily divert the Debtors' attention away from the reorganization process. Furthermore, if the Debtors do not pay such amounts in a timely manner, the Authorities may attempt to seek to lift the automatic stay and pursue other remedies that will harm the estates, including the suspension of the Debtors' operations and the filing of liens.

78.     The Debtors believe that immediate entry of an order granting the relief requested in the Sales and Use Tax Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates. I am also informed that courts in this District routinely grant relief similar, if not identical, to that requested by the Sales and Use Tax Motion.

### (iv)     Motion to Enjoin Utility Companies from Altering or Discontinuing Service

79.     By their Motion for Order Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (i) Prohibiting Utilities From Altering, Refusing or Discontinuing Service to the Debtors, (ii) Deeming Utility Companies Adequately Assured for Future Payment and (iii) Establishing Procedures for Determining Requests for Additional Adequate Assurance of Payment (the "Utility Motion"), and subject to any interim and/or final DIP financing and/or cash collateral orders entered in these cases, including any budgets attached thereto, the Debtors seek an order of this Court (i) prohibiting the Utility Companies (defined below) from altering, refusing or discontinuing service, (ii) deeming the Utility Companies adequately assured for future payment

---

[14]     This does not include any potential prepetition tax liability that may later come due as the result of an audit. The Debtors, therefore, request that the relief sought in the Sales and Use Tax Motion likewise to any liability resulting from audits of prepetition taxes, in the event such liability arises (for which the Debtors reserve all rights and defenses).

and (iii) establishing procedures for determining requests by the Utility Companies for "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code.

80.     In connection with the normal operation of their businesses, the various entities listed on Exhibit "A" attached to the Utility Motion (collectively, the "Utility Companies") provide the Debtors with telephone and communication services, water and sewer, gas and electric services and other similar services (collectively, the "Utility Services").[15]  Historically, the Debtors have paid all amounts owing to the Utility Companies on a timely basis.  To the best of the Debtors' knowledge, the Debtors are current with respect to all of their undisputed invoices for Utility Services prior to the commencement of these chapter 11 cases, except to the extent that the Debtors have not yet been billed for prepetition services or the Debtors have recently been billed for such services but payment has not yet been made.

81.     Prior to the Petition Date, the average aggregate monthly cost of Utility Services provided by the Utility Companies over the last twelve months was approximately $160,314.

82.     I am informed that section 366(b) of the Bankruptcy Code provides that the Utility Companies may discontinue providing Utility Services after expiration of the Stay Period if adequate assurance of payment -- in the form of a deposit or other security -- for Utility Services is not provided.  I am further informed that under section 366(c) of the Bankruptcy Code provides in part that the term "assurance of payment" means (i) a cash deposit; (ii) a letter of credit; (iii) a certificate of deposit; (iv) a surety bond; (v) a prepayment of utility consumption; or (iv) another form of security that is mutually agreed on between the utility and the debtor or the trustee.  As I understand it, section 366(c) also provides that a Utility Company (a) may alter, refuse, or discontinue utility services, if during the 30-day period beginning on the date of the

---

[15]     Nothing herein or in the Utility Motion shall be deemed an admission that any of the Utility Companies constitute "utilities" for purposes of section 366 of the Bankruptcy Code.

filing of the petition, the utility does not receive from the debtor or the trustee adequate

assurance of payment for utility service that is satisfactory to the utility. However, on request of

a party in interest and after notice and a hearing, the Court may order modification of the amount

of an assurance of payment under section 366(c)(2).

83.    To the extent the Debtors have previously posted a security deposit (the

"Prepetition Deposit") to some of the Utility Companies, the Debtors submit that such security

deposit should be deemed sufficient adequate assurance and no additional deposits or other

security is or should be required for those Utility Companies. To the extent the Debtors have not

posted a Prepetition Deposit to any Utility Company, the Debtors propose to place a cash

deposit, no later than 20 days after the Petition Date, equal to fifty percent (50%) of the Debtors'

estimated cost of monthly utility consumption with such Utility Company, calculated as an

historical average over the past twelve months (the "Utility Deposit") into a newly created

account (the "Utility Deposit Account") for the benefit of such Utility Companies, unless (i) any

such Utility Company agrees to a lesser amount, (ii) such Utility Company holds a Prepetition

Deposit in an amount greater than or equal to fifty percent (50%) of the Debtors' estimated cost

of monthly utility consumption, or (iii) such Utility Company is currently paid in advance for its

Utility Services. The Debtors estimate that the aggregate amount of all such deposits for the

Utility Companies will not exceed approximately $75,000. A list of all of the Utility Companies

and the amount of Utility Deposit to be made is set forth in Exhibit "A" to the Utility Motion.

