## EXHIBIT A

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT, dated as of December 18, 2009 (this "Restructuring Agreement"), is made with reference to the Second Lien Credit and Guaranty Agreement dated as of November 15, 2005 (as amended, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement"), among NEXTMEDIA GROUP, INC. (together with all of its direct and indirect subsidiaries, the "Company"), NEXTMEDIA OPERATING, INC. ("Nextmedia Opco"), the several banks and other financial institutions from time to time party thereto (the "Second Lien Lenders"), and NEXBANK, SSB, as administrative agent for the Second Lien Lenders (the "Second Lien Administrative Agent"), and entered into by each of the Company, NextMedia Investors LLC ("Investors") and NextMedia Opco (collectively with Investors and the Company, the "Company Parties" and, excluding Investors, the "Loan Parties"), certain funds and affiliates of funds managed by Strategic Value Partners LLC or its affiliates ("SVP"), certain funds and affiliates of funds managed by Angelo, Gordon & Co., L.P. or its affiliates ("Angelo, Gordon", together with SVP the "Second Lien Lead Investors") and the Second Lien Lenders from time to time party hereto (including SVP and Angelo, Gordon, each in its capacity as a Second Lien Lender, the "Consenting Lenders"; the Company Parties, SVP, Angelo, Gordon and the Consenting Lenders collectively, the "Parties"). Capitalized terms not defined herein shall have the meanings ascribed thereto in the Term Sheet (as defined below).

## Section 1.  Term Sheet, Plan of Reorganization and Definitive Documentation.

**1.1    Support of Term Sheet, Plan and Definitive Documentation.**

(a)    Until the Termination Date (as defined below) and subject to the terms and conditions hereof (including the Company Parties' fiduciary obligations as set forth in Section 1.1(d) below), the Company Parties, jointly and severally, agree, and agree to cause each of their direct and indirect subsidiaries to agree, to take any and all necessary and appropriate action to consummate the restructuring transactions (the "Restructuring") contemplated under this Restructuring Agreement and the term sheet attached hereto as Exhibit A and the Annexes thereto (the "Term Sheet") pursuant to either a prearranged or prepackaged plan of reorganization (the "Plan") that effectuates the Restructuring through the Chapter 11 Cases (as defined below), by:

(i)     commencing reorganization cases (the "Chapter 11 Cases") by filing voluntary petitions for the Loan Parties (the date of their filing, the "Petition Date") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

(ii)    filing, and seeking approval on an interim and final basis (to the extent applicable), of "first day" motions;

(iii)   filing and seeking approval, on an interim and final basis, of a motion or motions, in form and substance reasonably satisfactory

to the Second Lien Lead Investors and the Required Consenting Lenders, authorizing the use of cash collateral and providing adequate protection (x) to the lenders (the "First Lien Lenders") from time to time party to the first lien Credit and Guaranty Agreement dated as of November 15, 2005 (as amended, supplemented or otherwise modified from time to time) among the First Lien Lenders, the Company, NextMedia Opco and Wilmington Trust Co., as the administrative agent for the First Lien Lenders (the "First Lien Administrative Agent") by (1) paying all accrued and unpaid interest under the First Lien Credit Agreement owing as of the Petition Date and interest accruing thereafter (at the rate being paid as of the Petition Date), (2) providing the First Lien Lenders super-priority administrative claims and granting them senior, first priority replacement liens on all of the Loan Parties' property, in each case to the extent of any diminution in value of their collateral, and (3) paying the First Lien Administrative Agent's reasonable professional fees, and (y) to the Second Lien Lenders by (1) providing them super-priority administrative claims and granting them replacement liens on all of the Loan Parties' property, in each case to the extent of any diminution in value of their collateral and junior to the claims and liens granted to the First Lien Lenders (and with respect of the DIP Facility (as defined below)) and (2) paying the Second Lien Lead Investors' and the Second Lien Administrative Agent's reasonable fees, including reasonable professional fees (it being understood that the Second Lien Administrative Agent's professionals for purposes of adequate protection payments are Broadpoint Capital, Inc., Dechert LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP (solely as FCC counsel), as well as one local counsel) (an order with respect to such a motion, whether on an interim or final basis, a "Cash Collateral Order");

(iv)    to the extent the Loan Parties determine in their reasonable business judgment that borrowings thereunder shall be necessary to finance the working capital requirements of the Loan Parties during the pendency of the Chapter 11 Cases, filing and seeking approval, on an interim and final basis, of a motion, in form and substance reasonably satisfactory to the Second Lien Lead Investors, of an order (such an order, whether on an interim or final basis, the "DIP Facility Order") approving the Loan Parties' entry into, and borrowing under, the debtor-in-possession financing facility described in the commitment letter and term sheet attached hereto as Exhibit B (the "DIP Facility") (it being understood that if a DIP Facility Order were to incorporate the terms and conditions set forth in the preceding clause (iii), entry of such DIP Facility Order shall satisfy the Company Parties' obligations as to such clause (iii)); and

(v)    (1) preparing the Plan and related disclosure statement containing adequate information within the meaning of section

2

1125(a) of the Bankruptcy Code (the "Disclosure Statement"), (2) filing the Plan and Disclosure Statement with the Bankruptcy Court and seeking approval of the Disclosure Statement, (3) soliciting votes to accept or reject the Plan from the Second Lien Lenders, provided that if the Chapter 11 Cases are commenced as prepackaged bankruptcies, the Company Parties shall solicit votes prior to the Petition Date, and (4) seeking approval of a confirmation order with respect to the Plan, in form and substance reasonably satisfactory to the Second Lien Lead Investors, the Second Lien Administrative Agent and the Required Consenting Lenders (the "Confirmation Order"); and

(vi)    taking any and all necessary and appropriate actions in furtherance of the Restructuring.

(b)    Until the Termination Date, and subject to Section 2.2(b) below, each Consenting Lender, severally and not jointly, hereby agrees to take any and all necessary and appropriate actions in furtherance of the Restructuring by:

(i)    subject to receipt of a Disclosure Statement, voting its lender claims arising under the Second Lien Credit Agreement, now or hereafter beneficially owned by such Consenting Lender or for which the Consenting Lender now or hereafter serves as the nominee, investment manager or advisor for beneficial holders (as set forth on Exhibit C annexed hereto and as may be acquired pursuant to Section 7.1 of this Restructuring Agreement, the "Claims"), to accept the Plan and not changing or withdrawing (or causing to be changed or withdrawn) such vote;

(ii)    supporting confirmation of the Plan (and not objecting to, or supporting any other person's efforts to oppose or object to, confirmation of the Plan), including seeking the entry of the Confirmation Order;

(iii)    supporting (and not objecting to) the "first day" motions;

(iv)    refraining from taking any action not required by law which is inconsistent with, or that would materially delay or impede approval, confirmation or consummation of the Plan or that is otherwise inconsistent with the express terms of this Restructuring Agreement and the Term Sheet; and

(v)    not, directly or indirectly, proposing, supporting, soliciting, encouraging, or participating in the formulation of any plan of reorganization, proposal, dissolution, business combination, merger, consolidation, joint venture, sale of estate assets pursuant to section 363 of the Bankruptcy Code or liquidation in the Chapter 11 Cases other than the Plan (each, an "Alternative Proposal").

(c)     Except where Investors is subject to an unstayed court order to the contrary, Investors agrees that it (i) will not sell, transfer, exchange, or otherwise dispose (which, for purposes of this Section 1.1(c), includes abandonment or any deemed disposition) of its stock in the Company until after the consummation of the Restructuring contemplated under this Restructuring Agreement, (ii) will not claim for its 2009 taxable year a worthless stock deduction with respect to its stock in the Company or cause the Company to claim a worthless stock deduction with respect to the stock of any of its subsidiaries, (iii) will not take (and will use its good faith commercially reasonable efforts to prevent) any other actions that would result in an "ownership change" of the Company or its subsidiaries under section 382 of the Internal Revenue of 1986, as amended, at any time prior to the consummation of the Restructuring contemplated under this Restructuring Agreement unless otherwise required by the terms and conditions of the operating agreement of Investors as in effect on the date hereof and (iv) consents and agrees to entry of an injunction enjoining it from undertaking any sale, transfer, exchange, disposition, or other action prohibited by this Section 1.1(c). Any sale, transfer, exchange, disposition or other action taken in violation of the prohibitions in this Section 1.1(c) shall be void *ab initio*.

(d)     Notwithstanding anything to the contrary contained herein, to the extent necessary to comply with its fiduciary obligations under applicable law, the board of directors of each of the Company Parties (as to each, the "Board") may authorize the Company to provide information in response to, and consummate a restructuring with, a third party that such Board believes in good faith has made an unsolicited Alternative Proposal that it determines to be more favorable than the Restructuring to such parties that such Board owes a fiduciary duty (such an Alternative Proposal, a "Superior Proposal", it being understood that an Alternative Proposal would not be a "Superior Proposal" unless such proposal provided for the full repayment in cash of all outstanding obligations under the Second Lien Credit Agreement, including, without limitation, all accrued and unpaid interest and all outstanding fees and expenses of the Second Lien Lenders and the Second Lien Administrative Agent and for the payment of the Break-up Fee (as defined in the Commitment Letter)).

(e)     Without limiting any other provision hereof, the Parties hereby agree to negotiate in good faith each of the definitive agreements and documents referenced in this Restructuring Agreement and the Term Sheet or reasonably necessary or desirable to effectuate the Restructuring. Such definitive agreements and documents shall include, without limitation, any agreements governing or executed in connection with the New Term Financing, the shareholders agreement (including without limitation, the minority shareholder protections contained therein), agreements governing or executed in connection with the Equity Investment, the Plan, the Disclosure Statement and, to the extent applicable, the prepackaged plan scheduling motion, all of which shall be consistent with and incorporate the terms of this Restructuring Agreement and the Term Sheet and otherwise shall be in form and substance reasonably satisfactory to the Company Parties, the Second Lien Lead Investors, the Second Lien Administrative Agent and the Consenting Lenders (to the extent the Consenting Lenders are party thereto) (collectively, the "Definitive Documentation").

For the avoidance of doubt, each of the Parties also agrees, severally and not jointly, that, unless this Restructuring Agreement is terminated in accordance with the terms hereof, it will not take any action that would in any material respect interfere with, delay, or postpone the effectuation of the Restructuring and confirmation and consummation of the Plan and implementation of the Restructuring (it being understood that the support obligations of any Consenting Lender under Sections 1.1(b)(ii) and (iii) shall be deemed satisfied by such Consenting Lender's non-objection regarding the matters described therein).

## Section 2.  Termination Events.

**2.1    Termination Events.**

The occurrence of any of the following shall be a "Termination Event":

(a)    If the Chapter 11 Cases are commenced as prearranged bankruptcies:

(1) the 15th day after the Petition Date, unless the Company Parties have filed the Plan and the Disclosure Statement with the Bankruptcy Court;

(2) the 60th day after the Petition Date, unless the Bankruptcy Court shall have approved the Disclosure Statement prior thereto;

(3) the 100th day after the Petition Date, unless the Bankruptcy Court shall have entered the Confirmation Order prior thereto; or

(4) the later of (i) 15th day after public notice of the consent from the Federal Communications Commission ("FCC") of the pro forma involuntary applications approving the assignment of FCC licenses from the Loan Parties to the Loan Parties, as debtors-in-possession and (ii) two business days after the Plan is filed with the Bankruptcy Court, unless the Loan Parties have filed one or more applications with the FCC seeking approval of the transactions contemplated hereby and by the Term Sheet and the Plan; or

(b)    If the Chapter 11 Cases are commenced as prepackaged bankruptcies:

(1) the Loan Parties fail to file the Plan and Disclosure Statement, together with a prepackaged plan scheduling motion, with the Bankruptcy Court on the Petition Date;

(2) the 45th day after the Petition Date, unless the Bankruptcy Court shall have approved the Disclosure Statement and entered the Confirmation Order prior thereto; or

(3) 15th day after public notice of the consent from the FCC of the pro forma involuntary applications approving the assignment of FCC licenses from the Loan Parties to the Loan Parties, as debtors-in-possession, unless the Loan Parties have filed one or more applications with the FCC seeking approval of the transactions contemplated hereby and by the Term Sheet and the Plan; and

(c)    In all cases:

(1) (i) prior to the Petition Date, the Commitment Letter shall no longer be in full force and effect pursuant to the terms thereof or (ii) after the Petition Date, the Loan Parties fail, on or before the 30th day after the Petition Date (or such later date as may be agreed to by the Loan Parties and the Second Lien Lead Investors), to obtain an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Second Lien Lead Investors, assuming the obligations of the Loan Parties under the Commitment Letter;

(2) the Loan Parties fail to commence the Chapter 11 Cases on or prior to the 45th day after the Restructuring Agreement Effective Date;

(3) (i) amendment to, modification of, or the filing of a pleading by any of the Company Parties that seeks to amend or modify the Plan, the Disclosure Statement or any documents related to the Plan, notices, exhibits or appendices, which amendment, modification or filing is, within the reasonable judgment of the Second Lien Lead Investors, inconsistent with this Restructuring Agreement or the Term Sheet and (ii) the Company Parties take any of the following actions: withdrawing the Plan, publicly announcing their intention not to support the Plan or filing any Alternative Proposal or otherwise evincing an intention not to proceed with the Plan or an intention to proceed with an Alternative Proposal;

