## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| NEXTMEDIA GROUP, INC., *et al.*, | § | Case No. 09-_____(____) |
| | § | |
| Debtors. | § | Joint Administration Pending |

## DEBTORS' MOTION (i) FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING AND APPROVING (1) DEBTOR IN POSSESSION FINANCING PURSUANT TO SECTIONS 364(c) AND 364(d) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 4001(c), (2) THE USE OF CASH COLLATERAL AND THE GRANT OF ADEQUATE PROTECTION PURSUANT TO SECTIONS 361 AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 4001(b) AND (3) MODIFICATION OF THE AUTOMATIC STAY UNDER SECTION 362 OF THE BANKRUPTCY CODE AND (ii) SCHEDULING A FINAL HEARING AND APPROVING FORM AND MANNER OF NOTICE THEREOF

NextMedia Group, Inc. and its affiliated debtors in the above-captioned chapter 11 cases (collectively, the "Debtors" or the "Company"),[1] for their Motion (the "Motion") (i) for Interim and Final Orders (A) Authorizing and Approving (1) Debtor in Possession Financing Pursuant to Sections 364(c) and 364(d) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (2) the Use of Cash Collateral and the Grant of Adequate Protection Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b) and (3) Modification of the Automatic Stay Under Section 362 of the Bankruptcy Code, and (ii) Scheduling a Final Hearing and Approving Form and Manner of Notice Thereof, respectfully represent:

---

[1] The Debtors in these chapter 11 cases, along with the last four (4) digits of their taxpayer identification numbers, are: NextMedia Group, Inc. ("NM Group") (0791); NextMedia Investors LLC ("NM Investors") (9403); NextMedia Operating, Inc. ("NM OpCo") (5397); NM Licensing LLC (5396); NextMedia Outdoor, Inc. (5398); NM Texas, Inc. (4229); NextMedia Northern Colorado, Inc. (8422); NextMedia Franchising, Inc. (9913); and NextMedia Outdoor, LLC (9700). The Debtors' corporate headquarters are located at 6312 S. Fiddler's Green Circle, #205E, Greenwood Village, Colorado 80111.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§1408 and 1409.

## INTRODUCTION

3.      On December 21, 2009 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under the Bankruptcy Code.

4.      Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their properties as debtors in possession. Concurrently with the filing of this Motion, the Debtors have requested that their cases be jointly administered.

5.      No official committee, trustee or examiner has been appointed.

## BACKGROUND

### A.      The Business

6.      NM Investors is an investment limited liability company holding company. NM Group, a direct wholly-owned subsidiary of NM Investors, was formed as a holding company for the NextMedia operating entities. NM OpCo, a direct wholly-owned subsidiary of NM Group, is the principal operating entity which, with its wholly-owned and majority-owned subsidiaries, provides out-of-home media services in two (2) segments: (i) radio broadcasting (through NM OpCo and NM Licensing LLC) and (ii) outdoor advertising (through NM OpCo, NextMedia Outdoor, Inc. and NextMedia Northern Colorado, Inc.)[2]

---

[2]      NM Investors has no liabilities or operations. Its only asset is its equity interest in NM Group. Thus, all references to the Debtors' operations and business do not include NM Investors. NextMedia Outdoor, LLC is an indirect subsidiary of NM OpCo and 20% of its membership interests are owned by non-Debtors. NM Texas, Inc., a wholly-owned subsidiary of NM OpCo, has no assets, liabilities or operations.

2

7. As of the Petition Date, the Debtors operate an aggregate of thirty six (36) AM and FM radio stations in a total of seven (7) rated and unrated small, mid-sized and suburban markets, including the Greenville-New Bern-Jacksonville, North Carolina area; the Saginaw-Bay City-Midland, Michigan area; Canton, Ohio; Myrtle Beach, South Carolina; San Jose, California; suburban Chicago; and suburban Dallas. In the majority of these markets, the Debtors own and operate clusters of radio stations and target diverse demographic groups through a broad range of programming formats, including rock, adult contemporary, oldies, sports/news/talk, and country. In each of the radio markets served, the Debtors also provide radio broadcast advertising services to local, regional and national advertising customers.

8. The Debtors' outdoor advertising business consists of approximately 5,200 display faces in the form of traditional outdoor advertising bulletins and posters affixed to billboard structures, bus stop shelters and building wall displays. While many of the Debtors' outdoor advertising displays are located on leased premises, in certain circumstances a Debtor either owns the premises on which its displays are located, or it relies upon easements to use the property. The Debtors' six (6) outdoor advertising markets consist of the following geographic areas: the surrounding areas of San Francisco, California; Myrtle Beach, South Carolina; Green Bay, Wisconsin; Northern Colorado (including the areas in and around Cheyenne, Wyoming, Western Kansas and Nebraska); and the States of Virginia and North Carolina.

9. The Debtors are headquartered in Greenwood Village, Colorado, and currently have just under 500 employees (part-time and full-time) in at least thirteen (13) markets across the United States.

3

## B.    Prepetition Creditors Financing Arrangements

10.    The Debtors do not have any publicly traded debt or securities.  Prior to the Petition Date, the Debtors financed their operations through borrowings under two credit facilities, as described below.

11.    First Lien Debt.  The Debtors' first lien secured debt arises under that certain Credit and Guaranty Agreement dated as of November 15, 2005 (as modified, amended or supplemented from time to time prior to the Petition Date, the "First Lien Credit Agreement"), among NM OpCo as borrower, NM Group and the other Debtors (except NM Investors) as guarantors, the various lenders thereunder (the "First Lien Lenders"), Wilmington Trust FSB as successor administrative agent and collateral agent  (the "First Lien Agent"),[3] and the other parties thereto.  As of the Petition Date, the Debtors owed the First Lien Lenders approximately $162.3 million (including accrued but unpaid interest) (the "First Lien Debt") under the First Lien Credit Agreement, plus an additional approximately $2.9 million in certain interest rate swap obligations.  The First Lien Debt is secured by lien on substantially all of the Debtors' assets, including a pledge of the capital stock of each of NM Group's direct and indirect subsidiaries (the "Prepetition Collateral").

12.    Second Lien Debt.  The Debtors' second lien secured debt arises under that certain Second Lien Credit and Guaranty Agreement dated as of November 15, 2005 (as modified, amended or supplemented from time to time prior to the Petition Date, the "Second Lien Credit Agreement"), among NM OpCo as borrower, NM Group and the other Debtors (except NM Investors) as guarantors, the various lenders thereunder (the "Second Lien Lenders," together with the First Lien Lenders, the "Prepetition Lenders"), NexBank, SSB as

---

[3]    Shortly before the Petition Date, Wilmington Trust FSB replaced General Electric Capital Corporation as the administrative and collateral agent.

administrative agent (the "Second Lien Agent"), and the other parties thereto. As of the Petition Date, the Debtors owed the Second Lien Lenders approximately $89.6 million (including accrued but unpaid interest) (the "Second Lien Debt") under the Second Lien Credit Agreement. The Second Lien Debt is secured by a second lien on the Prepetition Collateral.

13.     There is an inter-creditor agreement among the Company, the First Lien Agent and the Second Lien Agent governing the parties' relative rights in the Prepetition Collateral and other related matters vis-à-vis the First Lien Credit Agreement and the Second Lien Credit Agreement, and the First Lien Debt and the Second Lien Debt.

14.     Prior to the Petition Date, by letters dated March 23, April 20 and June 5, 2009, the First Lien Agent notified the Debtors of the occurrence of certain events of default under the First Lien Credit Agreement. By letters dated March 25, April 23, June 12 and July 3, 2009, the Second Lien Agent notified the Debtors of the occurrence of certain events of default under the Second Lien Credit Agreement. Due to such defaults under the First Lien Credit Agreement, the Debtors have been paying interest to the First Lien Lenders at the default rate under the First Lien Credit Agreement since March 31, 2009. The Debtors did not make the required interest payment to the Second Lien Lenders on March 31, 2009, and have not made further interest payments to the Second Lien Lenders.

## C.     Restructuring Efforts and the Bankruptcy Filings

15.     Due to declining revenues in the radio and out-of-home advertising industries and the economic downturn that began in or around December 2007 and escalated during 2008,[4] the Company's profitability has suffered. As a result, in or around March 2009, Company hired Alvarez & Marsal Securities, LLC ("A&M") as its financial advisor to advise the Company on

---

[4]     Both radio and outdoor advertising revenues tend to be tied to the overall health of the U.S. economy, and has a positive correlation to nominal GDP growth.

5

potential restructuring initiatives and to assist with examining and evaluating various strategic alternatives to address the Debtors' over-leveraged capital structure. In connection therewith, the Debtors commenced negotiations with their Prepetition Lenders regarding the terms of a consensual restructuring to de-lever the Company and provide the Debtors with financial flexibility on a go-forward basis.

16. Extensive discussions with the Prepetition Lenders continued throughout 2009, as did discussions with other potential transaction parties. Eventually, the Debtors reached an agreement in principle with two of their Second Lien Lenders -- Strategic Value Partners LLC and Angelo, Gordon & Co., L.P. (together, the "Second Lien Lead Investors") -- for a consensual restructuring pursuant to a chapter 11 plan of reorganization (the "Plan") whereby, among other things: (i) the First Lien Debt and general unsecured claims will be unimpaired and paid in full through (a) a $55 million equity investment by the Second Lien Lead Investors (the "Equity Investment"), (b) $127.5 million in debt (exit) financing and (c) cash on hand; (ii) the Second Lien Debt will be converted into 95% of the equity in reorganized NM Group (subject to dilution as set forth in the Restructuring Term Sheet (defined below)); and (iii) common shares representing 66.67% of the equity in Reorganized NM Group will be issued to the Second Lien Lead Investors in exchange for the Equity Investment (subject to dilution as set forth in the Restructuring Term Sheet).[5] The Second Lien Lead Investors have agreed to "back stop" the $127.5 million in exit financing such that if the Debtors are unable to secure such exit financing in the capital markets, or are unable to secure exit financing on terms equal to or better than the terms of the back-stop, the Second Lien Lead Investors will supply the financing.

---

[5] The common shares to be issued to the Second Lien Lead Investors shall, *inter alia*, be of a different class than those to be issued to other constituents under the Plan, and enjoy a liquidation preference over such other common shares, all as set forth in the Restructuring Term Sheet and the attachments thereto.

6

17.     The terms of the above-described consensual restructuring are reflected in a term sheet (the "Restructuring Term Sheet") which sets forth the specific terms to be contained in the Plan. The Restructuring Term Sheet is attached as Exhibit "A" to the Restructuring Support Agreement (the "RSA"), which, in turn, is attached as Exhibit "A" to the Declaration of Eric W. Neumann in Support of Chapter 11 Petitions and First Day Motions (the "Neumann Declaration")). In connection therewith, the Second Lien Lead Investors have agreed to provide up to $20 million in debtor in possession financing to the Debtors on a junior basis.[6]

18.     To evidence their support of the above, the Second Lien Lead Investors and certain other Second Lien Lenders have executed the RSA, pursuant to which the parties thereto, including Second Lien Lenders representing approximately 86% in number and approximately 89% in dollar amount of holders of Second Lien Debt have agreed to support a Plan for the Debtors embodying the terms contained therein and in the Restructuring Term Sheet.

19.     After careful consideration of all available alternatives, the Debtors determined that implementing a reorganization pursuant to the terms set forth in the RSA, the Restructuring Term Sheet and the attachments thereto, and commencement of the chapter 11 cases, was the best way to maximize the value of the business and recoveries for all of the Debtors' stakeholders.[7]

20.     The Debtors were originally poised to prepare a chapter 11 plan and solicit acceptances thereof outside of bankruptcy and then file prepackaged chapter 11 cases (a "prepak") with all necessary acceptances in hand. However, on December 10, 2009, the First

---

[6]     The above summary of the terms of the Restructuring Term Sheet does not include a description of all of the terms and conditions of the Restructuring Term Sheet or other key provisions to be included in the Plan. As a result, the summary herein is qualified in its entirety by reference to specifics of the Restructuring Term Sheet, the RSA and attachments thereto.

[7]     It is expected that, as part of the reorganization process, NM Investors will be dissolved.

Lien Agent swept the vast majority of the Debtors' cash, which precipitated the need to abandon the prepak and file for bankruptcy promptly, on a pre-arranged basis, in order to implement the transactions contemplated by the RSA and the Restructuring Term Sheet.

## RELIEF REQUESTED

21.     By this Motion, the Debtors respectfully request entry of (i) an interim order (the "Interim DIP Order") and a final order (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders"), substantially in the form of Exhibit "B" attached hereto, authorizing the Debtors to obtain the DIP Financing (defined below), use the cash collateral of the Second Lien Lenders and granting adequate protection to the Second Lien Lenders and (ii) an interim cash collateral order ("Interim Cash Collateral Order") and Final Cash Collateral Order ("Final Cash Collateral Order," and together with the Interim Cash Collateral Order, the "Cash Collateral Orders"), substantially in the form of Exhibit "C" attached hereto, authorizing the Debtors to use the cash collateral of the First Lien Lenders and granting adequate protection to the First Lien Lenders, on the terms set forth below and herein:[8]

- authorizing and approving borrowing, on an interim basis, of up to $5 million (the "Interim DIP Loan") and on a final basis up to $20 million (the "DIP Financing"):

    (i)     pursuant to section 364(c)(1) of the Bankruptcy Code, providing superpriority claim status to the DIP Lenders, with such superpriority to be junior in priority to the Carve Out (defined below) and any superpriority claims granted to the First Lien Lenders, but senior to any superpriority claims granted to the Debtors' Second Lien Lenders;

    (ii)    pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a perfected first priority lien on all of the Debtors' property that is not subject to previously perfected, valid and non-avoidable liens in existence on the Petition Date (or valid liens in existence as of the

---

[8]     In addition to the matters expressly set forth herein, the Debtors also request that the Court authorize and approve other customary terms typically approved in connection with DIP financing and cash collateral matters, as more fully set forth in the Interim DIP Order and the Interim Cash Collateral Order.

Petition Date that are subsequently perfected pursuant to section 546(b) of the Bankruptcy Code);

    (iii)    pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a perfected junior lien on all of the Debtors' property that is subject to perfected, valid and non-avoidable liens in existence as of the Petition Date, including the liens securing the First Lien Debt (or valid liens in existence as of the Petition Date that are subsequently perfected pursuant to section 546(b) of the Bankruptcy Code), except in each case as described in paragraph (iv) below; and

    (iv)    pursuant to section 364(d)(1) of the Bankruptcy Code, secured by a perfected priming lien on, and security interest in, all of the Debtors' existing and after acquired property that is subject to valid, perfected and non-avoidable liens in existence as of the Petition Date to secure the Second Lien Debt and all present and after acquired property that is presently subject to other junior liens, provided that such priming lien is junior in all respects to the liens granted to the First Lien Lenders including any replacement liens granted to the First Lien Lenders as adequate protection;

- authorizing and approving the Debtors' use of the Prepetition Lenders' cash collateral ("Cash Collateral"), pursuant to section 363(c)(2) of the Bankruptcy Code and providing to the Prepetition Lenders, under sections 361 and 363(e) of the Bankruptcy Code, adequate protection for the use of such Cash Collateral in the form of replacement liens and superpriority claims to the extent of any diminution of value of such collateral, as well as (i) the payment of the reasonable fees and expenses of the First Lien Agent and the Second Lien Agent and (ii) payment of default interest to the First Lien Lenders as and when due under the Fist Lien Credit Agreement (all as set forth more fully herein and in the DIP Orders and the Cash Collateral Orders);

- modifying the automatic stay under section 362(d) to permit the implementation of the terms and conditions of the DIP Orders and Cash Collateral Orders and the granting and perfection of the liens and superpriority claims contemplated thereby; and

- scheduling a final hearing on the Motion in accordance with the time frames established by Bankruptcy Rule 4001(c) (the "Final Hearing") and approving the form and manner of notice to parties in interest of the Final Hearing and the DIP Credit Agreement (as defined below).

## THE PROPOSED FINANCING

22.    Prior to the Petition Date, the Debtors and A&M surveyed various sources of postpetition financing, including financing from the Debtors' Second Lien Lenders and unrelated

third parties. The only parties to provide a term sheet for DIP financing — on a basis junior to the First Lien Debt — were the Second Lien Lead Investors.[9]

23.     In exploring the Debtors' options, the Debtors and A&M recognized that the Prepetition Lenders are secured by first and second liens on substantially all of the Debtors' assets such that (i) their liens would have to be primed by any liens securing the DIP financing or (ii) the Debtors would have to find a postpetition lender willing to extend credit junior to the Prepetition Lenders' liens. The Debtors were unable to solicit any proposals for a DIP loan junior only to the First Lien Debt (never mind a DIP junior to both the First Lien Debt and the Second Lien Debt), and the Debtors were advised by the Prepetition Lenders that they would not consent to being primed by another lender.

