# Exhibit 2

# Commitment Letter

089904-0003-07091-Active.11866248

Strategic Value Partners LLC
100 West Putnam Avenue
Greenwich, Connecticut 06830

Angelo, Gordon & Co., L.P.
245 Park Avenue
New York, New York 10167

December 10, 2009

New Term Facility and Equity Investment
Commitment Letter

NextMedia Group, Inc.
NextMedia Operating, Inc.
6312 South Fiddlers Green
Suite 360E
Greenwood Village, CO 80111

Attention: Eric Neumann, Chief Financial Officer, Vice President and Treasurer

Ladies and Gentlemen:

You have advised us that NextMedia Group, Inc. (including its subsidiaries, the "Company" or "you") intends to engage in a series of transactions to effectuate a restructuring (collectively, the "Restructuring") of its outstanding debt obligations as set forth more fully in the Restructuring Support Agreement (including the term sheets attached thereto, and as amended, supplemented or otherwise modified from time to time, the "Restructuring Agreement"), among the Company, certain of its second lien lenders, its sole shareholder, NextMedia Investors LLC and the Second Lien Lead Investors (as defined below). Pursuant to the Restructuring you will (i) fully repay in cash all obligations outstanding under the Company's Credit and Guaranty Agreement dated as of November 15, 2005 (as amended, supplemented or otherwise modified from time to time, the "First Lien Credit Agreement") and (ii) issue new equity in the reorganized Company in exchange for all of the outstanding obligations held by the lenders (the "Second Lien Lenders") party to the Second Lien Credit and Guaranty Agreement, dated as of November 15, 2005 (as amended, supplemented or otherwise modified from time to time, the "Second Lien Credit Agreement"). You have advised us that you intend to finance the Restructuring, the related costs and expenses, and the ongoing working capital and other general corporate activities of the Company from the following sources:

1.  $127.5 million of debt financing pursuant to the Primary Debt Financing described below or, to the extent the Company is unable to obtain the Primary Debt Financing pursuant to conditions set forth in this Commitment Letter, having the terms and conditions set forth on the term sheet attached hereto as Exhibit A (the "New Term Facility Term Sheet" and such financing, the "New Term Facility").

2.  $55 million of equity investment (the "Equity Investment"), on the terms and conditions set forth on the term sheet attached hereto as Exhibit B (the "Equity

Investment Term Sheet", together with the New Term Facility Term Sheet, the "Term Sheets").

3. Cash on hand.

In connection with the foregoing and to protect the existing investments of certain funds and affiliates of funds managed by Strategic Value Partners LLC or Angelo, Gordon & Co., L.P. or their respective affiliates (such funds with respect to Strategic Value Partners LLC, "SVP" and with respect to Angelo, Gordon & Co., L.P. "Angelo, Gordon"; together with SVP, the "Second Lien Lead Investors", "we" or "us"), each of us is pleased to advise you, subject to the conditions set forth in the Term Sheets and this letter (this "Commitment Letter"), of our several (and not joint) commitment to (1) each provide 50% of the New Term Facility if you are not able to obtain the Primary Debt Financing described below and (2) each make 50% of the Equity Investment (the commitments described in this paragraph, the "Commitments").

You will use your commercially reasonable efforts to obtain $127.5 million of debt financing on market terms reasonably satisfactory to us (excluding the New Term Facility, the "Primary Debt Financing"). Assuming all of the conditions set forth in this Commitment Letter and the New Term Facility Term Sheet have been satisfied, but you have not (i) secured Primary Debt Financing by the effective date of your chapter 11 plan or (ii) secured Primary Debt Financing on terms that are equal to or better than the terms set forth herein and in the New Term Facility Term Sheet, the New Term Facility will serve as your exit financing and, subject to satisfaction of such conditions, shall become effective on the effective date of your chapter 11 plan.

