# Exhibit 3-C

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is dated as of [_____], 2010, between NEXTMEDIA GROUP, INC., a Delaware corporation ("Employer") and JAMES MATALONE ("Executive").

WHEREAS, Executive is employed by Employer under an Employment Agreement, effective as of January 1, 2005 (the "Original Employment Agreement");

WHEREAS, the Original Employment Agreement has expired by its terms but Executive has continued to work for Employer in accordance with the terms of the Original Employment Agreement; and

WHEREAS, Executive and Employer desire to confirm the termination of the Original Employment Agreement effective as of _____, 2010 and replace the Original Employment Agreement with this Agreement on the terms and conditions herein provided.

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, Employer and Executive agree as follows:

1. *Employment and Employment Period.* During the period specified in this Section 1, Employer shall employ Executive, and Executive shall serve Employer, on the terms and subject to the conditions set forth herein. The term of Executive's employment under this Agreement commenced on _____, 2010 (the "Effective Date") and, subject to prior termination as provided in Section 6 below, shall continue through the second anniversary of the Effective Date (the "Employment Period"); provided, however, that commencing with _____, 2012 and on each annual anniversary of such date thereafter (each an "Extension Date"), the Employment Period shall be automatically extended for an additional one-year period (and all references to the "Employment Period" shall include all such Extension Dates), unless Employer or Executive provides the other party hereto ninety (90) days prior written notice before the next Extension Date that the Employment Period shall not be so extended.

2. *Duties, Responsibilities, Reporting, No Services for Others.*

    (a) At all times during the Employment Period, Executive (i) shall serve as the Executive Vice President and Chief Executive Officer of Employer's traditional outdoor division or such other comparable management position or positions as may be designated by the Board of Directors of Employer (the Board of Directors or any successor equivalent governing body of Employer, the "Board of Directors") from time to time, (ii) shall perform duties in furtherance of the business of Employer, as may be assigned to him from time to time by the Chief Executive Officer, including specifically duties relating to managing day-to-day operations of Employer's traditional outdoor division, and (iii) except as set forth in Section 2(b) hereof, shall devote his entire business time, energy, talent, and best efforts to the faithful and efficient performance of

his duties as Executive Vice President and Chief Executive Officer of Employer's traditional outdoor division.

(b) Executive shall not, at any time during the Employment Period, directly or indirectly, render any business, commercial, or professional services to any other Person, firm, or organization (other than Employer and its Affiliates) for compensation without the prior approval of the Board of Directors. Nothing in this Agreement shall preclude Executive from devoting reasonable periods of time and effort to (i) charitable and community activities or (ii) the management of his personal investment assets; provided, that in each such case, such activities do not interfere in any material respect with the performance by Executive of his duties hereunder.

3. *Compensation.*

(a) *Base Salary.* During the Employment Period, Employer shall pay to Executive an annual base salary (the "Base Salary") in regular equal installments in accordance with Employer's usual payroll practice. Executive's Base Salary shall be Two Hundred Seventy-Five Thousand Dollars ($275,000). Any increases in the Base Salary shall be determined in the sole discretion of the compensation committee of the Board of Directors (the "Compensation Committee").

(b) *Annual Bonus.* Executive shall be eligible to receive an annual bonus (the "Annual Bonus") for each fiscal year in which Executive is employed hereunder in such amount, if any, as determined in the sole discretion of the Board of Directors based upon the achievement of performance objectives established by the Board of Directors for such year. The Annual Bonus, if any, shall be paid by Employer to Executive during the calendar year immediately following the year in respect of which it is earned, as soon as practicable following the completion of the annual audit of Employer. The amount of the overall aggregate annual bonus pool available for payment, if any, to Employer's senior executives as a group, shall be consistent with the aggregate annual bonus pool payable to the Employer's senior executives for the four calendar years preceding the Effective Date.

(c) *Withholdings.* Employer shall, in accordance with applicable law, deduct from the Base Salary, the Annual Bonus and all other cash amounts payable by Employer under the provisions of this Agreement to Executive, or, if applicable, to his estate, legal representatives or such other beneficiary designated in writing by Executive, all social security taxes, all federal, state and municipal taxes and all other charges and deductions that now or hereafter are required by law to be charges on the compensation of Executive or charges on cash benefits ("Tax" or "Taxes") payable by Employer hereunder to Executive's estate, legal representatives or other beneficiary.

