**Exhibit 4**

STOCKHOLDERS AGREEMENT

by and among

NEXTMEDIA GROUP, INC.

and

THE STOCKHOLDERS NAMED HEREIN

Dated as of [●]

# TABLE OF CONTENTS

Page

SECTION 1. DEFINITIONS ...................................................................................................1

    1.1   Defined Terms. ..............................................................................................1

    1.2   Other Definitional Provisions; Interpretation. ............................................8

SECTION 2. CORPORATE GOVERNANCE ........................................................................9

    2.1   Board of Directors .........................................................................................9

    2.2   Certificate of Incorporation and By-Laws ...................................................11

    2.3   Other Voting Matters .....................................................................................11

    2.4   Consent Rights ...............................................................................................11

    2.5   Elective Conversion of Common Stock .........................................................12

    2.6   Required Conversion of Common Stock ........................................................13

    2.7   Limited Voting Common Stock ......................................................................13

    2.8   Elective Conversion Into Warrants ...............................................................14

    2.9   Recapitalization .............................................................................................14

SECTION 3. INFORMATION REQUIREMENTS ................................................................15

    3.1   Annual and Quarterly Reports ......................................................................15

    3.2   Annual Budgets and Operating Plans ..........................................................15

    3.3   Confidentiality ...............................................................................................16

    3.4   FCC Information ............................................................................................16

SECTION 4. TRANSFERS AND ISSUANCES ....................................................................16

    4.1   Limitations on Transfer .................................................................................16

    4.2   Transfers to Affiliates ...................................................................................18

    4.3   Effect of Void Transfers ................................................................................18

    4.4   Legend on Securities .....................................................................................18

    4.5   Rights of First Offer ......................................................................................19

    4.6   Tag-Along Rights ...........................................................................................21

    4.7   Drag-Along Rights .........................................................................................23

    4.8   Participation Rights .......................................................................................25

    4.9   Reservation of Shares ....................................................................................27

    4.10  Other Media Related Transactions ..............................................................28

    4.11  Public Offerings, etc .....................................................................................28

SECTION 5. MISCELLANEOUS ...................................................................................28

    5.1   Additional Securities Subject to Agreement.................................................28

    5.2   Termination.................................................................................................28

    5.3   Injunctive Relief ........................................................................................28

    5.4   Other Stockholders Agreements ..............................................................28

    5.5   Amendments and Waivers .........................................................................29

    5.6   Successors, Assigns and Transferees; No Third Party Beneficiaries ..........29

    5.7   Notices ......................................................................................................29

    5.8   Integration .................................................................................................29

    5.9   Severability ...............................................................................................30

    5.10  Counterparts...............................................................................................30

    5.11  Governing Law, Etc....................................................................................30

    5.12  Waiver of Jury Trial....................................................................................30

    5.13  Management Stockholders...........................................................................31

    5.14  Lender Relationship....................................................................................31

    5.15  Representations of the Company .................................................................31

    5.16  Operation of Indemnification......................................................................31


EXHIBITS

EXHIBIT A   Form of Warrant Agreement...................................................................31

This STOCKHOLDERS AGREEMENT, dated as of [●], 2010, is entered into by and among NextMedia Group, Inc. (the "Company"), the Investors (as defined below), the Creditor Stockholders (as defined below), the Rollover Equity Stockholders (as defined below), the Management Stockholders (as defined below) and any other stockholder that may become a party to this Agreement after the date hereof and pursuant to the terms hereof (collectively with the Investors, the Creditor Stockholders, the Rollover Equity Stockholders and the Management Stockholders, the "Stockholders").

W I T N E S S E T H:

WHEREAS, the Company and the Stockholders are entering into this Agreement pursuant to the terms of the Restructuring Plan (as defined below) to set forth certain agreements with respect to the Company and its Subsidiaries (as defined below) and their respective ownership of Common Stock (as defined below) and other Common Stock Equivalents (as defined below).

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

SECTION 1.  DEFINITIONS

1.1 Defined Terms. As used in this Agreement, terms defined in the preamble and the recitals shall have their respective assigned meanings, and the following capitalized terms shall have the meanings ascribed to them below:

"Acceptance Notice" shall have the meaning set forth in Section 4.5(a)(ii).

"Accredited Investor" shall mean an "Accredited Investor," as such term is defined in Regulation D promulgated under the Securities Act, or any successor rule then in effect.

"Affiliate" (a) shall mean, with respect to any Person, any Person that directly or indirectly controls, is controlled by or is under common control with, such Person or any Immediate Family Member of such Person; and (b) shall also include, with respect to any Person who is an individual, a trust, the beneficiaries of which, or a corporation or partnership, the stockholders or limited or general partners of which, include only such individual and/or such individual's Immediate Family Members. For purposes of this definition, the term "control" (including the correlative terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"AG" shall mean funds and accounts and Affiliates of funds and accounts managed by Angelo, Gordon & Co., L.P. and its Affiliates.

"Agreement" shall mean this Stockholders Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"Applicable Drag Percentage" shall have the meaning set forth in Section 4.7(a).

"Award Agreement" shall mean the applicable award agreement entered into by and between the Company and the Management Stockholder named therein in connection with the 2010 NextMedia Group, Inc. Stock Incentive Plan.

"Bankruptcy Code" shall mean title 11 of the United States Code, as amended from time to time.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware or any other court of the United States having jurisdiction over the jointly administered chapter 11 bankruptcy cases of the Debtors.

"beneficial ownership" (and related terms such as "beneficially owned" or "beneficial owner") shall have the meaning set forth in Rule 13d-3 under the Exchange Act.

"Board" shall have the meaning set forth in Section 2.1(a).

"Business Cash Flow" shall mean the operating income from the business operations of the Company and its Subsidiaries, plus depreciation, amortization and corporate overhead.

"Business Day" shall mean a day other than a Saturday, Sunday, federal or New York State holiday or other day on which commercial banks in New York City are authorized or required by law to close.