84.    The Debtors submit that the payment of the Utility Deposit through establishment

of the Utility Deposit Account, in conjunction with their ability to pay for future Utility Services

in the ordinary course of business, constitutes adequate assurance of payment for each of the

Utility Companies. To the extent Utility Companies request additional adequate assurance, the

29

Debtors propose to establish the procedures (the "Procedures") set forth below by which a Utility

Company may request additional adequate assurance of future payment.

- Absent further order of this Court, the Utility Companies are prohibited from discontinuing, altering or refusing services on account of any unpaid prepetition charges, or requiring payment of an additional deposit or receipt of other security in connection with any unpaid prepetition charges;

- If a Utility Company is not satisfied with the assurance of future payment provided by the Debtors as set forth in the Utility Motion, the Utility Company must serve a written request (the "Request") upon the Debtors' counsel (as set forth below) stating the location(s) for the Utility Services provided, the account number(s) for such locations, the outstanding balance for each account, a summary of the Debtors' payment history on each account and an explanation of why its Prepetition Deposit or Utility Deposit is inadequate assurance of payment;

- The Request must be delivered to Debtors' counsel, Andrews Kurth LLP, 1717 Main Street, Suite 3700, Dallas, Texas 75201 (Attn: Jason S. Brookner) and Richards, Layton & Finger, P.A., One Rodney Square, P. O. Box 551, Wilmington, Delaware 19899 (Attn: Paul N. Heath), so as to be actually received no later than twenty-five (25) days after the date of the entry of the order granting the Utility Motion (the "Request Deadline");

- Without further order of this Court, to the extent that a Utility Company and the Debtors mutually agree on the reasonableness of the Request, the Debtors may enter into agreements providing additional adequate assurance to a Utility Company, as long as the same is in compliance with the terms of the Debtors' budget under any DIP financing and/or cash collateral orders entered in these cases;

- To the extent the Debtors and a Utility Company are unable to reach an agreement with respect to a Utility Company's Request within thirty (30) days after the Request Deadline, the Debtors shall file a motion pursuant to section 366(c)(2) of the Bankruptcy Code (a "Determination Motion"), seeking a determination of the proper adequate assurance. Pending notice and hearing on the Determination Motion, the Utility Company that is the subject of the unresolved Request may not alter, refuse or discontinue services to the Debtors; and

- Any Utility Company that fails to make a timely Request shall be deemed to have accepted the Debtors' proposed terms for adequate assurance, shall be barred from seeking any further additional adequate assurance and shall be barred from altering, refusing or discontinuing services to the Debtors.

85.    In addition, the Debtors request authority to supplement the list of Utility

Companies, without further order of this Court, to the extent that any Utility Companies have

been inadvertently omitted from the list of Utility Companies attached to the Utility Motion.  If

the Debtors supplement the list subsequent to the entry of an order granting the Utility Motion,

the Debtors will serve a copy of the Utility Motion, and the signed order, on any Utility

Company that has been added to the list (the "Supplemental Service").  In addition, the Debtors

will promptly provide each added Utility Company with a Utility Deposit consistent with the

Utility Motion, to the extent the Utility Company does not already hold a Prepetition Deposit.

Concurrently with the Supplemental Service, the Debtors will file a supplemental list of Utility

Companies, adding the names of the Utility Companies so served.  The added Utility Company

shall have thirty (30) days from the date of the Supplemental Service to make a Request.

86.    The Debtors further request that, in the event the Debtors terminate the services of

any Utility Company, such Utility Company must immediately refund, without exercising any

purported right of setoff or recoupment, the entire amount of its Utility Deposit to the Debtors.

87.    I am informed that many courts in this District have granted identical and nearly

identical relief to that requested in the Utility Motion.  Immediate entry of an order approving the

relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and

their estates.