(4) any court of competent jurisdiction or other competent governmental or regulatory authority issues an order making illegal or otherwise restricting, preventing or prohibiting the consummation of the transactions contemplated by this Restructuring Agreement or the Term Sheet or any of the Definitive Documentation in a way that cannot be reasonably remedied by the Company Parties;

(5) if the "Closing Date" under the DIP Facility has occurred and/or a DIP Facility Order has been entered, either on an interim or final basis, an unwaived event of default shall have occurred and be continuing under either the DIP Facility or DIP Facility Order, as the case may be, for five (5) business days;

(6) any of the Chapter 11 Cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee with plenary powers, a responsible officer, or an examiner with enlarged powers shall be appointed in any of the Chapter 11 Cases or the Company Parties shall file a motion or other request for any such relief;

(7) the entry of any order in the Chapter 11 Cases terminating the Loan Parties' exclusive right to file a plan or plans of reorganization pursuant to Section 1121 of the Bankruptcy Code;

(8) if a motion seeking approval of the DIP Facility has been filed and the Bankruptcy Court does not enter the DIP Facility Order on a final basis within thirty (30) days after the date of such filing;

(9) either (1) the Bankruptcy Court does not enter within (i) five (5) business days after the Petition Date, the Cash Collateral Order, on an interim basis, and (ii) thirty (30) days after the Petition Date, the Cash Collateral Order, on a final basis, or (2) termination of the Loan Parties' authority to use cash collateral;

6

(10)    the Loan Parties propose, file a motion with respect to or enter into a debtor-in-possession financing facility other than the DIP Facility;

(11)    either (i) a filing by any Company Party of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of or seeking avoidance of the liens securing the obligations under the Second Lien Credit Agreement (collectively, the "Secured Obligations") or any other cause of action against and/or with respect to the Secured Obligations, the prepetition liens securing such Secured Obligations, the Second Lien Administrative Agent or any of the Second Lien Lenders (or if the Company Parties support any such motion, application or adversary proceeding commenced by any third party or consent to the standing of any such third party), or (ii) the entry of an order of the Bankruptcy Court providing relief against the interests of any Consenting Lender or the Second Lien Administrative Agent with respect to any of the foregoing causes of action or proceedings;

(12)    the 180th day after entry of the Confirmation Order, unless the FCC has granted an initial order consenting to the Restructuring and the transfers contemplated thereby (excluding the transfer of any station with respect to which waivers were requested to enable the preservation of their grandfathered status under the FCC's media ownership rules, which consists of certain radio stations in Chicago, Illinois and Greenville-New Bern-Jacksonville, North Carolina) (the "Initial Approval");

(13)    if no objection has been filed to the Initial Approval, the 60th day after the date on which the FCC has granted the Initial Approval, unless the Initial Approval has become a final order and the Company Parties have otherwise consummated the Plan pursuant to the terms thereof;

(14)    the 270th day after the date on which the FCC has granted the Initial Approval, unless the Initial Approval has become a final order and the Company Parties have otherwise consummated the Plan pursuant to the terms thereof;

(15)    any event, circumstance or change has occurred that has caused or evidences, either in a case or in the aggregate, a Material Adverse Effect (as defined in the Commitment Letter); or

(16)    the occurrence of any breach of this Restructuring Agreement by any of the Parties (to the extent not otherwise cured or waived in accordance with the terms hereof).

## 2.2    Termination Event Procedures.

(a)    Upon the occurrence of a Termination Event, this Restructuring Agreement shall terminate five business days after the Second Lien Lead Investors shall have given written notice of such breach to the Company Parties and such breach shall not have been cured or waived by the Required Consenting Lenders (in accordance with Section 7.10 herein) during such five business day period (the date of termination being the "Termination Date"). For the avoidance of doubt, after the Petition Date, the automatic stay arising pursuant to Section 362 of the

Bankruptcy Code shall be deemed waived or modified for purposes of providing notice or exercising rights hereunder.

(b)     A Consenting Lender may terminate its obligations hereunder (x) if, in accordance with Section 7.10(b) below, the Definitive Documentation or Term Sheet is amended or a provision in the Definitive Documentation or Term Sheet is waived after the Restructuring Agreement Effective Date (as defined below) and such amendment or waiver effects a material change to the proposed treatment of the Claims of such Consenting Lender from that reflected in the Definitive Documentation or the Term Sheet immediately prior to any such amendment or (y) upon the occurrence of any Termination Event under Section 2.1 (a)(1), (a)(2), (a)(3), (a)(4), (b)(1), (b)(2), (b)(3), (c)(2), (c)(4), (c)(6), (c)(7), (c)(11), (c)(12), (c)(13) or (c)(14), provided that for purposes of this clause (y), any time periods set forth in such Sections shall be deemed to be increased by twenty days.  Such termination shall be effected by the giving of notice thereof to the Company Parties and the Second Lien Lead Investors within five business days after (i) the effectiveness of any amendment or waiver described in the foregoing clause (x) or (ii) the occurrence of a Termination Event as described in clause (y).

(c)     Notwithstanding anything herein to the contrary, if any Consenting Lender shall breach its obligations pursuant to this Restructuring Agreement, no Termination Event shall result from such breach and this Restructuring Agreement shall otherwise remain in full force and effect with respect to the Company Parties and all Consenting Lenders, provided that the Company Parties and the Second Lien Lead Investors shall be entitled to seek specific performance in accordance with Section 5 herein against such breaching Consenting Lender.

(d)     Notwithstanding anything herein to the contrary, this Restructuring Agreement may be terminated by mutual agreement of the Company Parties and the Required Consenting Lenders.

## Section 3.   Conditions Precedent to Restructuring Agreement

(a) The obligations of the Parties and the effectiveness hereof are subject to satisfaction of each of the following conditions (the date upon which all such conditions are satisfied, the "Restructuring Agreement Effective Date"):

(1) execution and delivery of signature pages for this Restructuring Agreement by each of the Company Parties and the Consenting Lenders (who, in any event, shall not be less than (A) 50% in number of the Second Lien Lenders and (B) 66-2/3% of the principal amount of the Obligations outstanding under, and as defined in, the Second Lien Credit Agreement as of the date hereof);

(2) execution and delivery of an amendment to the Second Lien Credit Agreement, substantially in the form attached hereto as Exhibit D, by the Loan Parties and the Requisite Lenders under, and as defined in, the Second Lien Credit Agreement; and

509265-1331-11363-Active.11865977

(3) receipt by counsel and the financial advisors to the Second Lien
Administrative Agent and the Second Lien Lead Investors of all outstanding fees
and expenses through the date hereof for which invoices have been submitted.

(b) Notwithstanding any provision herein to the contrary, this Restructuring Agreement
shall be of no force or effect if the Restructuring Agreement Effective Date has not occurred on
or before January 1, 2010.

### Section 4.  Mutual Representations, Warranties and Covenants.

### 4.1  Power and Authority.

Each of the Consenting Lenders, severally and not jointly, and the Company Parties,
jointly and severally, represents, warrants and covenants that, as of the date of this Restructuring
Agreement, (i) such Party has and shall maintain all requisite corporate, partnership, or limited
liability company power and authority to enter into this Restructuring Agreement and, subject to
the provisions of the Bankruptcy Code and any necessary Bankruptcy Court approvals, to carry
out the transactions contemplated by, and perform its respective obligations under this
Restructuring Agreement and (ii) the execution and delivery of this Restructuring Agreement and
the performance of its obligations hereunder have been duly authorized by all necessary action on
its part.

### 4.2  Enforceability.

Each of the Consenting Lenders, severally and not jointly, and the Company Parties,
jointly and severally, represents, warrants and covenants that, subject to Sections 1125 and 1126
of the Bankruptcy Code, this Restructuring Agreement is the legally valid and binding obligation
of it, enforceable in accordance with its terms, except as enforcement may be limited by
bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or
by equitable principles relating to enforceability or ruling of the Bankruptcy Court.

### 4.3  Governmental Consents.

The Company Parties, jointly and severally, represent, warrant and covenant that, as of
the date of this Restructuring Agreement, the execution, delivery, and performance by them of
this Restructuring Agreement does not and shall not require any registration or filing with,
consent or approval of, or notice to, or other action to, with, or by, any Federal, state, or other
governmental authority or regulatory body, except (i) such filings as may be necessary and/or
required for disclosure by the Securities and Exchange Commission and applicable state
securities or "blue sky" laws, (ii) any filings in connection with the Chapter 11 Cases, including
the approval of the Disclosure Statement and confirmation of the Plan by the Bankruptcy Court,
and (iii) (A) filings of amended articles of incorporation or formation or other organizational
documents with applicable state authorities, and (B) other registrations, filings, consents,
approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses,
qualifications, and governmental approvals to carry on the business of the Company Parties and
to effectuate the Restructuring, including, but not limited to, filing of an application for transfer of
control with the FCC and receipt of a final order by the FCC consenting to the Restructuring.

### 4.4  Ownership.

9

Each Consenting Lender, severally and not jointly, represents, warrants and covenants that (i) such Consenting Lender is the legal owner of its pro rata share of the Claims, and has and shall maintain the power and authority to bind the legal and beneficial owner(s) of such Claims to the terms of this Restructuring Agreement, (ii) such Consenting Lender (a) has and shall maintain full power and authority to vote on and consent to or (b) has received direction from the party having full power and authority to vote on and consent to such matters concerning its pro rata share of the Claims and to exchange, assign and transfer such Claims, and (iii) other than pursuant to this Restructuring Agreement, such Claims are and shall continue to be free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's performance of its obligations contained in this Restructuring Agreement at the time such obligations are required to be performed.

## Section 5.  Remedies.

It is understood and agreed by each of the Parties that any breach of this Restructuring Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and accordingly the Parties agree that, in addition to any other remedies, each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief for any such breach. The Company Parties agree that for so long as the Second Lien Lead Investors and the Consenting Lenders have not taken any action to prejudice the enforceability of this Restructuring Agreement (including without limitation, alleging in any pleading that this Restructuring Agreement is unenforceable), and have taken such actions as are reasonably required or desirable for the enforcement hereof, then the Second Lien Lead Investors and the Consenting Lenders shall have no liability for damages hereunder in the event a court determines that this Restructuring Agreement is not enforceable.

## Section 6.  Acknowledgement.

This Restructuring Agreement and the Term Sheet and transactions contemplated herein and therein are the product of negotiations among the Parties, together with their respective representatives. This Restructuring Agreement is not, and shall not be deemed to be, a solicitation of votes for the acceptance of the Plan or any plan of reorganization for the purposes of Sections 1125 and 1126 of the Bankruptcy Code or otherwise. The Company Parties will not solicit acceptances of the Plan from any Consenting Lender until such Consenting Lender has been provided with copies of a Disclosure Statement containing adequate information as required by Section 1125 of the Bankruptcy Code.

## Section 7.  Miscellaneous Terms.

### 7.1    Assignment; Transfer Restrictions.

(a)    Each Consenting Lender hereby agrees, severally and not jointly, for so long as this Restructuring Agreement shall remain in effect as to it, not to sell, assign, transfer, hypothecate or otherwise dispose of any Claim against the Company Parties unless the transferee thereof (a "Joining Lender Party") executes and delivers a joinder in the form of Exhibit E hereto (the "Lender Joinder") to the Second Lien Administrative Agent and SVP, no later than two (2) business days after the relevant transfer. Thereafter, such Joining Lender Party shall be deemed to be a Consenting Lender for all purposes of this Restructuring Agreement. The Company shall acknowledge such transfer in writing within two business days

and provide a copy of such acknowledgement to the Second Lien Administrative Agent and SVP. By providing such writing, the Company Parties shall be deemed to have acknowledged their obligations to such transferee.

(b)     Any sale, transfer or assignment of any Claim that does not comply with the procedures set forth in subsection 7.1(a) shall be deemed void *ab initio*.

(c)     With respect to the Claims held by the Joining Lender Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition of such Claims, the Joining Lender Party hereby makes the representations and warranties of the Consenting Lenders set forth in Section 4 of this Restructuring Agreement to the Company Parties.

(d)     This Restructuring Agreement shall in no way be construed to preclude any Consenting Lender from acquiring additional Claims; provided that any such Claims shall automatically be deemed to be subject to the terms of this Restructuring Agreement.

## 7.2    No Third Party Beneficiaries.

Unless expressly stated herein, this Restructuring Agreement shall be solely for the benefit of the Second Lien Administrative Agent, the Second Lien Lead Investors, the Company Parties, and each Consenting Lender solely in its capacity as a lender to the Company. No other person or entity shall be a third party beneficiary.

## 7.3    Entire Agreement.

This Restructuring Agreement, including Exhibits and Annexes, constitutes the entire agreement of the Parties with respect to the subject matter of this Restructuring Agreement, and supersedes all other prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Restructuring Agreement; provided, however, that any confidentiality agreement executed by any Party shall survive this Restructuring Agreement and shall continue in full force and effect, subject to the terms thereof, irrespective of the terms hereof.

## 7.4    Counterparts.

This Restructuring Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same agreement. Delivery of an executed signature page of this Restructuring Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

## 7.5    Settlement Discussions.

This Restructuring Agreement and the Term Sheet are part of a proposed settlement of disputes among the Parties hereto. Nothing herein shall be deemed to be an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Restructuring Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Restructuring Agreement.