24.     However, a subset of the Second Lien Lenders -- the Second Lien Lead Investors (who are the proposed "DIP Lenders") -- were willing to extend DIP financing on the terms described herein that is junior to the First Lien Debt but primes the Second Lien Debt. The Debtors are informed that the Second Lien Lenders do not oppose the DIP Financing sought herein, and indeed consent to being primed by the proposed DIP Financing, subject to the grant of adequate protection described herein and in the DIP Orders.

25.     The Debtors and the DIP Lenders engaged in arms' length negotiations with respect to the terms of the proposed DIP Financing, and have also agreed upon an Initial Budget (as defined below and attached to the Interim DIP Order), covering the first 13-weeks following the Petition Date. Based upon the facts and circumstances of these chapter 11 cases, as well as the Debtors' sound business judgment after consultation with their advisors, the Debtors have

---

[9]     The Debtors did not explore DIP financing with the First Lien Lenders because (i) the DIP Financing contemplated herein is part of, and in furtherance of, the overall restructuring plan negotiated among the Debtors and the Second Lien Lead Investors, and (ii) the First Lien Agent swept over $20 million in cash from the Debtors' bank accounts approximately one week prior to the Petition Date, leaving the Debtors with only $5 million of liquidity.

determined that financing on the terms and conditions set forth herein and in the term sheet attached hereto as Exhibit "A" (the "DIP Term Sheet") are the most favorable available to the Debtors under the circumstances.

26.     The Debtors have an immediate need to obtain the DIP Financing and use Cash Collateral in order to allow the business to continue uninterrupted, preserve their going concern value, make payroll and satisfy other working capital and general corporate needs.

27.     The salient provisions of the DIP Financing, as set forth in the DIP Term Sheet, are as follows:[10]

| | |
|---|---|
| Borrower: | NextMedia Operating, Inc. (the "Borrower"). |
| Guarantors: | NextMedia Group, Inc. and the subsidiaries of the Borrower (collectively, the "Guarantors", and together with the Borrower, the "Loan Parties"). |
| Lenders: | Certain funds and their respective affiliates managed by the Second Lien Lead Investors or their affiliates and such other financial institutions or entities acceptable to the Second Lien Lead Investors (including assignees thereof, collectively, the "DIP Lenders"). |

---

[10]     Due to the relatively short period in which these chapter 11 cases were commenced following the sweep of the Debtors' cash, the Interim DIP Loan will be made pursuant to the terms and conditions contained in the DIP Term Sheet and the Interim DIP Order. A form of DIP financing credit agreement (the "DIP Credit Agreement") will be filed with this Court as soon as possible following entry of the Interim DIP Order but no later than five (5) business days prior to the Final Hearing. The description herein of the matters contained in the DIP Term Sheet are qualified in their entirety by reference to the actual terms thereof.

11

| | |
|---|---|
| <u>Term Loan Commitment and Availability</u>: | A six-month term loan facility (the "<u>DIP Facility</u>") in the amount of $20 million (the loans thereunder, the "<u>DIP Loans</u>"). The DIP Loans shall be repaid on the earlier to occur of (x) the six month anniversary of the DIP Closing Date referred to below (as may be extended pursuant to the terms set forth below, the "<u>DIP Maturity Date</u>"), (y) the consummation of a chapter 11 plan for the Debtors (a "<u>Plan</u>"); <u>provided</u> that the DIP Maturity Date shall be extended without any fee for up to three months if (1) the Plan has been confirmed by the Bankruptcy Court and (2) the only outstanding condition precedent to consummation of the Plan is the Federal Communications Commission's ("<u>FCC</u>") approval of the restructuring contemplated by the Plan and (z) upon the mutual agreement of the DIP Lenders and the Borrower. |
| | The DIP Loans shall be made in no more than four drawings of $5 million each, with a first draw on the DIP Closing Date and the subsequent draws no earlier than one business day after the entry of the Final DIP Order approving the DIP Facility and subject to other terms and conditions to be set forth in the DIP Credit Agreement. |
| | In the event Borrower does not secure Bankruptcy Court approval of the DIP Facility, no fees of any kind shall be payable in respect thereof. In the event Borrower secures Bankruptcy Court approval for the DIP Facility but does not draw thereon, only the Commitment Fee called for therein shall be payable. |
| <u>Purpose</u>: | The proceeds of the DIP Loans shall be used for working capital and other general corporate purposes of the Loan Parties in accordance with the Budget (as defined below). |
| <u>Commitment Fee</u>: | 3% of the DIP Facility, to be paid on the DIP Closing Date ratably to each DIP Lender based upon its commitment under the DIP Facility. |
| <u>Interest Rate</u>: | LIBOR (to be defined in a manner to be agreed upon, including a floor of 2.5%) <u>plus</u> 11% or, at the Borrower's option, ABR (to be defined in a manner to be agreed upon, including a floor of 3.5%) <u>plus</u> 10%, payable monthly in arrears. Prior to entry of the Final DIP Order, LIBOR shall equal 2.5% and ABR shall equal 3.5%. |
| <u>Default Interest</u>: | Upon the occurrence and during the continuance of any event of default under the DIP Facility, interest shall be payable on all outstanding obligations on demand at 2.0% above the then applicable rate. |
| <u>Priority and Liens</u>: | All DIP Loans and other obligations under the DIP Facility (and |

DAL:754784 7

all guaranties of the foregoing by the Guarantors), shall at all times:

- pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority claim status in the Cases with such superpriority claims to be junior in priority to any superpriority claims granted to the Debtors' First Lien Lenders but senior to any superpriority claims granted to the Debtors' Second Lien Lenders; and

- pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Debtors' respective estates in the cases that is not subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code; and

- pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Debtors' respective estates in the cases that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code, except in each case as described below in the next paragraph; and

- pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a perfected priming lien on, and security interest in, all present and after acquired property of the Debtors' respective estates that is subject to a valid, perfected and non-avoidable liens in existence at the time of the commencement of the cases to secure the Second Lien Credit Agreement and all present and after-acquired assets that are presently subject to liens that are junior to the liens that secure the Second Lien Credit Agreement, provided that the priming liens described in this paragraph shall be junior in all respects to the liens granted to the First Lien Lenders, including any replacement liens granted to such lenders as adequate protection;

subject in each case to, in the event of the occurrence and during the continuance of an Event of Default, a carve-out of $750,000 for unpaid fees and expenses of professionals and

the United States Trustee incurred after an Event of Default (the "Carve Out").

| | |
|---|---|
| Optional and Mandatory Prepayments: | Market terms for financings of this type. |

Conditions to Initial of Extensions Credit:

Market terms for financings of this type and, in addition, the making of the initial extension of credit shall be subject to the satisfaction of the following conditions (the date on which all such conditions precedent shall be satisfied, the "DIP Closing Date"):

a.    The Interim DIP Order, in form and substance reasonably satisfactory to the DIP Lenders, shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not be subject to any stay.

b.    The administrative agent for the DIP Facility shall have received (i) a monthly budget for the six months following the Petition Date and (ii) a thirteen-week budget for the period of thirteen weeks following the Petition Date (the "Initial Budget"), in each case in form and substance reasonably satisfactory to the DIP Lenders.

Conditions to Subsequent Extensions of Credit

a.    The Final DIP Order, substantially in the form of the Interim DIP Order and otherwise in form and substance reasonably satisfactory to the DIP Lenders, shall have been entered by the Bankruptcy Court within 30 days after entry of the Interim DIP Order, shall be in full force and effect and shall not be subject to any stay.

b.    The accuracy in all material respects of all representations and warranties in the DIP Credit Agreement.

c.    There being no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit.

Adequate Protection

Usual and customary adequate protection in the form of (i) superpriority claims and replacement liens, which in the case of the Debtors' First Lien Lenders shall be senior to all other prepetition and postpetition liens, (ii) payment of reasonable fees and expenses of the administrative agent under the Second Lien Credit Agreement, including payment of the reasonable fees and expenses of Broadpoint Capital, Inc., Dechert LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP (solely as FCC counsel) in their capacities as professional advisors to the second

14

|                                          | lien administrative agent, as well as the reasonable fees and expenses of one local counsel to the second lien administrative agent, to the extent applicable and (iii) financial reporting in accordance with the terms of the second lien credit agreement. |
|------------------------------------------|------|

Events of Default:  Market terms for financings of this type, as well as a "Termination Event" occurring under the RSA and not being waived in accordance with the terms thereunder, as more specifically set forth in the Interim DIP Order.

Representations and Warranties; Financial and Other Covenants; Assignments and Participations; Indemnification; Voting   Market terms for financings of this type.

Expenses:  The Borrower will pay or reimburse the DIP Lenders for their reasonable out-of-pocket fees and expenses incurred in connection with the Cases.

Governing Law:  State of New York, except as governed by the Bankruptcy Code and the rules, regulations and policies of the FCC, including but not limited to any restrictions on pledging FCC licenses.

28.     The matters described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi) are set forth in the following sections of the DIP Term Sheet and the proposed form of Interim DIP Order:

(a)     ***Grant of Priority or a Lien on Property of the Estate.*** Interim DIP Order ¶¶6 and 7; Term Sheet: "Priority and Liens."

(b)     ***Adequate Protection or Priority for a Claim that Arose Before the Commencement of the Case.*** Interim DIP Order ¶13; Term Sheet: "Priority and Liens" and "Adequate Protection."

(c)     ***Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose Before the Commencement of the Case.*** Interim DIP Order ¶3.

(d)     ***Waiver or Modification of the Automatic Stay.*** Interim DIP Order ¶8.

(e)     ***Waiver or Modification of Authority to File a Plan, Seek an Extension of Time in which the Debtor has the Exclusive Right to File a Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit.*** N/A

15

(f) ***Establishment of Deadlines for Filing a Plan, for Approval of a Disclosure Statement, for a Hearing on Confirmation, or for Entry of a Confirmation Order.*** N/A

(g) ***Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien.*** Interim DIP Order ¶15.

(h) ***Release, Waiver, or Limitation on any Claim or Cause of Action Belonging to the Estate.*** Interim DIP Order ¶¶3(c) and 17.

(i) ***Indemnification of Any Entity.*** N/A

(j) ***Release, Waiver or Limitation on Rights Under 11 U.S.C. § 506(c).*** Interim DIP Order ¶9 (subject to entry of the Final DIP Order).

(k) ***Liens Granted on Claims Arising Under Chapter 5.*** N/A

29.     The terms and conditions of the DIP Financing have been negotiated at arms' length and in good faith by the Debtors and the DIP Lenders. The Debtors submit that the terms and conditions of the DIP Financing are fair and reasonable under the circumstances and reflect the most favorable terms upon which the Debtors could obtain the necessary funding.

30.     The Debtors believe the following provisions of the DIP Facility must be highlighted pursuant to Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"):

(a) ***Binding the Estate to Validity, Perfection, or Amount of Secured Creditor's Prepetition Lien.*** Interim DIP Order ¶¶3(a), (b) and (c); Term Sheet: "Priority and Liens."

(b) ***Waiver of Rights of the Estate Under 11 U.S.C. § 506(c).*** Interim DIP Order ¶9 (subject to entry of the Final DIP Order).

(c) ***Granting Liens Solely on Debtors' Section 544, 545, 546, 547, 548 and 549 Claims and Causes of Action.*** Interim DIP Order ¶¶V and 7(a) (liens to be granted on proceeds of chapter 5 causes of action, subject to entry of Final DIP Order).

(d) ***Deeming Prepetition Secured Debt to be Postpetition Debt or Using Postpetition Loans from Prepetition Secured Creditor to Pay Part or All of the Secured Creditor's Prepetition Debt.*** N/A

16

31.     With respect to the request to use the Cash Collateral, the matters described in Bankruptcy Rule 4001(b)(1)(B)(i)-(iv) are set forth at the following sections of the Interim Cash Collateral Order (with respect to the First Lien Lenders) and the Interim DIP Order (with respect to the Second Lien Lenders)

(a)     ***Name of Each Entity with Interest in the Cash Collateral.***  Interim Cash Collateral Order ¶E; Interim DIP Order ¶¶3(b), 11.

(b)     ***Purposes and Use of Cash Collateral.***  Interim Cash Collateral Order ¶2; Interim DIP Order ¶12.

(c)     ***Material Terms, Including Duration, of Use of Cash Collateral.***  Interim Cash Collateral Order ¶2; Interim DIP Order ¶12.

(d)     ***Liens, Cash Payments, or Other Adequate Protection to Be Provided to Each Entity with Interest in Cash Collateral.***  Interim Cash Collateral Order ¶3; Interim DIP Order ¶13.

## AUTHORITY

**A.     The DIP Facility Should Be Authorized**

32.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c). Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

33.	As discussed above, despite their efforts, the Debtors have been unable to (a) procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, (iii) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code, (iv) without liens on the Prepetition Collateral junior to the First Lien Lenders' liens thereon, and senior priming liens with respect to the Second Lien Lenders liens on such Prepetition Collateral, pursuant to section 364(d) of the Bankruptcy Code, or (b) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than the proposed DIP Financing. Therefore, the Debtors propose to obtain the financing set forth in the DIP Term Sheet by providing, *inter alia*, superpriority claims, security interests, and liens pursuant to sections 364(c)(1), (2), (3) and (d) of the Bankruptcy Code, with such claims, security interests and liens to be junior to those held by or granted to the Debtors' First Lien Lenders, but senior to those held by the Second Lien Lenders, all as set forth more fully herein and in the DIP Term Sheet.[11]

34.	Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Term Sheet with the DIP Lenders at arms' length. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, a debtor should be granted considerable deference in acting in accordance therewith. *See, e g, Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re U.S. Mineral Products Co.*, No. 01-2471 (JKF), 2005 WL 5887218, at *4 (Bankr. D. Del. Nov. 29, 2005) (finding that the post-

---

[11]	As noted previously, the Second Lien Lenders have consented to the priming of their liens by the DIP Financing, subject to the grant of adequate protection described herein and in the Interim DIP Order.

petition loan documents and terms of the exit loan facility reflected the trustee's exercise of prudent business judgment consistent with his fiduciary duties); *In re Trans World Airlines, Inc*, No. 01-00056 (PJW), 2001 WL 1820326, at *10-11 (Bankr. D. Del. Apr. 2, 2001) (rejecting a financing proposal of a bidder for the debtor's assets, finding it improper to substitute the court's judgment for the debtor's and noting that, in any event, the debtor had previously considered a DIP financing alternative and in the exercise of its business judgment, rejected it as a solution to its financial crisis); *In re Ames Dep't Stores, Inc*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

35. Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. *In re Snowshoe Co*, 789 F.2d 1085, 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re 495 Central Park Ave. Corp*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); *In re Aqua Assocs*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming loan was necessary if debtor were to obtain funding).

36. Here, as previously stated, the Debtors and A&M contacted several sources of potential funding and none were willing to provide a DIP loan that was junior to the First Lien

DAL:754784 7

Lenders and the Second Lien Lenders (nor were any sources of funding willing to provide DIP financing junior only to the First Lien Lenders). As set forth above, the priorities granted to the DIP Lenders will be junior to the First Lien Lenders, but senior to the Second Lien Lenders, and the DIP Lenders were the only sources of funding willing to provide DIP Financing on this basis.

37. A debtor may borrow money under section 364(d)(1) of the Bankruptcy Code if the debtor meets its burden of establishing that the holder of the lien to be subordinated is adequately protected. *RTC v. Swedeland Development Group, Inc. (In re Swedeland Development Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) (noting that section 364(d)(1) of the Bankruptcy Code provides that a bankruptcy court can authorize DIP financing supported by a superpriority lien only if the secured creditor who is to be primed is adequately protected, and that the burden to establish adequate protection falls on the debtor); *see also, e.g., Aqua Assocs.*, 123 B.R. at 196 (noting that section 364(d)(1)(B) requires the movant to prove that the lender who is subject to being primed will be adequately protected in the face of the loan transaction). The debtor also has the burden of demonstrating that (i) the credit transaction is necessary to preserve the estate and (ii) the terms of the transaction are fair and reasonable given the circumstances. *Id.*

38. Substantially all of the Debtors' assets are encumbered and, despite the diligent efforts of the Debtors and A&M, the Debtors have been unable to procure the required funding absent the grant of the proposed superpriority claims and priming liens (vis-<-vis the Second Lien Lenders). The Debtors have negotiated the best terms available to obtain funding they need to maintain sufficient liquidity to preserve their assets over the course of their chapter 11 cases and reach Plan confirmation. Moreover, Second Lien Lenders representing approximately 86%

in number and approximately 89% in dollar amount of holders of Second Lien Debt have agreed to the relief requested herein (as reflected by their signatures to the RSA) .