SVP and Angelo, Gordon may assign a portion of their Commitments to any of their affiliated funds or affiliated entities or to any third party investor, or any such investor's affiliated funds or affiliated entities, identified by us. In connection with any such syndication, you hereby authorize us to distribute the Term Sheets and drafts of definitive documentation with respect to the Restructuring.

As consideration for the Commitments and agreements of SVP and Angelo, Gordon hereunder, you agree to cause to be paid the nonrefundable fees described in the Term Sheets.

The Company and its subsidiaries and affiliates and their respective officers and directors shall not, and the Company shall instruct and cause its and its subsidiaries' and affiliates' employees, investment bankers, attorneys, accountants and other advisors or representatives to not, directly or indirectly, initiate, solicit or knowingly encourage any inquiries or the making of any proposal or offer with respect to any equity investment or restructuring of the Company's outstanding debt obligations other than pursuant to this Commitment Letter and the Term Sheets and the terms and conditions hereof and thereof (an "Alternative Proposal"). Notwithstanding anything to the contrary contained herein, to the extent necessary to comply with its fiduciary obligations under applicable law, the board of directors of each of the Company, its parent and its subsidiaries (as to each, the "Board") may authorize the Company to provide information in response to, and consummate a restructuring with, a third party that such Board believes in good faith has made an unsolicited Alternative Proposal that it determines to be more favorable than the Restructuring to such parties that such Board owes a fiduciary duty (such an Alternative Proposal, a "Superior Proposal", it being understood that an Alternative Proposal would not be a "Superior Proposal" unless such proposal provided for the full repayment in cash of all outstanding obligations under the Second Lien Credit Agreement, including, without limitation, all accrued and unpaid interest and all outstanding fees and expenses of the Second Lien Lenders and the administrative agent to the Second Lien Lenders and for the payment of the Break-up Fee (as defined below)). If the Company restructures its outstanding debt obligations through any other transaction or series of transactions other than as contemplated by the Restructuring Agreement or with any third parties other than the Second Lien Lead Investors or such third party as agreed to between the Second Lien Lead Investors and you, you

agree to pay to the Second Lien Lead Investors at the time of consummation of such transaction a break-up fee of $5.5 million (the "Break-up Fee").

The Second Lien Lead Investors' Commitments and agreements hereunder are subject to (a) since the date hereof, there not occurring or becoming known to the Second Lien Lead Investors any event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect (as defined in the New Term Facility Term Sheet), (b) the Company's EBITDA (to be determined in the same manner as in the First Lien Credit Agreement and the Second Lien Credit Agreement) for the twelve month period ending December 31, 2009 not being less than $20 million, (c) the Second Lien Lead Investors' satisfaction that there shall be no competing offering, placement or arrangement of any equity securities by or on behalf of the Company or any of its affiliates or subsidiaries, except as may be agreed to by the Second Lien Lead Investors, (d) assuming the Restructuring Agreement has become effective by its terms, the Restructuring Agreement remaining in full force and effect pursuant to the terms thereof and (e) the other conditions set forth in the Term Sheets and the Restructuring Agreement. Those matters that are not covered by the provisions hereof and of the Term Sheets are subject to the approval and agreement of you and the Second Lien Lead Investors.

You agree (a) to indemnify and hold harmless the Second Lien Lead Investors, their respective affiliates and their respective directors, employees, advisors, and agents (each, an "indemnified person") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the New Term Facility, the Equity Investment, the use of the proceeds thereof, the Restructuring or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any indemnified person is a party thereto, and to reimburse each indemnified person upon demand for any legal or other expenses incurred in connection with investigating or defending any of the foregoing, provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court to arise from the bad faith, willful misconduct or gross negligence of such indemnified person and (b) to reimburse the Second Lien Lead Investors and their respective affiliates on demand for all reasonable out-of-pocket expenses (including due diligence expenses, syndication expenses, consultant's fees and expenses, travel expenses, and reasonable fees, charges and disbursements of counsel) incurred in connection with the New Term Facility, the Equity Investment and any related documentation (including this Commitment Letter and the definitive financing documentation) or the administration, amendment, modification or waiver thereof. No indemnified person shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems or for any special, indirect, consequential or punitive damages in connection with the New Term Facility or the Equity Investment, except to the extent any such damages are found by a final, non-appealable judgment of a court to arise from the bad faith, gross negligence or willful misconduct of such indemnified person or such indemnified person's affiliates, directors, employees, advisors or agents.