4. *Employee Benefits.* During the Employment Period, Executive shall be entitled to participate in, and shall receive benefits in accordance with the terms of, all retirement and welfare benefits plans, practices, policies, and programs that are made available by Employer to other senior executives, which, at a minimum, shall include the following:

2

(a)     *Life Insurance.* Employer shall provide to Executive, and shall keep in full force and effect at all times during the Employment Period, without cost to Executive, a term life insurance policy with a death benefit equal to not more than Seven Hundred Thousand Dollars ($700,000), subject to Executive's insurability at standard group rates. Executive shall be solely responsible for the payment of any federal and/or state taxes that may be levied as a result of Employer furnishing such life insurance policy, and Executive, his estate and/or heirs hereby agree to indemnify and hold harmless Employer from and against any and all taxes that may be payable in connection with such life insurance policy. Executive shall have the privilege of designating the beneficiary thereof and may change the beneficiary thereof by providing written notice to Employer and shall have such other rights of ownership provided by such life insurance policy, subject to the rules and regulations of the issuing insurance company. Executive shall have the right to assign such life insurance policy to Executive's spouse or issue, or to a trust primarily for the benefit of Executive's spouse and/or issue. Upon the termination of this Agreement for any reason, Employer shall assign such life insurance policy to Executive, without cost to Executive; <u>provided</u> that Executive shall pay all premiums and other costs relating to such life insurance policy from and after the date of such assignment.

(b)     *Medical Benefits.* Employer shall provide to Executive and his immediate family, to the extent eligible and at all times during the Employment Period, major medical coverage and disability insurance in accordance with Employer's Executive Medical Benefit Plan. If Employer is notified that Executive does not qualify for such disability insurance at standard rates, Employer will so advise Executive within five (5) days after Employer has received such notification of non-qualification.

(c)     *Reimbursement for Business Expenses.* Employer shall reimburse Executive promptly upon production of reasonably detailed accounts, receipts, vouchers or other reasonable evidence of payment by Executive, for all ordinary, reasonable and necessary travel, entertainment and other expenses as shall be incurred by him in the performance of his duties hereunder.

(d)     *Automobile.* During the Employment Period, Employer shall provide Executive with or pay or reimburse Executive for his lease or purchase of an automobile, the aggregate expense of which shall not exceed Ten Thousand Dollars ($10,000) per calendar year.

(e)     *Vacation.* During each complete twelve (12) month period of the Employment Period, Executive shall be entitled to paid vacation time at the rate of not more than four (4) weeks per calendar year, provided that such vacation shall be taken at such time or times as Executive may determine in such a manner as to avoid undue disruption to the business of Employer. Executive also shall be entitled to such personal leave, holiday leave and sick leave as may be permitted pursuant to the general practice and policies of Employer.

(f)     *Club Membership.* During the Employment Period, Employer shall reimburse Executive for membership dues, up to a maximum of Five Thousand Dollars

3

($5,000) per calendar year, for a tennis, fitness, business lunch club or similar facility to be used by Executive for business purposes. Employer shall have the right to approve the club membership, which approval shall not be unreasonably withheld.

5. *Effect of Disability While in Employ of Employer.* If, during the Employment Period, Executive becomes disabled, by reason of physical or mental impairment, disability or infirmity to such an extent that he is unable to perform his duties under this Agreement for more than ninety (90) working days in any twelve (12) consecutive month period, as determined in good faith by the Board of Directors in its sole discretion ("Disability" or "Disabled"):

(a) Employer may relieve Executive of his duties under this Agreement for as long as Executive is so Disabled.

(b) Employer shall pay to Executive, net of the offset referred to in the last sentence of this Section 5(b), all Base Salary, if any, to which he would have been entitled under this Agreement had he continued to be actively employed by Employer to the earliest of (i) the first date on which he is no longer so Disabled, (ii) the date on which his employment is terminated by Employer due to Disability pursuant to Section 6(a), (iii) the date of his death, or (iv) the end of the Employment Period due to any reason other than termination by Employer due to Disability pursuant to Section 6(a) or death. Any payment referred to in this Section 5(b) shall be made at the same time as that payment would have been made if Executive were not Disabled. Payments under this Section 5(b) for any period shall be offset, dollar for dollar, by any disability benefits (other than benefits payable pursuant to any disability insurance policy all of the premiums for which were paid by Executive and not Employer) for that period that are received by Executive.