"CEO Designee" shall have the meaning set forth in Section 2.1(a)(i).

"Change of Control" shall mean the occurrence of any (a) sale or disposition, in one or a series of related transactions of assets of the Company which accounted for 80% or more of the Business Cash Flow for a 12-month period ended as of the last day of the month immediately preceding the month in which such sale or disposition or the last sale or disposition in a series of related transactions, as the case may be, occurs, unless such sale or disposition is made to a Person or a group of Persons who are acting together to acquire, hold, operate or dispose of such assets and such Person or group of Persons owned, directly or indirectly through one or more entities, 50% or more of the Company's capital stock immediately prior to such sale or disposition, or (b) consolidation or merger of the Company with or into any other entity, or any other corporate reorganization or transaction (including the acquisition of capital stock of the Company other than as a result of any public offering by the Company of its common stock or the sale by a Stockholder of shares of the Company's common stock in a public offering), whether or not the Company is a party thereto, such that, Persons who were Stockholders immediately prior to such sale, consolidation, merger, reorganization or other transaction, (i) own, either directly or indirectly through one or more entities, equity interests in the Company, other surviving entity, or resulting entity, successor entity or entities, less than 50% of all the equity interests in the Company, such surviving, resulting or successor entity or entities immediately after such sale, consolidation,

merger, reorganization or other transaction and, immediately after such sale, consolidation, merger, reorganization or other transaction, another Person or Persons constituting a "group" as defined in the Exchange Act, directly or indirectly, own equity interests in the Company, such surviving, resulting or successor entity or entities, more than 50% of all the equity interests therein; or (ii) do not directly, or indirectly through one or more entities, have the power to elect a majority of the entire board of the directors, board of managers or other governing body of the Company or other surviving, resulting or successor entity or entities, as the case may be, immediately after such sale, consolidation, merger, reorganization or other transaction; provided that any reincorporation transaction, consolidation or merger or conversion of the Company effected exclusively to change the domicile of the Company, convert the Company from a corporation to a different form of business organization, or to form a holding company in which the stockholders of the Company immediately prior to such reincorporation transaction, consolidation, merger or conversion own equity interests representing economic interests with respect to such redomiciled entity, holding company or converted entity in substantially the same proportions as their ownership of capital stock of the Company shall not constitute a "Change in Control" hereunder. Notwithstanding anything contained in the foregoing, a sale of the majority of equity interests in any of the Stockholders shall not constitute a "Change of Control" hereunder.

"Class" shall mean Class A or Class B.

"Class A" shall mean the Series A-1 Voting Common Stock and the Series A-2 Limited Voting Common Stock.

"Class B" shall mean the Series B-1 Voting Common Stock and the Series B-2 Limited Voting Common Stock.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Common Stock" shall mean the collective reference to Voting Common Stock and Limited Voting Common Stock.

"Common Stock Equivalents" shall mean any warrants, rights, calls, options or other securities exchangeable or exercisable for, or convertible into, Common Stock.

"Company" shall have the meaning set forth in the preamble hereto.

"Company Competitor" shall mean any Person that is engaged directly or indirectly in any business that competes with the business of the Company or its Subsidiaries as an operator of radio stations and related interests or outdoor advertising in the United States.

"Confidential Information" shall mean all information received from or on behalf of the Company or any of its Affiliates concerning the Company or any of its Subsidiaries and their respective assets, business, operations or identifiable and discrete business prospects or this Agreement other than any such information that is publicly available, or was known to a Stockholder from a source other than the Company or its

089904-0003-13090-Active.11878390.14

Subsidiaries, prior to disclosure by or on behalf of the Company or any of its Subsidiaries other than as a result of a breach of Section 3.3.

"Creditor Stockholders" shall mean the Second Lien Lenders.

"Debtors" shall mean the Company, NextMedia Investors LLC, NextMedia Operating, Inc., NM Licensing, LLC, NextMedia Outdoor, Inc., NM Texas, Inc., NextMedia Northern Colorado, Inc., NextMedia Franchising, Inc., and NextMedia Outdoor, LLC, collectively, in their capacities as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

"Director" and "Directors" shall have the meanings set forth in Section 2.1(a).

"Drag-Along Notice" shall have the meaning set forth in Section 4.7(a).

"Drag-Along Transaction" shall have the meaning set forth in Section 4.7(a).

"Effective Date" shall mean the effective date of the Restructuring Plan.

"Equity Event" shall have the meaning set forth in Section 2.6.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder, as the same may be amended from time to time.

"FCC" shall mean the U.S. Federal Communications Commission and any successor Governmental Authority performing functions similar to those performed by the Federal Communications Commission on the Effective Date.

"FCC Limitation" shall mean a material limitation on or impairment of any business activities or proposed business activities of the Company to which the Company would not otherwise be subject and which results from the application of the FCC Requirements; provided that a Stockholder's ownership or acquisition of an attributable interest in a Media Property shall not be deemed to cause an FCC Limitation merely because, under the FCC Requirements, such attributable interest may restrict or limit the Company from newly acquiring an attributable interest in another Media Property following the Effective Date, until and unless the Company has entered into a definitive agreement with a third party for the acquisition of an attributable interest in such other Media Property, at which time such restriction or limitation shall constitute an FCC Limitation.

"FCC Requirements" shall mean any requirement of the Communications Act of 1934, as amended, or the implementing published rules, regulations and policies of the FCC, including but not limited to foreign and media ownership restrictions.

"First Offer" shall have the meaning set forth in Section 4.5(a)(ii).

"First Offer Price" shall have the meaning set forth in Section 4.5(a)(i).

4

"Governmental Authority" shall mean any government, any state or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including, but not limited to, the FCC.

"Immediate Family Member" shall mean, with respect to any Person, a spouse, parent, child, grandchild or sibling of such Person.