### (v)    Motion for Authorization to (i) Incur Debtor in Possession Financing, (ii) Use Cash Collateral, (iii) Provide Adequate Protection and (iv) Related Relief

88.    By their Motion (i) for Interim and Final Orders (A) Authorizing and Approving

(1) Debtor in Possession Financing Pursuant to Sections 364(c) and 364(d) of the Bankruptcy

Code and Bankruptcy Rule 4001(c), (2) the Use of Cash Collateral and the Grant of Adequate

Protection Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule

31

4001(b) and (3) Modification of the Automatic Stay Under Section 362 of the Bankruptcy Code, and (ii) Scheduling a Final Hearing and Approving Form and Manner of Notice Thereof (the "DIP Financing Motion"), the Debtors seek interim and final authorization to borrow under the DIP Facility, use the Cash Collateral of the First Lien Lenders and Second Lien Lenders, and provide adequate protection to the First Lien Lenders and Second Lien Lenders. The Debtors seek interim authorization for interim DIP financing and interim cash collateral usage as soon as possible, followed by entry of final DIP financing and cash collateral orders in the time period contemplated by Bankruptcy Rule 4001(c) and as the Court's calendar permits.[16]

89.     The financing under the DIP Financing Motion, which seeks authorization to borrow up to $20 million on a final basis, will be provided by the Second Lien Lead Investors and will be junior in priority to the First Lien Debt and the liens in respect thereof., but will be senior to the Second Lien Debt and the liens in respect thereof.. The DIP Financing Motion sets forth in detail the terms of the proposed DIP financing and the terms of the proposed adequate protection to be provided to the First Lien Lenders and the Second Lien Lenders.

90.     On an interim basis, the Debtors estimate that their cash needs will be approximately $5 million to operate the business, in accordance with the budget attached to the DIP Financing Motion. The Debtors have an immediate need to obtain the DIP Financing and use Cash Collateral in order to allow the business to continue uninterrupted, preserve their going concern value, make payroll and satisfy other working capital and general corporate needs. Without access to the proposed DIP Facility and use of Cash Collateral, the Debtors' liquidity will quickly dry up, harming operations and the value of the business. In contrast, the value of the Prepetition Lenders' interest in their collateral will be preserved, if not increased, by the DIP

---

[16]     In addition to the matters expressly set forth in the DIP Financing Motion, the Debtors also request that the Court authorize and approve other customary terms typically approved in connection with DIP financing and cash collateral matters, as more fully set forth in the Interim DIP Order and the Interim Cash Collateral Order.

Facility and use of Cash Collateral because it ensures the uninterrupted continuance of the Debtors' operations which will generate cash and preserve the Debtors' enterprise value.

91.    The terms and conditions of the DIP Financing have been negotiated at arms' length and in good faith by the Debtors and the DIP Lenders. The terms and conditions of the DIP Financing are fair and reasonable under the circumstances and reflect the most favorable terms upon which the Debtors could obtain the necessary funding.

92.    Prior to the Petition Date, the Debtors and A&M contacted several sources of potential funding and none were willing to provide a DIP loan that was junior to the First Lien Lenders and the Second Lien Lenders (nor were any sources of funding willing to provide DIP financing junior only to the First Lien Lenders). Thus, despite their prepetition their efforts, the Debtors have been unable to (a) procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, (iii) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code, (iv) without granting junior liens with respect to the First Lien Lenders, and priming liens with respect to the Second Lien Lenders pursuant to section 364(d) of the Bankruptcy Code, or (b) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than the proposed DIP Financing.

93.    As for adequate protection, the First Lien Lenders are not being primed by the DIP Financing and, as set forth in the DIP Motion, the Debtors are, in essence, providing the First Lien Lenders with adequate protection that mirrors their rights under the First Lien Credit Agreement (*i.e.*, current-pay default interest, replacement liens, the payment of reasonable fees and expenses of the First Lien Agent and superpriority claims, all as set forth herein and in the

33

Interim Cash Collateral Order).  The First Lien Lenders are, therefore, adequately protected for

the Debtors' use of their Cash Collateral.

94.     The Debtors propose to provide the Second Lien Lenders with the following

adequate protection: (i) superpriority claims and replacement liens with such (a) superpriority

claims to be senior to all other postpetition superpriority claims except the superpriority claims

granted to the First Lien Lenders and the DIP Lenders and (b) replacement liens on all of the

property now owed or hereafter acquired by the Debtors, whether or not subject to any other

liens, with such liens to be subordinate only to the liens of the First Lien Lenders and the DIP

Lenders; (ii) payment of the Second Lien Agent's and the Second Lien Lead Investors'

reasonable fees and expenses in connection with these chapter 11 cases; and (iii) provide the

Second Lien Agent such financial reporting that is reported to, or required to be reported to, the

DIP Lenders.  The Debtors believe that this proposed adequate protection should be approved,

especially in light of the fact that the Second Lien Lenders holding approximately 89% of the

Second Lien Debt have consented, as reflected by their signatures to the RSA, to this proposed

adequate protection of their interests.