**7.6    Reservation of Rights.**

    (a)    Except as expressly provided in this Restructuring Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of each of the Consenting Lenders to protect and preserve its rights, remedies and interests, including, but not limited to, all of their rights and remedies under the Second Lien Credit Agreement and the Intercreditor Agreement (as defined in the Second Lien Credit Agreement), including any such rights and remedies relating to Defaults or Events of Default (each as defined in the Second Lien Credit Agreement) or other events that may have occurred prior to the execution of this Restructuring Agreement, any and all of its claims and causes of action against any of the Company Parties, any liens or security interests it may have in any assets of any of the Company Parties or any third parties, or its full participation in the Chapter 11 Cases, if commenced.

    (b)    Except as expressly provided in this Restructuring Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of the Second Lien Administrative Agent to protect and preserve its rights, remedies and interests under the Intercreditor Agreement.

    (c)    Notwithstanding anything herein to the contrary, the Parties acknowledge that the support of any Consenting Lender contained in this Restructuring Agreement relates solely to such Consenting Lender's rights and obligations as a Consenting Lender under the Second Lien Credit Agreement, and does not bind such Consenting Lender or its affiliates with respect to any other indebtedness owed by the Company or any of its subsidiaries and affiliates to such Consenting Lender or any affiliate of such Consenting Lender (for the avoidance of doubt, if a Consenting Lender is specified on the relevant signature page as a particular group or business within an entity, "Consenting Lender" shall mean such group or business and shall not mean the entity or its affiliates, or any other desk or business thereof, or any third party funds advised thereby). For purposes of this Restructuring Agreement, "Consenting Lender" shall also not include a holder of Claims signatory hereto in its capacity or to the extent of its holdings as a public-side broker, dealer or market maker of Loans under, and as defined in, the Second Lien Credit Agreement or any other claim against or security in the Company Parties.

**7.7    Governing Law; Waiver of Jury Trial.**

    (a)    The Parties waive all rights to trial by jury in any jurisdiction in any action, suit, or proceeding brought to resolve any dispute between the Parties, whether sounding in contract, tort or otherwise.

    (b)    This Restructuring Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provision which would require the application of the law of any other jurisdiction. By its execution and delivery of this Restructuring Agreement, each Party hereby irrevocably and unconditionally agrees for itself that, subject to the following sentence, any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Restructuring Agreement or for recognition or enforcement of any judgment rendered in any

12

such action, suit or proceeding, may be brought in any state or federal court of competent jurisdiction in New York County, State of New York, and by execution and delivery of this Restructuring Agreement, each of the Parties hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceedings.

(c)     Notwithstanding the foregoing, after the Chapter 11 Cases are commenced, nothing in subsections 7.7(a) or (b) shall limit the authority of the Bankruptcy Court to hear any matter related to or arising out of this Restructuring Agreement.

(d)     All Parties shall comply, where applicable, with all rules, regulations and policies of the FCC, and cooperate with the Loan Parties in providing information that is required by the FCC on a timely basis. The Parties hereto shall take no actions to transfer control of the Company until receipt of consent by the FCC.

**7.8     Successors.**

This Restructuring Agreement is intended to bind the Parties and inure to the benefit of the Consenting Lenders and each of the Company Parties and their respective successors, assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 7.8 shall be deemed to permit any transfer, tender, vote or consent, of any claims other than in accordance with the terms of this Restructuring Agreement.

**7.9     Independent Analysis.**

Each Party hereby confirms that it has made its own decision to execute this Restructuring Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate.

**7.10     Amendments, Modifications, Waivers.**

This Restructuring Agreement (including, without limitation, the Term Sheet) and the Plan may only be modified, amended or supplemented, and any of the terms thereof may only be waived, by an agreement in writing signed by each of the Company Parties and the Required Consenting Lenders; provided that (a) the written consent of each Consenting Lender shall be required for any modification, amendment, waiver or other supplement of this Restructuring Agreement that amends or modifies in any way (i) the definition of Required Consenting Lenders as used in this Restructuring Agreement or (ii) Section 2.2(b) and (b) subject to the rights of each Consenting Lender under Section 2.2(b), the written consent of Consenting Lenders holding at least 66 2/3% of the aggregate Claims held by all Consenting Lenders shall be required for any amendment, waiver or other supplement of this Restructuring Agreement, the Term Sheet or the Plan that effects a material change to the proposed treatment of the Second Lien Lenders from that reflected as of the date hereof. "Required Consenting Lenders" shall mean the Consenting Lenders holding greater than 50% of the aggregate Claims held by all Consenting Lenders.

**7.11     Severability of Provisions.**

If any provision of this Restructuring Agreement for any reason is held to be invalid, illegal or unenforceable in any respect, that provision shall not affect the validity, legality or enforceability of any other provision of this Restructuring Agreement.

## 7.12 Notices.

All notices and other communications required or permitted hereunder shall be in writing and shall be deemed given when: (a) delivered personally or by overnight courier to the following address of the other Party hereto, (b) sent by fax to the following fax number of the other Party hereto with the confirmatory copy delivered by overnight courier to the address of such Party listed below or (c) emailed to the following email address of the other Party hereto.

If to the Company Parties, to:

> NextMedia Group, Inc.
> 6312 S. Fiddlers Green Circle, Suite 205E
> Greenwood Village, Colorado 80111
> Attention: Eric W. Neumann
> Telecopy: (801) 346-9775
> Telephone: (303) 694-4511
> Email: eneumann@nextmediagroup.net

> with a copy to:

> Andrews Kurth LLP
> 1717 Main Street, Suite 3700
> Dallas, Texas 75201
> Attention: Jason S. Brookner and John E. Quattrocchi
> Telecopy: (214) 659-4401
> Telephone: (214) 659-4400
> Email: jbrookner@andrewskurth.com
> jquattrocchi@andrewskurth.com

If to SVP, to:

> Strategic Value Partners, LLC
> 100 West Putnam Avenue
> Greenwich, Connecticut 06830
> Attention: Steve Kovacs
> Telephone: (203) 618-3577
> Email: skovacs@svpglobal.com

> - and -

> Attention: Alan Carr
> Telephone: (203) 618-3576
> Email: acarr@svpglobal.com

> with a copy to

> Simpson Thacher & Bartlett LLP

509265-1331-11363-Active 11865977

425 Lexington Avenue
New York, New York 10017
Attention: Kenneth Ziman, Esq.
Telecopy: (212) 455-2502
Telephone: (212) 455-2565
Email: kziman@stblaw.com

If to Angelo, Gordon, to:

Angelo, Gordon & Co., L.P.
245 Park Avenue
New York, New York 10167
Attention: Peter Gingold
Telecopy: (212) 692-1388
Telephone: (212) 692-8223
Email: pgingold@angelogordon.com

- and -

Attention: Bradley G. Pattelli
Telecopy: (212) 692-1388
Telephone: (212) 692-2018
Email: bpattelli@angelogordon.com

If to the Second Lien Administrative Agent, to:

NexBank, SSB
3455 Noel Road, Suite 2220
Dallas, Texas 75240
Attention: Kristen Mitchell, Agency Administrator
Telecopy: (972) 934-4790

with a copy to

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036
Attention: Michael J. Sage
Telecopy: (212) 698-0439
Telephone: (212) 698-3503
Email: michael.sage@dechert.com

[SIGNATURE PAGES FOLLOW]

15

Please sign in the space provided below to indicate your agreement and consent to the terms hereof.

Very truly yours,

NEXTMEDIA GROUP, INC.

By:
Name:
Title:

NEXTMEDIA INVESTORS LLC

By:
Name:
Title:

NEXTMEDIA OPERATING, INC.

By:
Name:
Title:

NM LICENSING LLC

By:
Name:
Title:

NEXTMEDIA OUTDOOR, INC.

By:
Name:
Title:

NEXTMEDIA NORTHERN COLORADO, INC.

By:
Name:
Title:

NEXTMEDIA FRANCHISING, INC.

By:
Name:
Title:

NEXTMEDIA OUTDOOR, LLC

By:
Name:
Title:

NM TEXAS, INC.

By:
Name:
Title:

[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

NEXTMEDIA OUTDOOR, INC.

By: _____
Name:
Title:


NEXTMEDIA NORTHERN COLORADO,
INC.

By: _____
Name:
Title:


NEXTMEDIA FRANCHISING, INC.

By: _____
Name:
Title:


NEXTMEDIA OUTDOOR, LLC

By: _____
Name:
Title:


NM TEXAS, INC.

By: _____
Name:
Title:


[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

STRATEGIC VALUE PARTNERS LLC,
on behalf of certain funds and affiliates of funds
managed by it or its affiliates, in their capacities
as Second Lien Lead Investors and in their
capacities as Consenting Lenders

By:
Name: JAMES VARLEY
Title: SECRETARY

ANGELO, GORDON & CO., L.P.
on behalf of certain funds and affiliates of funds
managed by it or its affiliates, in their capacities as
Second Lien Lead Investors and in their capacities as
Consenting Lenders

By:
Name:   **Thomas M. Fuller**
Title:   **Authorized Signatory**

[CONSENTING LENDER SIGNATURE
BLOCKS], as a Consenting Lender

By: _____
Name:
Title:

[All Consenting Lender Signature Pages Intentionally Omitted]

**EXHIBIT A**

**TERM SHEET**

## NEXTMEDIA GROUP, INC. – RESTRUCTURING TERM SHEET

Set forth below is an outline of the principal terms for a consensual restructuring of the First Lien and Second Lien Credit Agreements of NextMedia Group, Inc. ("NextMedia") and its subsidiaries to be effected through voluntary chapter 11 cases. On the Plan Effective Date (as defined below), (i) the lenders under the First Lien Credit Agreement will be paid in full in cash, (ii) the lenders under the Second Lien Credit Agreement will receive an initial allocation of 95% of the existing equity of reorganized NextMedia, subject to dilution from equity (x) issued in the Equity Investment (as defined below) and (y) reserved for awards under the Management Incentive Plan (as defined below), and (iii) certain funds or affiliates of funds managed by Strategic Value Partners LLC or its affiliates ("SVP") and certain funds or affiliates of funds managed by Angelo, Gordon & Co., L.P. or its affiliates ("Angelo, Gordon", together with SVP, the "Second Lien Lead Investors") shall (1) provide a new $55 million Equity Investment, and (2) commit to provide $127.5 million in new term debt financing as a backstop on terms described in the Commitment Letter (as defined below). Capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Restructuring Support Agreement to which this Term Sheet is attached (as amended, supplemented or otherwise modified in accordance with the terms thereof, the "Restructuring Agreement").

| | |
|---|---|
| New Term Financing: | NextMedia Operating, Inc., as borrower (the "Borrower"), and NextMedia and each of the Borrower's direct and indirect present and future domestic subsidiaries, as guarantors, shall enter into a new term loan facility or shall issue notes in a high yield offering (as applicable, the "New Term Financing") in a principal amount of $127.5 million, the proceeds of which shall be used to pay all existing indebtedness under the First Lien Credit Agreement. Indebtedness outstanding under the New Term Financing will be on market terms; *provided* that SVP and Angelo, Gordon shall, severally and not jointly, commit to provide the New Term Financing as a backstop on the terms described in the Commitment Letter dated as of December 10, 2009 among NextMedia, the Borrower, SVP and Angelo, Gordon, a copy of which is attached hereto as Annex 1 (including exhibits and annexes thereto, the "Commitment Letter") and the New Term Facility Term Sheet attached to the Commitment Letter as Exhibit A. |
| Equity Investment: | SVP and Angelo, Gordon shall severally and not jointly make a $55 million cash investment in exchange for 66.67% of the equity of reorganized NextMedia to be issued and outstanding on the Plan Effective Date (as defined below), subject to dilution only by the Management Incentive Plan, as more fully described in the |

|                                                                    | Commitment Letter and Equity Investment Term Sheet attached thereto as Exhibit B (the "Equity Investment"). |
|--------------------------------------------------------------------|--------------------------------------------------------------------------------------------------------------|

Common Equity:

Prior to the Plan Effective Date, NextMedia shall authorize additional shares of common stock and other equity in an amount sufficient to effectuate the issuances contemplated by the Restructuring.

First Lien Lenders:

On the Plan Effective Date, holders of the indebtedness under the First Lien Credit Agreement shall be paid fully in cash on account of such indebtedness and the First Lien Credit Agreement shall be terminated and all obligations thereunder shall be discharged.

Second Lien Lenders:

On the Plan Effective Date, each Second Lien Lender will receive its pro rata share of an initial allocation of 95% of the equity of reorganized NextMedia, subject to dilution by the Management Incentive Plan and the Equity Investment in exchange for the second lien obligations owed to such Second Lien Lender (the "Second Lien Equity Conversion").

Existing Equity:

On the Plan Effective Date, NextMedia Investors LLC ("Investors") will retain 5% of the equity of reorganized NextMedia or, if Investors is dissolved, Investors' members will receive 5% of the equity of reorganized NextMedia, in either case subject to further dilution by the Management Incentive Plan and the Equity Investment.

General Unsecured Claims:

All general unsecured claims, including, but not limited to, claims under contract and unexpired leases assumed as part of the Restructuring, and trade payables owed to any third party creditor, will be unimpaired and, subject to (i) entry of an order of the Bankruptcy Court permitting such payment, and/or (ii) any applicable provisions of the Bankruptcy Code that may govern a particular claim, paid in full in the ordinary course as such claims become due.