39.    The terms and conditions of the DIP Credit Facility are fair and reasonable, and were negotiated by well-represented, independent parties in good faith and at arms' length. The Debtors believe that the adequate protection and replacement liens provided to the Prepetition Lenders furnish the same level of protection as if there had not been superpriority financing.

40.    The ability of the Debtors to continue to operate their businesses, preserve their enterprise value and reorganize under chapter 11 depends upon their ability to obtain the DIP Financing (which will ultimately be memorialized in the DIP Credit Agreement). As a result, the Debtors respectfully submit that the proposed DIP Financing is a proper exercise of their sound business judgment, is in the best interests of the Debtors and their respective estates, creditors, and equity interest holders, and that the financing on the terms provided in the DIP Term Sheet should be approved in all respects.

## B.    The Use of Cash Collateral Should Be Approved

41.    Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Debtors require the use of the Cash Collateral to fund their day-to-day operations. Indeed, absent such relief, the Debtors' business will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors. The interests of the Prepetition Lenders in the Debtors' Cash Collateral will be protected by the adequate protection set forth below.

21

C.    **The Proposed Adequate Protection Should be Authorized**

42.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code sets forth the forms of adequate protection which may be provided, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. *See MNBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987); *Martin v. U.S. (In re Martin)*, 761 F.2d 472 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 856 (Bankr. W.D. Pa. 2003). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 554 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

43.    As noted above, as adequate protection for their interests, the Debtors propose to provide the following adequate protection to the First Lien Lenders, to the extent of any diminution in the value of their collateral:

- superpriority claims and replacement liens, pursuant to sections 361(2), 363(e), 503(b)(1), 507(a)(2) and 507(b) of the Bankruptcy Code, with such (a) superpriority claims to be senior to all other postpetition superpriority claims and (b) replacement liens to be (1) senior and first priority on all postpetition collateral not otherwise encumbered by a validly perfected and unavoidable lien on the Petition Date, (2) senior and first priority priming lien upon (A) that portion of postpetition collateral that constitutes Prepetition Collateral and (B) postpetition collateral subject to a lien that is junior to the liens securing the First Lien Debt, and (3) junior and second priority on all postpetition

22

collateral (other that that described in the preceding clause (1)) which is subject to a validly perfected and enforceable lien as of the Petition Date;

- payment of all accrued and unpaid interest on the First Lien Debt, at the default rate, as and when due under the terms of the First Lien Credit Agreement until the effective date of a confirmed chapter 11 plan; and

- payment of the First Lien Agent's reasonable fees and expenses under the First Lien Credit Agreement, including the reasonable fees and expenses of the First Lien Agent's advisors.

44.    The First Lien Lenders are not being primed by the DIP Financing and the Debtors are, in essence, providing them with their rights under the First Lien Credit Agreement until the First Lien Debt is paid in full pursuant to the Plan (*i.e.*, current-pay default interest, replacement liens, the payment of reasonable fees and expenses of the First Lien Agent and superpriority claims, all as set forth herein and in the Interim Cash Collateral Order). The First Lien Lenders are, therefore, adequately protected for the Debtors' use of their Cash Collateral.

45.    As adequate protection for their interests, the Debtors propose to provide the following adequate protection to the Second Lien Lenders to the extent of any diminution in the value of their collateral:

- superpriority claims and replacement liens, pursuant to sections 361(2), 363(c)(2), 364(d)(1), 503(b)(1), 507(a)(2) and 507(b) of the Bankruptcy Code with such (a) superpriority claims to be senior to all other postpetition superpriority claims except the superpriority claims granted to the First Lien Lenders and the DIP Lenders and (b) replacement liens on all of the property now owed or hereafter acquired by the Debtors, whether or not subject to any other liens, with such liens to be subordinate only to the liens of the First Lien Lenders and the DIP Lenders;

- payment of the Second Lien Agent's reasonable fees and expenses under the Second Lien Credit Agreement, including the reasonable fees and expenses of the Second Lien Agent's advisors (who are Broadpoint Capital, Inc., Dechert LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP (solely as FCC counsel) as well as one local counsel); and

- provide the Second Lien Agent such financial reporting that is reported to, or required to be reported to, the DIP Lenders.

46. Without access to the proposed DIP Facility and use of the Cash Collateral, the Debtors' liquidity will quickly dry up, harming operations and the value of the business. In contrast, the value of the Prepetition Lenders' interest in their collateral is preserved, if not increased, by the DIP Facility and use of Cash Collateral because it ensures the uninterrupted continuance of the Debtors' operations which will generate cash and preserve the Debtors' enterprise value.

47. The Debtors believe, and respectfully submit, that replacement liens, cash payments and other protections offered to the Prepetition Lenders as adequate protection will, when taken together, sufficiently protect their interests in the collateral. Moreover, the Second Lien Lenders have consented to the adequate protection of their interests proposed herein. Accordingly, the proposed adequate protection is fair and reasonable and sufficient to satisfy the requirement of Bankruptcy Code sections 363(c)(2) and (e) and 364(d).

**D.    The Automatic Stay Should be Modified on a Limited Basis**

48. The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to (i) grant the security interests, liens, and superpriority claims described above and to allow the DIP Lenders and the Debtors to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (ii) implement the terms of the proposed DIP Orders and Cash Collateral Orders.

49. Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

DAL:754784 7

E.    **Interim Approval Should Be Granted**

50.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of post-petition credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

51.    Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on this Motion and (a) authorize the Debtors to use Cash Collateral and borrow up to $5 million under the DIP Term Sheet on an interim basis, pending entry of the Final DIP Order and Final Cash Collateral Order, in order to (i) maintain and finance the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest and (b) schedule the Final Hearing.

52.    Absent authorization from the Court to use Cash Collateral and obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtors will be immediately and irreparably harmed. The use of Cash Collateral and availability of interim loans under the DIP Term Sheet will provide necessary assurance to the Debtors' vendors, employees, and clients of the Debtors' ability to meet their near-term obligations. Failure to meet these obligations and to provide these assurances likely would have a long-term negative impact on the value of the Debtors' businesses, to the detriment of all parties in interest. Furthermore, the lack of interim borrowing ability would result in accelerated cash demands on

the Debtors. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating their reorganization efforts.

**E.      Form and Manner of Notice of Final Hearing**

53.      The Debtors propose to (i) no later than three (3) business days following entry of the Interim DIP Order and the Interim Cash Collateral Order, file with the Court and cause to be served upon parties in interest and any statutory committee appointed in these chapter 11 cases notice of Final Hearing and a copy of the Interim DIP Order and Interim Cash Collateral Order and apprising such parties that the DIP Credit Agreement will be filed with the Court and made available at least five (5) business days prior to the Final Hearing, and (ii) no later than five (5) days prior to the Final Hearing, file the DIP Credit Agreement with the Court and make the same available to all parties in interest.

**NOTICE**

54.      Notice of this Motion shall be provided to (i) the office of the United States Trustee for the District of Delaware, (ii) the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis, (iii) counsel to the First Lien Agent and the Second Lien Agent, (iv) counsel to the Second Lien Lead Investors, (v) all other parties, if any, known by the Debtors to hold a security interest in the Debtors' assets; and (vi) all other parties requesting notice in these chapter 11 cases. The Debtors respectfully submit that no other or further notice need be provided.

55.      As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m). Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

26

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court (i) grant the relief requested herein and (ii) grant such other and further relief as may be just and proper.

Respectfully submitted this 21st day of December, 2009.

RICHARDS, LAYTON & FINGER, P.A.

By: _____
    Paul N. Heath (Bar No. 3704)
    Michael J. Merchant (Bar No. 3854)
    Chun I. Jang (Bar No. 4790)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701
heath@rlf.com
merchant@rlf.com
jang@rlf.com

--and--

ANDREWS KURTH LLP
    Jason S. Brookner (*pro hac vice* pending)
    Texas State Bar No. 24033684
    Monica S. Blacker (*pro hac vice* pending)
    Texas State Bar No. 00796534
1717 Main Street, Suite 3700
Dallas, Texas 75201
Telephone: (214) 659-4400
Facsimile: (214) 659-4401
jbrookner@akllp.com
mblacker@akllp.com

**PROPOSED ATTORNEYS FOR THE DEBTORS AND DEBTORS IN POSSESSION**

DAL:754784.7

# EXHIBIT A

## DIP TERM SHEET

## NEXTMEDIA OPERATING, INC.

### Outline of Terms and Conditions for
### Debtor-in-Possession Term Loan Facility
### in the Amount of $20,000,000

Borrower:

NextMedia Operating, Inc., a Delaware corporation (the "Borrower"), as a debtor-in-possession in a case (the "Debtor's Case") pending under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

Guarantors:

NextMedia Group, Inc. and the subsidiaries of the Borrower, each of which is a debtor-in-possession in a case (together with the Debtor's Case, the "Cases"; the date of the commencement of the Cases, the "Petition Date") pending under Chapter 11 of the Bankruptcy Code (collectively, the "Guarantors", and, together with the Borrower, the "Loan Parties" or the "Debtors").

Lenders:

Certain funds and their respective affiliates managed by Strategic Value Partners LLC or its affiliates ("SVP") and certain funds and their respective affiliates managed by Angelo, Gordon & Co., L.P. or its affiliates ("Angelo, Gordon"; together with SVP, the "Second Lien Lead Investors") and such other financial institutions or entities acceptable to the Second Lien Lead Investors (including assignees thereof, collectively, the "DIP Lenders").

## FACILITIES

Term Loan Commitment and
Availability:

A six-month term loan facility (the "DIP Facility") in the amount of
$20,000,000 (the loans thereunder, the "DIP Loans"). The DIP Loans
shall be repaid on the earlier to occur of (x) the six month anniversary
of the Closing Date referred to below (as may be extended pursuant to
the terms set forth below, the "DIP Maturity Date"), (y) the
consummation of the Plan (as defined in the Restructuring Agreement
referred to below); provided that the DIP Maturity Date shall be
automatically extended (without any fee) to the 285th day after the
Petition Date if on the sixth month anniversary of the Closing Date
(1) the Plan has been confirmed by the Bankruptcy Court and (2) the
only outstanding condition precedent to consummation of the Plan is the
Federal Communications Commission's ("FCC") initial approval of the
restructuring contemplated by the Plan becoming a final order and
(z) upon the mutual agreement of the DIP Lenders and the Borrower.

The DIP Loans shall be made in no more than four drawings of $5
million each, with a first draw on the DIP Closing Date and the
subsequent draws no earlier than one business day after the entry of the
final order approving the DIP Facility and subject to other terms and
conditions to be agreed upon.

The Borrower shall not be, and is not, required to draw on any portion
of the DIP Facility, nor is Borrower required to file any motion with the
Bankruptcy Court to approve the DIP Facility. In the event Borrower
does not secure Bankruptcy Court approval of the DIP Facility, no fees
of any kind shall be payable in respect thereof. In the event Borrower
secures Bankruptcy Court approval for the DIP Facility but does not
draw thereon, only the Commitment Fee called for herein shall be
payable.

Purpose:

The proceeds of the DIP Loans shall be used for working capital and
other general corporate purposes of the Loan Parties in accordance with
the Budget (as defined below).

Commitment Fee:

3% of the DIP Facility, to be paid on the DIP Closing Date ratably to
each DIP Lender based upon its commitment under the DIP Facility.

Interest Rate:

LIBOR (to be defined in a manner to be agreed upon, including a floor
of 2.5%) plus 11% or, at the Borrower's option, ABR (to be defined in a
manner to be agreed upon, including a floor of 3.5%) plus 10%, payable
monthly in arrears.

Default Interest:

Upon the occurrence and during the continuance of any event of default
under the DIP Facility, interest shall be payable on all outstanding
obligations on demand at 2.0% above the then applicable rate.

## GENERAL PROVISIONS

Priority and Liens:

All DIP Loans and other obligations under the DIP Facility (and all
guaranties of the foregoing by the Guarantors), shall at all times:

I.       pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority claim status in the Cases with such superpriority claims to be junior in priority to any superpriority claims granted to the Debtors' first lien lenders but senior to any superpriority claims granted to the Debtors' second lien lenders; and

II.     pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Debtors' respective estates in the Cases that is not subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code; and

III.    pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Debtors' respective estates in the Cases that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, except in each case as described below in paragraph IV; and

IV.    pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected priming lien on, and security interest in, all present and after acquired property of the Debtors' respective estates that is subject to a valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases to secure the Second Lien Credit Agreement and all present and after-acquired assets that are presently subject to liens that are junior to the liens that secure the Second Lien Credit Agreement, provided that the priming liens described in this paragraph IV shall be junior in all respects to the liens granted to the first lien lenders, including any replacement liens granted to such lenders as adequate protection;

subject in each case to, in the event of the occurrence and during the continuance of an Event of Default, a carve-out of $750,000 for unpaid fees and expenses of professionals and the United States Trustee incurred after an Event of Default.

| | |
|---|---|
| <u>Optional and Mandatory Prepayments</u>: | Market terms for financings of this type. |
| <u>Conditions to Initial of Extensions Credit</u>: | Market terms for financings of this type and, in addition, the making of the initial extension of credit shall be subject to the satisfaction of the following conditions (the date on which all such conditions precedent shall be satisfied, the "<u>DIP Closing Date</u>"): |

      (a)    The interim order approving the DIP Facility and providing for

the use of the pre-petition lenders' cash collateral, in form and substance reasonably satisfactory to the DIP Lenders (the "<u>Interim Order</u>"), shall have been entered by the bankruptcy court having jurisdiction over the Cases (the "<u>Bankruptcy Court</u>"), shall be in full force and effect and shall not be subject to any stay.

(b)    The Administrative Agent shall have received (i) a monthly budget for the six months following the Petition Date and (ii) a thirteen-week budget for the period of thirteen weeks following the Petition Date (the "<u>Initial Budget</u>"), in each case in form and substance reasonably satisfactory to the DIP Lenders.

**Conditions to Subsequent Extensions of Credit**

(a)    The final order approving the DIP Facility, substantially in the form of the Interim Order and otherwise in form and substance reasonably satisfactory to the DIP Lenders, shall have been entered by the Bankruptcy Court within 30 days after entry of the Interim Order, shall be in full force and effect and shall not be subject to any stay.

(b)    The accuracy in all material respects of all representations and warranties in the Credit Documentation.

(c)    There being no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit.

**Adequate Protection**

Usual and customary adequate protection in the form of (i) superpriority claims and replacement liens, which in the case of the Debtors' first lien lenders shall be senior to all other pre-petition and post-petition liens, (ii) payment of reasonable fees and expenses of the administrative agents to the prepetition second lien credit agreement, including payment of the reasonable fees and expenses of Broadpoint Capital, Inc., Dechert LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP (solely as FCC counsel) in their capacities as professional advisors to the second lien administrative agent, as well as the reasonable fees and expenses of one local counsel to the second lien administrative agent, to the extent applicable and (iii) financial reporting in accordance with the terms of the Second Lien Credit Agreement.

**Events of Default:**

Market terms for financings of this type, as well as a "Termination Event" occurring under the Restructuring Support Agreement, dated as of December 19, 2009 (as amended, supplemented or otherwise modified from time to time, the "<u>Restructuring Agreement</u>") and not being waived in accordance with the terms thereunder.

<u>Representations and Warranties</u>; <u>Financial and Other Covenants</u>; <u>Assignments and Participations</u>; <u>Indemnification</u>; <u>Voting</u>

Market terms for financings of this type.

<u>Expenses:</u>

The Borrower will pay or reimburse the DIP Lenders for their

reasonable out-of-pocket fees and expenses incurred in connection with the Cases.

Governing Law:                State of New York, except as governed by the Bankruptcy Code and the rules, regulations and policies of the FCC, including but not limited to any restrictions on pledging FCC licenses.