You acknowledge that the Second Lien Lead Investors and their respective affiliates may be providing debt financing, equity capital or other services to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. You also acknowledge that the Second Lien Lead Investors have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies. Nothing in this paragraph shall in any way affect any obligations under any non-disclosure or confidentiality agreements the parties have entered into prior to the date hereof. Notwithstanding the above, the Second Lien Lead Investors shall timely disclose to the Company, upon request, any information that is necessary for the Company to comply with the rules, regulations and policies promulgated by the Federal Communications Commission (the "FCC").

This Commitment Letter shall not be assignable by you without the prior written consent of the Second Lien Lead Investors (and any purported assignment without such consent shall be null and void). This Commitment Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and the Second Lien Lead Investors. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile transmission or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter, the Restructuring Agreement and the documentation referred to therein are the only agreements that have been entered into among us with respect to the New Term Facility and the Equity Investment and set forth the entire understanding of the parties with respect thereto and supersede all prior agreements or writings delivered prior to the date hereof.

This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. Each of the parties hereto consents to the nonexclusive jurisdiction and venue of the state or federal courts located in the City of New York. Each party hereto irrevocably waives, to the fullest extent permitted by applicable law, (a) any objection that it may now or hereafter have to the laying of venue of any such legal proceeding in the state or federal courts located in the City of New York and (b) any right it may have to a trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of this Commitment Letter, the Term Sheets, the transactions contemplated hereby or the performance of services hereunder.

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor the Term Sheets nor any of their terms or substance shall be disclosed, directly or indirectly, to any other person (including, without limitation, other potential providers or arrangers of financing) except (a) to your officers, employees, representatives, agents and advisors who are directly involved in the consideration of this matter or (b) as may be compelled in a judicial or administrative proceeding or as otherwise required by law or a court of competent jurisdiction (in which case you agree to inform us promptly thereof), provided, you may disclose this Commitment Letter and the Term Sheets (x) in connection with any court proceeding regarding the approval of this Commitment Letter and the Term Sheets and the obligations hereunder and thereunder and (y) to the administrative agents and the lenders under the First Lien Credit Agreement and Second Lien Credit Agreement, in each case subject to the Second Lien Lead Investors' right to redact in their sole discretion any information herein or in the Term Sheets they deem confidential or proprietary.

The compensation, reimbursement, indemnification and confidentiality provisions contained herein and any other provision herein or therein which by its terms expressly survives the termination of this Commitment Letter shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; provided, that your obligations under this Commitment Letter (other than (i) provisions relating to titles awarded in connection with the New Term Facility and assistance to be provided by you in connection with the syndication thereof, (ii) the indemnification provisions to the extent providing benefits not provided under the definitive documentation relating to the New Term Facility or Equity Investment and (iii) the confidentiality provisions set forth above) shall automatically terminate and be superseded by the provisions of such definitive documentation upon the initial funding thereunder, and you shall automatically be released from all liability in connection therewith at such time.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms hereof and of the Term Sheets by returning to us executed counterparts hereof not later than 5:00 p.m., New York City time, on December 11, 2009. This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence. In

addition, this Commitment Letter will terminate and be of no force and effect and parties will be relieved of their obligations hereunder if the Restructuring Agreement has not become effective in accordance with its terms by no later than January 1, 2010, _provided_ that your obligation in respect of the Break-up Fee shall survive such termination if the Restructuring Agreement has not become effective due to the failure of each of the Company Parties (as defined in the Restructuring Agreement) to execute and deliver signature pages to such Restructuring Agreement.