(c) Except as provided in this Section 5, Employer shall have no further obligations to Executive for Base Salary or Annual Bonus for any period during which Executive is so Disabled.

(d) Executive agrees to submit such medical evidence regarding Executive's Disability as may be reasonably requested by the Board of Directors.

6. *Termination.*

(a) *Death or Disability.* Executive's employment hereunder will terminate immediately upon Executive's death. Employer may terminate Executive's employment hereunder as of the effective date specified in Employer's notice of termination if Executive is Disabled, which effective date shall not be earlier than the ninety-first (91st) working day (excluding vacation days) following the commencement of Executive's Disability, provided, that such notice shall be delivered to Executive not later than ten (10) days from the effective date of termination specified in such notice.

(b) *By Employer for Cause.* Employer may terminate Executive's employment under this Agreement for "Cause" (and Executive's employment will be deemed to have been terminated for "Cause") if, as of the date of termination, any of the following circumstances have occurred:

4

(i) Except as otherwise permitted by Section 2(b) hereof, Executive has refused to perform his duties as an employee of Employer or failed to devote his entire business, time, energy, talent and best efforts to the performance of his duties under this Agreement in any material respect;

(ii) Executive has been convicted of, or entered a plea of nolo contendere to, a felony;

(iii) Executive has engaged in any fraudulent or dishonest conduct or act in the course of his employment with Employer relating to Employer or any of its Affiliates;

(iv) Executive breaches any of his obligations hereunder in any material respect;

(v) Executive has been grossly negligent in the performance of his duties under this Agreement; or

(vi) Executive has engaged in the illegal use of drugs or suffers from drug dependence or habitual insobriety.

No termination of Executive pursuant to any of clauses (i), (iv), (v), or (vi) above will be effective unless and until Executive has first been given written notice of the conduct or circumstance purported to constitute "Cause" thereunder and, unless such conduct or circumstance is not reasonably susceptible of cure or such conduct or circumstance has already been the subject of notice hereunder and cured by Executive previously, Executive has failed to cure that conduct or omission within thirty (30) days following receipt of notice by Executive. Any termination under either clause (ii) or (iii) or, subject to the exceptions provided for in the immediately preceding sentence, any other termination, shall be effective on such current or prospective date as may be specified by Employer when giving written notice of the termination.

(c) *By Employer Without Cause.* Subject to Section 7(c) hereof, Employer may terminate Executive's employment hereunder without Cause upon written notice from the Chief Executive Officer to Executive.

(d) *By Executive for Good Reason.* Executive may terminate his employment hereunder for "Good Reason" at any time if, as of the date of termination, any of the following circumstances have occurred:

(i) failure by Employer to pay Executive the Base Salary or the Annual Bonus when due and payable under this Agreement, or a reduction in the Base Salary by Employer, other than a reduction pursuant to any retirement or welfare benefit plan;

(ii) failure by Employer to provide Executive with employee welfare benefits substantially in accordance with Section 4 hereof;

5

DAL:760240.2

(iii) Executive's position, duties and scope of responsibilities as described in Section 2(a) hereof are materially reduced from those in effect on the Effective Date other than for Cause (and other than due to Executive's physical or mental incapacity) without the consent of Executive (it being understood that the reassignment of Executive's functions, duties or responsibilities other than those customarily performed by an executive vice president and a chief executive officer of a division of a business of comparable size and complexity to one or more other persons who report directly or indirectly to Executive shall not be considered a reduction of Executive's duties or responsibilities);

(iv) the failure of Employer to obtain the assumption in writing of its obligation to perform this Agreement by any successor to all or substantially all of the assets of Employer within fifteen (15) days after such sale or after a merger, consolidation or similar transaction in which Employer is not the surviving entity, as applicable; or

(v) Employer requires a physical transfer or relocation of Executive to a location unacceptable to Executive in order for Executive to continue to perform his duties and responsibilities under this Agreement.

No termination by Executive pursuant to any of clauses (i), (ii), (iii), or (iv) above will be effective unless and until Employer has first been given written notice of the conduct or circumstance purported to constitute "Good Reason" hereunder and, unless such conduct or circumstance is not reasonably susceptible of cure or such conduct or circumstance has already been the subject of notice hereunder and cured by Employer previously (in which case, such termination shall be effective on such current or prospective date as may be specified by Executive when giving written notice of the termination), Employer has failed to cure that conduct or omission within thirty (30) days following receipt of that written notice by Executive, except that if such conduct or circumstance is the failure to pay any money due to Executive under Section 3 hereof, then the cure period shall be fifteen (15) days following receipt of such written notice. Any termination under clause (v) shall be effective on such current or prospective date as may be specified by Employer when giving written notice of the termination.