"Independent Director" shall have the meaning set forth in Section 2.1(a)(iii).

"Investors" shall mean SVP and AG.

"Issuance" shall have the meaning set forth in Section 4.8(a).

"Limited Converted Basis" shall mean a basis for calculating the ownership percentage of Common Stock and Common Stock Equivalents such that to the extent that Common Stock Equivalents are constituted by Warrants, they are to be counted on an as converted to Common Stock basis and the remaining Common Stock Equivalents are to be counted on an as exercised basis.

"Limited Voting Common Stock" shall mean the Series A-2 Limited Voting Common Stock together with the Series B-2 Limited Voting Common Stock.

"Limited Voting Stockholder" shall mean any holder of shares of Limited Voting Common Stock; provided, however, that any reference to a Limited Voting Stockholder shall be made exclusively with respect to the shares of Limited Voting Common Stock held by such Person.

"Majority Stockholders" shall mean the holders of a majority of the outstanding shares of Voting Common Stock.

"Management Stockholders Agreement" shall mean the Management Stockholders Agreement dated [    ] entered into by and between the Company and the Management Stockholders.

"Management Stockholders" shall mean, as of the Effective Date, employees (and their Affiliates) of the Company or its Subsidiaries and, after the Effective Date, employees (and their Affiliates) and former employees (and their Affiliates) of the Company and its Subsidiaries who were employed as of the Effective Date, in each case who hold Common Stock and/or Common Stock Equivalents, as well as any Person who is or will be a key employee of the Company or any of its Subsidiaries and who becomes a party to this Agreement pursuant to Section 5.13 below.

"Media Property" shall mean a Person that is, or directly or indirectly holds an attributable interest in, a radio or television broadcast license issued by the FCC (other than an FCC license held by the Company or its Affiliate on the Effective Date) or daily English-language newspaper.

"Offer Notice" shall have the meaning set forth in Section 4.5(a)(i).

"Offered Securities" shall have the meaning set forth in Section 4.5(a)(i).

"Offering Holder" shall have the meaning set forth in Section 4.5(a)(i).

"Other Agreements" shall have the meaning set forth in Section 5.8.

"Other Capital Stock" shall have the meaning set forth in Section 4.8(a)(ii).

"Other Capital Stock Equivalents" shall have the meaning set forth in Section 4.8(a)(ii).

"Permitted Transferee" shall mean any Person to whom a Stockholder (or any direct or indirect Permitted Transferee thereof) Transfers Common Stock and/or Common Stock Equivalents in accordance with the terms of this Agreement (including, for the avoidance of doubt, any consent or waiver pursuant to and in accordance with the terms of this Agreement) and who becomes a party to, and is bound to the same extent as its Transferor by the terms of, this Agreement; provided, however, that in no event shall any Company Competitor or an Affiliate of any Company Competitor constitute a "Permitted Transferee".

"Person" shall mean any individual, corporation, partnership, limited liability company, trust, joint stock company, business trust, unincorporated association, joint venture, Governmental Authority or other entity of any nature whatsoever.

"Public Offering" shall mean a public offering and sale of Common Stock pursuant to an effective registration statement under the Securities Act (other than a registration statement on Form S-4 that does not result in the Company or any successor thereto from any transaction contemplated by such registration statement on Form S-4 being required to register a class of its equity securities under Section 12(g) of the Exchange Act or in the listing of equity securities of the Company or that successor on a national securities exchange (as defined in the Exchange Act) or Form S-8 or any similar or successor form).

"Purchasing Holder" shall have the meaning set forth in Section 4.8(d).

"Registration Rights Agreement" shall mean the Registration Rights Agreement dated as of [   ] entered into by and among the Company and the Holders as defined and named therein.

"Related Party Transaction" shall mean any transaction by the Company or any of its Subsidiaries, on the one hand, and any Person whose employee or consultant or designee is on the Board, on the other hand.

"Required Conversion" shall have the meaning set forth in Section 2.6.

"Required Holders" shall have the meaning set forth in Section 2.4(a).

6

"Restructuring" shall mean the restructuring of the Company's indebtedness pursuant to the Restructuring Plan and the documents referred to therein, including the Restructuring Agreement.

"Restructuring Agreement" shall mean the Restructuring Support Agreement dated as of December 18, 2009, among the Debtors, the Investors and the other Second Lien Lenders signatories thereto, as the same has been or may be amended from time to time.

"Restructuring Plan" shall mean the Amended Joint Chapter 11 Plan of Reorganization pursuant to section 1121(a) of the Bankruptcy Code filed by the Debtors with the United States Bankruptcy Court for the District of Delaware on February 17, 2010.

"Right" shall have the meaning set forth in Section 4.8(a).

"ROFO Recipients" shall have the meaning set forth in Section 4.5(a)(i).

"Rollover Equity Stockholder" shall mean the holders of the common equity of NextMedia Investors, LLC, the sole stockholder of the Company prior to the Restructuring.

"Second Lien Credit Agreement" shall mean that certain Second Lien Credit and Guaranty Agreement dated as of November 15, 2005, among NextMedia Operating, Inc., NextMedia Group, Inc., the Second Lien Agent (as defined therein) and the Second Lien Lenders, and any related security documents or agreements, each as modified, amended or supplemented from time to time.

"Second Lien Lenders" shall mean the lenders under the Second Lien Credit Agreement.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder, as the same may be amended from time to time.

"Selling Stockholder(s)" shall have the meaning set forth in Section 4.7(a).

"Series A-1 Voting Common Stock" shall mean the class A common stock, par value $0.01 per share, of the Company which has unlimited voting rights.

"Series A-2 Limited Voting Common Stock" shall mean the class A common stock, par value $0.01 per share, of the Company which has limited voting rights.

"Series B-1 Voting Common Stock" shall mean the class B common stock, par value $0.01 per share, of the Company which has unlimited voting rights.