### (vi)     Motion for Authorization to Pay Prepetition Claims of Certain Creditors in the Ordinary Course of Business

95.     By their Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code

for Authorization to Pay Prepetition Claims of Certain Creditors in the Ordinary Course of

Business (the "Vendor Motion"), and subject to any interim and/or final DIP financing and/or

cash collateral orders entered in these cases, including any budgets attached thereto, the Debtors

seek entry of an order authorizing, but not directing, payment in the ordinary course of business

the allowed, fixed, liquidated, non-contingent, and undisputed prepetition vendor claims (the

34

"Vendor Claims") of the entities set forth on Exhibit "A" attached to the Vendor Motion.  The maximum amount of Vendor Claims sought to be paid is $250,000.

96.     In the ordinary course, the Debtors do business with multiple thousands of vendors in their thirteen (13) markets across the United States. Although most of these vendors are, on some level, "typical," in that they may either be relatively easily replaced if they ceased doing business with the Debtors and/or are not "sole source" providers, the Debtors do business with approximately twenty-nine (29) vendors who are absolutely critical to the business and whose continuing services must not be jeopardized.  If any of the Vendors were to cease doing business with the Debtors, or if the flow of goods and services to the Debtors from these Vendors were interrupted, the negative effect on the Debtors business would be demonstrable and perhaps disastrous.  The Vendors sought to be paid by the Vendor Motion fall into seven (7) basic categories, as discussed below.

97.     Vinyl Production ("VP") and Vinyl Installation ("VI") Vendors.  The VP and VI Vendors are regional operators who are in the midst of providing key services for the Debtors: putting up and installing signs and billboards for the Debtors' advertisers.  This is the lynchpin of the Debtors' outdoor business.  If any of the VP or VI Vendors were to discontinue providing services to the Debtors (i.e., stopped installing signs and billboards currently in progress) it would be extremely disruptive to the operation of the business as, among other things, the delivery time to advertisers would be increased, which would impair the Debtors' ability to serve their customers.  Although the Debtors could theoretically replace some or perhaps all of the VP and/or VI Vendors, the search for replacements would be time consuming, may not be successful and, all the while, the jobs the VP and VI Vendors are in the middle of completing would remain

unfinished, thus also tarnishing the Debtors' reputation.   In the aggregate, the VP and VI Vendors are owed approximately $94,000.

98.    <u>Repair and Maintenance Vendors</u>.   The Debtors' Repair and Maintenance Vendors fall into two general categories: (i) digital billboard display and maintenance and (ii) structural repair and maintenance.   The Debtors' digital displays -- and the parts for and maintenance of the same -- are very specialized.   The Debtors' digital billboard vendor maintains the digital billboards, replaces parts very quickly if and when they fail, and also supplies parts for and assists in the installation of new digital billboards.   If the Debtors were required to find a new digital billboard vendor the business would be harmed as the repair and replacement period would be much longer which, in turn, would tarnish the Debtors' reputation with its customers.

99.    The structural repair and maintenance vendors are critical in that they serve a public health and safety purpose by installing safety upgrades to ensure that VI Vendors are not endangered or physically injured while installing vinyl on the Debtors' billboards.   The structural repair and maintenance vendors also maintain the structural integrity of the Debtors' billboards, ensuring that they don't fall over, break or the like.   These vendors are also in progress on certain jobs and were they to cease providing services, surrounding areas and persons could be in danger.

100.   In the aggregate, the Repair and Maintenance Vendors are owed approximately $133,000.

101.   <u>Computer and IT Vendors</u>.   Debtors' computer and IT services vendors are currently providing the following services:

- Designing a new application for housing leasing and billboard data.   This vendor is critical as it is in the middle of developing a database to replace old and outdated software.   The database is a custom design and is central to the Company's market operations for outdoor advertising.   Were this vendor to

36

stop working, the ensuing delay to the process would severely hamper and hinder the Debtors' operations and their ready access to critical business information;

- Housing overnight storage and replacement of old and outdated servers. This vendor knows the ins and outs of the Debtors' business and computer and IT systems, is on call, and maintains all of the Debtors' hardware. If the Debtors lost this service they would also be unable to produce the financial reports required by their lenders and the Court. The Debtors do not have an in-house IT department. It would be practically impossible to replace this vendor and even if replacement were possible, replacement could not occur without significant delay, expense and disruption to business operations; and

- On-going development and maintenance of the Debtors' customer contract database. There are no employees at the Company who are able to understand and manipulate the database. The database is necessary to record advertising contracts and revenues and is historically the only way that the Debtors perform these functions and track certain revenues.