Management Incentive Plan and New Employment Agreements:

Promptly following the Plan Effective Date, NextMedia shall implement a management incentive plan (the "Management Incentive Plan") for the benefit of designated employees of NextMedia and non-management members of the Board (as defined below). 14% of the equity of reorganized NextMedia (after giving effect to the Equity Investment, the equity issued to Investors and the Second Lien Equity Conversion) shall be reserved for issuance in respect of awards under the Management Incentive Plan, which awards shall take the form of stock options. The terms of the Management Incentive Plan and initial allocations thereunder shall be approved by the new Board, and shall

2

incorporate the terms and conditions of the Option Term Sheet attached hereto as Annex 2.

NextMedia will retain its senior management as part of the Restructuring, subject to senior management waiving certain terms of their existing employment agreements, including but not limited to "change of control" provisions. On or prior to the Plan Effective Date management will enter into new employment agreements, with such agreements incorporating the terms and conditions set forth on Annex 3 hereto.

| | |
|---|---|
| Board of Directors: | After the Plan Effective Date, the board of directors of NextMedia (the "Board") shall consist of 5 members, one of whom shall be the chief executive officer of NextMedia. For so long as SVP shall own not less than 39% of the outstanding equity of NextMedia, SVP shall have the right to designate the majority of the Board. The remainder of the Board shall be chosen by a majority of the outstanding common equity of NextMedia. |
| Shareholder Agreement: | All holders of common equity of NextMedia, including without limitation, holders of options issued under the Management Incentive Plan, shall become parties to a shareholder agreement providing voting agreement to effect agreed corporate governance and containing customary minority protections, transfer restrictions, rights of first refusal, as well as registration, preemptive, drag-along and tag-along rights. |
| Tax Issues: | The Restructuring shall be structured to preserve favorable tax attributes of NextMedia to the extent practicable. NextMedia shall consult with advisors to the Second Lien Lead Investors on tax issues and matters of tax structure relating to the Restructuring. |
| Expenses: | NextMedia will pay or reimburse 1) the Second Lien Lead Investors for their reasonable out-of-pocket fees and expenses incurred in connection with the Restructuring, and 2) the Second Lien Administrative Agent for its reasonable out-of-pocket fees and expenses, including payment of the reasonable fees and expenses of Broadpoint Capital, Inc., Dechert LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP (solely as FCC counsel) in their capacities as professional advisors to the Second Lien Administrative Agent, as well as the reasonable fees and expenses of one local counsel to the Second Lien Administrative Agent, to the extent applicable, whether or not the Restructuring is ultimately consummated. |
| Effectiveness: | As used herein, "Plan Effective Date" shall mean the date on which the Restructuring is consummated through the consummation of |

3

the Plan as described in the Restructuring Agreement, provided there being no modification or stay of confirmation order or entry of other court order prohibiting the Plan transactions from being consummated.

FCC Compliance:

All parties hereto acknowledge that the above transactions are subject to the rules, regulations and policies of the FCC including, but not limited to, receiving prior consent to any transfer of control of NextMedia, and its affiliates, multiple ownership rules, and restrictions on foreign ownership. All parties shall cooperate with NextMedia, on a timely basis, by providing such information to NextMedia in connection therewith.

Releases, Indemnification and Exculpation:

The Plan will contain exculpation, indemnification and release provisions mutually satisfactory to the Second Lien Lead Investors, NextMedia and the Second Lien Administrative Agent.

089904-0003-07091-Active.11866248

**Annex 1**

**Commitment Letter**

099904-0003-07091-Active 11866248

Strategic Value Partners LLC
100 West Putnam Avenue
Greenwich, Connecticut 06830

Angelo, Gordon & Co., L.P.
245 Park Avenue
New York, New York 10167

December 10, 2009

<u>New Term Facility and Equity Investment</u>
<u>Commitment Letter</u>

NextMedia Group, Inc.
NextMedia Operating, Inc.
6312 South Fiddlers Green
Suite 360E
Greenwood Village, CO 80111

Attention: Eric Neumann, Chief Financial Officer, Vice President and Treasurer

Ladies and Gentlemen:

You have advised us that NextMedia Group, Inc. (including its subsidiaries, the "<u>Company</u>" or "<u>you</u>") intends to engage in a series of transactions to effectuate a restructuring (collectively, the "<u>Restructuring</u>") of its outstanding debt obligations as set forth more fully in the Restructuring Support Agreement (including the term sheets attached thereto, and as amended, supplemented or otherwise modified from time to time, the "<u>Restructuring Agreement</u>"), among the Company, certain of its second lien lenders, its sole shareholder, NextMedia Investors LLC and the Second Lien Lead Investors (as defined below). Pursuant to the Restructuring you will (i) fully repay in cash all obligations outstanding under the Company's Credit and Guaranty Agreement dated as of November 15, 2005 (as amended, supplemented or otherwise modified from time to time, the "<u>First Lien Credit Agreement</u>") and (ii) issue new equity in the reorganized Company in exchange for all of the outstanding obligations held by the lenders (the "<u>Second Lien Lenders</u>") party to the Second Lien Credit and Guaranty Agreement, dated as of November 15, 2005 (as amended, supplemented or otherwise modified from time to time, the "<u>Second Lien Credit Agreement</u>"). You have advised us that you intend to finance the Restructuring, the related costs and expenses, and the ongoing working capital and other general corporate activities of the Company from the following sources:

1.  $127.5 million of debt financing pursuant to the Primary Debt Financing described below or, to the extent the Company is unable to obtain the Primary Debt Financing pursuant to conditions set forth in this Commitment Letter, having the terms and conditions set forth on the term sheet attached hereto as Exhibit A (the "<u>New Term Facility Term Sheet</u>" and such financing, the "<u>New Term Facility</u>").

2.  $55 million of equity investment (the "<u>Equity Investment</u>"), on the terms and conditions set forth on the term sheet attached hereto as Exhibit B (the "<u>Equity</u>

Investment Term Sheet", together with the New Term Facility Term Sheet, the
"Term Sheets").

3. Cash on hand.

In connection with the foregoing and to protect the existing investments of certain
funds and affiliates of funds managed by Strategic Value Partners LLC or Angelo, Gordon & Co.,
L.P. or their respective affiliates (such funds with respect to Strategic Value Partners LLC, "SVP" and
with respect to Angelo, Gordon & Co., L.P. "Angelo, Gordon"; together with SVP, the "Second Lien
Lead Investors", "we" or "us"), each of us is pleased to advise you, subject to the conditions set forth
in the Term Sheets and this letter (this "Commitment Letter"), of our several (and not joint)
commitment to (1) each provide 50% of the New Term Facility if you are not able to obtain the
Primary Debt Financing described below and (2) each make 50% of the Equity Investment (the
commitments described in this paragraph, the "Commitments").

You will use your commercially reasonable efforts to obtain $127.5 million of debt
financing on market terms reasonably satisfactory to us (excluding the New Term Facility, the
"Primary Debt Financing"). Assuming all of the conditions set forth in this Commitment Letter and
the New Term Facility Term Sheet have been satisfied, but you have not (i) secured Primary Debt
Financing by the effective date of your chapter 11 plan or (ii) secured Primary Debt Financing on
terms that are equal to or better than the terms set forth herein and in the New Term Facility Term
Sheet, the New Term Facility will serve as your exit financing and, subject to satisfaction of such
conditions, shall become effective on the effective date of your chapter 11 plan.

SVP and Angelo, Gordon may assign a portion of their Commitments to any of their
affiliated funds or affiliated entities or to any third party investor, or any such investor's affiliated
funds or affiliated entities, identified by us. In connection with any such syndication, you hereby
authorize us to distribute the Term Sheets and drafts of definitive documentation with respect to the
Restructuring.

As consideration for the Commitments and agreements of SVP and Angelo, Gordon
hereunder, you agree to cause to be paid the nonrefundable fees described in the Term Sheets.

The Company and its subsidiaries and affiliates and their respective officers and
directors shall not, and the Company shall instruct and cause its and its subsidiaries' and affiliates'
employees, investment bankers, attorneys, accountants and other advisors or representatives to not,
directly or indirectly, initiate, solicit or knowingly encourage any inquiries or the making of any
proposal or offer with respect to any equity investment or restructuring of the Company's outstanding
debt obligations other than pursuant to this Commitment Letter and the Term Sheets and the terms
and conditions hereof and thereof (an "Alternative Proposal"). Notwithstanding anything to the
contrary contained herein, to the extent necessary to comply with its fiduciary obligations under
applicable law, the board of directors of each of the Company, its parent and its subsidiaries (as to
each, the "Board") may authorize the Company to provide information in response to, and
consummate a restructuring with, a third party that such Board believes in good faith has made an
unsolicited Alternative Proposal that it determines to be more favorable than the Restructuring to such
parties that such Board owes a fiduciary duty (such an Alternative Proposal, a "Superior Proposal", it
being understood that an Alternative Proposal would not be a "Superior Proposal" unless such
proposal provided for the full repayment in cash of all outstanding obligations under the Second Lien
Credit Agreement, including, without limitation, all accrued and unpaid interest and all outstanding
fees and expenses of the Second Lien Lenders and the administrative agent to the Second Lien
Lenders and for the payment of the Break-up Fee (as defined below)). If the Company restructures its
outstanding debt obligations through any other transaction or series of transactions other than as
contemplated by the Restructuring Agreement or with any third parties other than the Second Lien
Lead Investors or such third party as agreed to between the Second Lien Lead Investors and you, you

agree to pay to the Second Lien Lead Investors at the time of consummation of such transaction a break-up fee of $5.5 million (the "Break-up Fee").

The Second Lien Lead Investors' Commitments and agreements hereunder are subject to (a) since the date hereof, there not occurring or becoming known to the Second Lien Lead Investors any event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect (as defined in the New Term Facility Term Sheet), (b) the Company's EBITDA (to be determined in the same manner as in the First Lien Credit Agreement and the Second Lien Credit Agreement) for the twelve month period ending December 31, 2009 not being less than $20 million, (c) the Second Lien Lead Investors' satisfaction that there shall be no competing offering, placement or arrangement of any equity securities by or on behalf of the Company or any of its affiliates or subsidiaries, except as may be agreed to by the Second Lien Lead Investors, (d) assuming the Restructuring Agreement has become effective by its terms, the Restructuring Agreement remaining in full force and effect pursuant to the terms thereof and (e) the other conditions set forth in the Term Sheets and the Restructuring Agreement. Those matters that are not covered by the provisions hereof and of the Term Sheets are subject to the approval and agreement of you and the Second Lien Lead Investors.

You agree (a) to indemnify and hold harmless the Second Lien Lead Investors, their respective affiliates and their respective directors, employees, advisors, and agents (each, an "indemnified person") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the New Term Facility, the Equity Investment, the use of the proceeds thereof, the Restructuring or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, and to reimburse each indemnified person upon demand for any legal or other expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court to arise from the bad faith, willful misconduct or gross negligence of such indemnified person and (b) to reimburse the Second Lien Lead Investors and their respective affiliates on demand for all reasonable out-of-pocket expenses (including due diligence expenses, syndication expenses, consultant's fees and expenses, travel expenses, and reasonable fees, charges and disbursements of counsel) incurred in connection with the New Term Facility, the Equity Investment and any related documentation (including this Commitment Letter and the definitive financing documentation) or the administration, amendment, modification or waiver thereof. No indemnified person shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems or for any special, indirect, consequential or punitive damages in connection with the New Term Facility or the Equity Investment, except to the extent any such damages are found by a final, non-appealable judgment of a court to arise from the bad faith, gross negligence or willful misconduct of such indemnified person or such indemnified person's affiliates, directors, employees, advisors or agents.

You acknowledge that the Second Lien Lead Investors and their respective affiliates may be providing debt financing, equity capital or other services to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. You also acknowledge that the Second Lien Lead Investors have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies. Nothing in this paragraph shall in any way affect any obligations under any non-disclosure or confidentiality agreements the parties have entered into prior to the date hereof. Notwithstanding the above, the Second Lien Lead Investors shall timely disclose to the Company, upon request, any information that is necessary for the Company to comply with the rules, regulations and policies promulgated by the Federal Communications Commission (the "FCC").

This Commitment Letter shall not be assignable by you without the prior written consent of the Second Lien Lead Investors (and any purported assignment without such consent shall be null and void). This Commitment Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and the Second Lien Lead Investors. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile transmission or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter, the Restructuring Agreement and the documentation referred to therein are the only agreements that have been entered into among us with respect to the New Term Facility and the Equity Investment and set forth the entire understanding of the parties with respect thereto and supersede all prior agreements or writings delivered prior to the date hereof.

This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. Each of the parties hereto consents to the nonexclusive jurisdiction and venue of the state or federal courts located in the City of New York. Each party hereto irrevocably waives, to the fullest extent permitted by applicable law, (a) any objection that it may now or hereafter have to the laying of venue of any such legal proceeding in the state or federal courts located in the City of New York and (b) any right it may have to a trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of this Commitment Letter, the Term Sheets, the transactions contemplated hereby or the performance of services hereunder.

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor the Term Sheets nor any of their terms or substance shall be disclosed, directly or indirectly, to any other person (including, without limitation, other potential providers or arrangers of financing) except (a) to your officers, employees, representatives, agents and advisors who are directly involved in the consideration of this matter or (b) as may be compelled in a judicial or administrative proceeding or as otherwise required by law or a court of competent jurisdiction (in which case you agree to inform us promptly thereof), *provided*, you may disclose this Commitment Letter and the Term Sheets (x) in connection with any court proceeding regarding the approval of this Commitment Letter and the Term Sheets and the obligations hereunder and thereunder and (y) to the administrative agents and the lenders under the First Lien Credit Agreement and Second Lien Credit Agreement, in each case subject to the Second Lien Lead Investors' right to redact in their sole discretion any information herein or in the Term Sheets they deem confidential or proprietary.