## EXHIBIT B

## INTERIM DIP FINANCING ORDER

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| NEXTMEDIA GROUP, INC., *et al*, | § | Case No. 09-_____ (____) |
| | § | |
| Debtors. | § | Joint Administration Pending |

**INTERIM ORDER (I) AUTHORIZING AND APPROVING (1) DEBTOR IN POSSESSION FINANCING PURSUANT TO SECTIONS 364(C) AND 364(D) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 4001(c), (2) THE USE OF SECOND LIEN LENDERS' CASH COLLATERAL AND THE GRANT OF ADEQUATE PROTECTION PURSUANT TO SECTIONS 361 AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 4001(b) AND (3) MODIFICATION OF THE AUTOMATIC STAY UNDER SECTION 362 OF THE BANKRUPTCY CODE AND (II) SCHEDULING A FINAL HEARING AND APPROVING FORM AND MANNER OF NOTICE THEREOF**

Upon the motion, dated December 21, 2009 (the "Motion"), of NextMedia Operating, Inc. (the "Borrower"), NextMedia Group, Inc. ("NM Group") and the Borrower's subsidiaries (together with NM Group, the "Guarantors"), each as a debtor and debtor in possession (collectively, the "Debtors") in the above-captioned cases (the "Cases") commenced on December 21, 2009 (the "Petition Date") for interim and final orders under sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), seeking:

(I)  authorization for (a) the Borrower to obtain up to $20,000,000 in aggregate principal amount of postpetition financing (the "DIP Loans") from funds and affiliates of funds managed by Strategic Value Partners, LLC or its affiliates and funds and affiliates of funds managed by Angelo, Gordon & Co.,

L.P. or its affiliates (such funds, the "Lead DIP Lenders", and together with any other financial institution or entity acceptable to the Lead DIP Lenders, the "DIP Lenders") on the terms and conditions set forth in this interim order (this "Order"), the Final Order (as defined below), the term sheet attached hereto as Exhibit A (together with the DIP Commitment Letter (as defined below), the "DIP Term Sheet"), the DIP Credit Agreement and the other DIP Documents (each as defined below) and (b) the Guarantors to guarantee on a secured basis the Borrower's obligations in respect of the DIP Loans;

(II)     authorization for the Debtors to execute and deliver final documentation consistent with the DIP Term Sheet and to perform such other and further acts as may be necessary or appropriate in connection therewith, which final documents shall include (a) a Credit and Guaranty Agreement (the "DIP Credit Agreement") among the Borrower, the Guarantors and the DIP Lenders and (b) other agreements, documents and instruments delivered or executed in connection with the DIP Term Sheet and the DIP Credit Agreement, all of which shall be in form and substance acceptable to the Borrower, the Guarantors and the Lead DIP Lenders, shall incorporate the terms and conditions of the DIP Term Sheet and shall be filed with the Bankruptcy Court no later than five (5) business days prior to the date set for the Final Hearing referred to below (such documentation, together with the DIP Term Sheet and, when applicable, the DIP Credit Agreement, the "DIP Documents");

(III)     authorization for the Debtors to (a) use the Cash Collateral (as defined below) pursuant to section 363 of the Bankruptcy Code, and all other

Prepetition Collateral (as defined below) and (b) provide adequate protection to the lenders (the "Second Lien Lenders") under the Second Lien Credit and Guaranty Agreement, dated as of November 15, 2005 (as amended, supplemented or otherwise modified as of the Petition Date, the "Second Lien Credit Agreement"; and together with any other security, pledge or guaranty agreements and all other documentation executed in connection with any of the foregoing, each as amended, supplemented or otherwise modified as of the Petition Date, the "Second Lien Documents"), among the Borrower, the Guarantors, the Second Lien Lenders and Nexbank, SSB, as administrative agent and collateral agent for the Second Lien Lenders (in such capacities, the "Second Lien Agent");

(IV)    authorization for the Lead DIP Lenders, on behalf of the DIP Lenders, to exercise remedies upon the occurrence and continuance of an Event of Default (as defined below), including without limitation, upon the entry of an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code in respect of the Debtors' assets having a value in excess of $100,000;

(V)    subject to entry of the Final Order, authorization to grant liens to the DIP Lenders on the proceeds of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (collectively, the "Avoidance Actions");

(VI) subject to entry of the Final Order, the waiver by the Debtors of any right to seek to surcharge against the DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code;

(VII) to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of this Order (a) authorizing the Borrower, on an interim basis, to borrow under the DIP Term Sheet up to $5,000,000 of the DIP Loans to be used for working capital and general corporate purposes of the Debtors in accordance with Debtors' budget attached hereto as Exhibit B (including the variances thereto permitted under the DIP Documents and as such budget may be supplemented or modified in accordance with the terms hereof and the DIP Documents, the "Budget") and to authorize the Guarantors to guarantee on a secured basis the obligations of the Borrower with respect to the DIP Loans, (b) authorizing the Debtors to use the Cash Collateral and the other Prepetition Collateral and (c) granting adequate protection to the Second Lien Agent and the Second Lien Lenders; and

(VIII) to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") for this Court to consider entry of a final order (the "Final Order") authorizing the Borrower, on a final basis, to borrow under the DIP Credit Agreement the balance of the DIP Loans and to continue to use the other Prepetition Collateral and to authorize the Guarantors to guarantee, on a secured basis, the obligations of the Borrower with respect to the DIP Loans, and authorizing and approving, on a final basis, the relief requested in the Motion.

The Interim Hearing having been held by this Court on December [22], 2009, and upon the record made by the Debtors at the Interim Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1. *Jurisdiction.* This Court has core jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. *Notice.* Notice of the Motion, the relief requested therein and the Interim Hearing was served by the Debtors on their thirty largest unsecured creditors (on a consolidated basis), the Lead DIP Lenders, the First Lien Agent (as defined below), the Second Lien Agent and the United States Trustee for the District of Delaware (the "U.S. Trustee"). Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and the Interim Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c).

3. *Debtors' Stipulations.* Without prejudice to the rights of any other party (but subject to the limitations thereon contained in paragraphs 17 and 18 below) the Debtors admit, stipulate, and agree that:

(a) as of the Petition Date, the Debtors were truly and justly indebted to the Second Lien Agent and the Second Lien Lenders, without defense, counterclaim or offset of any kind, in the aggregate amount of not less than $89.6 million (including accrued and unpaid interest) in respect of loans made by the Second Lien Lenders pursuant to the Second Lien Documents, plus any fees and expenses (including fees and expenses of attorneys and advisors) as provided in the Second Lien Documents (collectively, the "Second Lien Obligations");

(b)     the liens and security interests granted by the Debtors to the Second Lien Agent, for the benefit of itself and the Second Lien Lenders, to secure the Second Lien Obligations are (i) valid, binding, perfected (except with respect to NM Texas, Inc.), enforceable, second priority liens on and security interests (subject to the First Lien Priority Liens (as defined in paragraph 19 below) and other permitted exceptions under the Second Lien Credit Agreement) in the personal and real property of such Debtors constituting "Collateral" under, and as defined in, the Second Lien Documents in respect of the Second Lien Obligations (together with the Cash Collateral, the "Prepetition Collateral"), (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject and subordinate only to (A) after giving effect to this Order, the Carve Out (as defined below) and the liens and security interests granted to secure the DIP Loans and the Adequate Protection Obligations (as defined below), (B) valid, perfected and unavoidable liens permitted under the Second Lien Documents to the extent such permitted liens are senior to the liens securing the Second Lien Obligations and (C) the First Lien Priority Liens;

(c)     (i) no portion of the Second Lien Obligations is subject to avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (ii) the Debtors do not have, and hereby forever release, any claims, counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, against the Second Lien Agent and the Second Lien Lenders, and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors.

4.     *Findings Regarding The DIP Loans*

(a)     Good cause has been shown for the entry of this Order.

(b)     The Debtors have an immediate need to obtain the DIP Loans and to use the Prepetition Collateral, including the Cash Collateral, in order to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, make payroll and satisfy other working capital and general corporate purposes of the Debtors. The Debtors' use of the Prepetition Collateral (including the Cash Collateral) is, therefore, necessary to ensure that the Debtors have sufficient working capital and liquidity to preserve and maintain the going concern value of the Debtors' estates.

(c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting the priming DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below), in each case (x) on the terms and conditions set forth in this Order and the DIP Documents and (y) subject to the First Lien Priority Liens and the First Lien Superpriority Claims (as defined in paragraph 19 below).

(d)     The terms of the DIP Loans and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Documents and the use of the Prepetition Collateral (including the Cash Collateral) have been the subject of extensive negotiations conducted in good faith and at arm's length among the Borrower, the Guarantors, the Lead DIP Lenders, the Second Lien

Agent and the Second Lien Lenders, and all of the Debtors' obligations and indebtedness arising under or in connection with the DIP Loans, including without limitation, (i) all loans made to the Borrower as contemplated and authorized by this Order and (ii) all other obligations of the Debtors under the DIP Documents and this Order paid to any DIP Lenders, including, without limitation, any fees provided for in the DIP Commitment Letter (collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Lenders in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(f)     The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent granting the interim relief set forth in this Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Loans and the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Order and the DIP Documents are, therefore, in the best interest of the Debtors' estates.

5.     *Authorization Of The DIP Loans And The DIP Documents.*

(a)     The Debtors are hereby authorized to enter into and perform under the DIP Documents, including the DIP Term Sheet and the DIP Credit Agreement, and the DIP Term Sheet is hereby approved and incorporated herein by reference. Pending the execution of the DIP Credit Agreement and the other DIP Documents, the DIP Term Sheet and this Order (including Schedule 2) shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Lenders and the terms and conditions to which such accommodations are subject.

(b)    Subject to entry of an order providing for the Debtors' use of the First Lien Lenders' cash collateral on terms and conditions satisfactory to the Lead DIP Lenders, (i) the Borrower is hereby authorized to borrow under the DIP Term Sheet up to an aggregate principal amount of $5,000,000 of the DIP Loans for working capital and other general corporate purposes of the Debtors, including without limitation, to pay interest, fees and expenses in connection with the DIP Loans, in accordance with the Budget and (ii) the Guarantors are hereby authorized to guarantee the obligations of the Borrower under the DIP Documents, in accordance with the terms of the DIP Documents without the need for approval of this Court, provided that the Debtors' use of proceeds from the DIP Loan shall only be in accordance with the Budget.

(c)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts and to execute and deliver all instruments and documents that the Lead DIP Lenders determine to be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Documents, including without limitation:

(i)    the execution, delivery and performance of the DIP Documents, including the DIP Credit Agreement;

(ii)    the execution, delivery and performance of the guarantees by the Guarantors of the obligations of the Borrower;

(iii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in such form as the Debtors and the Lead DIP Lenders may agree, and no further approval of this Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees paid in connection therewith) that do not materially and

adversely affect the Debtors or which do not (A) shorten the maturity of the DIP Loans, (B) increase the commitments under the DIP Credit Agreement or the DIP Term Sheet or the rate of interest payable on the DIP Loans under the DIP Credit Agreement, or (C) modify any Event of Default to be materially more restrictive; provided, however, that a copy of any such amendment, waiver, consent or other modification shall be filed by the Debtors with this Court and served by the Debtors on the U.S. Trustee and any statutory committee of unsecured creditors appointed in the Cases (the "Committee");

(iv)    the non-refundable payment to the DIP Lenders, as the case may be, of the fees set forth in the DIP Documents and referred to in the commitment letter, dated December 17, 2009, among NM Group, the Borrower and the Lead DIP Lenders (the "DIP Commitment Letter"); and

(v)    the performance of all other acts required under or in connection with the DIP Documents.

(d)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Order and the DIP Documents. No obligation, payment, transfer or grant of liens on and security by the Debtors under the DIP Documents or this Order shall be stayed, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.    *Superpriority Claims.*

(a)     Except to the extent expressly set forth in this Order in respect of the Carve Out and subject to the First Lien Superpriority Claims, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative claims (the "DIP Superpriority Claims") against the Debtors with priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. Except to the extent expressly set forth in this Order, the DIP Lenders shall not receive or retain any payments, property or other amounts in respect of the DIP Superpriority Claims unless and until all amounts owed under the First Lien Cash Collateral Order and the First Lien Credit Agreement (each as defined in paragraph 19 below; such amounts, the "First Lien Obligations") shall have been indefeasibly paid in full in cash.

(b)     For purposes hereof, the "Carve Out" shall mean (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code and (ii) after the occurrence and during the continuance of an Event of Default, the payment of accrued and unpaid professional fees and expenses incurred by the Debtors and the Committee and allowed by this Court, in an aggregate amount not exceeding $750,000 (plus all unpaid professional fees and expenses allowed by this Court that were incurred prior to the occurrence of such Event of Default), provided that (A) the Carve Out shall not be available to pay any such professional fees and expenses incurred in

connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lenders, the Second Lien Lenders or the Second Lien Agent, (B) so long as no Event of Default shall have occurred and be continuing, the Carve Out shall not be reduced by the payment of fees and expenses allowed by this Court and payable under sections 330 and 331 of the Bankruptcy Code and (C) nothing in this Order shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates.

7.      *DIP Liens.*  As security for the DIP Obligations, effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Lenders of any property, the following security interests and liens are hereby granted to the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral"), in each case subject only to (i) the Carve Out and (ii) the First Lien Priority Liens (all such liens and security interests granted to the DIP Lenders pursuant to this Order, the "DIP Liens"):

(a)      Senior Liens On Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code and subject to applicable law and subject and subordinate to the First Lien Replacement Liens (as defined in paragraph 19 below), a valid, binding, continuing, enforceable, fully-perfected senior lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date (collectively, the "Unencumbered Property"),

including without limitation, any and all unencumbered cash, accounts receivable, inventory, general intangibles, contracts, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property and the proceeds of all of the foregoing, provided that the Unencumbered Property shall not include the Avoidance Actions and any assets upon which a lien or security interest may not be lawfully granted, but subject to the entry of the Final Order, Unencumbered Property shall include any proceeds or property recovered in respect of any Avoidance Actions.

(b)     Liens Junior To Certain Existing Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code and subject and subordinate to the First Lien Prepetition Liens (as defined in paragraph 19 below), a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property of the Debtors (other than the property described in paragraph 7(c), as to which the DIP Liens will be as described in such paragraph), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Lenders shall be junior to such valid, perfected and unavoidable liens.

(c)     Liens Priming Second Lien Lenders' Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code and subject and subordinate to the First Lien Priority Liens, a valid, binding, continuing, enforceable, fully-perfected, senior priming lien on, and security interest in, all Prepetition Collateral.  The DIP Liens on the Prepetition Collateral shall be senior in all

respects to the security interests in, and liens on, the Prepetition Collateral of the Second Lien Agent and the Second Lien Lenders (including, without limitation, the Adequate Protection Liens (as defined in paragraph 13(a) below)), but shall be junior to any valid, perfected and unavoidable security interests in and liens on the Prepetition Collateral that were senior to the liens of the Second Lien Agent and the Second Lien Lenders as of the Petition Date, including as permitted by section 546(b) of the Bankruptcy Code.

(d)     <u>Liens Senior To Certain Other Liens</u>.  Other than the First Lien Priority Liens, the DIP Liens and the Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

8.      *Remedies After Event of Default*  The automatic stay under section 362 of the Bankruptcy Code is vacated and modified to the extent necessary to permit the Lead DIP Lenders, on behalf of the DIP Lenders, to exercise, five business days following written notice to the Debtors and the Second Lien Agent after the occurrence of any of the events listed hereto on Schedule 1 or paragraph 16(b) (each an "<u>Event of Default</u>"; the five business days following written notice of such Event of Default, provided such Event of Default has not been cured or waived during such five business day period, the "<u>Termination Date</u>"), all rights and remedies provided for in this Order and the DIP Documents. Upon the Termination Date, (i) the DIP Obligations shall become immediately due and payable and (ii) the Lead DIP Lenders, on behalf of the DIP Lenders, may exercise the rights and remedies available under the DIP Documents, this Order or applicable law, including, without limitation, foreclosing upon and selling all or a

portion of the DIP Collateral in order to collect the DIP Obligations. The actions described in clauses (i) and (ii) above may be taken without further order of or application to the Court as the Lead DIP Lenders shall, in their discretion, elect. Subject to prior payment of the First Lien Obligations, the payments or proceeds of the DIP Collateral shall be applied in accordance with the provisions of the DIP Loan Documents, and in no event shall the DIP Lenders be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Obligations or the DIP Collateral. Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights, remedies, benefits and protections provided to the DIP Lenders under this Order shall survive the Termination Date. In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing. Any delay or failure to exercise rights and remedies under the DIP Documents or this Order shall not constitute a waiver of the DIP Lenders' rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Credit Agreement.