All parties hereto acknowledge that the above transactions are subject to the rules, regulations and policies of the FCC including, but not limited to, receiving prior consent to any transfer of control of the Company, and its affiliates, multiple ownership rules, and restrictions on foreign ownership. All parties shall cooperate with the Company, on a timely basis, by providing such information to the Company in connection therewith.

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

STRATEGIC VALUE PARTNERS LLC,
on behalf of certain funds and affiliates of funds managed by it or its affiliates

By: _____
Name: JAMES VARLEY
Title: SECRETARY

ANGELO, GORDON & CO., L.P.
on behalf of certain funds and affiliates of funds
managed by it or its affiliates

By: _____

Name:
Title:       **Thomas M. Fuller**
             **Authorized Signatory**

Accepted and agreed to as of
the date first written above by:

NEXTMEDIA GROUP, INC.

By: _____
    Name:
    Title:


NEXTMEDIA OPERATING, INC.

By: _____
    Name:
    Title:

NEXTMEDIA OPERATING, INC.
TERM LOAN FACILITY
Summary of Terms and Conditions

**PARTIES**

Borrower:                        NextMedia Operating, Inc. (the "Borrower").

Guarantors:                      NextMedia Group, Inc. ("Holdings") and each of the Borrower's
                                 direct and indirect, existing and future, subsidiaries (excluding
                                 foreign subsidiaries to the extent a guarantee thereby could
                                 reasonably be expected to result in adverse tax consequences)
                                 (collectively, the "Guarantors"; the Borrower and the
                                 Guarantors, collectively, the "Loan Parties").

Administrative Agent:            To be determined by the Second Lien Lead Investors (as defined
                                 below) and reasonably satisfactory to the Borrower.

Lenders:                         Certain funds and their respective affiliates managed by Strategic
                                 Value Partners LLC or its affiliates ("SVP") and certain funds
                                 and their respective affiliates managed by Angelo, Gordon &
                                 Co., L.P. or its affiliates ("Angelo, Gordon", together with SVP,
                                 the "Second Lien Lead Investors") and such other financial
                                 institutions or entities that become lenders therein (the
                                 "Lenders").

**FACILITY**

Type and Amount:                 A five-year term loan facility (the "New Term Facility") in the
                                 amount of $127,500,000 (the loans thereunder, the "Loans"). The
                                 Loans shall be repayable annually in an amount equal to 1% of
                                 the New Term Facility, such repayments to be made in quarterly
                                 installments beginning in the quarter ending March 31, 2011,
                                 with the balance of the Loans payable on the maturity date.

Availability:                    The Loans shall be made in a single draw occurring on the
                                 Closing Date (as defined below).

Purpose:                         The proceeds of the Loans shall be used to finance a portion of
                                 the Restructuring.

**CERTAIN PAYMENT PROVISIONS**

Fees and Interest Rates:         As set forth on Annex I.

| | |
|---|---|
| Optional Prepayments: | Loans may be prepaid by the Borrower in minimum amounts to be agreed upon. Optional prepayments of the Loans shall be applied to the respective installments thereof in a manner to be agreed upon. Optional prepayments of the Loans may not be reborrowed. |
| Mandatory Prepayments: | The following amounts shall be applied to prepay the Loans from (a) net proceeds of (i) the sale or issuance of equity by Holdings, the Borrower or any of its subsidiaries, (ii) the incurrence of certain indebtedness by Holdings, the Borrower or any of its subsidiaries, and (iii) asset sales or other dispositions by Holdings, the Borrower or any of its subsidiaries and (b) excess cash flow, in each case in such amounts to be agreed upon and subject to exceptions (including reinvestment rights) to be agreed upon. |

Mandatory prepayments of the Loans shall be applied to the respective installments thereof in a manner to be agreed upon. Mandatory prepayments of the Loans may not be reborrowed.