(e) *By Executive Without Good Reason.* Executive may terminate his employment hereunder without Good Reason (as defined above) at any time, <u>provided</u> that Executive will be required to give the Chairman of the Board of Directors at least ninety (90) days advance written notice of any resignation of Executive's employment.

7. *Payments Upon Termination.*

(a) *Termination by Employer For Cause or by Executive Other Than for Good Reason.*

(i) If Executive's employment hereunder is terminated by Employer for Cause or by Executive other than for Good Reason during the Employment Period, Employer shall pay to Executive:

6

(A) any Base Salary and unused or unpaid vacation accrued through the Termination Date, payable in accordance with Employer's usual payment practices;

(B) any Annual Bonus earned, but unpaid, as of the Termination Date for the immediately preceding fiscal year, paid in accordance with Section 3(b); and

(C) reimbursement, within 60 days following submission by Executive to Employer of appropriate supporting documentation, for any unreimbursed business expenses properly incurred by Executive in accordance with Employer policy prior to the Termination Date; provided that claims for such reimbursement (accompanied by appropriate supporting documentation) are submitted to Employer within 90 days following the date of Executive's termination of employment. Amounts described in clauses (A) through (C) hereof being referred to as the "Accrued Rights."

(ii) Following any termination of Executive's employment by Employer for Cause or termination by Executive without Good Reason, except as set forth in this Section 7(a), Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(b) *Termination Upon Death or Disability.* If Executive's employment hereunder is terminated during the Employment Period due to his death or Disability, Employer shall pay to Executive or the beneficiaries designated in writing by Executive or Executive's estate, as applicable, (i) any Accrued Rights and (ii) a pro rata portion of the Annual Bonus, if any, that Executive would have been entitled to receive pursuant to Section 3(b) hereof in respect of such year based upon the percentage of the fiscal year that has elapsed through the Termination Date, payable when such Annual Bonus would have otherwise been payable to Executive pursuant to Section 3(b) had Executive's employment not terminated. Following Executive's termination of employment due to death or Disability, except as set forth in this Section 7(b), Executive shall have no further rights to any compensation or any other benefits under this Agreement.

(c) *Termination by Employer Without Cause or by Executive for Good Reason.* If Executive's employment hereunder is terminated by Employer without Cause (other than by reason of death or Disability) or by Executive for Good Reason during the Employment Period:

(i) Employer shall pay to Executive any Accrued Rights;

(ii) Subject to Executive's execution, delivery and non-revocation of a general release of claims in favor of Employer and its Affiliates in a form reasonably prescribed by Employer within 45 days following the Termination Date, Executive shall be entitled to receive continued payment of the Base Salary in accordance with Employer's normal payroll practices, as in effect on the

7

Termination Date, until twelve (12) months after the Termination Date determined as if such termination had not occurred (such amounts the "Salary Continuation Payments"); provided that the aggregate amounts described in this clause (ii) shall be in lieu of any other cash severance or termination benefits payable to Executive under any other plans, programs or arrangements of Employer or its Affiliates; provided further that the Salary Continuation Payments shall be made only if Executive is in compliance with his obligations under Section 8 hereof. The Salary Continuation Payments shall commence on the 60th day following the Termination Date (with payment in arrears from the Termination Date);

(iii) Subject to Executive's continued compliance with his obligations under Section 8 hereof and execution, delivery and non-revocation of a general release of claims in favor of Employer and its Affiliates in a form reasonably prescribed by Employer within 45 days following the Termination Date, Employer shall continue to provide to Executive the same or equivalent medical coverage as in effect for Executive immediately prior to the Termination Date until the earlier of (A) the expiration of twelve (12) months following the Termination Date and (B) the date Executive has commenced new employment and has thereby become eligible for comparable benefits. In order to facilitate such coverage, Executive and his spouse and dependents, as applicable, in accordance with Employer's policies in effect at the time of Executive's termination, shall agree to elect continuation coverage in accordance with the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1986, as amended ("COBRA Coverage") and Executive's premium obligation for such COBRA Coverage shall be limited to the amount that Executive would have been obligated to pay for such insurance coverage if Executive's employment had not terminated; and

(iv) Employer shall continue to provide Executive with reasonably appropriate access to office space and secretarial support and assistance at the Employer's office, at no cost to Executive, for a period of up to six (6) months following the Termination Date.