"Series B-2 Limited Voting Common Stock" shall mean the class B common stock, par value $0.01 per share, of the Company which has limited voting rights.

089904-0003-13090-Active.11878390.14

"Stockholders" shall have the meaning set forth in the preamble hereto.

"Subscription Agreements" shall mean the subscription agreements entered into between the Company and each of the Investors dated [ ], respectively.

"Subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which 50% or more of the total voting power of shares of capital stock entitled (without regard to the occurrence of any contingency) to vote generally in the election of directors, managers or trustees thereof, or 50% or more of the equity interest therein, is at the time owned or controlled, directly or indirectly, by any Person or one or more of the other Subsidiaries of such Person or a combination thereof.

"SVP" shall mean SVP I LLC and, subsequent to the date hereof but after any required FCC approval has been obtained, any Affiliate that SVP I LLC designates as such in place of or in addition to itself.

"SVP Designee" shall have the meaning set forth in Section 2.1(a)(ii).

"Tagging Stockholder" shall have the meaning set forth in Section 4.6(a).

"Third Party" shall have the meaning set forth in Section 4.6(a).

"Transfer" shall mean any transfer, sale, offer, assignment, exchange, distribution, mortgage, pledge, hypothecation or other disposition; provided that a conversion of Voting Common Stock to Limited Voting Common Stock, or of Limited Voting Common Stock to Voting Common Stock or of Common Stock to Warrants or the exercise of any Common Stock Equivalent shall not be considered to be a Transfer. "Transferor" and "Transferee" have correlative meanings.

"Transferring Stockholder" shall have the meaning set forth in Section 4.6(a).

"Unpaid Director Indemnity Amounts" shall have the meaning set forth in Section 5.16.

"Voting Common Stock" shall mean the Series A-1 Voting Common Stock together with the Series B-1 Voting Common Stock.

"Warrant Agreements" shall mean the Warrant Agreements to be entered into among any holder, the Company and the Warrant Agent (as defined therein), in substantially the form of Exhibit A attached hereto.

"Warrantholders" shall mean the holders of the Warrants.

"Warrants" shall mean the warrants issued pursuant to the Warrant Agreements.

1.2 Other Definitional Provisions; Interpretation.

8

(a)     The words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Subsection, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(b)     The headings in this Agreement are included for convenience of reference only and shall not limit or otherwise affect the meaning or interpretation of this Agreement.

(c)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(d)     The words "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation".

(e)     References to agreements and other documents shall be deemed to include all subsequent amendments and other modifications thereto.

(f)     References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions consolidating, amending or replacing the statute or regulation.

(g)     Except as otherwise set forth herein, exhibits, schedules and annexes to this Agreement are a material part hereof and shall be treated as if fully incorporated into the body of the Agreement and shall be included in the definition of "Agreement".

(h)     Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified and shall be counted from the day immediately following the date from which such number of days are to be counted.

SECTION 2.     CORPORATE GOVERNANCE

2.1  Board of Directors.

(a)     The parties agree to cause the Board of Directors of the Company (the "Board") initially to consist of five directors (individually, a "Director" and, collectively, the "Directors"), subject to future increase or decrease in accordance with this Agreement and the Company's by-laws. Each Stockholder hereby agrees that so long as this Agreement shall remain in effect, such Stockholder shall vote all of the Voting Common Stock beneficially owned or held of record by such Stockholder so as to elect and, subject to Section 2.1(d) below, to continue in office:

(i)     at any time, the current Chief Executive Officer of the Company or, if the current Chief Executive Officer ceases to serve as a member of the Board by reason of removal for cause, incapacitation or otherwise, at SVP's election, if SVP owns at least 5% of the outstanding Common Stock, another designee (the "CEO Designee") who was (w) nominated by AG, if it owns at least 5% of the outstanding Common Stock, and (x) approved by SVP, if it owns at least 5% of the outstanding Common Stock; provided that (y) if SVP ceases to

own at least 5% of the outstanding Common Stock, AG shall, at its election, nominate the CEO Designee who shall only be elected upon an affirmative vote by the Majority Stockholders and (z) if AG ceases to own at least 5% of the outstanding Common Stock, SVP shall designate the CEO Designee;

        (ii)     for so long as SVP owns not less than 39% of the outstanding Common Stock, three (3) SVP designated Directors to the Board (each such Director designated by SVP, an "<u>SVP Designee</u>"); and

        (iii)    one independent Director who shall be [●] (the "<u>Independent Director</u>").

        (b)    At such time as SVP shall cease to own at least 39% of the outstanding Common Stock but owns greater than 19.9% of the outstanding Common Stock, SVP shall have the right to designate two (2) SVP Designees rather than three (3) SVP Designees pursuant to Section 2.1(a). At such time as SVP shall cease to own at least 19.9% of the outstanding Common Stock but owns greater than 4.9% of the outstanding Common Stock, SVP shall have the right to designate one (1) SVP Designee rather than two (2) SVP Designees pursuant to this Section 2.1(b). At such time as SVP shall cease to own at least 4.9% of the outstanding Common Stock, SVP shall cease to have the right to designate a director to the Board pursuant to Section 2.1(a) and this Section 2.1 (b). SVP's ownership percentage shall be reviewed by the Board 90 days prior to each annual meeting and if as a result of such review SVP is no longer entitled to designate the same number of SVP Designees as on the date of the most recently concluded annual meeting, one or more SVP Designees (chosen at SVP's sole discretion) shall resign from the Board, effective upon the date of the next annual meeting, in order to comply with SVP's designation rights set forth in this Section 2.1. Upon any such resignation, the Stockholders, at the discretion of the Majority Stockholders, shall use their commercially reasonable best efforts to cause the Directors remaining in office to either decrease the size of the Board to eliminate such vacancy or cause the vacancy created thereby to be filled by a designee selected by a majority of the Directors remaining in office.