102.    In the aggregate, the computer and IT vendors are owed approximately $13,000.

103.    <u>Local Regional Credit Card Companies (Fuel Cards)</u>. The Debtors have arranged for certain employees to be issued credit cards in certain regional areas to be used to fuel their vehicles (*e.g.*, Pump 'n Pantry and Phillips 66). These employees typically do not have credit cards of their own, nor do they have ready access to cash, and they need ready access to gasoline to perform their jobs. In some cases, these employees drive trucks and other large vehicles that require over $100 of gas at any given fill-up. Because these employees work in the field, it is not practical for them to return to a local office for petty cash to pay for gas, and there is no other feasible way to ensure that these employees have access to the fuel they require in their daily job duties. In the aggregate, the local credit card vendors are owed approximately $6,100.

104.    <u>Payroll Processor</u>. The Debtors' payroll processor is Ceridian, who is owed $1,000. As part of its duties, the payroll processor administers the Debtors' entire payroll system and process. Although other vendors in this industry are available, it would take many weeks to transition to a new payroll processor. During this time, the Debtors' ability to pay wages and

37

benefits would be severely impaired, which, as a practical matter, puts the Debtors in an untenable and unacceptable situation.

105.   <u>Independent Contractor.</u>   In North Carolina, the Debtors use the services of one independent contractor who is the sole account executive for all of North Carolina. The Debtors cannot generate any revenue in North Carolina without the services of this person, who is owed approximately $2,500.

106.   Absent continuity of payment of the Vendor Claims in the ordinary course, the Debtors' business and the value thereof will be harmed. The maximum cost of paying the Vendor Claims will be $250,000, which is a *de minimis* and modest sum for a company of the Debtors' size. The Debtors do business with multiple thousands of vendors and, through a careful and deliberative process, pared the number of truly "critical" vendors down to 29, which is an extremely small percentage of the Debtors' overall vendor population.[17] During the twelve (12) months prior to these chapter 11 cases, the Debtors overall business expenses exceeded $47.5 million.

107.   Payment of the Vendor Claims as provided above and in the Vendor Motion will allow the Debtors to avoid any disruption in their ability to obtain the critical goods and services provided by these vendors that are key to the operation of their business, thus furthering the restructuring effort, preserving value and avoiding disruptions that would be harmful to the business.

**C.**   **Retention of Professionals and Noticing and Balloting Agent**

108.   The Debtors will shortly be filing applications to retain the following professionals (collectively, the "<u>Applications</u>"): (i) Andrews Kurth LLP and Richards, Layton &

---

[17]   Conservatively, the Debtors do business with over 3,000 vendors. The 29 vendors sought to be paid herein represent 0.97% of 3,000 vendors, which is a very small percentage.

DAL:754540.6

Finger, P.A. as co-counsel to the Debtors; (ii) Alvarez & Marsal Securities, LLC as financial

advisor to the Debtors; (iii) PricewaterhouseCoopers LLP as tax advisors and auditors to the

Debtors; (iv) Leibowitz & Associates, P.A. as special FCC regulatory counsel to the Debtors and

(v) certain ordinary course professionals.  I am informed that these retention applications would

not be considered on a "first day" basis due to recent changes to the Bankruptcy Rules.

However, I believe that these professionals are well suited for this engagement given their

respective experience and expertise in chapter 11 matters generally, and their familiarity with the

Debtors and their operations.  For the reasons set forth in the Applications, the relief requested

therein should be approved when presented to the Court.

109.    On a first day basis, the Debtors seek Court approval to retain BMC Group, Inc.

("BMC") as their claims, noticing and balloting agent, in accordance with the requirements of

Local Rule 2002-1(f).  BMC has been engaged as claims, noticing and balloting agent in many

chapter 11 cases both in this District and in others.  I believe that BMC is well qualified to serve

the Debtors in this capacity and that BMC's retention should be approved as soon as possible so

that they may immediately begin providing the necessary claims and noticing services that will

be required in these chapter 11 cases.

## IV.    CONCLUSION

110.    As a result of the above, I respectfully request that the Court grant all relief

requested in the First Day Motions, along with any and all other and further relief that the Court

may deem to be just and proper.

[remainder of page intentionally left blank]

DAL:754540.6

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 20th day of December, 2009.

Eric W. Neumann
Vice President and Chief Financial Officer
of NextMedia Group, Inc.