The compensation, reimbursement, indemnification and confidentiality provisions contained herein and any other provision herein or therein which by its terms expressly survives the termination of this Commitment Letter shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; *provided,* that your obligations under this Commitment Letter (other than (i) provisions relating to titles awarded in connection with the New Term Facility and assistance to be provided by you in connection with the syndication thereof, (ii) the indemnification provisions to the extent providing benefits not provided under the definitive documentation relating to the New Term Facility or Equity Investment and (iii) the confidentiality provisions set forth above) shall automatically terminate and be superseded by the provisions of such definitive documentation upon the initial funding thereunder, and you shall automatically be released from all liability in connection therewith at such time.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms hereof and of the Term Sheets by returning to us executed counterparts hereof not later than 5:00 p.m., New York City time, on December 11, 2009. This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence. In

addition, this Commitment Letter will terminate and be of no force and effect and parties will be relieved of their obligations hereunder if the Restructuring Agreement has not become effective in accordance with its terms by no later than January 1, 2010, <u>provided</u> that your obligation in respect of the Break-up Fee shall survive such termination if the Restructuring Agreement has not become effective due to the failure of each of the Company Parties (as defined in the Restructuring Agreement) to execute and deliver signature pages to such Restructuring Agreement.

All parties hereto acknowledge that the above transactions are subject to the rules, regulations and policies of the FCC including, but not limited to, receiving prior consent to any transfer of control of the Company, and its affiliates, multiple ownership rules, and restrictions on foreign ownership. All parties shall cooperate with the Company, on a timely basis, by providing such information to the Company in connection therewith.

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

STRATEGIC VALUE PARTNERS LLC,
on behalf of certain funds and affiliates of funds
managed by it or its affiliates

By:

Name: JAMES VARLEY
Title: SECRETARY

ANGELO, GORDON & CO., L.P.
on behalf of certain funds and affiliates of funds
managed by it or its affiliates

By: _____

Name:
Title:      **Thomas M. Fuller**
            **Authorized Signatory**

Accepted and agreed to as of
the date first written above by:

NEXTMEDIA GROUP, INC.

By:
   Name:
   Title:

NEXTMEDIA OPERATING, INC.

By:
   Name:
   Title:

*[Signature Page to Commitment Letter]*

NEXTMEDIA OPERATING, INC.
TERM LOAN FACILITY
Summary of Terms and Conditions

**PARTIES**

Borrower:                  NextMedia Operating, Inc. (the "Borrower").

Guarantors:                NextMedia Group, Inc. ("Holdings") and each of the Borrower's
                           direct and indirect, existing and future, subsidiaries (excluding
                           foreign subsidiaries to the extent a guarantee thereby could
                           reasonably be expected to result in adverse tax consequences)
                           (collectively, the "Guarantors"; the Borrower and the
                           Guarantors, collectively, the "Loan Parties").

Administrative Agent:      To be determined by the Second Lien Lead Investors (as defined
                           below) and reasonably satisfactory to the Borrower.

Lenders:                   Certain funds and their respective affiliates managed by Strategic
                           Value Partners LLC or its affiliates ("SVP") and certain funds
                           and their respective affiliates managed by Angelo, Gordon &
                           Co., L.P. or its affiliates ("Angelo, Gordon", together with SVP,
                           the "Second Lien Lead Investors") and such other financial
                           institutions or entities that become lenders therein (the
                           "Lenders").

**FACILITY**

Type and Amount:           A five-year term loan facility (the "New Term Facility") in the
                           amount of $127,500,000 (the loans thereunder, the "Loans"). The
                           Loans shall be repayable annually in an amount equal to 1% of
                           the New Term Facility, such repayments to be made in quarterly
                           installments beginning in the quarter ending March 31, 2011,
                           with the balance of the Loans payable on the maturity date.

Availability:              The Loans shall be made in a single draw occurring on the
                           Closing Date (as defined below).

Purpose:                   The proceeds of the Loans shall be used to finance a portion of
                           the Restructuring.

**CERTAIN PAYMENT PROVISIONS**

Fees and Interest Rates:   As set forth on Annex I.

Optional Prepayments:      Loans may be prepaid by the Borrower in minimum amounts to be agreed upon. Optional prepayments of the Loans shall be applied to the respective installments thereof in a manner to be agreed upon. Optional prepayments of the Loans may not be reborrowed.

Mandatory Prepayments:      The following amounts shall be applied to prepay the Loans from (a) net proceeds of (i) the sale or issuance of equity by Holdings, the Borrower or any of its subsidiaries, (ii) the incurrence of certain indebtedness by Holdings, the Borrower or any of its subsidiaries, and (iii) asset sales or other dispositions by Holdings, the Borrower or any of its subsidiaries and (b) excess cash flow, in each case in such amounts to be agreed upon and subject to exceptions (including reinvestment rights) to be agreed upon.

Mandatory prepayments of the Loans shall be applied to the respective installments thereof in a manner to be agreed upon. Mandatory prepayments of the Loans may not be reborrowed.

COLLATERAL      The obligations of each Loan Party in respect of the New Term Facility provided by any Lender (or any affiliate of a Lender) shall be secured by a perfected first priority security interest in all of its tangible and intangible assets (including, without limitation, Federal Communications Commission ("FCC") licenses, to the extent permitted by applicable law, intellectual property, real property and all of the capital stock of the Borrower and each of its direct and indirect subsidiaries (limited, in the case of foreign subsidiaries, to 66% of the capital stock of first tier foreign subsidiaries to the extent a pledge of a greater percentage could reasonably be expected to result in adverse tax consequences)), except for those assets as to which the Lenders shall determine in their sole discretion that the cost of obtaining a security interest therein are excessive in relation to the value of the security to be afforded thereby.

CERTAIN CONDITIONS

Initial Conditions:      The availability of the New Term Facility shall be conditioned upon the prior or simultaneous satisfaction of the following conditions (the date upon which all such conditions precedent shall be satisfied, the "Closing Date"):

(a)    Each Loan Party shall have executed and delivered satisfactory definitive financing documentation with respect to the New Term Facility (the "Loan Documentation").

(b)    The prior or simultaneous occurrence of the "Closing" under the definitive documentation governing the Restructuring.

(c)   The Lenders shall have received all fees required to be paid, and all expenses required to be paid for which invoices have been presented, on or before the Closing Date.

(d)   All governmental and third party approvals necessary in connection with the Restructuring, the financing contemplated hereby and the continuing operations of the Borrower and its subsidiaries (including, without limitation, shareholder approval, FCC approval and, to the extent required, FTC approval) shall have been obtained on satisfactory and final terms and shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose adverse conditions on the Restructuring or the financing thereof or, any of the transactions contemplated hereby; provided, however, that the FCC's failure or refusal to grant a waiver to enable the preservation of the grandfathered status under the FCC's media ownership rules of certain stations in Chicago, Illinois and Greenville-New Bern-Jacksonville, North Carolina (the "Grandfathered Stations") shall not be, or be deemed to be, a failure by the Borrower to obtain any necessary governmental or third party approvals.

(e)   The Borrower shall have delivered audited consolidated financial statements of the Borrower for the fiscal year ending December 31, 2009, to the extent the Closing Date occurs after the time at which such financial statements are available.

(f)   The Borrower shall have delivered a pro forma consolidated balance sheet of the Borrower and its subsidiaries as at the date of the most recent consolidated balance sheet delivered pursuant to the preceding paragraph, and a pro forma statement of operations for the twelve-month period ending on such balance sheet date, in each case adjusted to give effect to the consummation of the Restructuring and the financings contemplated hereby as if such transactions had occurred on such date or on the last day of such period, as the case may be.

(g)   The Borrower shall have delivered projections through 2015, which shall demonstrate operational and financial performance of the Loan Parties consistent with or better than the projections delivered to SVP prior to the date hereof.

(h)   The Second Lien Lead Investors shall be satisfied with the resolution of the litigation regarding the dissolution of NextMedia Investors LLC.

(i)    The Lenders shall have received the results of a recent lien search in each relevant jurisdiction with respect to Holdings, the Borrower and their subsidiaries, and such search shall reveal no liens on any of the assets of Holdings, the Borrower and their subsidiaries except for liens permitted by the Loan Documentation or liens to be discharged on or prior to the Closing Date pursuant to documentation satisfactory to the Lenders.

(j)    All documents and instruments required to perfect the first priority security interest in the collateral under the New Term Facility (including delivery of stock certificates and undated stock powers executed in blank) shall have been executed and be in proper form for filing, and, in connection with any real estate collateral, the Lenders shall have received satisfactory title insurance policies, surveys and other customary documentation to the extent reasonably requested by it and provided that the Borrower has previously insured such real estate collateral in connection with its historical ordinary course operations of the business.

(k)    The Lenders shall have received a satisfactory solvency certificate from the chief financial officer of the Borrower that shall document the solvency of the Borrower and its subsidiaries after giving effect to the Restructuring and the other transactions contemplated hereby.

(l)    Since the most recent audited consolidated financial statements of the Borrower, the Loan Parties shall continue to be licensees under all material FCC licenses; provided, however, that the FCC licenses for the Grandfathered Stations shall be deemed to be immaterial.

(m)    The Lenders shall have received such legal opinions (including opinions (i) from counsel to the Borrower and its subsidiaries, and (ii) from such special and local counsel as may be required by the Lenders), documents and other instruments as are customary for transactions of this type or as they may reasonably request.

(n)    All representations and warranties in the Loan Documentation shall be true and correct in all respects.

(o)    No default or event of default under the Loan Documentation shall exist on the Closing Date.

## CERTAIN DOCUMENTATION MATTERS

The Loan Documentation shall contain representations, warranties, covenants and events of default (in each case, applicable to Holdings, the Borrower and their subsidiaries) customary for financings of this

type and other terms deemed appropriate by the Lenders, including, without limitation:

| | |
|---|---|
| Representations and Warranties: | Financial statements (including pro forma financial statements); absence of undisclosed liabilities; since the date of the Commitment Letter, no event, circumstance or change has occurred that has caused or evidences, either in a case or in the aggregate, a Material Adverse Effect; corporate existence; compliance with law; corporate power and authority; enforceability of Loan Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve regulations; labor matters, ERISA; Investment Company Act and other regulations; subsidiaries; use of proceeds; environmental matters; accuracy of disclosure; creation and perfection of security interests; solvency; Regulation H; and delivery of certain documents. |

"Material Adverse Effect" means a material adverse effect on (i) the business, operations, properties, assets or condition of the Loan Parties taken as a whole; (ii) the ability of any Loan Party to fully and timely perform its obligations under the New Term Facility; or (iii) the legality, validity, binding effect or enforceability against a Loan Party of the New Term Facility; provided, however, that the occurrence of any of the following shall not be deemed to be a Material Adverse Effect: (x) in connection with the Restructuring, the Company is required to dispose of any of the Grandfathered Stations as a result of the loss of such stations' grandfathered status under the FCC's media ownership rules or (y) any loss sustained by the Company that is covered by insurance.

| | |
|---|---|
| Affirmative Covenants: | Delivery of financial statements, reports, accountants' letters, projections, officers' certificates and other information requested by the Lenders; payment of taxes and other obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations; maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records; notices of defaults, litigation and other material events; compliance with environmental laws; further assurances (including, without limitation, with respect to security interests in after-acquired property); and agreement to obtain interest rate protection in an amount and manner satisfactory to the Lenders. |
| Financial Covenants: | To include minimum interest coverage ratio, minimum fixed charge coverage ratio and maximum leverage ratio. |
| Negative Covenants: | Limitations on: indebtedness (including guarantee obligations), but with permission for a $10 million revolving credit facility, on a senior lien basis with the New Term Facility, so long as any lender of such revolving credit facility is, and the terms of any intercreditor agreement are, acceptable to the Second Lien Lead Investors in their |

sole discretion; liens; mergers, consolidations, liquidations and dissolutions; sales of assets; dividends and other payments in respect of capital stock; capital expenditures; acquisitions, investments, loans and advances; prepayments and modifications of subordinated and other material debt instruments; transactions with affiliates; sale-leasebacks; changes in fiscal year; hedging arrangements; negative pledge clauses and clauses restricting subsidiary distributions; changes in lines of business; and amendments to the material transaction documents with respect to the Restructuring.

Events of Default:    Nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period to be agreed upon; material inaccuracy of a representation or warranty when made; violation of a covenant (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); cross-default to material indebtedness; bankruptcy events; certain ERISA events; material judgments; actual or asserted invalidity of any guarantee or security document; changes in the passive holding company status of Holdings; and a change of control (the definition of which is to be agreed upon).