9. *Limitation On Charging Expenses Against Collateral.* Subject to and effective upon entry of the Final Order, except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Lead DIP Lenders or the Second Lien Agent, as the case may be, and no such consent shall be

implied from any other action or inaction by the DIP Lenders, the Second Lien Agent or the Second Lien Lenders

10.   *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Lenders or the Second Lien Agent on behalf of the Second Lien Lenders pursuant to the provisions of this Order or any subsequent order of this Court shall be received free and clear of any claim, charge, interest, assessment or other liability.

11.   *The Cash Collateral.*  To the extent any of the Debtors' cash, including without limitation, any cash and other amounts on deposit or maintained by the Debtors in any account or accounts with any Second Lien Lender and any cash proceeds of the disposition of any Prepetition Collateral, such cash constitutes proceeds of the Prepetition Collateral and, therefore, is cash collateral of the Second Lien Lenders within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

12.   *Use Of Prepetition Collateral (including Cash Collateral)*  The Debtors are hereby authorized to use the Prepetition Collateral, including the Cash Collateral, during the period from the Petition Date through and including the Termination Date for working capital and general corporate purposes in accordance with the Budget and the terms and conditions of this Order, provided that, (a) the Second Lien Lenders and the Second Lien Agent are granted adequate protection as hereinafter set forth and (b) except on the terms of this Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.

13.   *Adequate Protection*  The Second Lien Agent and the Second Lien Lenders are entitled, pursuant to sections 361, 363(c)(2) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Collateral, including

without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, the priming by the DIP Liens of the liens on the Prepetition Collateral for the benefit of the Second Lien Agent and the Second Lien Lenders, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "Adequate Protection Obligations"). As adequate protection, the Second Lien Agent and the Second Lien Lenders are hereby granted the following:

(a)    Adequate Protection Liens  As security for the payment of the Adequate Protection Obligations, the Second Lien Agent (for itself and for the benefit of the Second Lien Lenders) is hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "Adequate Protection Liens"), subject and subordinate only to (i) the First Lien Priority Liens, (ii) the DIP Liens, and (iii) the Carve Out.

(b)    Section 507(b) Claim.  The Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve Out, (ii) the First Lien Superpriority Claims and (iii) the DIP Superpriority Claims.  Except to the extent expressly set forth in this Order, the Second Lien Agent and the Second Lien Lenders shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until the First Lien Obligations and the DIP Obligations

shall have been indefeasibly paid in full in cash. In addition and notwithstanding anything to the contrary contained herein, the Adequate Protection Obligations may be satisfied in a plan of reorganization confirmed in the Cases in the manner set forth in such plan if holders of more than 66 2/3% in amount and 50% in number of the Adequate Protection Obligations consent to such treatment, regardless of their status as 507(b) Claims.

(c) <u>Fees And Expenses</u>. The Debtors shall pay to the Second Lien Agent and the Second Lien Lead Investors (as defined in the Motion) all reasonable fees and expenses in connection with these Cases, including without limitation, the prepetition and postpetition reasonable fees and disbursements of the Second Lien Agent and the Second Lien Lead Investors and their respective advisors (it being understood that the Second Lien Agent's advisors for purposes of this paragraph 13(c) are Broadpoint Capital, Inc., Dechert LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP (solely as FCC counsel), as well as one local counsel). None of the fees and expenses payable pursuant to this paragraph 13(c) shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto. The Debtors shall pay the fees and expenses provided for in this paragraph 13(c) promptly after receipt of invoices therefor.

(d) <u>Information</u>. The Debtors shall promptly provide to the Second Lien Agent any written financial information or periodic reporting that is provided to, or required to be provided to, the DIP Lenders.

14. *Reservation of Rights of Second Lien Lenders*. Based upon the consent of the Second Lien Lenders, this Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Second Lien Agent and the Second Lien Lenders.

Except as expressly provided herein, nothing contained in this Order (including without limitation, the authorization to use any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to the Second Lien Agent or any Second Lien Lender including, without limitation, under the Second Lien Documents and the Intercreditor Agreement (as defined in the Second Lien Credit Agreement). The consent of the Second Lien Agent and the Second Lien Lenders to the priming of their liens on the Prepetition Collateral by the DIP Liens is limited to the DIP Obligations.

15.    *Perfection Of DIP Liens And Adequate Protection Liens.*

(a)    The Lead DIP Lenders and the Second Lien Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the DIP Liens and the Adequate Protection Liens granted to them hereunder. Whether or not the Lead DIP Lenders or the Second Lien Agent shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the DIP Liens and the Adequate Protection Liens, such DIP Liens and the Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Order.

(b)    A copy of this Order may, in the discretion of the Lead DIP Lenders or the Second Lien Agent, as the case may be, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar

instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

        (c)      The Debtors shall execute and deliver to the Lead DIP Lenders and the Second Lien Agent, as the case may be, all such agreements, financing statements, instruments and other documents as the Lead DIP Lenders or the Second Lien Agent may reasonably request to evidence, confirm, validate or perfect the DIP Liens and the Adequate Protection Liens.

        (d)      Any provision of any lease or other license (other than Federal Communications Commission licenses), contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest or license, or the proceeds thereof, or other DIP Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the granting of the DIP Liens or the Adequate Protection Liens on such leasehold interest or license or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Lenders, the Second Lien Agent or the Second Lien Lenders in accordance with the terms of the DIP Documents or this Order.

      16.     *Preservation Of Rights Granted Under The Order.*

        (a)      Other than the First Lien Superpriority Claims and the First Lien Priority Liens, no claim or lien having a priority senior to or *pari passu* with those granted by this Order to the DIP Lenders, the Second Lien Agent or the Second Lien Lenders, shall be granted or allowed while any portion of the DIP Obligations (or any refinancing thereof) or the Adequate Protection Obligations remain outstanding, and the DIP Liens and the Adequate Protection Liens

shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)     Unless all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash, the Debtors shall not seek, and it shall constitute an Event of Default hereunder and under the DIP Documents and a termination of the right to use the Cash Collateral if any of the Debtors seeks, or if there is entered, (i) any modification of this Order without the prior written consent of the Lead DIP Lenders and the Second Lien Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lenders or the Second Lien Agent or (ii) an order converting or dismissing any of the Cases. If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (A) the DIP Superpriority Claims, the 507(b) Claims, the other administrative claims granted pursuant to this Order, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Order until all DIP Obligations and all Adequate Protection Obligations shall have been paid and satisfied in full (and that the DIP Superpriority Claims, the 507(b) Claims, such other administrative claims granted pursuant to this Order, the DIP Liens and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (A) above.

(c)     If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity, priority or enforceability of any DIP Obligations or any Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Lead DIP Lenders or the Second Lien Agent, as applicable, of the effective date of such reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens. Notwithstanding any such reversal, stay, modification or vacatur, any use of Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to the DIP Lenders, the Second Lien Agent or the Second Lien Lenders, as the case may be, prior to the actual receipt of written notice by the DIP Lenders and the Second Lien Agent of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Order, and the DIP Lenders, the Second Lien Agent and the Second Lien Lenders, shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Documents with respect to all uses of Cash Collateral, all DIP Obligations and all Adequate Protection Obligations.

(d)     Except as expressly provided in this Order or in the DIP Documents, the DIP Liens, the DIP Obligations, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, the 507(b) Claims and all other rights and remedies of the DIP Lenders, the Second Lien Agent and the Second Lien Lenders, granted by this Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases or by any other act or omission, (ii) the appointment of a chapter 11

trustee with plenary power in any of the Cases or (iii) the entry of an order confirming a plan of

reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code,

the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate

Protection Obligations. The terms and provisions of this Order and the DIP Documents shall

continue in the Cases, in any successor cases if the Cases cease to be jointly administered, or in

any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Adequate

Protection Liens, the DIP Obligations, the DIP Superpriority Claims, the Section 507(b) Claims,

the other administrative Claims granted pursuant to this Order, and all other rights and remedies

of the DIP Lenders, the Second Lien Agent and the Second Lien Lenders granted by this Order

and the DIP Documents shall continue in full force and effect until all DIP Obligations and all

Adequate Protection Obligations are indefeasibly paid in full in cash.

17. *Effect Of Stipulations On Third Parties.* The stipulations and admissions

contained in this Order, including without limitation, in paragraphs 3 and 11 of this Order, shall

be binding solely upon the Debtors under all circumstances. The stipulations and admissions

contained in this Order, including without limitation, in paragraphs 3 and 11 of this Order, shall

be binding upon all other parties in interest, including without limitation, the Committee, unless

(a) the Committee or any other party-in-interest with standing to do so has timely filed an

adversary proceeding or contested matter (subject to the limitations contained herein, including

without limitation, in paragraph 18) by no later than the date that is 45 days after the appointment

of counsel to the Committee, (A) challenging the validity, enforceability, priority or extent of the

Second Lien Obligations or the liens on the Prepetition Collateral securing the Second Lien

Obligations or (B) otherwise asserting or prosecuting any Avoidance Actions or any other

claims, counterclaims or causes of action, objections, contests or defenses (collectively, the

"Claims and Defenses") against the Second Lien Agent or any of the Second Lien Lenders or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors in connection with any matter related to the Second Lien Obligations or the Prepetition Collateral and (b) an order is entered and becomes final in favor of the plaintiff sustaining any such challenge or claim in any such timely filed adversary proceeding or contested matter, provided that, as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished as of the Petition Date. If no such adversary proceeding or contested matter is timely filed in respect of the Second Lien Obligations (x) the Second Lien Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Cases and any subsequent chapter 7 case, (y) the liens on the Prepetition Collateral securing the Second Lien Obligations shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 3(b), not subject to defense, counterclaim, recharacterization, subordination or avoidance and (z) the Second Lien Obligations, the Second Lien Agent and the Second Lien Lenders, as the case may be, and the liens on the Prepetition Collateral granted to secure the Second Lien Obligations shall not be subject to any other or further challenge by the Committee or any other party-in-interest, and the Committee or such party-in-interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for any of the Debtors). If any such adversary proceeding or contested matter is timely filed, the stipulations and admissions contained in paragraphs 3 and 11 of this Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Committee and any other party-in-interest, except as to any such

findings and admissions that were expressly and successfully challenged in such adversary proceeding or contested matter. Nothing in this Order vests or confers on any Entity (as defined in the Bankruptcy Code), or the Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including without limitation, Claims and Defenses with respect to the Second Lien Documents, the Second Lien Obligations, or any liens granted by any Debtor to secure any of the foregoing.

18. *Limitation On Use Of DIP Loans And DIP Collateral.* The Debtors shall use the DIP Loans and the Prepetition Collateral (including the Cash Collateral) solely as provided in this Order and the DIP Documents. Notwithstanding anything herein or in any other order of this Court to the contrary, no DIP Loans, no DIP Collateral, no Prepetition Collateral (including the Cash Collateral) or the Carve Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Second Lien Documents or the liens or claims granted under this Order, the DIP Documents or the Second Lien Documents, (b) assert any Claims and Defenses or any other causes of action against the DIP Lenders, the Second Lien Agent or the Second Lien Lenders or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Lenders' or the Second Lien Agent's assertion, enforcement or realization on the Prepetition Collateral or the DIP Collateral in accordance with the DIP Documents, the Second Lien Documents or this Order, (d) seek to modify any of the rights granted to the DIP Lenders, the Second Lien Agent or the Second Lien Lenders hereunder or under the DIP Documents or the Second Lien Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments

are (i) approved by an Order of this Court and (ii) permitted under the DIP Documents, provided that, notwithstanding anything to the contrary herein, no more than an aggregate of $50,000 of the Prepetition Collateral (including the Cash Collateral), the DIP Loans, the DIP Collateral or the Carve Out may be used by any Committee to investigate the validity, enforceability or priority of the Second Lien Obligations or the liens on the Prepetition Collateral securing the Second Lien Obligations, or investigate any Claims and Defenses or other causes action against the Second Lien Agent or the Second Lien Lenders.

19. *First Lien Lenders' Cash Collateral Order.* The Debtors, certain financial institutions (the "First Lien Lenders") and Wilmington Trust FSB, as the administrative agent for the First Lien Lenders (the "First Lien Agent") are party to that first lien Credit and Guaranty Agreement, dated as of November 15, 2005 (as amended, modified or otherwise supplemented as of the Petition Date, the "First Lien Credit Agreement"), in respect of which the First Lien Agent, for the ratable benefit of the First Lien Lenders, was granted a first priority lien (the "First Lien Prepetition Liens") on substantially all of the Debtors' prepetition property. Upon motion from the Debtors, this Court has concurrently entered the "Interim Order (I) Authorizing and Approving (a) the Use of First Lien Lenders' Cash Collateral and the Grant of Adequate Protection Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(B) and (b) Modification of the Automatic Stay Under Section 362 of the Bankruptcy Code and (II) Scheduling a Final Hearing and Approving Form and Manner of Notice Thereof" (whether on an interim or final basis, the "First Lien Cash Collateral Order") authorizing the use of the First Lien Lenders' prepetition collateral, including cash collateral, and granting adequate protection to the First Lien Agent and the First Lien Lenders by, among other things, granting replacement liens (the "First Lien Replacement Liens", together with the First Lien Prepetition

Liens, the "First Lien Priority Liens") and superpriority claims (the "First Lien Superpriority Claims") to the extent of any diminution in value of the First Lien Lenders' prepetition collateral. Nothing in this Order shall be construed to (i) affect the prepetition or postpetition priority of or (ii) grant DIP Liens, Adequate Protection Liens, DIP Superpriority Claims or 507(b) Claims, and/or other liens or claims that prime or otherwise are senior to or *pari passu* with, the First Lien Priority Liens or the First Lien Superpriority Claims. Nothing herein or in the DIP Documents shall impair or modify any rights, claims or defenses granted to the First Lien Agent or First Lien Lenders under the First Lien Cash Collateral Order.

20. *Order Governs.* In the event of any inconsistency between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.

21. *Binding Effect; Successors And Assigns.* The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties-in-interest in the Cases, including without limitation, the DIP Lenders, the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, the Committee, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Lenders, the Second Lien Agent, the Second Lien Lenders and the Debtors and their respective successors and assigns, provided that, except to the extent expressly set forth in this Order, the DIP Lenders, the Second Lien Agent and the Second Lien Lenders shall have no obligation to permit the use of Cash Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estate of any Debtor.

22.    *Limitation Of Liability.* In determining to make any loan under the DIP

Documents, permitting the use of Cash Collateral or in exercising any rights or remedies as and

when permitted pursuant to this Order or the DIP Documents, the Second Lien Agent, the DIP

Lenders and the Second Lien Lenders shall not be deemed to be in control of the operations of

any Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the

operation or management of the Debtors (as such terms, or any similar terms, are used in the

United States Comprehensive Environmental Response, Compensation and Liability Act, 29

U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing

in this Order or in the DIP Documents shall in any way be construed or interpreted to impose or

allow the imposition upon the DIP Lenders, the Second Lien Agent or the Second Lien Lenders

any liability for any claims arising from the prepetition or postpetition activities of any of the

Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code).

23.    *Effectiveness*  This Order shall constitute findings of fact and conclusions of law

and shall take effect immediately upon execution hereof as of the Petition Date, and there shall

be no stay of execution of effectiveness of this Order.

24.    *Final Hearing.* The Final Hearing is scheduled for _____,

2009 at _____ _.m., prevailing Eastern time, before this Court.

25.    *Final Hearing Notice.* The Debtors shall promptly mail copies of this Order

(which shall constitute adequate notice of the Final Hearing) to the parties having been given

notice of the Interim Hearing, and to any other party that has filed a request for notices with this

Court and to the Committee after the same has been appointed, or Committee counsel, if the

same shall have been appointed. Such notice shall also state that the DIP Credit Agreement will

be filed with the Court and made available to parties in interest no later than five (5) business

days prior to the Final Hearing. Any party-in-interest objecting to the relief sought at the Final

Hearing shall serve and file written objections, which objections shall be served upon (a)

Andrews Kurth LLP, 1717 Main Street, Suite 3700, Dallas, Texas 75201, Attention: Jason S.

Brookner, Esq., and Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street,

Wilmington, Delaware 19801, Attention: Paul N. Heath, Esq., attorneys for the Debtors, (b)

Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017,

Attention: Kenneth S. Ziman, Esq., and Young, Conaway, Stargatt & Taylor, LLP, 1000 West

Street, 17th Floor, Wilmington, Delaware 19801, Attention: Robert S. Brady, Esq., attorneys of

the DIP Lenders, (c) Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036,

Attention: Michael J. Sage, Esq., and Ashby & Geddes, 500 Delaware Avenue, P.O. Box 1150,

Wilmington Delaware 19899, Attention: William Bowden, Esq., attorneys for the Second Lien

Agent and (d) the Office of the U.S. Trustee for the District of Delaware, and shall be filed with

the Clerk of the United States Bankruptcy Court, District of Delaware, in each case to allow

actual receipt by the foregoing no later than ____, 2009 at 4:00 p.m., prevailing Eastern time.