**COLLATERAL**

The obligations of each Loan Party in respect of the New Term Facility provided by any Lender (or any affiliate of a Lender) shall be secured by a perfected first priority security interest in all of its tangible and intangible assets (including, without limitation, Federal Communications Commission ("FCC") licenses, to the extent permitted by applicable law, intellectual property, real property and all of the capital stock of the Borrower and each of its direct and indirect subsidiaries (limited, in the case of foreign subsidiaries, to 66% of the capital stock of first tier foreign subsidiaries to the extent a pledge of a greater percentage could reasonably be expected to result in adverse tax consequences)), except for those assets as to which the Lenders shall determine in their sole discretion that the cost of obtaining a security interest therein are excessive in relation to the value of the security to be afforded thereby.

**CERTAIN CONDITIONS**

Initial Conditions:

The availability of the New Term Facility shall be conditioned upon the prior or simultaneous satisfaction of the following conditions (the date upon which all such conditions precedent shall be satisfied, the "Closing Date"):

(a) Each Loan Party shall have executed and delivered satisfactory definitive financing documentation with respect to the New Term Facility (the "Loan Documentation").

(b) The prior or simultaneous occurrence of the "Closing" under the definitive documentation governing the Restructuring.

3

(c) The Lenders shall have received all fees required to be paid, and all expenses required to be paid for which invoices have been presented, on or before the Closing Date.

(d) All governmental and third party approvals necessary in connection with the Restructuring, the financing contemplated hereby and the continuing operations of the Borrower and its subsidiaries (including, without limitation, shareholder approval, FCC approval and, to the extent required, FTC approval) shall have been obtained on satisfactory and final terms and shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose adverse conditions on the Restructuring or the financing thereof or, any of the transactions contemplated hereby; provided, however, that the FCC's failure or refusal to grant a waiver to enable the preservation of the grandfathered status under the FCC's media ownership rules of certain stations in Chicago, Illinois and Greenville-New Bern-Jacksonville, North Carolina (the "Grandfathered Stations") shall not be, or be deemed to be, a failure by the Borrower to obtain any necessary governmental or third party approvals.

(e) The Borrower shall have delivered audited consolidated financial statements of the Borrower for the fiscal year ending December 31, 2009, to the extent the Closing Date occurs after the time at which such financial statements are available.

(f) The Borrower shall have delivered a pro forma consolidated balance sheet of the Borrower and its subsidiaries as at the date of the most recent consolidated balance sheet delivered pursuant to the preceding paragraph, and a pro forma statement of operations for the twelve-month period ending on such balance sheet date, in each case adjusted to give effect to the consummation of the Restructuring and the financings contemplated hereby as if such transactions had occurred on such date or on the last day of such period, as the case may be.

(g) The Borrower shall have delivered projections through 2015, which shall demonstrate operational and financial performance of the Loan Parties consistent with or better than the projections delivered to SVP prior to the date hereof.

(h) The Second Lien Lead Investors shall be satisfied with the resolution of the litigation regarding the dissolution of NextMedia Investors LLC.

(i)    The Lenders shall have received the results of a recent lien search in each relevant jurisdiction with respect to Holdings, the Borrower and their subsidiaries, and such search shall reveal no liens on any of the assets of Holdings, the Borrower and their subsidiaries except for liens permitted by the Loan Documentation or liens to be discharged on or prior to the Closing Date pursuant to documentation satisfactory to the Lenders.

(j)    All documents and instruments required to perfect the first priority security interest in the collateral under the New Term Facility (including delivery of stock certificates and undated stock powers executed in blank) shall have been executed and be in proper form for filing, and, in connection with any real estate collateral, the Lenders shall have received satisfactory title insurance policies, surveys and other customary documentation to the extent reasonably requested by it and provided that the Borrower has previously insured such real estate collateral in connection with its historical ordinary course operations of the business.