Following Executive's termination of employment by Employer without Cause (other than by reason of Executive's death or Disability) or by Executive's resignation for Good Reason, except as set forth in this Section 7(c), Executive shall have no further rights to any compensation or any other benefits under this Agreement or under any other severance or termination benefit plan sponsored or maintained by Employer or its Affiliates.

(d) *Election Not to Extend the Employment Period.*

(i) In the event either party elects not to extend the Employment Period pursuant to Section 1, unless Executive's employment is earlier terminated pursuant to paragraphs (a), (b) or (c) of this Section 7, Executive's rights under this Agreement shall terminate on the close of business on the day immediately

8

DAL:760240.2

preceding the next scheduled Extension Date and Executive shall be entitled to receive the Accrued Rights.

(ii) Notwithstanding the foregoing, upon the expiration of the Employment Period due to Employer's election not to extend the Employment Period pursuant to Section 1, if Employer provides Executive with a timely Non-Compete Election Notice pursuant to Section 8(c)(ii) designating a Non-Compete Period in excess of 0 months, then subject to Executive's execution, delivery and non-revocation of a general release of claims in favor of Employer and its Affiliates in a form reasonably prescribed by Employer within 45 days following the Termination Date, Executive shall be entitled to receive continued payment of the Base Salary in accordance with Employer's normal payroll practices, as in effect on the Termination Date for the number of months corresponding to the Elected Non-Compete Period (such amounts the "Non-Extension Salary Payments"); provided that the aggregate amounts described in this clause (ii) shall be in lieu of any other cash severance or termination benefits payable to Executive under any other plans, programs or arrangements of Employer or its Affiliates; provided further that the Non-Extension Salary Payments shall be made only if Executive is in compliance with his obligations under Section 8 hereof. The Non-Extension Salary Payments shall commence on the 60th day following the Termination Date (with payment in arrears from the Termination Date).

(iii) Following such termination of Executive's employment hereunder as a result of either party's election not to extend the Employment Period, except as set forth in this Section 7(d), Executive shall have no further rights to any compensation or any other benefits under this Agreement. Unless the parties otherwise agree in writing, continuation of Executive's employment with Employer beyond the expiration of the Employment Period shall be deemed an employment at will and shall not be deemed to extend any of the provisions of this Agreement and Executive's employment may thereafter be terminated at will by either Executive or Employer; provided that the provisions of Section 8 of this Agreement shall survive any termination of this Agreement or Executive's termination of employment hereunder.

(e) *No Duty to Mitigate.* Executive shall not be obligated to seek other employment or to take any other action to mitigate the amounts payable to Executive under this Agreement.

(f) *Payments and Benefits Constitute Exclusive Remedy.* Executive agrees that if his employment is terminated during the Employment Period under circumstances entitling him to payment of any amounts and/or provision of any benefits under this Section 7, his sole right and remedy against Employer in connection with his employment, this Agreement, and the termination of his employment shall be to collect those amounts and/or receive those benefits, all as otherwise limited by the other provisions of this Section 7.

(g) *Board/Committee Resignation.* Upon termination of Executive's employment from Employer for any reason, Executive agrees to resign, as of the date of such termination and to the extent applicable, from the Board of Directors (and any committees thereof) and the Board of Directors (and any committees thereof) of any of Employer's Affiliates.

8. *Confidentiality, Nonsolicitation, Noncompetition, Inventions.* Executive acknowledges that the business in which Employer engages is competitive and that his employment with Employer will require that he have access to, and knowledge of, confidential and proprietary information pertaining to Employer that is of vital importance to the success of Employer's business; that the direct or indirect disclosure of any such confidential information to existing or potential competitors of Employer would place Employer at a competitive disadvantage and would do material damage, financial and otherwise, to its business; and that by virtue of Executive's experience and expertise, some of his services to Employer will be special and unique and that Employer and Executive are entering into this Agreement with the intention of preserving the goodwill of the business of Employer. Executive further acknowledges that the duties of Executive to be performed hereunder shall be performed across the United States, and not limited to a specific geographic area therein.