        (c)    The Directors shall have a term initially expiring at the second annual meeting of the Company's Stockholders after the Effective Date. Following the expiration of their initial terms, all Directors shall serve for terms of one (1) year or until the next succeeding annual meeting of the Company's Stockholders and may be re-designated, subject to the terms hereof, for additional terms.

        (d)    The Company agrees to include in the slate of nominees recommended by the Board to the Stockholders, the CEO Designee and the SVP Designees and to use its best efforts to cause the election of each such nominee to the Board.

        (e)    Upon his or her resignation or upon the expiration of his or her term, the Independent Director shall specify his or her replacement or choose to serve another term. However, if the Independent Director ceases to serve as a member of the Board by reason of removal for cause, incapacitation or otherwise, AG so long as it owns 5% of the outstanding Common Stock shall be entitled to nominate a successor Director to fill the vacancy created thereby but such successor Director shall only be elected upon an affirmative vote by the

10

Majority Stockholders; provided that any such nominee (A) shall not be an employee or Affiliate of the Company, or any Subsidiary of the Company, (B) shall not be an employee or Affiliate or an employee of an Affiliate of any Company Competitor and (C) shall have the qualifications necessary, with respect to experience and educational background, to serve as a Director of the Company. Each Stockholder agrees that such Stockholder shall vote all of the shares of Voting Common Stock beneficially owned or held of record by such Stockholder so as to elect any such successor Director.

(f)     The parties hereby agree that any individual designated as a Director may be removed (in accordance with the by-laws of the Company) only with the consent of the party which designated such individual. A vacancy created by such removal shall be filled only by the Stockholder who designated the removed Director, subject to Section 2.1(b) in the case of a Director designated by SVP.

2.2 Certificate of Incorporation and By-Laws. The Company and the Stockholders shall take or cause to be taken all lawful action necessary to ensure at all times that the certificates of incorporation and by-laws (or equivalent governing documents) of the Company and its Subsidiaries, as the same may be amended from time to time in accordance with the terms hereof and thereof, are not, at any time, inconsistent with the provisions of this Agreement.

2.3 Other Voting Matters. Except as otherwise provided in Section 2.4 or otherwise in this Agreement, in the amended and restated certificate of incorporation or by-laws of the Company, all actions of the Board shall require the affirmative approval of a simple majority of the Board; provided that any Related Party Transaction shall require the affirmative vote of a majority of all the Directors who are not employees, consultants or designees of any party (excluding the Company and its Subsidiaries) or such party's Affiliates in such Related Party Transaction. Notwithstanding anything contained in the Agreement to the contrary, the size of the Board may not be changed without the consent of the majority of the SVP Designees if any, except to the extent permitted by the last sentence of Section 2.1(b).

2.4 Consent Rights. (a) For so long as both (i) SVP beneficially owns not less than 39% of the outstanding Common Stock and (ii) AG beneficially owns not less than 35% of the outstanding Common Stock, then in addition to any vote or consent of the Board or the stockholders of the Company required by law or the amended and restated certificate of incorporation and by-laws of the Company, and notwithstanding anything in this Agreement to the contrary, the Company shall not, and shall not permit any of its Subsidiaries to, take any of the following actions, or enter into any arrangement or contract to do any of the following actions, without (X) the approval of AG and (Y) the approval of Stockholders beneficially owning a majority of the outstanding Common Stock (together, the "Required Holders"), which shall be necessary for authorizing, effecting or validating such transactions:

(1)     an initial public offering, except pursuant to a Stockholder's demand registration rights;

(2)     a sale of all or substantially all of the assets of the Company (including by way of sale of the stock or the assets of its Subsidiaries) or a merger or a consolidation of the Company, whether in a single transaction or a series of related transactions;

(3)     any authorization, creation (by way of reclassification, merger, consolidation or otherwise) or issuance of any equity securities of the Company, other than (i) pursuant to any employee option plans, (ii) the issuance of any equity securities as consideration in a merger or acquisition that does not require approval hereunder, or (iii) any conversion of Voting Common Stock to Limited Voting Common Stock or vice versa or any conversion of Common Stock into Warrants or any exercise of Warrants;

(4)     the sale of the radio station operating business or outdoor advertising business of the Company;

(5)     except as required by applicable law, any amendment, repeal or alteration of the certificate of incorporation or by-laws, or the organizational documents of the Company, whether by or in connection with a merger or consolidation or otherwise;

(6)     any increase or decrease in the size of the Board, except to the extent permitted by Section 2.1(b); and

(7)     any plan of liquidation, dissolution or wind-up of the Company.

(b)     Notwithstanding Section 2.4(a), at such time as SVP (together with its Affiliates) shall cease to own at least 39% of the outstanding Common Stock or AG shall cease to own at least 35% of the outstanding Common Stock, the actions described under clauses (2) and (4) of Section 2.4(a) shall require the approval of (i) for so long as it beneficially owns 15% of the outstanding Common Stock, SVP; (ii) for so long as it beneficially owns 15% of the outstanding Common Stock, AG; and (iii) holders of at least 50% of outstanding Common Stock voting as a group.

2.5 Elective Conversion of Common Stock.  Limited Voting Common Stock shall be convertible into Voting Common Stock (and vice versa) of the same Class at the request of the holder thereof, which request shall be made at the sole and absolute discretion of such holder and not subject to any rights of consent or approval of any other Person, including, without limitation, the Company, and which conversion shall be subject to the amended and restated certificate of incorporation and by-laws of the Company; provided that prior to every such elective conversion, the Stockholder shall certify, to the reasonable satisfaction of the Company, that such conversion, individually and when considered in the aggregate with the ownership of Common Stock by other Stockholders, shall not cause a violation of the FCC Requirements by such Stockholder or the Company and shall not subject the Company to any FCC Limitation, and the Company shall co-operate with and provide all information reasonably requested by such Stockholder in order for the Stockholder to make such certification; provided further that if, as a result of such conversion, compliance with the FCC Requirements would require the prior approval of the FCC, such conversion shall not occur until such approval has been obtained from the FCC and the Company and the relevant Stockholder shall use commercially reasonable efforts to obtain any required FCC approval. For the avoidance of

12

doubt, Limited Voting Common Stock and Voting Common Stock of the same Class shall receive identical consideration in a Change of Control transaction.