Voting:    Amendments and waivers with respect to the Loan Documentation shall require the approval of Lenders holding more than 50% of the aggregate amount of the Loans, except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of any amortization or final maturity of any Loan, (ii) reductions in the rate of interest or any fee or extensions of any due date thereof and (iii) increases in the amount or extensions of the expiry date of any Lender's commitment and (b) the consent of 100% of the Lenders shall be required with respect to (i) reductions of any of the voting percentages, (ii) releases of all or substantially all the collateral and (iii) releases of all or substantially all the Guarantors.

| | |
|---|---|
| Assignments and Participations: | The Lenders shall be permitted to assign all or a portion of their Loans and commitments with the consent, not to be unreasonably withheld, of (a) the Borrower, unless (i) the assignee is a Lender, an affiliate of a Lender or an approved fund or (ii) an event of default has occurred and is continuing, and (b) the Second Lien Lead Investors, unless a Loan is being assigned to a Lender, an affiliate of a Lender or an approved fund; provided that if the Second Lien Lead Investors do not provide their consent, SVP and/or Angelo, Gordon shall purchase such Loans from any such initial Lender at the same price negotiated with its proposed assignee. In the case of partial assignments (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $1,000,000. The Lenders shall also be permitted to sell participations in their Loans. Participants shall have the same benefits as the Lenders with respect to yield protection and increased cost provisions subject to customary limitations. Voting rights of participants shall be limited to those matters set forth in clause (a) under "Voting" with respect to which the affirmative vote of the Lender from which it purchased its participation would be required. Pledges of Loans in accordance with applicable law shall be permitted without restriction. |
| Yield Protection: | The Loan Documentation shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Eurodollar Loan (as defined in Annex I) on a day other than the last day of an interest period with respect thereto. |
| Expenses and Indemnification: | The Borrower shall pay (a) all reasonable out-of-pocket expenses of SVP and Angelo, Gordon associated with the administration of the Loan Documentation and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel) and (b) all out-of-pocket expenses of the Lenders (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Loan Documentation. |
| | The Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of the relevant indemnified person. |
| Governing Law and Forum: | State of New York. |
| FCC Compliance | The Parties hereto shall comply with all FCC rules, regulations and |

Matters:                policies including, but not limited to, the requirement of receiving prior consent for any transfer of control, multiple ownership rules, and restrictions on foreign ownership and control. In connection thereto, upon the request of the Borrower or its affiliates, all Parties hereto shall timely provide information to the Borrower or its affiliates, as may be necessary, for the Borrower or its affiliates to comply with FCC rules, regulations and policies.

Counsel to SVP and      Simpson Thacher & Bartlett LLP.
Angelo, Gordon:

## INTEREST AND CERTAIN FEES

Interest Rate Options:

The Borrower may elect that the Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR plus the Applicable Margin or (b) the LIBOR plus the Applicable Margin.

As used herein:

"ABR" shall be defined in a manner to be agreed upon, including a floor of 3.5%.

"Applicable Margin" means (a) 10% in the case of ABR Loans and (b) 11% in the case of LIBOR Loans.

"LIBOR" shall be defined in a manner to be agreed upon, including a floor of 2.5%.

Interest Payment Dates:

In the case of Loans bearing interest based upon the ABR ("ABR Loans"), quarterly in arrears.

In the case of Loans bearing interest based upon the LIBOR ("LIBOR Loans"), on the last day of each relevant interest period and, in the case of any interest period longer than three months, on each successive date three months after the first day of such interest period.

Default Rate:

At any time when the Borrower is in default in the payment of any amount of principal due under the New Term Facility, all outstanding Loans shall bear interest at 2% above the rate otherwise applicable thereto. Overdue interest, fees and other amounts shall bear interest at 2% above the rate applicable to the relevant ABR Loans.

Commitment Fee:

A commitment fee in an amount equal to 3% of the full amount of the New Term Facility, payable on the Closing Date.

Ticking Commitment Fee:

A ticking commitment fee for the period from the date that the Borrower and the Second Lien Lead Investors reasonably determine that Primary Debt Financing will not be obtained to the Closing Date, calculated at 0.50% per annum on the total amount of the New Term Facility (computed on the basis of the actual number of days elapsed over a 360-day year), payable on the Closing Date.

Original Issue Discount:

The Loans shall be issued with an original issue discount of 2.0%.

Rate and Fee Basis:

All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans the interest rate payable on which is then based on the Prime Rate) for actual

days elapsed.

## EQUITY INVESTMENT TERM SHEET

| | |
|---|---|
| **Issuer:** | NextMedia Group, Inc., a Delaware corporation ("NextMedia"). |
| **Class B Equity:** | Class B Equity of NextMedia (the "Class B Equity") to be purchased by certain funds and affiliates of funds managed by Strategic Value Partners LLC or its affiliates (collectively, "SVP") and by certain funds and affiliates of funds managed by Angelo, Gordon & Co., L.P. or its affiliates for $55 million, which shall represent 66.67% of all of the outstanding equity of the Company at the closing date. |
| **Liquidation Preference:** | The Liquidation Preference is $55 million. |
| **Application of Distributions:** | In the event any distributions are made to holders of the outstanding equity of NextMedia, whether as a result of NextMedia voluntarily or involuntarily liquidating, dissolving or winding up, or the sale of substantially all assets, or the board of directors of NextMedia declaring dividends or authorizing the repurchase of any equity, all such distributions will be applied as follows: |

first, to the holders of Class B Equity until such holders have received in the aggregate $55 million on account of such distributions;

second, after giving effect to the distributions in the preceding clause, to the holders of equity of NextMedia otherwise issued or retained pursuant to the Restructuring (the "Restructuring Equity") until such holders have received in the aggregate $27.5 million on account of such distributions;

third, after giving effect to the distributions in the two preceding clauses, any balance shall be distributed ratably to all holders of NextMedia equity.

| | |
|---|---|
| **Ranking:** | With respect to rights on liquidation, winding-up and dissolution, the Class B Equity will rank senior to the Restructuring Equity and each other class or series of capital stock or other equity established after the date of issuance of the Class B Equity, the terms of which do not expressly provide that it ranks on a parity with or senior to the Class B Equity as to rights on liquidation, winding-up and dissolution. |
| **Dividends:** | Dividends may be declared by the board of directors of NextMedia at any time, subject to all dividend payments complying with the order of distributions set forth herein. |

**Dilution:** Holders of the Class B Equity at closing will own 66.67% of all of the outstanding equity of the Company. All of NextMedia's equity, including the Class B Equity, shall be subject to dilution by equity of NextMedia issued in connection with management incentive plan awards as contemplated by the Restructuring Agreement.

**Other Provisions:** Except as otherwise set forth herein, the Class B Equity will have the same voting and other rights as the Restructuring Equity.

**Governance:** After the closing date, the board of directors of NextMedia (the "Board") shall consist of 5 members, one of whom shall be the chief executive officer of NextMedia. For so long as funds or affiliates of funds managed by SVP or its affiliates shall own not less than 39% of the outstanding equity of NextMedia, SVP shall have the right to designate the majority of the Board.

**Governing Law:** The Parties hereto acknowledge that the transactions contemplated hereto are subject to applicable rules, regulations and policies promulgated by the Federal Communications Commission, including but not limited to the requirement of prior consent for a transfer of control, multiple ownership restrictions and foreign ownership restrictions.

## NextMedia Group Inc.
## Option Term Sheet

Non-qualified options (the "Options") to acquire up to 14% of the Fully Diluted Shares (defined below) will be available for award to senior management (the "Senior Managers") of NextMedia Group Inc. (the "Company"). "Fully Diluted Shares" shall mean the sum of the outstanding shares of common stock (the "Common Stock") of the Company after giving effect to the consummation of the transaction contemplated by the Restructuring Support Agreement among the Company and the other parties thereto (the "Restructuring") plus the number of shares of Common Stock underlying the Options. Options to acquire approximately, 12.6% of the Fully Diluted Shares will be granted by the Company at the time of the Restructuring with the balance reserved for future allocation.

**Options:**    Strike Price. Each Option granted at the time of the Restructuring will have a per share exercise price equal to the "fair market value" of a share of Common Stock at the time of the Restructuring based on an aggregate equity value of $82.5 million (or such other aggregate equity value as shall be determined at the time of the Restructuring by the parties thereto). Future Option grants will have a per share exercise price equal to the "fair market value" (as determined in good faith by the Company's board of directors (the "Board")) of a share of Common Stock as of the date of grant.

Option Allocations. The initial Option allocations will be as set forth on Schedule I attached hereto. Future Option allocations will be determined by the Board. All of the Options will be time-vesting Options.

Vesting Schedule. Subject to continued employment with the Company or its subsidiaries through the applicable Vesting Dates, a Senior Manager's Options will vest and become exercisable as to 20% of the underlying shares on each of the first five anniversaries of the date of grant (the "Vesting Dates").

Accelerated Vesting Upon a Change of Control. Subject to the Senior Manager's continued employment with the Company or its subsidiaries, any unvested Options will vest and become exercisable upon a "change of control" of the Company.

Expiration; Unvested Options. Any unvested Options will be forfeited upon a termination of a Senior Manager's employment for any reason.

Expiration; Vested Options. The vested portion of the Options will expire on the earliest of:

(i)    the 10th anniversary of the date of grant;

(ii)    the 30th day after a termination of employment by the Company without Cause or a voluntary resignation (with or without Good Reason);

(iii)    the 90th day after termination due to permanent disability;

(iv)    the 180th day after termination due to death;

(v)    immediately upon termination with Cause.

No Stockholders Rights: No Transfer. No optionholder will have any rights of a stockholder (including as to voting or dividends) with respect to the shares subject to an Option until exercise of the Option and payment of the exercise price. Options are not transferable, except upon death.

**Management**
**Shareholders**
**Agreement:**    All shares acquired upon exercise of an Option shall be held subject to the terms and conditions of a management shareholders agreement, which shall include customary transfer restrictions, call rights, tag along, drag along, and piggyback registration provisions.

## SCHEDULE I

*[Initial Option Allocation TBD]*

## NextMedia Group Inc.
## Employment Agreement Term Sheet

The following executives (the "Executives") of the Company shall waive all rights under their current employment agreements ("Prior Agreements"), which agreements shall be terminated at the time of the Restructuring, and enter into new employment agreements with the Company containing the following terms and conditions:

**Executives:** Steven Dinetz (CEO), Jeffrey Dinetz (EVP), James Matalone (EVP), Scot Mcartor (EVP), Mark Gamble (Director of Real Estate), and Eric Neumann (CFO).

**Term:** 3 years (Steven Dinetz); 2 years (all other Executives), with one year automatic renewal unless either party provides 180 days (Steven Dinetz) or 90 days (all other Executives) notice prior to end of the term to terminate the agreement.

**Base Salary:** Same as under Prior Agreements.

**Signing Bonus:** The following Executives shall be entitled to a signing bonus at the time of the Restructuring, which, net of taxes, will be in the amount set forth below:

- Jeffrey Dinetz: $250,000

- James Matalone: $25,000

- Scot Mcartor: $100,000

If the Executive quits without Good Reason or the Company terminates Executive's employment with Cause prior to the second anniversary of the effective date, the signing bonus should be subject to repayment by the Executive in full to the Company.

**Annual Bonus:** Executives will be eligible to earn annual bonuses based on the achievement of annual performance targets established by the Board. Annual bonuses, if any, shall be granted in the sole discretion of the Board. The aggregate annual bonus pool, if any, will be consistent with the Company's aggregate annual bonus pool in each of the last four years prior to the Restructuring.

**Employee Benefits:** Executives shall be entitled to the same car allowance and club membership reimbursements as provided under the Prior Agreements. Executive shall

participate in all other employee benefit programs of the Company on the same basis as those benefits are generally made available to other senior executives of the Company.

**Severance:** *Termination By the Company Without Cause or By Executive for Good Reason*: Subject to Executive's execution of a general release of claims against the Company and compliance with the Restrictive Covenants (described below):

- Two times base salary, payable over 24 months in monthly installments  and 24 months of continued medical coverage (Steven Dinetz); or

- One times base salary payable over 12 months in monthly installments and 12 months of continued medical coverage (each of the other Executives).

*Termination due to death or Disability:* Pro-rated portion of discretionary annual bonus.

**Restrictive Covenants:** Executives will be subject to (i) indefinite confidentiality and nondisparagement provisions, (ii) IP assignment provisions and (iii) non-competition and non-solicitation provisions during employment and continuing for 24 months (Steven Dinetz) or 12 months (each of the other Executives) following termination of employment for any reason.

**Governing Law:** Delaware.

**Defined Terms:** "Cause" shall have the same meaning as under the Prior agreement, except that the following provisions will <u>not</u> be included:

- the Company materially breaches any financial covenant contained in any of its contractual obligations and such breach is not cured or waived prior to the expiration of any applicable grace or cure periods;

- the Company shall fail to pay the principal of, or interest in, or to make any required payment (regardless of amount) in connection with any of its indebtedness when and as the same may become due and payable and such failure is not cured or waived prior to the expiration of any applicable grace or cure periods;

- any event or circumstance shall have occurred the effect of which would permit the holder of any indebtedness of the Company to cause or require such indebtedness to become due or to be redeemed or repurchased prior to its

stated maturity and such event is not cured or waived prior to the expiration of any applicable grace or cure periods, or

- the Company and its subsidiaries, if any, taken together, shall have failed to meet at least 90% of their budget in any given fiscal year, as such budget was recommended by the CEO and approved by the Board.

"Good Reason" shall have the same meaning as under the Prior Agreements with the following exceptions:

- Good Reason shall not be deemed to occur by reason of a "change of control" of the Company as provided under the Prior Agreements.