Dated:   December ____, 2009
         Wilmington, Delaware

         _____
         UNITED STATES BANKRUPTCY JUDGE

DIP Term Sheet

# NEXTMEDIA OPERATING, INC.

## Outline of Terms and Conditions for
## Debtor-in-Possession Term Loan Facility
## in the Amount of $20,000,000

| | |
|---|---|
| Borrower: | NextMedia Operating, Inc., a Delaware corporation (the "Borrower"), as a debtor-in-possession in a case (the "Debtor's Case") pending under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). |
| Guarantors: | NextMedia Group, Inc. and the subsidiaries of the Borrower, each of which is a debtor-in-possession in a case (together with the Debtor's Case, the "Cases"; the date of the commencement of the Cases, the "Petition Date") pending under Chapter 11 of the Bankruptcy Code (collectively, the "Guarantors", and, together with the Borrower, the "Loan Parties" or the "Debtors"). |
| Lenders: | Certain funds and their respective affiliates managed by Strategic Value Partners LLC or its affiliates ("SVP") and certain funds and their respective affiliates managed by Angelo, Gordon & Co., L.P. or its affiliates ("Angelo, Gordon"; together with SVP, the "Second Lien Lead Investors") and such other financial institutions or entities acceptable to the Second Lien Lead Investors (including assignees thereof, collectively, the "DIP Lenders"). |

## FACILITIES

**Term Loan Commitment and Availability:** A six-month term loan facility (the "DIP Facility") in the amount of $20,000,000 (the loans thereunder, the "DIP Loans"). The DIP Loans shall be repaid on the earlier to occur of (x) the six month anniversary of the Closing Date referred to below (as may be extended pursuant to the terms set forth below, the "DIP Maturity Date"), (y) the consummation of the Plan (as defined in the Restructuring Agreement referred to below); provided that the DIP Maturity Date shall be automatically extended (without any fee) to the 285th day after the Petition Date if on the sixth month anniversary of the Closing Date (1) the Plan has been confirmed by the Bankruptcy Court and (2) the only outstanding condition precedent to consummation of the Plan is the Federal Communications Commission's ("FCC") initial approval of the restructuring contemplated by the Plan becoming a final order and (z) upon the mutual agreement of the DIP Lenders and the Borrower.

The DIP Loans shall be made in no more than four drawings of $5 million each, with a first draw on the DIP Closing Date and the subsequent draws no earlier than one business day after the entry of the final order approving the DIP Facility and subject to other terms and conditions to be agreed upon.

The Borrower shall not be, and is not, required to draw on any portion of the DIP Facility, nor is Borrower required to file any motion with the Bankruptcy Court to approve the DIP Facility. In the event Borrower does not secure Bankruptcy Court approval of the DIP Facility, no fees of any kind shall be payable in respect thereof. In the event Borrower secures Bankruptcy Court approval for the DIP Facility but does not draw thereon, only the Commitment Fee called for herein shall be payable.

**Purpose:** The proceeds of the DIP Loans shall be used for working capital and other general corporate purposes of the Loan Parties in accordance with the Budget (as defined below).

**Commitment Fee:** 3% of the DIP Facility, to be paid on the DIP Closing Date ratably to each DIP Lender based upon its commitment under the DIP Facility.

**Interest Rate:** LIBOR (to be defined in a manner to be agreed upon, including a floor of 2.5%) plus 11% or, at the Borrower's option, ABR (to be defined in a manner to be agreed upon, including a floor of 3.5%) plus 10%, payable monthly in arrears.

**Default Interest:** Upon the occurrence and during the continuance of any event of default under the DIP Facility, interest shall be payable on all outstanding obligations on demand at 2.0% above the then applicable rate.

## GENERAL PROVISIONS

**Priority and Liens:** All DIP Loans and other obligations under the DIP Facility (and all guaranties of the foregoing by the Guarantors), shall at all times:

I.     pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority claim status in the Cases with such superpriority claims to be junior in priority to any superpriority claims granted to the Debtors' first lien lenders but senior to any superpriority claims granted to the Debtors' second lien lenders; and

II.     pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Debtors' respective estates in the Cases that is not subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code; and

III.     pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Debtors' respective estates in the Cases that is subject to valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases or to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, except in each case as described below in paragraph IV; and

IV.     pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected priming lien on, and security interest in, all present and after acquired property of the Debtors' respective estates that is subject to a valid, perfected and non-avoidable liens in existence at the time of the commencement of the Cases to secure the Second Lien Credit Agreement and all present and after-acquired assets that are presently subject to liens that are junior to the liens that secure the Second Lien Credit Agreement, provided that the priming liens described in this paragraph IV shall be junior in all respects to the liens granted to the first lien lenders, including any replacement liens granted to such lenders as adequate protection;

subject in each case to, in the event of the occurrence and during the continuance of an Event of Default, a carve-out of $750,000 for unpaid fees and expenses of professionals and the United States Trustee incurred after an Event of Default.

Optional and Mandatory Prepayments:     Market terms for financings of this type.

Conditions to Initial of Extensions Credit:     Market terms for financings of this type and, in addition, the making of the initial extension of credit shall be subject to the satisfaction of the following conditions (the date on which all such conditions precedent shall be satisfied, the "DIP Closing Date"):

(a)     The interim order approving the DIP Facility and providing for

the use of the pre-petition lenders' cash collateral, in form and substance reasonably satisfactory to the DIP Lenders (the "Interim Order"), shall have been entered by the bankruptcy court having jurisdiction over the Cases (the "Bankruptcy Court"), shall be in full force and effect and shall not be subject to any stay.

(b)    The Administrative Agent shall have received (i) a monthly budget for the six months following the Petition Date and (ii) a thirteen-week budget for the period of thirteen weeks following the Petition Date (the "Initial Budget"), in each case in form and substance reasonably satisfactory to the DIP Lenders.

**Conditions to Subsequent Extensions of Credit**

(a)    The final order approving the DIP Facility, substantially in the form of the Interim Order and otherwise in form and substance reasonably satisfactory to the DIP Lenders, shall have been entered by the Bankruptcy Court within 30 days after entry of the Interim Order, shall be in full force and effect and shall not be subject to any stay.

(b)    The accuracy in all material respects of all representations and warranties in the Credit Documentation.

(c)    There being no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit.

**Adequate Protection**

Usual and customary adequate protection in the form of (i) superpriority claims and replacement liens, which in the case of the Debtors' first lien lenders shall be senior to all other pre-petition and post-petition liens, (ii) payment of reasonable fees and expenses of the administrative agents to the prepetition second lien credit agreement, including payment of the reasonable fees and expenses of Broadpoint Capital, Inc., Dechert LLP and Paul, Weiss, Rifkind, Wharton & Garrison LLP (solely as FCC counsel) in their capacities as professional advisors to the second lien administrative agent, as well as the reasonable fees and expenses of one local counsel to the second lien administrative agent, to the extent applicable and (iii) financial reporting in accordance with the terms of the Second Lien Credit Agreement.

**Events of Default:**

Market terms for financings of this type, as well as a "Termination Event" occurring under the Restructuring Support Agreement, dated as of December 19, 2009 (as amended, supplemented or otherwise modified from time to time, the "Restructuring Agreement") and not being waived in accordance with the terms thereunder.

**Representations and Warranties; Financial and Other Covenants; Assignments and Participations; Indemnification; Voting**

Market terms for financings of this type.

**Expenses:**

The Borrower will pay or reimburse the DIP Lenders for their

reasonable out-of-pocket fees and expenses incurred in connection with the Cases.

Governing Law:    State of New York, except as governed by the Bankruptcy Code and the rules, regulations and policies of the FCC, including but not limited to any restrictions on pledging FCC licenses.

## Events of Default

The occurrence of any of the following shall be an "Event of Default":

1.     the occurrence of a "Termination Event" under the Restructuring Support Agreement, dated as of December 18, 2009 (as amended, supplemented or otherwise modified from time to time, the "Restructuring Agreement"), among the Lead DIP Lenders, NextMedia Investors LLC, the Debtors, the Second Lien Agent and the Second Lien Lenders parties thereto, and such event not having been cured or waived by the terms thereunder within five business days of such occurrence;

2.     the Debtors fail, on or before the 30th day after the Petition Date (or such later date as may be agreed to by the Debtors and the Lead DIP Lenders), to obtain an order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Lead DIP Lenders, assuming the obligations of the Debtors under that commitment letter, dated as of December 10, 2009, governing the equity investment and exit term facility to be provided by the Lead DIP Lenders;

3.     the 15th day after the Petition Date, unless the Debtors have filed with the Bankruptcy Court (a) a plan of reorganization, incorporating the terms of the Restructuring Agreement and the restructuring term sheet attached thereto as an exhibit (the "Restructuring Term Sheet") and otherwise in form and substance reasonably satisfactory to the Lead DIP Lenders (the "Plan") and (b) the related disclosure statement, in form and substance reasonably satisfactory to the Lead DIP Lenders (the "Disclosure Statement");

4.     (a) the Debtors file any amendment to, modification of, or the filing of a pleading by any of the Debtors that seeks to amend or modify the Plan, the Disclosure Statement or any documents related to the Plan, notices, exhibits or appendices, which amendment, modification or filing is, within the reasonable judgment of the Lead DIP Lenders, inconsistent with Restructuring Term Sheet and (b) the Debtors take any of the following actions: withdrawing the Plan, publicly announcing their intention not to support the Plan or filing any alternative plan of reorganization other than the Plan or otherwise evincing an intention not to proceed with the Plan;

5.     the 60th day after the Petition Date, unless the Bankruptcy Court shall have approved the Disclosure Statement prior thereto;

6.     the 100th day after the Petition Date, unless the Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the Lead DIP Lenders, confirming the Plan (a "Confirmation Order") prior thereto;

7.     any court of competent jurisdiction or other competent governmental or regulatory authority issues an order making illegal or otherwise restricting, preventing or

1

prohibiting the consummation of the transactions contemplated by the Restructuring Term Sheet or the Plan in a way that cannot be reasonably remedied by the Debtors;

   8.     the later of (a) 15th day after public notice of the consent from FCC of the pro forma involuntary applications approving the assignment of FCC licenses from the Debtors to the Debtors, as debtors-in-possession and (b) two days after the Plan is filed with the Bankruptcy Court, unless the Debtors have filed one or more applications with the FCC seeking approval of the transactions contemplated by the Restructuring Term Sheet and the Plan;

   9.     the 180th day after entry of the Confirmation Order, unless the FCC has granted an initial order consenting to the restructuring contemplated by the Plan and Restructuring Term Sheet and the transfers contemplated thereby (excluding the transfer of any station with respect to which waivers were requested to enable the preservation of their grandfathered status under the FCC's media ownership rules, which consists of certain radio stations in Chicago, Illinois and Greenville-New Bern-Jacksonville, North Carolina) (the "Initial Approval");

   10.    if no objection has been filed to the Initial Approval, the 60th day after the date on which the FCC has granted the Initial Approval, unless the Initial Approval has become a final order and the Debtors have otherwise consummated the Plan pursuant to the terms thereof;

   11.    the 270th day after date on which the FCC has granted the Initial Approval, unless the Initial Approval has become a final order and the Debtors have otherwise consummated the Plan pursuant to the terms thereof;

   12.    any of the Cases shall be dismissed or converted to a chapter 7 case, or a chapter 11 trustee with plenary powers, a responsible officer, or an examiner with enlarged powers shall be appointed in any of the Cases or the Debtors shall file a motion or other request for any such relief;

   13.    the entry of any order in the Cases terminating the Debtors' exclusive right to file a plan or plans of reorganization pursuant to section 1121 of the Bankruptcy Code;

   14.    the 30th day after the Petition Date, unless a final order approving the debtor-in-possession financing pursuant to the DIP Documents, in substantially the form of this Order and otherwise in form and substance reasonably satisfactory to the Lead DIP Lenders, has been entered;

   15.    any Debtor proposes or files a motion with respect to or enter into a debtor in possession financing facility other than the DIP Documents;

   16.    either (a) a filing by any Debtor of any motion, application or adversary proceeding challenging the validity, enforceability, perfection or priority of or seeking avoidance of the Second Lien Obligations or any other cause of action against and/or with respect to the Second Lien Obligations, the Prepetition Liens, the Second Lien Agent or any of the Second Lien Lenders (or if any Debtor supports any such motion, application or adversary proceeding

2

commenced by any third party or consent to the standing of any such third party), or (b) the entry of an order of the Bankruptcy Court providing relief against the interests of any Second Lien Lender or the Second Lien Agent with respect to any of the foregoing causes of action or proceedings;

17.   entry of an order or orders by the Bankruptcy Court granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code in respect of the Debtors' assets having a value in excess of $100,000;

18.   any event, circumstance or change has occurred that has caused or evidences, either in a case or in the aggregate, a Material Adverse Effect (as defined in the DIP Commitment Letter);

19.   the Debtors shall make any dividend, loan or other transfer to NextMedia Investors LLC in excess of an amount necessary for NextMedia Investors LLC to pay out-of-pocket legal fees and other administrative expenses incurred in the ordinary course of business;

20.   (a) At the end of each one-week period set forth in the Initial Budget commencing with the week ending January 15, 2010, (i) the aggregate cumulative expenditures and disbursements by the Borrower for the period from the date of initial funding of the DIP Loans through the last day of such one-week period shall exceed one hundred fifteen percent (115%) of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the Budget; and (ii) the aggregate cumulative receipts by the Borrower for the period from the date of initial funding of the DIP Loans through the last day of such one-week period shall be less than eighty-five percent (85%) of the aggregate cumulative amount budgeted for such cumulative time period pursuant to the Budget or (b) the Debtors shall fail to deliver no later than Friday of each calendar week, a comparison of actual weekly cash flows for the week immediately preceding the week in which such comparison is delivered to the Budget, and a comparison of cumulative actual weekly cash flows from the date of initial funding of the DIP Loans through the week immediately preceding the week in which such comparison is delivered to the Budget;

21.   (a) an order of the Bankruptcy Court shall be entered granting another superpriority claim or lien *pari passu* with or senior to that granted (x) to the DIP Lenders, or (y) to the Second Lien Lender), in each case other than as set forth in the First Lien Cash Collateral Order (b) an order of the Bankruptcy Court shall be entered reversing, staying for a period in excess of 10 days, vacating or otherwise amending, supplementing or modifying the Interim Order without the written consent of the Lead DIP Lenders; (c) the Cash Collateral shall be used in a manner inconsistent with this Order, or (d) an order of a court of competent jurisdiction shall be entered terminating the use of the Cash Collateral;

22.   except as permitted under this Order, any proceeding shall be commenced by any Debtor seeking, or otherwise consenting to, (i) the invalidation, subordination or other challenging of the DIP Superpriority Claims and DIP Liens granted to secure the DIP

3

Obligations or (ii) any relief under Section 506(c) of the Bankruptcy Code with respect to any DIP Collateral; or

23. this Order shall cease, for any reason, to be in full force and effect, or any Debtor or any affiliate of any Debtor shall so assert, or any DIP Liens or DIP Superpriority Claims created by this Order shall cease to be enforceable and of the same effect and priority purported to be created thereby other than by reason of the release thereof in accordance with the terms of this Order or the DIP Documents.

4

In addition to the terms and conditions set forth in the Term Sheet and this Order, the initial DIP Loans may be borrowed under this Order and the Term Sheet subject to the following:

1. receipt by the Lead DIP Lenders by no later than 10:00 A.M., New York time, one business day prior to the anticipated borrowing date of a notice of borrowing (which may be made by email) from the Borrower specifying (x) the amount of the requested DIP Loans which shall be in an amount not to exceed $5,000,000 and (y) wiring instructions for the proceeds of the DIP Loans;

2. the Lead DIP Lenders shall be permitted to deduct from the DIP Loan proceeds the fees and expenses to be paid by the Borrower on the DIP Closing Date (as defined in the Term Sheet), including without limitation the Commitment Fee described in the Term Sheet;

3. the DIP Loans shall bear interest at the Eurodollar Rate[1] for three-month interest periods, plus 11%; and

4. interest on the DIP Loans shall be computed on the basis of a 360-day year basis and shall be payable in arrears on the last business day of each calendar month to the accounts designated by the Lead DIP Lenders to the Borrower.