(k)    The Lenders shall have received a satisfactory solvency certificate from the chief financial officer of the Borrower that shall document the solvency of the Borrower and its subsidiaries after giving effect to the Restructuring and the other transactions contemplated hereby.

(l)    Since the most recent audited consolidated financial statements of the Borrower, the Loan Parties shall continue to be licensees under all material FCC licenses; provided, however, that the FCC licenses for the Grandfathered Stations shall be deemed to be immaterial.

(m)    The Lenders shall have received such legal opinions (including opinions (i) from counsel to the Borrower and its subsidiaries, and (ii) from such special and local counsel as may be required by the Lenders), documents and other instruments as are customary for transactions of this type or as they may reasonably request.

(n)    All representations and warranties in the Loan Documentation shall be true and correct in all respects.

(o)    No default or event of default under the Loan Documentation shall exist on the Closing Date.

## CERTAIN DOCUMENTATION MATTERS

The Loan Documentation shall contain representations, warranties, covenants and events of default (in each case, applicable to Holdings, the Borrower and their subsidiaries) customary for financings of this

type and other terms deemed appropriate by the Lenders, including, without limitation:

**Representations and Warranties:** Financial statements (including pro forma financial statements); absence of undisclosed liabilities; since the date of the Commitment Letter, no event, circumstance or change has occurred that has caused or evidences, either in a case or in the aggregate, a Material Adverse Effect; corporate existence; compliance with law; corporate power and authority; enforceability of Loan Documentation; no conflict with law or contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve regulations; labor matters; ERISA; Investment Company Act and other regulations; subsidiaries; use of proceeds; environmental matters; accuracy of disclosure; creation and perfection of security interests; solvency; Regulation H; and delivery of certain documents.

"Material Adverse Effect" means a material adverse effect on (i) the business, operations, properties, assets or condition of the Loan Parties taken as a whole; (ii) the ability of any Loan Party to fully and timely perform its obligations under the New Term Facility; or (iii) the legality, validity, binding effect or enforceability against a Loan Party of the New Term Facility; provided, however, that the occurrence of any of the following shall not be deemed to be a Material Adverse Effect: (x) in connection with the Restructuring, the Company is required to dispose of any of the Grandfathered Stations as a result of the loss of such stations' grandfathered status under the FCC's media ownership rules or (y) any loss sustained by the Company that is covered by insurance.

**Affirmative Covenants:** Delivery of financial statements, reports, accountants' letters, projections, officers' certificates and other information requested by the Lenders; payment of taxes and other obligations; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations; maintenance of property and insurance; maintenance of books and records; right of the Lenders to inspect property and books and records; notices of defaults, litigation and other material events; compliance with environmental laws; further assurances (including, without limitation, with respect to security interests in after-acquired property); and agreement to obtain interest rate protection in an amount and manner satisfactory to the Lenders.

**Financial Covenants:** To include minimum interest coverage ratio, minimum fixed charge coverage ratio and maximum leverage ratio.

**Negative Covenants:** Limitations on: indebtedness (including guarantee obligations), but with permission for a $10 million revolving credit facility, on a senior lien basis with the New Term Facility, so long as any lender of such revolving credit facility is, and the terms of any intercreditor agreement are, acceptable to the Second Lien Lead Investors in their

sole discretion; liens; mergers, consolidations, liquidations and dissolutions; sales of assets; dividends and other payments in respect of capital stock; capital expenditures; acquisitions, investments, loans and advances; prepayments and modifications of subordinated and other material debt instruments; transactions with affiliates; sale-leasebacks; changes in fiscal year; hedging arrangements; negative pledge clauses and clauses restricting subsidiary distributions; changes in lines of business; and amendments to the material transaction documents with respect to the Restructuring.