(a) *Confidentiality.* Executive shall not, at any time during the Employment Period and at all times thereafter, except in connection with the performance of services hereunder or in furtherance of the business of Employer or its Affiliates, communicate, divulge, or disclose to any other Person not a director, officer, or employee, or not engaged to render services to or for, Employer or its Affiliates, or use for his own benefit or purposes any Confidential Information (as defined below) of or relating to Employer or its Affiliates that he has obtained from Employer or its Affiliates or any predecessor entity (whether obtained by Executive before, during, or after the term of his employment under this Agreement and including any such information developed by Executive while employed by Employer); except that this provision shall not preclude Executive from divulging, communicating or using any information made known generally to the public by Employer or by any party unrelated to Executive, or from making any disclosure required by applicable law, rules, regulations, or court or governmental or regulatory authority order or decree provided that, if practicable, Executive shall not make any such disclosure without first giving Employer notice of intention to make that disclosure and an opportunity to interpose an objection to the disclosure. All files, records, and documents pertaining to Employer's business shall belong to and remain the sole and exclusive property of Employer and if Employer requests the return of such information at any time during, upon or after termination of executive's employment, Executive shall immediately deliver the same to Employer.

"Confidential Information" means information relating to the services or operations of Employer or its Affiliates that is not generally known, is proprietary to Employer or its Affiliates and is made known to Executive or learned or acquired by Executive while in the employ of Employer, including, without limitation, (i) information relating to research, development, purchasing, accounting, marketing, merchandising, advertising, selling, leasing, finance and business methods and techniques and (ii) customer lists and other information relating to past, present or prospective customers.

10

(b)     *Nonsolicitation.*  During the period commencing on the Effective Date and continuing thereafter through the first anniversary of the Termination Date, Executive shall not, except in connection with his duties hereunder or otherwise for the sole account and benefit of Employer, directly or indirectly, induce or solicit any employee of Employer of its Affiliates to leave their employ or approach any such employee for any of the foregoing purposes or authorize, solicit or assist in the taking of such actions by any third party.

(c)     *Noncompetition.*

(i)     During the period commencing on the Effective Date and continuing thereafter through the Non-Compete Period (as defined below), Executive shall not, directly or indirectly, engage, participate, make any financial investment in, or become employed by or render advisory or other services to or for any Person or other business enterprise which engages in the outdoor advertising business in any market in which (i) Employer or its Affiliates engage in any material respect in the outdoor advertising business, and (ii) Executive was performing services hereunder in the course of his employment with Employer (any of the foregoing activities being referred to herein as "Competitive Activities") (other than the Employer or its Affiliates or any existing investments of Executive on the Effective Date disclosed to Employer and set forth on **Schedule A** which shall not be deemed Competitive Activities).  Executive also shall not provide management services to any Person engaged in Competitive Activities.  The foregoing covenant respecting Competitive Activities shall not be construed to preclude Executive from making any investments (that are non-attributable interests under the rules, regulations or policies of the Federal Communications Commission or any successor agency) in the securities of any company, whether or not engaged in Competitive Activities with Employer or its Affiliates, to the extent such investments are actively traded on a national securities exchange and such investment does not exceed 1.0% of the issued and outstanding shares of such company or give Executive the right or power to control or participate directly in making the policy decisions of any such company.

(ii)     "Non-Compete Period" shall mean 12 months following the Termination Date; <u>provided</u> that, in the event of Executive's termination of employment upon the expiration of the Employment Period due to Employer's election not to extend the Employment Period pursuant to Section 1, then the Non-Compete Period shall be either 12 months, 6 months or 0 months (as applicable, the "Elected Non-Compete Period") as elected by Employer in its discretion in a written notice ("Non-Compete Election Notice") provided to Executive no later than 90 days prior to the scheduled expiration date of the Employment Period resulting from such Employer election not to extend the Employment Period.  If Employer fails to provide Executive with a timely Non-Compete Election Notice, the Non-Compete Period shall be deemed to be 0 months.

11

(d)  *Inventions*. Executive will promptly disclose to Employer and furnish to Employer a complete record of every discovery, invention, improvement, innovation, design, or work (any "<u>Intellectual Development</u>") that Executive may make or create, whether individually or with others, while Executive is employed by Employer. Executive acknowledges and agrees that any and all such Intellectual Developments, whether or not disclosed to Employer, shall be the property of Employer. Upon request of Employer, whether made before or after the termination of the employment relationship, Executive will assign to Employer (or to a party designated by Employer) all rights throughout the world to any Intellectual Developments that relate to Employer's current or prospective business or that result from Executive's work with Employer. Executive will cooperate fully with Employer in securing rights with respect to all such Intellectual Developments, including executing any documentation reasonably proposed by Employer and testifying, under oath if requested, without expense to Executive, to secure Employer's rights to Intellectual Developments in any jurisdiction.