2.6 <u>Required Conversion of Common Stock</u>. If the Company makes a determination in good faith, after consultation with any Person, that such Person's (including any Stockholder's) current or proposed ownership and/or exercise of any rights of ownership with respect to Common Stock and/or Common Stock Equivalents held or proposed to be held by such Stockholder, as applicable (each, an "<u>Equity Event</u>"), individually and when considered in the aggregate with the ownership of Common Stock and/or Common Stock Equivalents by other Stockholders (a) results or is reasonably likely to result in a violation by such Stockholder or such Person of an FCC Requirement (including such violations of FCC Requirements resulting from a Transfer of Common Stock and/or Common Stock Equivalent by another Person, including another Stockholder); (b) results or is reasonably likely to result in a violation by the Company of an FCC Requirement; or (c) will or is reasonably likely to subject the Company to an FCC Limitation, then the Company may require that such Stockholder or such Person (even if such Stockholder or Person did not initiate, would not benefit from, and would otherwise be unaffected by such Equity Event) to undertake one of the following conversions reasonably determined by the Company to mitigate clauses (a)-(c) above, as applicable: (i) exchange all or a portion of the shares of Voting Common Stock held by such Stockholder for an equal number of shares of Limited Voting Common Stock of the same Class, or receive in lieu of all or a portion of the shares of Voting Common Stock proposed to be held by such Stockholder an equal number of shares of Limited Voting Common Stock of the same Class; and/or (ii) convert all or a portion of the shares of Voting Common Stock or Limited Voting Common Stock held, or proposed to be held, by such Stockholder into Warrants (i) and (ii) each, a "<u>Required Conversion</u>"); <u>provided</u> that such Required Conversion (y) is imposed by the Company upon similarly situated Stockholders or Persons in a substantially similar manner and (z) has minimum effect on the interests in the Company of the Person or Stockholder subject to the Required Conversion (individually and relative to other holders of Common Stock and Common Stock Equivalents), in each case (y) and (z), that is reasonably feasible without materially adversely affecting the objectives of the Company in requiring such Required Conversion, and <u>provided further</u> that if the Required Conversion requires the prior approval of the FCC, the Required Conversion shall not occur until such approval has been obtained from the FCC and the Company and the relevant Stockholder shall use commercially reasonable efforts to obtain any required FCC approval; <u>provided further</u> that each such Required Conversion, individually and when considered in the aggregate with the ownership of Common Stock by other Stockholders, shall not cause a violation of the FCC Requirements by such Stockholder or the Company and shall not subject the Company to any FCC Limitation.

2.7 <u>Limited Voting Common Stock</u>. Unless otherwise expressly set forth herein and subject to the amended and restated certificate of incorporation and by-laws of the Company, no Limited Voting Stockholder shall be entitled to vote any shares of Limited Voting Common Stock beneficially owned or held of record by such Limited Voting Stockholder with respect to any matters submitted to a vote of the Stockholders. Notwithstanding the foregoing and subject to the amended and restated certificate of incorporation and by-laws of the Company, if and only if any of the following actions are submitted to a vote of the Stockholders, each Limited Voting Stockholder shall be entitled to vote any or all of the shares of Limited Voting Common Stock

13

beneficially owned or held of record by such Limited Voting Stockholder, together with the holders of the Voting Common Stock as a single class:

      (1)    an initial public offering, except pursuant to a Stockholder's demand registration rights;

      (2)    a sale of all or substantially all of the assets of the Company (including by way of sale of the stock or the assets of its Subsidiaries) or a merger or a consolidation of the Company, whether in a single transaction or a series of related transactions;

      (3)    any authorization, creation (by way of reclassification, merger, consolidation or otherwise) or issuance of any equity securities of the Company, other than (i) pursuant to any employee option plans, (ii) the issuance of any equity securities as consideration in a merger or acquisition that does not require approval hereunder, or (iii) any conversion of Voting Common Stock to Limited Voting Common Stock or vice versa or any conversion of Common Stock into Warrants or exercise of Warrants;

      (4)    the sale of the radio station operating business or outdoor advertising business of the Company;

      (5)    except as required by applicable law, any amendment, repeal or alteration of the certificate of incorporation or by-laws, or the organizational documents of the Company, whether by or in connection with a merger or consolidation or otherwise;

      (6)    any increase or decrease in the size of the Board, except to the extent permitted by Section 2.1(b); and

      (7)    any plan of liquidation, dissolution or wind-up of the Company.

      2.8 <u>Elective Conversion Into Warrants</u>. Common Stock shall be convertible into Warrants at the request of the holder thereof, which request shall be made at the sole and absolute discretion of such holder and not subject to any rights of consent or approval of any other Person, including, without limitation, the Company and which conversion shall be subject to the amended and restated certificate of incorporation and by-laws of the Company and the provisions of the Warrant Agreements; <u>provided</u> that prior to every such elective conversion, the Stockholder shall certify, to the reasonable satisfaction of the Company, that such conversion, individually and when considered in the aggregate with the ownership of Common Stock by other Stockholders, shall not cause a violation of the FCC Requirements by such Stockholder or the Company and shall not subject the Company to any FCC Limitation and the Company shall co-operate with and provide all information reasonably requested by such Stockholder in order for the Stockholder to make such certification; <u>provided further</u> that if, as a result of such conversion, compliance with the FCC Requirements would require the prior approval of the FCC, such conversion shall not occur until such approval has been obtained from the FCC and the Company and the relevant Stockholder shall use commercially reasonable efforts to obtain any required FCC approval.