## DIP COMMITMENT LETTER

Strategic Value Partners LLC
100 West Putnam Avenue
Greenwich, Connecticut 06830

Angelo, Gordon & Co., L.P.
245 Park Avenue
New York, New York 10167

December 10, 2009

$10,000,000 Debtor-in-Possession Facility
Commitment Letter

NextMedia Operating, Inc.
6312 South Fiddlers Green
Suite 360E
Greenwood Village, CO 80111
Attention: Eric Neumann, Chief Financial Officer, Vice President and Treasurer

Ladies and Gentlemen:

You have advised us that NextMedia Operating, Inc. (including its subsidiaries, the "Company" or "you") and certain of its subsidiaries and affiliates are considering filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code") in order to effectuate a restructuring (the "Restructuring") of their outstanding debt obligations as set forth more fully in the Restructuring Support Agreement (including the term sheets attached thereto, and as amended, supplemented or otherwise modified from time to time, the "Restructuring Agreement"), among the Company, its second lien lenders, the administrative agent to the second lien lenders, the Second Lien Lead Investors (as defined below), NextMedia Group, Inc. and NextMedia Group, Inc.'s sole shareholder, NextMedia Investors LLC.

Each of us is pleased to advise you of our several (and not joint) commitment (on behalf of certain funds and affiliates of funds managed by Strategic Value Partners LLC or its affiliates ("SVP") and certain funds and affiliates of funds managed by Angelo, Gordon & Co., L.P. or its affiliates ("Angelo, Gordon"; together with SVP, the "Second Lien Lead Investors", "we" or "us")) to each provide to the Company 50% of a $10,000,000 secured debtor-in-possession credit facility under Sections 364(c)(1), (2) and (3) and (d)(1) of the Bankruptcy Code (the "DIP Facility"), all of the Company's obligations under which will be guaranteed by the Company, NextMedia Group, Inc. and the Company's subsidiaries (collectively, the "Guarantors") on a secured and superpriority basis as described in the term sheet attached hereto as Exhibit A (the "DIP Facility Term Sheet") and subject to the conditions set forth or referred to in this commitment letter (this "DIP Facility Commitment Letter") and in the DIP Facility Term Sheet. The superpriority claims and liens granted to the DIP Facility Lenders (as defined in the DIP Facility Term Sheet) shall be (x) junior in priority to the superpriority claims and liens, including replacement liens, granted to the lenders under the Company's Credit and Guaranty Agreement dated as of November 15, 2005 (as amended, supplemented or otherwise modified as of the petition date, the "First Lien Credit Agreement"), and (y) senior in priority to the superpriority claims and liens, including replacement liens, granted to the lenders under the Company's Second Lien Credit and Guaranty Agreement, dated as of November 15, 2005 (as amended, supplemented or otherwise modified as of the petition date, the "Second Lien Credit Agreement").

SVP and Angelo, Gordon may assign a portion of their commitments hereunder to any of their affiliated funds or affiliated entities or to any third party investor, or such investors' affiliated funds or affiliated entities, identified by us. In connection with any such syndication, you hereby authorize us to distribute the DIP Facility Term Sheet and drafts of definitive documentation with respect to the Restructuring.

As consideration for the commitments and agreements of SVP and Angelo, Gordon hereunder, you agree to cause to be paid the nonrefundable fees described in the DIP Facility Term Sheet on the DIP Closing Date (as defined in the DIP Facility Term Sheet).

The commitments of SVP and Angelo, Gordon hereunder are subject to the negotiation, execution and delivery of definitive documentation with respect to the DIP Facility consistent with the DIP Facility Term Sheet and otherwise reasonably satisfactory in form and substance to the Second Lien Lead Investors and you.

The commitments of SVP and Angelo, Gordon hereunder are also subject to (a) the Second Lien Lead Investors' reasonable satisfaction with, and the approval by the Bankruptcy Court of, (i) all aspects of the DIP Facility and the transactions contemplated thereby, including without limitation, the administrative expense priority of, and the liens to be granted to secure, the DIP Facility and all definitive documentation in connection therewith consistent with the DIP Facility Term Sheet and (ii) all actions to be taken, undertakings to be made and obligations to be incurred by the Company and the Guarantors in connection with the DIP Facility (all such approvals to be evidenced by the entry of one or more orders of the Bankruptcy Court reasonably satisfactory in form and substance to the Second Lien Lead Investors, which orders shall, among other things, approve the payment by the Company of all applicable fees that are provided for in, and the other terms of, this DIP Facility Commitment Letter and the DIP Facility Term Sheet); (b) since the date hereof, there not having occurred or becoming known to the Second Lien Lead Investors any material adverse effect on (1) the business, operations, properties, assets or condition of the Company and the Guarantors taken as a whole; (2) the ability of the Company or any Guarantor to fully and timely perform its obligations under the DIP Facility; or (3) the legality, validity, binding effect or enforceability against the Company or any Guarantor of the DIP Facility (other than those occurring as a result of events leading up to and following the commencement of the Chapter 11 cases and the consequences that customarily result therefrom) ("Material Adverse Effect"); provided, however, that the occurrence of any of the following shall not be deemed to be a Material Adverse Effect: (A) in connection with the Restructuring, the Company is required to dispose of certain stations in Chicago, Illinois and Greenville-New Bern-Jacksonville, North Carolina as a result of the loss of such stations' grandfathered status under the Federal Communications Commission's (the "FCC") media ownership rules or (B) any loss sustained by the Company that is covered by insurance; (c) the Restructuring Agreement remaining in full force and effect pursuant to the terms thereof; and (d) the other conditions set forth or referred to herein and in the DIP Facility Term Sheet. The terms and conditions of the definitive documentation with respect to the DIP Facility are not limited to the terms and conditions set forth herein. Those matters that are not covered by or made clear under the provisions hereof or of the DIP Facility Term Sheet are subject to the approval and agreement of the Second Lien Lead Investors and the Company.

Subject to the additional terms in this DIP Facility Commitment Letter, the commitments of SVP and Angelo, Gordon herein shall terminate at the earlier of (i)  November 1, 2010 and (ii) the date at which the Company's and its applicable affiliates and subsidiaries' plans of reorganization are confirmed.

You agree (a) to indemnify and hold harmless the Second Lien Lead Investors, each of their affiliates and their respective directors, employees, advisors, and agents (each, an "indemnified person") from and against any and all losses, claims, damages and liabilities to which any such

indemnified person may become subject arising out of or in connection with any suit, investigation or proceeding arising out of this DIP Facility Commitment Letter, the DIP Facility, the use of the proceeds thereof, the Restructuring or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, and to reimburse each indemnified person upon demand for any legal or other expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court to arise from the bad faith, willful misconduct or gross negligence of such indemnified person, and (b) to reimburse the Second Lien Lead Investors and their affiliates on demand for all reasonable out-of-pocket expenses (including due diligence expenses, syndication expenses, consultant's fees and expenses, travel expenses, and reasonable fees, charges and disbursements of counsel) incurred in connection with the DIP Facility and any related documentation (including this DIP Facility Commitment Letter and the definitive financing documentation) or the administration, amendment, modification or waiver thereof. No indemnified person shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems or for any special, indirect, consequential or punitive damages in connection with the DIP Facility Commitment Letter, the DIP Facility, or the use of the proceeds thereof, except to the extent such damages are found by a final, non-appealable judgment of a court to arise from the bad faith, gross negligence or willful misconduct of such indemnified person.

You acknowledge that SVP, Angelo, Gordon and their respective affiliates may be providing debt financing, equity capital or other services to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. You also acknowledge that the Second Lien Lead Investors have no obligations to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies. Nothing in this paragraph shall in any way affect any obligations under any non-disclosure or confidentiality agreements the parties have entered into prior to the date hereof. Notwithstanding the above, the Second Lien Lead Investors shall timely disclose to the Company, upon request, any information that is necessary for the Company to comply with FCC rules, regulations and policies.

This DIP Facility Commitment Letter shall not be assignable by you without the prior written consent of the Second Lien Lead Investors (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons. This DIP Facility Commitment Letter may not be amended or waived except by an instrument in writing signed by you and the Second Lien Lead Investors. This DIP Facility Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this DIP Facility Commitment Letter by email or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

This DIP Facility Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York (subject to applicable FCC rules or regulations). The Company consents to the nonexclusive jurisdiction and venue of the state or federal courts located in the City of New York, provided however, that the parties also submit to the jurisdiction of the applicable Bankruptcy Court in which venue the Company and its affiliates and subsidiaries file their voluntary petitions. Each party hereto irrevocably waives, to the fullest extent permitted by applicable law, (a) any objection that it may now or hereafter have to the laying of venue of any such legal proceeding in the state or federal courts located in the City of New York or in the applicable Bankruptcy Court and (b) any right it may have to a trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the DIP Facility Commitment Letter, the DIP Facility Term Sheet, the transactions contemplated hereby or the performance of services hereunder.

This DIP Facility Commitment Letter is delivered to you on the understanding that neither this DIP Facility Commitment Letter nor the DIP Facility Term Sheet nor any of their terms or substance shall be disclosed, directly or indirectly, to any other person (including, without limitation, other potential providers or arrangers of financing) except (a) to your officers, employees, representatives, agents and advisors who are directly involved in the consideration of this matter or (b) as may be compelled in a judicial or administrative proceeding or as otherwise required by law or a court of competent jurisdiction (in which case you agree to inform us promptly thereof), provided, you may disclose this DIP Facility Commitment Letter and the DIP Facility Term Sheet (x) in connection with any court proceeding regarding the approval of this DIP Facility Commitment Letter, the DIP Facility and the DIP Facility Term Sheet and the obligations hereunder and thereunder and (y) to the administrative agents and the lenders under the First Lien Credit Agreement and Second Lien Credit Agreement, in each case subject to the Second Lien Lead Investors' right to redact in their sole discretion any information herein or in the DIP Facility Term Sheet they deem confidential or proprietary.

The compensation, reimbursement, indemnification and confidentiality provisions contained herein and in the DIP Facility Term Sheet and any other provision herein or therein which by its terms expressly survives the termination of this DIP Facility Commitment Letter shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this DIP Facility Commitment Letter or the commitments hereunder.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms hereof by signing in the appropriate space below and returning to us the enclosed duplicate originals (or facsimile counterparts) of the DIP Facility Commitment Letter by the earlier of 5:00 p.m. (New York City time) on December 11, 2009 and the time of the filing by the Company and its applicable subsidiaries and affiliates of their petitions under Chapter 11 of the Bankruptcy Code.

We are pleased to have been given the opportunity to assist you in connection with this important financing.

[Signature Page Follows]

Very truly yours,

STRATEGIC VALUE PARTNERS LLC.
on behalf of certain funds and affiliates of funds
managed by it or its affiliates

By: _____
    Name: JAMES VANCLEY
    Title: SECRETARY

ANGELO, GORDON & CO., L.P.
on behalf of certain funds and affiliates of funds
managed by it or its affiliates

By: _____

Name:
Title:      **Thomas M. Fuller**
            **Authorized Signatory**

Accepted and agreed to as of
the date first written above by:

NEXTMEDIA GROUP, INC.

By:
   Name:
   Title:


NEXTMEDIA OPERATING, INC.

By:
   Name:
   Title:


[*DIP Facility Commitment Letter Signature Page*]

EXHIBIT A

## NEXTMEDIA OPERATING, INC.

### Outline of Terms and Conditions for
### Debtor-in-Possession Term Loan Facility
### in the Amount of $10,000,000

Borrower:

NextMedia Operating, Inc., a Delaware corporation (the "Borrower"), as a debtor-in-possession in a case (the "Debtor's Case") pending under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

Guarantors:

NextMedia Group, Inc. and the subsidiaries of the Borrower, each of which is a debtor-in-possession in a case (together with the Debtor's Case, the "Cases"; the date of the commencement of the Cases, the "Petition Date") pending under Chapter 11 of the Bankruptcy Code (collectively, the "Guarantors", and, together with the Borrower, the "Loan Parties" or the "Debtors").

Lenders:

Certain funds and their respective affiliates managed by Strategic Value Partners LLC or its affiliates ("SVP") and certain funds and their respective affiliates managed by Angelo, Gordon & Co., L.P. or its affiliates ("Angelo, Gordon"; together with SVP, the "Second Lien Lead Investors") and such other financial institutions or entities acceptable to the Second Lien Lead Investors (including assignees thereof, collectively, the "DIP Lenders").

## FACILITIES

**Term Loan Commitment and Availability:**

A six-month term loan facility (the "<u>DIP Facility</u>") in the amount of $10,000,000 (the loans thereunder, the "<u>DIP Loans</u>"). The DIP Loans shall be repaid on the earlier to occur of (x) the six month anniversary of the DIP Closing Date referred to below (as may be extended pursuant to the terms set forth below, the "<u>DIP Maturity Date</u>"), (y) the consummation of the Plan (as defined in the Restructuring Agreement referred to below); provided that the DIP Maturity Date shall be extended without any fee for up to three months if (1) the Plan has been confirmed by the Bankruptcy Court and (2) the only outstanding condition precedent to consummation of the Plan is the Federal Communications Commission's ("<u>FCC</u>") approval of the restructuring contemplated by the Plan and (z) upon the mutual agreement of the DIP Lenders and the Borrower.

The DIP Loans shall be made in no more than two drawings, a first draw of not less than $5 million on the DIP Closing Date and a second draw no earlier than one business day after the entry of the final order approving the DIP Facility and subject to other terms and conditions to be agreed upon.

The Borrower shall not be, and is not, required to draw on any portion of the DIP Facility, nor is Borrower required to file any motion with the Bankruptcy Court to approve the DIP Facility. In the event Borrower does not secure Bankruptcy Court approval of the DIP Facility, no fees of any kind shall be payable in respect thereof. In the event Borrower secures Bankruptcy Court approval for the DIP Facility but does not draw thereon, only the Commitment Fee called for herein shall be payable.