---

[1] **"Eurodollar Rate"** means, for any interest period, a rate of interest determined by the Lead DIP Lenders equal to the offered rate for deposits in U.S. dollars for the applicable interest period that appears on Reuters Screen LIBOR01 Page as of 11:00 a.m. (London time), on the second full business day (or such shorter period as the Lead DIP Lenders may agree) next preceding the first day of such Interest Period (unless such date is not a business day, in which event the next succeeding business day will be used). If such interest rates shall cease to be available from Reuters, the Eurodollar Rate shall be determined from such financial reporting service or other information as shall be available to the Lead DIP Lenders. Notwithstanding any of the foregoing, for purposes of this Order at no time shall the Eurodollar Rate be less than 2.5%.

1

The Budget

# NextMedia Group DIP Budget - December 18, 2009

| Week Ended | 12/17/09 | 12/24/09 | 12/31/09 | 01/07/10 | 01/14/10 | 01/21/10 | 01/28/10 | 02/04/10 | 02/11/10 | 02/18/10 | 02/25/10 | 03/04/10 | 03/11/10 | 03/18/10 | 03/25/10 | 04/01/10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow Actual/Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Inflows (Outflows)** | | | | | | | | | | | | | | | | |
| **Cash Receipts** | | | | | | | | | | | | | | | | |
| AR + Cash | 1,878,602 | 1,658,334 | 807,567 | 1,494,550 | 1,494,550 | 1,494,550 | 1,465,558 | 1,362,359 | 1,084,184 | 1,084,184 | 1,084,184 | 1,308,837 | 1,371,598 | 1,371,598 | 1,346,598 | 1,327,984 |
| Other | | | | | | | | | | | | | | | | |
| **Total Cash Receipts** | 1,878,602 | 1,658,334 | 807,567 | 1,494,550 | 1,494,550 | 1,494,550 | 1,465,558 | 1,362,359 | 1,084,184 | 1,084,184 | 1,084,184 | 1,308,837 | 1,371,598 | 1,371,598 | 1,346,598 | 1,327,984 |
| **Cash Disbursements** | | | | | | | | | | | | | | | | |
| Payroll | (1,808,812) | (82,435) | (1,504,812) | (601,837) | (1,604,812) | (1,604,812) | (1,604,812) | (794,356) | (288,529) | (1,604,812) | (288,529) | (1,546,812) | (279,665) | (1,546,812) | (232,238) | (1,049,812) |
| Accounts Payable | (28,732) | | (59,517) | (685,844) | (228,946) | (237,556) | (237,605) | (696,844) | (298,529) | (228,168) | (298,529) | (725,864) | | (240,904) | | (342,731) |
| Outside Lease Payments/Rents | (41,320) | | | (1,307,681) | (65,431) | | | (65,844) | | (41,305) | | (68,844) | | (47,005) | | (685,844) |
| **Total Op. Cash Disbursements** | (1,124,320) | (62,435) | (1,100,370) | (1,397,681) | (1,339,189) | (1,287,601) | (1,297,641) | (1,300,164) | (288,529) | (1,327,268) | (288,529) | (2,461,728) | (279,665) | (1,346,976) | (232,238) | (2,323,471) |
| **Net Operating Cash Flow** | 753,733 | 1,595,872 | (292,761) | 208,870 | 155,382 | 1,237,014 | 181,870 | (127,925) | 875,655 | (265,501) | 875,655 | (1,192,883) | 1,092,910 | 24,610 | 1,114,360 | (934,392) |
| **Non-operating Payments** | | | | | | | | | | | | | | | | |
| Taxes (cash) | (239,308) | (199,295) | | (210,794) | (329,691) | (18,750) (329,691) | (232,753) | (219,794) | (219,794) | (18,750) (219,794) | (18,750) (219,794) | (65,938) | (65,938) | (18,750) (65,938) | (65,938) | (43,956) |
| **Interest Expense / Fees** | | | | | | | | | | | | | | | | |
| Pre-petition market interest | (85,425) | | (136,176) | | | | | | | | | | | | | (828,472) |
| Pre-petition term loan interest | (2,422,382) | | (275,471) | | | | (22,500) | | | | | | | | | (2,522,337) |
| DIP facility interest | | | (38,250) | | | | | | | | (165,000) | | | | | (142,186) |
| SVP/UCC Commitment Fee | | (608,000) | | | | | | | (2,178,000) | | | | | | | |
| SVP/UCC DIP Fee | (982,621) | (155,238) | | | | | | | | | | | (1,593,000) | | | |
| Professional Fees | (20,176,388) | | (2,644,252) | | | | | | | | | | | | | |
| Contingency | (24,605,472) | (654,527) | (3,468,111) | (219,794) | (329,691) | (348,441) | (310,253) | (219,794) | (2,398,794) | (238,544) | (214,897) | (65,938) | (2,058,938) | (84,688) | (65,938) | (3,629,645) |
| **Total Non-Operating Payments** | (25,810,801) | (1,035,500) | (4,597,440) | (1,507,475) | (1,668,879) | (855,977) | (1,603,934) | (1,602,988) | (2,607,323) | (1,558,329) | (423,420) | (2,527,658) | (2,337,625) | (1,431,667) | (298,176) | (5,952,327) |
| **Total Cash Disbursements** | | | | | | | | | | | | | | | | |
| **Cash Balance** | | | | | | | | | | | | | | | | |
| Beginning Cash Balance (per Book) | 28,006,455 | 9,154,716 | 8,766,609 | 5,956,187 | 5,881,253 | 5,885,934 | 6,697,597 | 6,563,124 | 6,215,685 | 6,215,685 | 9,682,265 | 9,317,223 | 9,877,979 | 8,610,158 | 7,833,132 | 7,593,903 |
| Net Cash Inflow (Outflow) | (23,941,739) | 631,344 | (3,769,871) | (72,925) | (174,350) | 888,573 | (134,383) | (347,716) | (1,731,570) | (475,845) | 602,758 | (1,268,821) | (658,026) | (50,505) | (46,069) | (4,626,938) |
| Draw/(Repayment) | 5,000,000 | | | | | | | | 5,000,000 | 5,000,000 | | | | | | 5,000,000 |
| Ending Cash Balance (per book) | 9,154,716 | 9,786,060 | 5,996,187 | 5,883,263 | 5,885,934 | 6,697,597 | 6,563,174 | 6,215,685 | 9,602,260 | 9,217,221 | 9,877,979 | 8,610,158 | 7,833,132 | 7,593,903 | 8,641,485 | 9,917,147 |
| **DIP Loan** | | | | | | | | | | | | | | | | |
| Beginning Balance | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| Draw/(Repayment) | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 5,000,000 |
| Ending Balance | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 15,000,000 |
| Total DIP Commitment | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| Available Under DIP | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 5,000,000 |
| **Compliance Summary:** | | | | | | | | | | | | | | | | |
| Cumulative Receipts (Budgeted) | NA | 1,658,334 | 2,475,872 | 3,970,422 | 5,464,973 | 6,959,523 | 8,429,074 | 9,691,333 | 10,775,517 | 11,859,711 | 12,943,895 | 14,252,732 | 15,624,330 | 16,995,927 | 18,342,525 | 19,670,510 |
| Cumulative Receipts (Compliance @ 85.0%) | NA | 1,418,609 | 2,164,491 | 3,374,859 | 4,645,227 | 5,915,595 | 7,164,713 | 8,237,632 | 9,159,189 | 10,080,711 | 11,002,311 | 12,082,822 | 13,246,648 | 14,412,536 | 15,591,147 | 16,569,933 |
| Cumulative Disbursements (Budgeted) | NA | 1,035,960 | 5,633,400 | 7,141,875 | 8,818,755 | 9,460,732 | 11,030,666 | 12,639,654 | 15,237,877 | 16,787,256 | 17,210,632 | 19,748,290 | 22,085,915 | 23,517,590 | 23,815,759 | 29,768,078 |
| Cumulative Disbursements (Compliance @ 115.0%) | NA | 1,192,354 | 6,478,500 | 8,213,157 | 10,172,068 | 10,859,242 | 12,873,766 | 14,535,252 | 17,523,674 | 19,305,735 | 19,803,727 | 22,710,533 | 25,398,803 | 27,045,217 | 27,388,123 | 34,233,290 |

(1) Draw at 35% and 32% extended at DIP 35 and DIP 35, respectively. Available Repayable Inter at 25% which are...
(2) Assumes current DIP structure at 30% of DIP amount. Money % Save 25 and Key 15

# NextMedia Group DIP Budget - December

| Week Ended Cash Flow Actual/Forecast | 04/03/10 Forecast | 04/10/10 Forecast | 04/17/10 Forecast | 04/24/10 Forecast | 05/01/10 Forecast | 05/08/10 Forecast | 05/15/10 Forecast | 05/22/10 Forecast | 05/29/10 Forecast | 06/05/10 Forecast | 06/12/10 Forecast | 06/19/10 Forecast | 06/26/10 Forecast | 07/03/10 Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Inflows / (Outflows)** | | | | | | | | | | | | | | |
| **Cash Receipts** | | | | | | | | | | | | | | |
| A/R - Cash | 1,606,321 | 1,606,321 | 1,606,321 | 1,011,321 | 1,424,590 | 1,483,771 | 1,483,771 | 1,483,771 | 1,483,771 | 1,555,484 | 1,633,340 | 1,633,340 | 1,633,340 | 1,592,133 |
| Other | | | | | | | | | | | | | | |
| **Total Cash Receipts** | 1,606,321 | 1,606,321 | 1,606,321 | 1,011,321 | 1,424,590 | 1,483,771 | 1,483,771 | 1,483,771 | 1,483,771 | 1,555,484 | 1,633,340 | 1,633,340 | 1,633,340 | 1,592,133 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| Payroll | (222,902) | (606,812) | (207,543) | (1,040,812) | (633,708) | (1,040,812) | (216,797) | (1,040,812) | (633,708) | (1,040,812) | (231,659) | (1,040,812) | (633,708) | (1,040,812) |
| Accounts Payable | (213,762) | (207,543) | (207,543) | (231,017) | (633,708) | (271,742) | (47,653) | (47,653) | (264,310) | (654,544) | (47,653) | (231,552) | (47,653) | (482,972) |
| Outside Lease Payments & Rents | (47,653) | (47,653) | | (1,278,870) | (1,331,552) | (1,331,552) | (1,331,552) | (264,310) | (233,250) | (2,348,031) | (231,552) | (1,320,874) | (231,552) | (2,299,628) |
| **Total Op. Cash Disbursements** | (1,311,177) | (1,311,177) | (207,543) | (1,278,870) | (1,331,552) | (1,331,552) | (1,331,552) | (264,310) | (233,250) | (2,348,031) | (231,552) | (1,320,874) | (231,552) | (2,299,628) |
| **Net Operating Cash Flow** | 633,369 | (751,855) | 788,778 | (259,580) | 103,038 | 162,218 | 1,291,480 | 1,295,552 | 1,258,552 | (792,537) | 1,431,828 | 324,266 | 1,431,828 | (785,495) |
| **Non-operating Payments** | | | | | | | | | | | | | | |
| Taxes (cash) | (206,904) | (18,750) | (103,930) | | (193,930) | | (18,750) | | | | | | (18,750) | |
| Interest Expense / Fees | | (103,930) | | (148,750) | | | (66,663) | | | (193,750) | | | (66,663) | |
| Pre-petition revolver interest | | | | | | | | | | | | | | (822,472) |
| Pre-petition term loan interest | | | | | | | | | | | | | | (2,515,893) |
| DIP facility interest | | | | | | | | | | | | | | (262,509) |
| SVP/AC Commitment Fee | | | | | | | | | | | | | | |
| SVP/AC DIP Fee | | | | | | | | | | | | | | |
| Professional Fees | | | | | (1,281,900) | | | | | | | (1,281,900) | | |
| Other | | | | | | | | | | | | | | |
| **Total Non-Operating Payments** | (206,904) | (1,840,756) | (193,930) | (242,680) | (193,930) | (1,474,550) | (115,718) | (280,736) | | (66,508) | | (1,417,568) | (115,718) | (3,705,935) |
| **Total Cash Disbursements** | (513,816) | (4,357,493) | (401,479) | (1,613,515) | (1,515,488) | (2,766,488) | (380,028) | (650,977) | (193,750) | (2,444,569) | (318,480) | (2,747,042) | (337,230) | (6,004,491) |
| **Cash Balance** | | | | | | | | | | | | | | |
| Beginning Cash Balance (per Book) | 9,807,147 | 9,559,811 | 6,258,470 | 6,853,312 | 6,271,118 | 6,180,220 | 9,657,603 | 10,971,245 | 10,971,245 | 11,929,039 | 11,930,534 | 12,374,394 | 11,250,692 | 12,998,882 |
| Net Cash Inflow / (Outflow) | 542,465 | (3,351,742) | 594,842 | (582,194) | (90,898) | (1,313,717) | 1,103,742 | 957,794 | | (889,065) | 1,314,860 | (1,093,702) | 1,316,110 | (4,582,326) |
| Draw/(Repayment) | | | | | | 5,200,600 | | | | | | | | |
| **Ending Cash Balance (per book)** | 9,559,811 | 6,258,470 | 6,893,312 | 6,271,118 | 6,180,220 | 9,657,603 | 10,971,245 | 11,929,039 | 11,939,534 | 11,939,534 | 12,374,394 | 11,250,692 | 12,998,882 | 8,054,474 |
| **DIP Loan** | | | | | | | | | | | | | | |
| Beginning Balance | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| Draw/(Repayment) | | | | | | 5,000,000 | | | | | | | | |
| Ending Balance | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| Total DIP | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 | 20,000,000 |
| Available Under DIP | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | 5,000,000 | | | | | | | | | |
| **Covenant Summary** | | | | | | | | | | | | | | |
| Cumulative Receipts (Budgeted) | 20,616,431 | 21,743,162 | 22,769,473 | 23,832,794 | 25,355,364 | 26,739,164 | 28,222,935 | 29,691,606 | 31,137,150 | 32,890,539 | 34,613,870 | 36,107,310 | 37,799,314 | |
| Cumulative Receipts (Compliance @ 85.0%) | 17,543,956 | 18,481,679 | 19,379,552 | 20,258,175 | 21,497,076 | 22,728,291 | 23,989,486 | 25,239,441 | 26,515,612 | 27,956,951 | 29,382,299 | 30,767,628 | 32,139,342 | |
| Cumulative Disbursements (Budgeted) | 30,281,033 | 34,689,358 | 35,509,876 | 36,714,304 | 38,320,870 | 41,026,367 | 43,222,825 | 45,693,396 | 47,637,352 | 49,180,478 | 44,303,371 | 46,476,852 | 47,415,994 | 54,200,574 |
| Cumulative Disbursements (Compliance @ 115.0%) | 34,824,225 | 39,853,267 | 48,356,008 | 43,221,550 | 43,564,301 | 47,180,322 | 49,167,735 | 48,192,478 | 51,036,227 | 51,171,478 | 54,200,574 | 54,918,393 | 61,927,923 | |

# EXHIBIT C

# INTERIM CASH COLLATERAL ORDER

_

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| NEXTMEDIA GROUP, INC., *et al*, | § | Case No. 09-_____ (____) |
| | § | |
| Debtors. | § | Joint Administration Pending |

## INTERIM ORDER (I) AUTHORIZING
## AND APPROVING (A) THE USE OF FIRST LIEN LENDERS' CASH COLLATERAL
## AND THE GRANT OF ADEQUATE PROTECTION PURSUANT TO SECTIONS 361
## AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 4001(b) AND
## (B) MODIFICATION OF THE AUTOMATIC STAY UNDER SECTION 362 OF THE
## BANKRUPTCY CODE AND (II) SCHEDULING A FINAL HEARING AND
## APPROVING FORM AND MANNER OF NOTICE THEREOF

Upon the motion (the "Motion"), dated as of December 21, 2009, of the above-captioned

debtors and debtors in possession (other than debtor NextMedia Investors LLC, each a "Loan

Party Debtor" and collectively, the "Loan Party Debtors"), (a) seeking this Court's authorization,

pursuant to Section 363(c) of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (as

amended, the "Bankruptcy Code"), to use the Cash Collateral (as defined below) and, pursuant to

Sections 361 and 363 of the Bankruptcy Code, to provide adequate protection to the First Lien

Lenders (as defined below) with respect to any diminution in the value of the First Lien Lenders'

interests in the Prepetition Collateral (as defined below), including for the use of the Cash

Collateral, the use, sale, lease, depreciation, decline in market price or other diminution in value

of the Prepetition Collateral other than the Cash Collateral, or the imposition of the automatic

stay pursuant to Section 362(a) of the Bankruptcy Code; (b) seeking an interim hearing (the

"Interim Hearing") on the Motion to consider entry of an interim order pursuant to Bankruptcy

Rule 4001(b) (this "Interim Order") authorizing the Loan Party Debtors to use the First Lien

Lenders' Cash Collateral; and (c) requesting that a final hearing (the "Final Hearing") be

scheduled, and that notice procedures in respect of the Final Hearing be established by this Court

to consider entry of a final order (the "Final Order") authorizing on a final basis the Loan Party Debtors' use of the Cash Collateral;[1] and due and sufficient notice of the Motion and the Interim Hearing under the circumstances having been given; and the Interim Hearing on the Motion having been held before this Court on December [22], 2009; and upon the entire record made by the Loan Party Debtors at the Interim Hearing, and this Court having found good and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS:**

      A.     On December 21, 2009 (the "Petition Date"), the Loan Party Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (these "Chapter 11 Cases"). The Loan Party Debtors are continuing to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner and no official committee of unsecured creditors (the "Committee") has yet been appointed in these Chapter 11 Cases.