**Events of Default:**   Nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period to be agreed upon; material inaccuracy of a representation or warranty when made; violation of a covenant (subject, in the case of certain affirmative covenants, to a grace period to be agreed upon); cross-default to material indebtedness; bankruptcy events; certain ERISA events; material judgments; actual or asserted invalidity of any guarantee or security document; changes in the passive holding company status of Holdings; and a change of control (the definition of which is to be agreed upon).

**Voting:**   Amendments and waivers with respect to the Loan Documentation shall require the approval of Lenders holding more than 50% of the aggregate amount of the Loans, except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of any amortization or final maturity of any Loan, (ii) reductions in the rate of interest or any fee or extensions of any due date thereof and (iii) increases in the amount or extensions of the expiry date of any Lender's commitment and (b) the consent of 100% of the Lenders shall be required with respect to (i) reductions of any of the voting percentages, (ii) releases of all or substantially all the collateral and (iii) releases of all or substantially all the Guarantors.

| | |
|---|---|
| Assignments and Participations: | The Lenders shall be permitted to assign all or a portion of their Loans and commitments with the consent, not to be unreasonably withheld, of (a) the Borrower, unless (i) the assignee is a Lender, an affiliate of a Lender or an approved fund or (ii) an event of default has occurred and is continuing, and (b) the Second Lien Lead Investors, unless a Loan is being assigned to a Lender, an affiliate of a Lender or an approved fund; provided that if the Second Lien Lead Investors do not provide their consent, SVP and/or Angelo, Gordon shall purchase such Loans from any such initial Lender at the same price negotiated with its proposed assignee. In the case of partial assignments (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $1,000,000. The Lenders shall also be permitted to sell participations in their Loans. Participants shall have the same benefits as the Lenders with respect to yield protection and increased cost provisions subject to customary limitations. Voting rights of participants shall be limited to those matters set forth in clause (a) under "Voting" with respect to which the affirmative vote of the Lender from which it purchased its participation would be required. Pledges of Loans in accordance with applicable law shall be permitted without restriction. |
| Yield Protection: | The Loan Documentation shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Eurodollar Loan (as defined in Annex I) on a day other than the last day of an interest period with respect thereto. |
| Expenses and Indemnification: | The Borrower shall pay (a) all reasonable out-of-pocket expenses of SVP and Angelo, Gordon associated with the administration of the Loan Documentation and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel) and (b) all out-of-pocket expenses of the Lenders (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the Loan Documentation. |
| | The Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of the relevant indemnified person. |
| Governing Law and Forum: | State of New York. |
| FCC Compliance | The Parties hereto shall comply with all FCC rules, regulations and |

| Matters: | policies including, but not limited to, the requirement of receiving prior consent for any transfer of control, multiple ownership rules, and restrictions on foreign ownership and control. In connection thereto, upon the request of the Borrower or its affiliates, all Parties hereto shall timely provide information to the Borrower or its affiliates, as may be necessary, for the Borrower or its affiliates to comply with FCC rules, regulations and policies. |
| Counsel to SVP and Angelo, Gordon: | Simpson Thacher & Bartlett LLP. |

## INTEREST AND CERTAIN FEES

**Interest Rate Options:**

The Borrower may elect that the Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR plus the Applicable Margin or (b) the LIBOR plus the Applicable Margin.

As used herein:

"<u>ABR</u>" shall be defined in a manner to be agreed upon, including a floor of 3.5%.

"<u>Applicable Margin</u>" means (a) 10% in the case of ABR Loans and (b) 11% in the case of LIBOR Loans.

"<u>LIBOR</u>" shall be defined in a manner to be agreed upon, including a floor of 2.5%.

**Interest Payment Dates:**

In the case of Loans bearing interest based upon the ABR ("<u>ABR Loans</u>"), quarterly in arrears.

In the case of Loans bearing interest based upon the LIBOR ("<u>LIBOR Loans</u>"), on the last day of each relevant interest period and, in the case of any interest period longer than three months, on each successive date three months after the first day of such interest period.