(e)  *Acknowledgment*. Executive hereby acknowledges that (i) the respective time periods and geographical areas provided above are necessary for the protection of the business and goodwill of Employer, (ii) if a final judicial determination is made by a court of competent jurisdiction that the time or territory or any other restriction contained in this Agreement is an unenforceable restriction against Executive, the provisions of this Agreement shall not be rendered void but shall be deemed amended to apply as to such maximum time and territory and to such maximum extent as such court may judicially determine or indicate to be enforceable and (iii) this Section 8 shall continue beyond the termination of his relationship with Employer hereunder to the extent provided herein. In addition, if any court of competent jurisdiction finds that any restriction contained in this Agreement is unenforceable, and such restriction cannot be amended so as to make it enforceable, such finding shall not affect the enforceability of any of the other restrictions contained herein. Executive further acknowledges that the services to be rendered by Executive hereunder are extraordinary and unique and are vital to the success of Employer's business, and that the breach of any of the covenants undertaken hereunder would cause substantial damage to Employer, impossible of exact ascertainment.

(f)  *Equitable Relief*. The parties hereto, recognizing that irreparable injury will result to Employer, its business and property, in the event of a breach of the provisions of Section 8 of this Agreement by Executive, and that but for the agreements contained in this Section 8, Employer would not enter into this Agreement, hereby agree that in the event of any actual or threatened breach of the provisions of this Section 8 by Executive, Employer shall be entitled, in addition to any other remedies and damages available, to temporary relief without notice and to all injunctive relief without bond to restrain the violation thereof by Executive, Executive's partners, agents, servants, employers, business associates, and all Persons acting for or with Executive. The prevailing party in such action shall be entitled to recover from the other party all costs associated therewith, including, without limitation, reasonable and necessary attorney's fees.

9.  *Waiver*. No provision of this Agreement may be modified, waived, or discharged unless such waiver, modification, or discharge is agreed to in a writing signed by Executive and

12

DAL:760240.2

Employer. No waiver by either party hereto at any time of any breach by the other party of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver of similar or dissimilar provisions or conditions at the same time or at any prior or subsequent time.

10. *Entire Agreement.* No agreement or representation, oral or otherwise, express or implied, with respect to the subject matter hereof has been made by either party which is not set forth expressly in this Agreement.

11. *Notices.* Notices under this Agreement shall be in writing and will be effective immediately upon delivery if delivered in person (or by facsimile or e-mail with confirmation of receipt) to Executive (in the case of notices to Executive) or in person (or by facsimile or e-mail with confirmation of receipt) to the individual indicated below (in the case of notices to Employer) or three (3) days after mailing if deposited in the United States mail, postage prepaid, and addressed:

| | |
|---|---|
| if to Executive, to: | James Matalone<br>2627 Pleasant Place<br>Sarasota, FL 34239<br>Email: jmatalone@nextmediagroup.net |
| and if to Employer, to: | NextMedia Group, Inc.<br>6312 South Fiddler's Green Circle<br>Suite 205-E<br>Englewood, CO 80111<br>Attention: Steven Dinetz<br>Facsimile: (303) 694-4940<br>Email: sdinetz@nextmediagroup.net |

Either party may change the address to which notice to that party may be mailed by notifying the other party of the change in the manner contemplated in this section.

12. *Severability.* Any provision of this Agreement that is prohibited or unenforceable shall be ineffective to the extent, but only to the extent, of such prohibition or unenforceability without invalidating the remaining portions hereof and such remaining portions of this Agreement shall continue to be in full force and effect.

13. *Assignment.* Neither Executive nor Employer may assign, transfer or otherwise dispose of any of their rights hereunder without the prior written consent of the other party, in its sole discretion. Any attempted assignment in violation of the foregoing shall be void.