      2.9 <u>Recapitalization</u>. [In the event that the Investors are required to provide the term loan financing to the Company in connection with the Restructuring, the Stockholders agree

to cooperate in effecting a plan of recapitalization of the Company's Common Stock and Common Stock Equivalents or in taking other actions, such that, in the reasonable judgment of each of the Investors, no non-US investor of each of the Investors will be treated as a "10-percent shareholder" of the Company (within the meaning of Section 871(h)(3)(B) of the Code); provided that pursuant to such recapitalization or other action each Stockholder shall receive stock which entitles it to the same rights (other than those rights that cause the non-US investor(s) to be a "10-percent shareholder" of the Company within the meaning of Section 871(h)(3)(B) of the Code) and economic interest in the Company that such Stockholder would have had in the absence of the recapitalization or other action; provided further that such recapitalization or other action shall not take place until it is in compliance with the FCC Requirements and does not subject the Company to an FCC Limitation.][1]

SECTION 3.  INFORMATION REQUIREMENTS

3.1 Annual and Quarterly Reports.  Until the Company becomes subject to the reporting requirements of the Exchange Act, the Company shall provide each of the Stockholders, other than any Management Stockholder, with:

(a)  as soon as available and in any event within 90 days after the end of each fiscal year of the Company, a consolidated balance sheet of the Company and its Subsidiaries as of the end of such year, and consolidated statements of income and cash flows of the Company and its Subsidiaries for the year then ended prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis, except as otherwise noted therein, and setting forth in each case in comparative form the figures for the previous fiscal year, together with an auditor's report thereon of a firm of established national reputation and including a management discussion and analysis of financial condition and results of operations; and

(b)  as soon as available and in any event within 45 days after the end of each of the first three quarters of each fiscal year of the Company, consolidated balance sheets of the Company and its Subsidiaries as of the end of such period, and consolidated statements of income and cash flows of the Company and its Subsidiaries for the period then ended prepared in conformity with generally accepted accounting principles in the United States applied on a consistent basis, except as otherwise noted therein, and subject to the absence of footnotes and to year-end adjustments, and setting forth in each case in comparative form the figures for the corresponding period of the previous fiscal year, and including, for each such quarter, a management discussion and analysis of financial condition and results of operations.

3.2 Annual Budgets and Operating Plans.  Upon and to the extent of a prior written request therefor, the Company shall provide each of the Stockholders, other than any Management Stockholder, with annual budgets and operating plans. Additionally, upon and to the extent of a prior written request therefor, the Company shall provide to each of the Investors reasonable access during normal business hours to personnel, books and records and such other information as such Investor may reasonably require for tax or regulatory purposes that are

---

[1] To be removed if third party financing is obtained at closing.

customary for transactions of this type, including all rights necessary to satisfy VCOC requirements, and each Investor may enter into a standard VCOC management rights letter with the Company and its Subsidiaries.

3.3 <u>Confidentiality</u>. Each Stockholder agrees to use commercially reasonable efforts (equivalent to the efforts such Stockholder applies to maintaining the confidentiality of its own confidential information) to maintain as confidential all Confidential Information provided to such Stockholder for a period of two (2) years following receipt thereof, except that such Stockholder may disclose such Confidential Information (a) to such Stockholder's directors, officers, employees, stockholders, members, partners, agents, counsel, investment advisers or other representatives in the normal course of the performance of their duties or to any financial institution providing credit to such Stockholder or to any investor or potential investor of such Stockholder or its Affiliates; <u>provided</u> that any such Person has agreed to comply with the covenant contained in this Section 3.3; (b) in connection with any Transfer or proposed Transfer of Common Stock and/or Common Stock Equivalents to any *bona fide* and proposed Permitted Transferee that has agreed to comply with the covenant contained in this Section 3.3 (and any such *bona fide* proposed Permitted Transferee may disclose the Confidential Information to such Persons who are its representatives as described in clause (a) of this Section 3.3); (c) as requested or required by any Governmental Authority or reasonably believed by such Stockholder to be compelled by any court decree, subpoena or legal or administrative order or process; (d) as, on the advice of such Stockholder's counsel, is required by law; (e) in connection with the exercise of any right or remedy under this Agreement or in connection with any action, claim, lawsuit, demand, investigation or proceeding to which such Stockholder is a party before any Governmental Authority or before any arbitrator or panel of arbitrators; or (f) that ceases to be confidential through no fault of such Stockholder or any other Person to whom such Stockholder provided such Confidential Information. Each Stockholder shall be responsible and liable for any violation of this Section 3.3 by any Person described in clause (a) or (b) of this Section 3.3.

3.4 <u>FCC Information</u>. Upon and to the extent of a prior written request therefor, each of the Stockholders shall promptly provide the Company with such information as the Company may reasonably request for purposes of confirming ongoing compliance of the Company or any Stockholder with the FCC Requirements or confirming that the Company has not become subject to an FCC Limitation.

SECTION 4.   TRANSFERS AND ISSUANCES

4.1 <u>Limitations on Transfer</u>.

(a)     Each Stockholder hereby agrees that no Transfer of Common Stock and/or Common Stock Equivalents or any Capital Stock or Capital Stock Equivalents shall occur in any manner that violates the provisions of the amended and restated certificate of incorporation and by-laws of the Company, this Agreement, the Registration Rights Agreement or any applicable federal or state securities laws.