**Purpose:**

The proceeds of the DIP Loans shall be used for working capital and other general corporate purposes of the Loan Parties in accordance with the Budget (as defined below).

**Commitment Fee:**

3% of the DIP Facility, to be paid on the DIP Closing Date ratably to each DIP Lender based upon its commitment under the DIP Facility.

**Interest Rate:**

LIBOR (to be defined in a manner to be agreed upon, including a floor of 2.5%) <u>plus</u> 11% or, at the Borrower's option, ABR (to be defined in a manner to be agreed upon, including a floor of 3.5%) <u>plus</u> 10%, payable monthly in arrears.

**Default Interest:**

Upon the occurrence and during the continuance of any event of default under the DIP Facility, interest shall be payable on all outstanding obligations on demand at 2.0% above the then applicable rate.

## GENERAL PROVISIONS

**Priority and Liens:**

All DIP Loans and other obligations under the DIP Facility (and all

guaranties of the foregoing by the Guarantors), shall at all times:

I.  pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled
    to joint and several superpriority claim status in the Cases with
    such superpriority claims to be junior in priority to any
    superpriority claims granted to the Debtors' first lien lenders but
    senior to any superpriority claims granted to the Debtors' second
    lien lenders; and

II. pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured
    by a perfected first priority lien on all property of the Debtors'
    respective estates in the Cases that is not subject to valid, perfected
    and non-avoidable liens in existence at the time of the
    commencement of the Cases or to valid liens in existence at the
    time of such commencement that are perfected subsequent to such
    commencement as permitted by Section 546(b) of the Bankruptcy
    Code; and

III. pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured
     by a perfected junior lien on all property of the Debtors' respective
     estates in the Cases that is subject to valid, perfected and non-
     avoidable liens in existence at the time of the commencement of
     the Cases or to valid liens in existence at the time of such
     commencement that are perfected subsequent to such
     commencement as permitted by Section 546(b) of the Bankruptcy
     Code, except in each case as described below in paragraph IV; and

IV. pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured
    by a perfected priming lien on, and security interest in, all present
    and after acquired property of the Debtors' respective estates that is
    subject to a valid, perfected and non-avoidable liens in existence at
    the time of the commencement of the Cases to secure the Second
    Lien Credit Agreement and all present and after-acquired assets
    that are presently subject to liens that are junior to the liens that
    secure the Second Lien Credit Agreement, provided that the
    priming liens described in this paragraph IV shall be junior in all
    respects to the liens granted to the first lien lenders, including any
    replacement liens granted to such lenders as adequate protection;

subject in each case to, in the event of the occurrence and during the
continuance of an Event of Default, a carve-out of $750,000 for unpaid
fees and expenses of professionals and the United States Trustee
incurred after an Event of Default.

| | |
|---|---|
| Optional and Mandatory Prepayments: | Market terms for financings of this type |
| Conditions to Initial of Extensions Credit: | Market terms for financings of this type and, in addition, the making of the initial extension of credit shall be subject to the satisfaction of the following conditions (the date on which all such conditions precedent shall be satisfied, the "DIP Closing Date"): |

      (a)      The interim order approving the DIP Facility and providing for the use of the pre-petition lenders' cash collateral, in form and substance reasonably satisfactory to the DIP Lenders (the "Interim Order"), shall have been entered by the bankruptcy court having jurisdiction over the Cases (the "Bankruptcy Court"), shall be in full force and effect and shall not be subject to any stay.

      (b)      The Administrative Agent shall have received (i) a monthly budget for the six months following the Petition Date and (ii) a thirteen-week budget for the period of thirteen weeks following the Petition Date (the "Initial Budget"), in each case in form and substance reasonably satisfactory to the DIP Lenders.

**Conditions to Subsequent Extensions of Credit**

      (a)      The final order approving the DIP Facility, substantially in the form of the Interim Order and otherwise in form and substance reasonably satisfactory to the DIP Lenders, shall have been entered by the Bankruptcy Court within 30 days after entry of the Interim Order, shall be in full force and effect and shall not be subject to any stay.

      (b)      The accuracy in all material respects of all representations and warranties in the Credit Documentation.

      (c)      There being no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit.

**Adequate Protection**

Usual and customary adequate protection in the form of (i) superpriority claims and replacement liens, which in the case of the Debtors' first lien lenders shall be senior to all other pre-petition and post-petition liens, (ii) payment of reasonable fees and expenses of the administrative agents to the prepetition second lien credit agreement, including payment of the reasonable fees and expenses of Broadpoint Capital, Inc., Dechert LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP (solely as FCC counsel) in their capacities as professional advisors to the second lien administrative agent, as well as the reasonable fees and expenses of one local counsel to the second lien administrative agent, to the extent applicable and (iii) financial reporting in accordance with the terms of the Second Lien Credit Agreement.

**Events of Default:**

Market terms for financings of this type, as well as a "Termination Event" occurring under the Restructuring Support Agreement (as amended, supplemented or otherwise modified from time to time, the "Restructuring Agreement") and not being waived in accordance with the terms thereunder.

**Representations and Warranties; Financial and Other Covenants; Assignments and Participations; Indemnification; Voting**

Market terms for financings of this type.

Expenses:              The Borrower will pay or reimburse the DIP Lenders for their
                       reasonable out-of-pocket fees and expenses incurred in connection with
                       the Cases.

Governing Law:         State of New York, except as governed by the Bankruptcy Code and the
                       rules, regulations and policies of the FCC, including but not limited to
                       any restrictions on pledging FCC licenses.

**EXHIBIT C**

**CLAIMS**



[All Claim Amounts Have Been Redacted]

### AMENDMENT TO THE SECOND LIEN CREDIT AGREEMENT

**FOURTH AMENDMENT TO CREDIT AND GUARANTY AGREEMENT (Second Lien)**

THIS FOURTH AMENDMENT TO CREDIT AND GUARANTY AGREEMENT (Second Lien) (this "<u>Amendment</u>") is entered into as of December 18, 2009, by and among NextMedia Operating, Inc., a Delaware corporation (the "<u>Borrower</u>"), the other Credit Parties signatory hereto, NexBank, SSB as administrative agent for the Lenders (the "<u>Administrative Agent</u>") and the Lenders signatory hereto.

RECITALS

A.      Borrower, the other Credit Parties signatory thereto, the Lenders signatory thereto from time to time and the Administrative Agent are parties to that certain Second Lien Credit and Guaranty Agreement, dated as of November 15, 2005, as amended by that certain First Amendment to Credit and Guaranty Agreement (Second Lien), dated as of April 10, 2006, that certain Second Amendment to Credit and Guaranty Agreement (Second Lien), dated as of June 28, 2006 and that certain Third Amendment to Credit and Guaranty Agreement (Second Lien), dated as April 10, 2008 (as amended, and as the same may be further amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>").

B.      Borrower and the Requisite Lenders have agreed to amend the Credit Agreement, subject to the terms and conditions as set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and intending to be legally bound, the parties hereto agree as follows:

A.  AMENDMENTS

1.      <u>Amendment to Section 1.1</u>.  The Credit Agreement is amended by inserting the following new definitions of "Fourth Amendment", "Fourth Amendment Effective Date" and "Restructuring Support Agreement" into Section 1.1 of the Credit Agreement in the appropriate alphabetical order:

"<u>Fourth Amendment</u>" means the Fourth Amendment to Credit and Guaranty Agreement (Second Lien), dated as of December 18, 2009, by and among Borrower, the other Credit Parties signatory thereto, the Administrative Agent and the Requisite Lenders.

"<u>Fourth Amendment Effective Date</u>" means the date on which the conditions precedent set forth in Section B of the Fourth Amendment are satisfied.

"<u>Restructuring Support Agreement</u>" means the Restructuring Support Agreement, dated December 18, 2009, among the Borrower, Holdings, NextMedia Investors, LLC and the Lenders time to time party thereto, as amended, supplemented or otherwise modified from time to time.

2.      Amendment to Section 1.1. The Credit Agreement is amended by adding the following proviso to the end of the definition of "Eligible Assignee" immediately before the period therein:

> provided further, that on and after the Fourth Amendment Effective Date, no Person shall be an "Eligible Assignee" unless prior to or substantially contemporaneously with the execution of the applicable Assignment Agreement, such Person is or becomes a party to the Restructuring Support Agreement.

## B. CONDITIONS PRECEDENT

Notwithstanding any other provision of this Amendment and without affecting in any manner the rights of Lenders hereunder, it is understood and agreed that this Amendment shall not become effective, Borrower shall have no rights under this Amendment and Lenders shall not be obligated to take, fulfill or perform any action hereunder until the this Amendment shall have been executed by (i) Lenders having or holding Loan Exposure representing more than 50% of the aggregate Loan Exposure of all Lenders and (ii) the Borrower and the other Credit Parties.

## C. REPRESENTATIONS AND WARRANTIES

1.      Borrower and each other Credit Party hereby represents and warrants that (i) each has the power and is duly authorized to enter into, deliver and perform this Amendment, and (ii) this Amendment, the Credit Agreement, as amended, and each of the other Credit Documents is the legal, valid and binding obligation of Borrower and each other Credit Party enforceable against it in accordance with its terms except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

## D. OTHER AGREEMENTS

1.      Continuing Effectiveness of Credit Documents. As amended hereby, all terms of the Credit Agreement and the other Credit Documents shall be and remain in full force and effect and shall constitute the legal, valid, binding and enforceable obligations of the Credit Parties party thereto except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability. To the extent any terms and conditions in any of the other Credit Documents shall contradict or be in conflict with any terms or conditions of the Credit Agreement, after giving effect to this Amendment, such terms and conditions are hereby deemed modified and amended accordingly to reflect the terms and conditions of the Credit Agreement as modified and amended hereby. Upon the effectiveness of this Amendment such terms and conditions are hereby deemed modified and amended accordingly to reflect the terms and conditions of the Credit Agreement as modified and amended hereby.

2.      Reaffirmation of Guaranty. Each Guarantor consents to the execution and delivery by Borrower of this Amendment and the consummation of the transactions described herein, and ratifies and confirms the terms of the Guaranty to which such Guarantor is a party with respect to the indebtedness now or hereafter outstanding under the Credit Agreement as amended hereby and all promissory notes issued thereunder.

3.     <u>Effect of Agreement.</u> The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of the Lenders under the Credit Agreement, nor constitute a waiver of any provision of the Credit Agreement. This Amendment shall constitute a Credit Document for all purposes of the Credit Agreement.

4.     <u>Governing Law.</u> This Amendment shall be governed by, and construed in accordance with, the internal laws of the State of New York and all applicable federal laws of the United States of America.

5.     <u>Counterparts.</u> This Amendment may be executed by one or more of the parties hereto in any number of separate counterparts, each of which shall be deemed an original and all of which, taken together, shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of this Amendment by facsimile transmission shall be as effective as delivery of a manually executed counterpart hereof.

6.     <u>Binding Nature.</u> This Amendment shall be binding upon and inure to the benefit of the parties hereto, their respective successors, successors-in-titles, and assigns.

7.     <u>Entire Understanding.</u> This Amendment sets forth the entire understanding of the parties with respect to the matters set forth herein, and shall supersede any prior negotiations or agreements, whether written or oral, with respect thereto.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, this Amendment has been duly executed as of the date first written above.

NEXTMEDIA OPERATING, INC., as Borrower

_____

By:
Name:
Title:

NEXTMEDIA GROUP, INC., as Holdings

_____

By:
Name:
Title:

[OTHER CREDIT PARTIES]

_____

By:
Name:
Title:

[NEXBANK, SSB, as Administrative Agent]

_

_____
By:
Name:
Title:

[LENDER]

—

_____
By:
Name:
Title:

**EXHIBIT E**

**LENDER JOINDER**

This Lender Joinder to the Restructuring Support Agreement, dated as of December [  ], 2009 (as amended, the "Restructuring Agreement), by and among NextMedia Group, Inc. (the "Company"), certain of the Company's subsidiaries, NextMedia Operating, Inc., NextMedia Investors LLC, SVP, Angelo, Gordon and the Consenting Lenders signatory thereto, is executed and delivered by [  ] (the "Joining Lender Party") as of [_], 20[__]. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Restructuring Agreement.

1.        Agreement to be Bound. The Joining Lender Party hereby agrees to be bound by all of the terms of the Restructuring Agreement, attached to this Lender Joinder as Annex I (as the same may be hereafter amended, restated or otherwise modified from time to time). The Joining Lender Party shall hereafter be deemed to be a "Consenting Lender" and a party for all purposes under the Restructuring Agreement.

2.        Representations and Warranties. With respect to the aggregate principal amount of Claims held by the Joining Lender Party upon consummation of the sale, assignment, transfer, hypothecation or other disposition of such Claims, the Joining Lender Party hereby makes the representations and warranties of the Consenting Lenders set forth in Section 4 of the Restructuring Agreement to each of the other Parties in the Restructuring Agreement.

3.        Governing Law. This Lender Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

* * * * *

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Joining Lender Party has caused this Lender Joinder to be executed as of the date first written above.

_____

Entity Name of Joining Lender Party

Authorized Signatory:

By:_____
  Name:
  Title:

          Amount of Claim under Second Lien Credit
          Agreement]: $[   ]

[LENDER JOINDER]

**ANNEX I**

[Restructuring Support Agreement]