      B.     This Court has jurisdiction over these Chapter 11 Cases and the Motion pursuant to 28 U.S.C. § 157(b) and 1334. Consideration of this Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

      C.     Pursuant to the Credit and Guaranty Agreement dated as of November 15, 2005 (as amended, supplemented or otherwise modified, the "First Lien Credit Agreement"), among NextMedia Operating, Inc. ("NM Operating"), NextMedia Group, Inc., certain of NM

---

[1] The Motion seeks approval for both (i) interim and final DIP financing orders and (ii) interim and final cash collateral orders. This Interim Order pertains only to the use of the First Lien Lenders' Cash Collateral, and otherwise provides adequate protection to the First Lien Lenders. By separate order [Docket # __] the Court has authorized (x) interim DIP financing, (y) the use of the Second Lien Lenders' cash collateral and (z) providing adequate protection to the Second Lien Lenders (the "DIP Financing Order").

Operating's subsidiaries party thereto, the several lenders party thereto (together with any holders of the Swap Obligations (as defined below), the "First Lien Lenders"), Wilmington Trust FSB, as administrative agent for the First Lien Lenders (in such capacity, the "First Lien Agent"), the First Lien Lenders made loans and other financial accommodations to or for the benefit of the Loan Party Debtors. In connection with the First Lien Credit Agreement, the Loan Party Debtors entered into certain collateral and ancillary documentation, including certain interest rate protection arrangments, (such documentation, together with the First Lien Credit Agreement, the "First Lien Loan Documents"). All such loans, financial accommodations and other amounts owing by the Loan Party Debtors in connection with the First Lien Loan Documents, including the Loan Party Debtors' obligations in respect of certain interest rate protection arrangements (the "Swap Obligations"), are hereinafter referred to as the "First Lien Obligations".

D.    Without prejudice to the rights of any other party (but subject to the limitations thereon described below in decretal paragraph 7), the Loan Party Debtors acknowledge and agree that, as of the Petition Date, the Loan Party Debtors were liable to the First Lien Lenders under the First Lien Credit Agreement and the other First Lien Loan Documents in the aggregate principal amount of approximately $162.3, including accrued but unpaid interest, plus approximately $2.9 million in respect of the Swap Obligations.

E.    Without prejudice to the rights of any other party (but subject to the limitations thereon described below in decretal paragraph 7), the Loan Party Debtors acknowledge and agree that, pursuant to the First Lien Loan Documents, the First Lien Obligations are secured by perfected, valid and enforceable first priority liens and security interests upon and in substantially all of the assets and property of the Loan Party Debtors

including, without limitation, accounts, chattel paper, documents, general intangibles, goods, instruments, insurance, intellectual property, investment related property, letter of credit rights, money, receivables and receivable records, commercial tort claims, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (collectively the "Prepetition Collateral"). Without prejudice to the rights of any other party (but subject to the limitations thereon described below in decretal paragraph 7), the Loan Party Debtors acknowledge and agree that (i) the First Lien Obligations are not subject to defense, counterclaim or offset of any kind, and (ii) the First Lien Agent's liens and security interests have been properly filed or recorded, as applicable, so as to be perfected in accordance with applicable law. Without prejudice to the rights of any other party (but subject to the limitations thereon described below in decretal paragraph 7), the Loan Party Debtors acknowledge and agree that certain cash of the Loan Party Debtors, including cash on deposit in accounts maintained with any First Lien Lender, constitutes Prepetition Collateral or the proceeds of the Prepetition Collateral and, therefore, is the cash collateral of the First Lien Lenders within the meaning of Section 363(a) of the Bankruptcy Code (the "Cash Collateral"). The First Lien Agent does not consent to the use by the Loan Party Debtors of the Prepetition Collateral, including the Cash Collateral, except on the terms of this Interim Order (or other order that may be entered by the Bankruptcy Court with respect to the Cash Collateral). In addition, the First Lien Lenders are entitled, pursuant to Sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral to the extent of the diminution in value, including for the use of the Cash Collateral, the use, sale, lease, depreciation, decline in market price or other diminution in value of the Prepetition Collateral other than the Cash Collateral, and the imposition of the automatic stay.

F.    Pursuant to this Motion, the Loan Party Debtors have also sought approval of a $20 million debtor in possession financing that would rank junior in priority to the proposed First Lien Adequate Protection Obligations (as defined below) and that would be secured by liens junior to the liens securing the First Lien Obligations. The liens securing the First Lien Obligations are not being primed (other than by the First Lien Replacement Liens (as defined below) granted by this Interim Order).

G.    Good cause has been shown for the entry of this Interim Order. The Loan Party Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses absent continued use of the First Lien Lenders' Cash Collateral. Among other things, entry of this Interim Order will minimize disruption of the Loan Party Debtors' businesses and operations and permit them to make payroll and other operating expenses, maintain business relationships with their vendors and retain customer and vendor confidence by demonstrating an ability to maintain normal operations. The use of the Cash Collateral is therefore of the utmost significance and importance to the preservation and maintenance of the going concern value of the Loan Party Debtors and their estates, and will enhance the prospects for a successful reorganization of the Loan Party Debtors under Chapter 11 of the Bankruptcy Code.

H.    The Loan Party Debtors represent that notice of the Preliminary Hearing and the relief requested in the Motion has been provided by the Loan Party Debtors, whether by U.S. mail, facsimile, electronic mail, overnight courier, or hand delivery, on December 21, 2009 to certain parties in interest (collectively, the "Notice Parties"), including: (i) the United States Trustee for Region 3; (ii) the Internal Revenue Service; (iii) the Securities and Exchange Commission; (iv) the creditors holding the thirty (30) largest unsecured claims against the Loan

Party Debtors' estates; (v) counsel to the First Lien Agent; (vi) counsel to the administrative agent (the "Second Lien Agent") to the lenders (the "Second Lien Lenders") under the Loan Party Debtors' Second Lien Credit and Guaranty Agreement, dated as of November 15, 2005, and (vii) counsel to the lead lenders (the "Lead DIP Lenders") under the Loan Party Debtors' debtor in possession financing facility (the "DIP Facility"). Under the circumstances, notice of the Interim Hearing and the relief requested in the Motion is due and sufficient notice and complies with Section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c), and 4001(d), and the Local Rules of the Bankruptcy Court for the District of Delaware.

I.    Based on the record presented to the Court at the Interim Hearing the terms of the Loan Party Debtors' use of the First Lien Lenders' Cash Collateral appear to be fair and reasonable, and to reflect the Loan Party Debtors' and their respective directors' exercise of prudent business judgment consistent with their fiduciary duties.

J.    The Loan Party Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2). The permission granted herein to use the First Lien Lenders' Cash Collateral is necessary to avoid immediate and irreparable harm to the Loan Party Debtors. This Court concludes that entry of this Interim Order is in the best interest of the Loan Party Debtors' estates and creditors.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1.    The Motion is granted on an interim basis. Any objections to the relief sought in the Motion that have not been previously resolved or withdrawn are hereby overruled

on their merits or, to the extent applicable, deferred until the hearing on the Final Order. This Interim Order shall become effective immediately upon its entry.

2. The Loan Party Debtors are hereby authorized to use the Cash Collateral during the period from the Petition Date through and including the conclusion of the Final Hearing for general corporate purposes and costs and expenses related to these Chapter 11 Cases in accordance with the terms and conditions of this Interim Order.

3. (a) As adequate protection for, and to the extent of, any diminution in the value of the First Lien Lenders' interest in the Prepetition Collateral resulting from (x) the use of the Cash Collateral pursuant to Section 363(c) of the Bankruptcy Code, (y) the use, sale, lease, depreciation, decline in market price or other diminution in value of the Prepetition Collateral (other than the Cash Collateral) pursuant to Section 363(c) of the Bankruptcy Code and (z) the imposition of the automatic stay pursuant to Section 362(a) of the Bankruptcy Code (the amount of any such diminution being referred to hereinafter as the "First Lien Adequate Protection Obligations"): to the extent permitted by applicable law, the First Lien Agent (for the benefit of the First Lien Lenders) and the First Lien Lenders are hereby granted (effective as of the Petition Date and without the necessity of the execution by the Loan Party Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or otherwise), valid and perfected, replacement security interests in, and liens (the "First Lien Replacement Liens") on all of the right, title and interest of the Loan Party Debtors in, to and under all present and after-acquired property of the Loan Party Debtors of any nature whatsoever including, without limitation, all cash contained in any account of the Loan Party Debtors, and causes of action and proceeds of all causes of action, other than (i) causes of action arising under Chapter 5 of the Bankruptcy Code (collectively, the "Avoidance Actions"; provided that, subject to entry of the

Final Order, First Lien Replacement Liens shall attach to any proceeds or property recovered in respect of any Avoidance Actions) and (ii) Permitted Liens (as defined below) (collectively, with the proceeds and products of any and all of the foregoing, the "Postpetition Collateral"). Subject to the Carve Out (as defined below) and Permitted Liens, said First Lien Replacement Liens shall be (x) a first priority perfected lien upon all of the Postpetition Collateral that is not otherwise encumbered by a validly perfected, enforceable, non-avoidable security interest or lien on the Petition Date, (y) a first priority, senior, priming and perfected lien upon (A) that portion of the Postpetition Collateral that is comprised of the Prepetition Collateral and (B) Postpetition Collateral subject to a lien that is junior to the liens securing the First Lien Obligations and (z) a second priority, junior perfected lien upon all Postpetition Collateral (other than the portion described in the preceding clause (y)), which is subject to a validly perfected and enforceable lien as of the Petition Date.

(b)     each calendar quarter as and when due under the First Lien Credit Agreement, the Loan Party Debtors are authorized and directed to pay, as adequate protection, an amount equal to all accrued but unpaid interest on the First Lien Obligations at the default rate as set forth in the First Lien Credit Agreement.

(c)     As additional adequate protection, the Loan Party Debtors shall pay to the First Lien Agent all reasonable fees and expenses payable to the First Lien Agent under the First Lien Loan Documents, including without limitation, the reasonable fees and disbursements of advisors to the First Lien Agent. None of the fees and expenses payable pursuant to this paragraph 3(c) shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses) and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto. The

Loan Party Debtors shall pay the fees and expenses provided for in this paragraph 3(c) promptly after receipt of invoices therefore, and the Loan Party Debtors shall promptly provide copies of such invoices to the Committee and the U.S. Trustee.

(d) Under the circumstances the provisions of this Interim Order are sufficient to adequately protect the interests of the First Lien Lenders.

4.    For purposes hereof, "Carve Out" shall have the meaning given to it in the DIP Financing Order.

5.    Subject to the Carve Out, the First Lien Adequate Protection Obligations shall constitute expenses of administration under Sections 503(b)(1), 507(a) and 507(b) of the Bankruptcy Code (the "First Lien Superpriority Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code including, without limitation, Sections 105, 326, 328, 330, 331 and 726 of the Bankruptcy Code.

6.    Except as expressly set forth in this Interim Order, the liens granted pursuant to this Interim Order shall not be (i) subject to any lien that is avoided and preserved for the benefit of the Loan Party Debtors' estates under Section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with any other lien under Sections 363 and 364 of the Bankruptcy Code, other than any Permitted Lien. The First Lien Replacement Liens granted pursuant to this Interim Order shall constitute valid, enforceable and duly perfected security interests and liens, and the First Lien Agent and the First Lien Lenders shall not be required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Loan

Party Debtors to execute any documentation relating to the First Lien Replacement Liens shall in no way affect the validity, enforceability, perfection or priority of such First Lien Replacement Liens.

       7.     The Loan Party Debtors' acknowledgments and agreements contained in paragraphs D and E of this Interim Order, shall be binding solely upon the Loan Party Debtors. The stipulations and admissions contained in this Interim Order, including without limitation, in paragraphs D and E of this Interim Order, shall be binding upon all other parties in interest, including without limitation, the Committee, unless (a) the Committee or any other party-in-interest with standing to do so has timely filed an adversary proceeding or contested matter by no later than the date that is 60 days after the Petition Date, (A) challenging the validity, enforceability, priority or extent of (i) the First Lien Obligations or the liens on the Prepetition Collateral securing the First Lien Obligations or (B) otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the First Lien Agent, any of the First Lien Lenders or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors in connection with any matter related to the First Lien Obligations or the Prepetition Collateral and (b) an order is entered and becomes final in favor of the plaintiff sustaining any such challenge or claim in any such timely filed adversary proceeding or contested matter, provided that, as to the Loan Party Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished as of the Petition Date. If no such adversary proceeding or contested matter is timely filed in respect of the First Lien Obligations (x) the First Lien Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Chapter 11 Cases

and any subsequent chapter 7 case, (y) the liens on the Prepetition Collateral securing the First

Lien Obligations shall be deemed to have been, as of the Petition Date, and to be, legal, valid,

binding, perfected and of the priority specified in paragraph D and E, not subject to defense,

counterclaim, recharacterization, subordination or avoidance and (z) the First Lien Obligations,

the First Lien Agent and the First Lien Lenders, as the case may be, and the liens on the

Prepetition Collateral granted to secure the First Lien Obligations shall not be subject to any

other or further challenge by the Committee or any other party-in-interest, and the Committee or

such party-in-interest shall be enjoined from seeking to exercise the rights of the Loan Party

Debtors' estates, including without limitation, any successor thereto (including, without

limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for any of

the Loan Party Debtors). If any such adversary proceeding or contested matter is timely filed,

the stipulations and admissions contained in paragraphs D and E of this Interim Order shall

nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph)

on the Committee and any other party-in-interest, except as to any such findings and admissions

that were expressly and successfully challenged in such adversary proceeding or contested

matter. Nothing in this Interim Order vests or confers on any Person (as defined in the

Bankruptcy Code), including the Committee, standing or authority to pursue any cause of action

belonging to the Loan Party Debtors or their estates, including without limitation, Claims and

Defenses with respect to the First Lien Documents, the First Lien Obligations, or any liens

granted by any Loan Party Debtor to secure any of the foregoing.

     8.     The Loan Party Debtors shall promptly mail copies of this Interim Order (which

shall constitute adequate notice of the Final Hearing) to the parties having been given notice of

the Interim Hearing, and to any other party that has filed a request for notices with this Court and

to the Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed. Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served upon (a) Andrews Kurth LLP, 1717 Main Street, Suite 3700, Dallas, Texas 75201 Attention: Jason S. Brookner, Esq., and Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801, Attention: Paul N. Heath, Esq., attorneys for the Loan Party Debtors, (b) Sidley Austin LLP, One South Dearborn, Chicago, Illinois 60603 Attention: Larry J. Nyhan, Esq., attorney for the First Lien Agent, (c) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attention: Kenneth S. Ziman, Esq., and Young, Conaway, Stargatt & Taylor, LLP, 1000 West Street, 17th Floor, Wilmington, Delaware 19801, Attention: Robert S. Brady, Esq. attorneys for the Lead DIP Lenders, (d) Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036, Attention: Michael J. Sage, Esq., attorney for the Second Lien Agent and (e) the Office of the U.S. Trustee for the District of Delaware, and shall be filed with the Clerk of the United States Bankruptcy Court, District of Delaware, in each case to allow actual receipt by the foregoing no later than ____, 2009 at 4:00 p.m., prevailing Eastern time.

9.      Notwithstanding the possible applicability of Rules 6004(g), 7062, and 9014 of the Bankruptcy Rules, or otherwise, the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

10.      The court retains jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

Dated: [          ], 2009
       Wilmington, Delaware

Stipulated and Agreed to on the record at the hearing held on [          ], 2009:

_____

The Honorable [                    ]
United States Bankruptcy Judge