**Default Rate:**

At any time when the Borrower is in default in the payment of any amount of principal due under the New Term Facility, all outstanding Loans shall bear interest at 2% above the rate otherwise applicable thereto. Overdue interest, fees and other amounts shall bear interest at 2% above the rate applicable to the relevant ABR Loans.

**Commitment Fee:**

A commitment fee in an amount equal to 3% of the full amount of the New Term Facility, payable on the Closing Date.

**Ticking Commitment Fee:**

A ticking commitment fee for the period from the date that the Borrower and the Second Lien Lead Investors reasonably determine that Primary Debt Financing will not be obtained to the Closing Date, calculated at 0.50% per annum on the total amount of the New Term Facility (computed on the basis of the actual number of days elapsed over a 360-day year), payable on the Closing Date.

**Original Issue Discount:**

The Loans shall be issued with an original issue discount of 2.0%.

**Rate and Fee Basis:**

All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans the interest rate payable on which is then based on the Prime Rate) for actual

days elapsed.

## EQUITY INVESTMENT TERM SHEET

| | |
|---|---|
| **Issuer:** | NextMedia Group, Inc., a Delaware corporation ("NextMedia"). |
| **Class B Equity:** | Class B Equity of NextMedia (the "Class B Equity") to be purchased by certain funds and affiliates of funds managed by Strategic Value Partners LLC or its affiliates (collectively, "SVP") and by certain funds and affiliates of funds managed by Angelo, Gordon & Co., L.P. or its affiliates for $55 million, which shall represent 66.67% of all of the outstanding equity of the Company at the closing date. |
| **Liquidation Preference:** | The Liquidation Preference is $55 million. |
| **Application of Distributions:** | In the event any distributions are made to holders of the outstanding equity of NextMedia, whether as a result of NextMedia voluntarily or involuntarily liquidating, dissolving or winding up, or the sale of substantially all assets, or the board of directors of NextMedia declaring dividends or authorizing the repurchase of any equity, all such distributions will be applied as follows: |
| | first, to the holders of Class B Equity until such holders have received in the aggregate $55 million on account of such distributions; |
| | second, after giving effect to the distributions in the preceding clause, to the holders of equity of NextMedia otherwise issued or retained pursuant to the Restructuring (the "Restructuring Equity") until such holders have received in the aggregate $27.5 million on account of such distributions; |
| | third, after giving effect to the distributions in the two preceding clauses, any balance shall be distributed ratably to all holders of NextMedia equity. |
| **Ranking:** | With respect to rights on liquidation, winding-up and dissolution, the Class B Equity will rank senior to the Restructuring Equity and each other class or series of capital stock or other equity established after the date of issuance of the Class B Equity, the terms of which do not expressly provide that it ranks on a parity with or senior to the Class B Equity as to rights on liquidation, winding-up and dissolution. |
| **Dividends:** | Dividends may be declared by the board of directors of NextMedia at any time, subject to all dividend payments complying with the order of distributions set forth herein. |

**Dilution:** Holders of the Class B Equity at closing will own 66.67% of all of the outstanding equity of the Company. All of NextMedia's equity, including the Class B Equity, shall be subject to dilution by equity of NextMedia issued in connection with management incentive plan awards as contemplated by the Restructuring Agreement.

**Other Provisions:** Except as otherwise set forth herein, the Class B Equity will have the same voting and other rights as the Restructuring Equity.

**Governance:** After the closing date, the board of directors of NextMedia (the "Board") shall consist of 5 members, one of whom shall be the chief executive officer of NextMedia. For so long as funds or affiliates of funds managed by SVP or its affiliates shall own not less than 39% of the outstanding equity of NextMedia, SVP shall have the right to designate the majority of the Board.

**Governing Law:** The Parties hereto acknowledge that the transactions contemplated hereto are subject to applicable rules, regulations and policies promulgated by the Federal Communications Commission, including but not limited to the requirement of prior consent for a transfer of control, multiple ownership restrictions and foreign ownership restrictions.