14. *Compliance with IRC Section 409A.* Notwithstanding anything herein to the contrary, (i) if at the time of Executive's termination of employment with Employer Executive is a "specified employee" as defined in Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") and the deferral of the commencement of any payments or benefits otherwise payable hereunder as a result of such termination of employment is necessary in order to prevent any accelerated or additional Tax under Section 409A of the Code, then Employer will

13

defer the commencement of the payment of any such payments or benefits hereunder (without any reduction in such payments or benefits ultimately paid or provided to Executive) until the date that is six months following Executive's termination of employment with Employer (or the earliest date as is permitted under Section 409A of the Code without any accelerated or additional Tax) and (ii) if any other payments of money or other benefits due to Executive hereunder could cause the application of an accelerated or additional Tax under Section 409A of the Code, such payments or other benefits shall be deferred if deferral will make such payment or other benefits compliant under Section 409A of the Code, or otherwise such payment or other benefits shall be restructured, to the extent possible, in a manner, determined by the Board of Directors, that is reasonably expected not to cause such an accelerated or additional Tax. For purposes of Section 409A of the Code, each payment made under this Agreement shall be designated as a "separate payment" within the meaning of the Section 409A of the Code, and references herein to Executive's "termination of employment" shall refer to Executive's separation from service with Employer within the meaning of Section 409A. To the extent any reimbursements or in-kind benefits due to Executive under this Agreement constitute "deferred compensation" under Section 409A of the Code, any such reimbursements or in-kind benefits shall be paid to Executive in a manner consistent with Treas. Reg. Section 1.409A-3(i)(1)(iv). Employer shall consult with Executive in good faith regarding the implementation of the provisions of this Section 14; provided that neither Employer nor any of its employees or representatives shall have any liability to Executive with respect thereto.

15. *Counterparts.* This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together shall constitute but one and the same instrument and a signature to any one of such counterparts shall be deemed to be a signature to all such counterparts.

16. *Governing Law.* The provisions of this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made in that state.

17. *Attorney's Fees and Expenses.* If either of the parties institutes any legal action to enforce its rights under, or to recover damages for material breach of, this Agreement, the prevailing party shall be entitled to recover from the other party any actual expenses for attorney's fees, costs, expenses and disbursements incurred by the prevailing party.

18. *Executive Representations.* Executive hereby represents and warrants to Employer that (a) Executive's execution and delivery of this Agreement and his performance of his duties and obligations hereunder will not conflict with, or cause a default under, or give any party a right to damages under, or to terminate, any other agreement to which Executive is a party or by which he is bound and (b) there are no agreements or understandings that would make unlawful Executive's execution or delivery of this Agreement or his employment hereunder.

19. *Disputes.* Any dispute or controversy arising under, out of, in connection with or in relation to this Agreement shall, at the election and upon written demand of either Executive or Employer, be finally determined and settled by arbitration in Denver, Colorado in accordance with the rules and procedures of the American Arbitration Association, and judgment upon the

14

award may be entered in any court having jurisdiction thereof. Employer shall pay the costs and expenses of such arbitration and the fees of Executive's counsel and experts unless the finder of fact determines that Employer is the prevailing party in such arbitration.

20.  *Miscellaneous*.  The provisions of this Agreement shall survive the termination of Executive's employment with Employer. This Agreement supersedes any prior written or oral agreements or understanding between the parties relating to the subject matter hereof, including without limitation the Original Employment Agreement, which agreement is hereby terminated in all respects. The headings in this Agreement are inserted for convenience of reference only and shall not be a part of or control or affect the meaning of any provision hereof.

21.  *Definitions*.  In addition to the defined terms set forth throughout this Agreement, the following capitalized terms shall have the respective meanings set forth below:

"*Affiliate*" shall mean with respect to any Person:

(a)  Any Person directly or indirectly Controlling, Controlled by or under common Control with such Person ("Control Persons");

(b)  Individuals who are members of the family of any individual who is a Control Person;

(c)  Entities that are Controlled by such family members; and

(d)  Entities in which Control Persons have a material investment.

"*Control*" (including the correlative terms "controlled by" and "controlling") shall mean the possession, directly or indirectly, of the power to direct, or to cause the direction of, the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"*Person*" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company or government, or any agency or political subdivision thereof.

"*Termination Date*" shall mean the date on which Executive's employment with Employer and its Affiliates terminates.

[The Remainder of this Page Is Intentionally Left Blank.]

15

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

"EMPLOYER"                                          "EXECUTIVE"

NEXTMEDIA GROUP, INC.

By: _____
Name: _____                  _____
Title: _____                 James Matalone

## Schedule A

None.

DAL:760240.2