(b)     Each Stockholder hereby agrees that, except for Transfers pursuant to Section 4.2, 4.6 or 4.7 or Transfers effected pursuant to an effective registration statement filed under the Securities Act, no Transfer of Common Stock and/or Common Stock Equivalents shall

16

occur unless the Company has been furnished, after it has made a written request to that effect, with an opinion in form and substance reasonably satisfactory to the Company from counsel reasonably satisfactory to the Company that such Transfer may be made without registration under Section 5 under the Securities Act; provided, however, that this Section 4.1(b) shall not apply to Transfers of Common Stock and/or Common Stock Equivalents by a Stockholder who has furnished the Company with a certificate, in form and substance reasonably satisfactory to the Company, signed by an authorized officer of the Stockholder effecting such Transfer, to the effect that the Transfer is being made in compliance with Rule 144 under the Securities Act or Transfers of Common Stock and/or Common Stock Equivalents to the Company pursuant to the repurchase provisions of any management equity plan or agreement or independent director equity plan or agreement.

(c)     Each Stockholder hereby agrees that no Transfer of Common Stock and/or Common Stock Equivalents shall be permitted unless and until the proposed Transferee agrees in writing to become a party to, and be bound to the same extent as its Transferor by the terms of, this Agreement.

(d)     Notwithstanding any other provisions of this Agreement to the contrary, prior to a Public Offering, no Transfer of Common Stock and/or Common Stock Equivalents (including without limitation those pursuant to Sections 4.2, 4.5, 4.6, 4.7 and 4.8) shall be permitted if, after giving effect to such Transfer, and after giving effect to the conversion, exercise or exchange of all Common Stock Equivalents or other warrants, options and other rights to acquire such Common Stock and/or Common Stock Equivalents, such Transfer would result in the Company becoming subject to the reporting requirements of the Exchange Act. Further, notwithstanding any other provision of this Agreement to the contrary, no Transfer of Common Stock and/or Common Stock Equivalents (including those pursuant to Sections 4.2, 4.5, 4.6, 4.7 and 4.8) shall be permitted until the Company is reasonably satisfied that such Transfer, when considered individually, in the aggregate with the ownership of Common Stock by other Stockholders, or in connection with other Transfers contemplated concurrently therewith, (i) shall not cause a violation of the FCC Requirements by the Transferor, Transferee, or Company; and (ii) shall not subject the Company to an FCC Limitation; provided that if, as a result of such Transfer, compliance with the FCC Requirements would require the prior approval of the FCC, such Transfer shall not occur until such approval has been obtained from the FCC and the Company shall use commercially reasonable efforts to obtain any required FCC approval; provided further that the Transferor, Transferee and the Company shall use commercially reasonable efforts to relieve any such FCC Limitation that would otherwise arise or be likely to arise as a result of such Transfer, including taking any action pursuant to Section 2.6.

(e)     Each Stockholder hereby agrees that, except for Transfers pursuant to a Public Offering or pursuant to Sections 4.6 (with respect to Tagging Stockholders) or 4.7, it shall not Transfer Common Stock and/or Common Stock Equivalents to any Company Competitor or an Affiliate of any Company Competitor, without the prior written consent of (i) AG, so long as AG owns 35% of the Common Stock and Common Stock Equivalents (calculated on a Limited Converted Basis), and the Board and (ii) in all other cases, the Board.

17

(f)    Notwithstanding any other provisions of this Agreement to the contrary, no Transfer of Common Stock and/or Common Stock Equivalents shall be permitted by Management Stockholders, except pursuant to Sections 4.6 and 4.7, the Registration Rights Agreement and as provided in any Other Agreement.

4.2    Transfers to Affiliates.  Notwithstanding any other provision of this Agreement to the contrary, but subject to Sections 4.1(c), (d), (e) and (f), each Stockholder and its Affiliates shall be permitted to Transfer from time to time any or all of the Common Stock and/or Common Stock Equivalents beneficially owned by it to any of its Affiliates. Notwithstanding anything else in this Agreement to the contrary, if any Transfer of Common Stock and/or Common Stock Equivalents to Affiliates permitted hereunder is not permitted under any of the Other Agreements applicable to such Common Stock and/or Common Stock Equivalents, then such Transfer to Affiliates shall not be permitted hereunder. For the avoidance of doubt, any Transfer by AG to another Person included in the definition of "AG" and any Transfer by SVP to another Person included in the definition of "SVP" shall be considered a Transfer to an Affiliate under this Section 4.2.

4.3    Effect of Void Transfers.  In the event of any purported Transfer of Common Stock and/or Common Stock Equivalents in violation of the provisions of this Agreement, such purported Transfer shall be void and of no effect, and the Company shall not give effect to such Transfer nor shall it cause any third party transfer agent to effect such Transfer, to the extent it appoints one.

4.4    Legend on Securities. Unless and until the Board shall determine otherwise, shares of Common Stock shall be uncertificated and recorded in the books and records of the Company.  If at any time the Board shall determine to certificate shares of Common Stock issued to any Stockholder or any additional Common Stock and/or Common Stock Equivalents that become subject to this Agreement pursuant to Section 5.1, each certificate representing Common Stock and/or Common Stock Equivalents issued to any Stockholder (except (i) for unexercised options issued pursuant to any management equity plan or agreement or independent director equity plan or agreement, which shall bear the legend set forth in Section 4.4(b) below, and (ii) for Warrants, which shall bear the legend set forth in the Warrant Agreements) shall bear the following legend on the face thereof; provided, however, that certificates representing Common Stock and/or Common Stock Equivalents not subject to the Registration Rights Agreement, shall make no reference to the Registration Rights Agreement:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAW AND ARE SUBJECT TO (A) A STOCKHOLDERS AGREEMENT AMONG NEXTMEDIA GROUP, INC. (THE "COMPANY") AND THE STOCKHOLDERS PARTIES THERETO, AND (B) A REGISTRATION RIGHTS AGREEMENT AMONG THE COMPANY AND CERTAIN HOLDERS OF REGISTRABLE COMMON STOCK (AS THAT TERM IS DEFINED IN THE REGISTRATION RIGHTS AGREEMENT), COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE COMPANY.  NO DIRECT OR INDIRECT TRANSFER, SALE, OFFER, ASSIGNMENT, EXCHANGE, DISTRIBUTION, MORTGAGE, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE