SECURITIES REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THE STOCKHOLDERS AGREEMENT AND REGISTRATION RIGHTS AGREEMENT AND (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) IF THE COMPANY HAS BEEN FURNISHED EITHER WITH AN OPINION REASONABLY SATISFACTORY IN FORM AND SUBSTANCE TO THE COMPANY FROM COUNSEL THAT SUCH TRANSFER, SALE, OFFER, ASSIGNMENT, EXCHANGE, DISTRIBUTION, MORTGAGE, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION MAY BE MADE WITHOUT REGISTRATION UNDER SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED, AND THE RULES AND REGULATIONS THEREUNDER. THE HOLDER OF THIS CERTIFICATE, BY ACCEPTANCE OF THIS CERTIFICATE, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT AND REGISTRATION RIGHTS AGREEMENT, INCLUDING RESTRICTIONS RELATING TO THE EXERCISE OF ANY VOTING RIGHTS."

(b)     Each unexercised option that is certificated and issued pursuant to any management equity plan or agreement or independent director equity plan or agreement shall bear the following legend:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAW AND ARE SUBJECT TO A STOCKHOLDERS AGREEMENT AMONG NEXTMEDIA GROUP, INC. (THE "COMPANY") AND THE OTHER STOCKHOLDERS PARTIES THERETO AND A STOCK OPTION AGREEMENT, COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE COMPANY. NO DIRECT OR INDIRECT TRANSFER, SALE, OFFER, ASSIGNMENT, EXCHANGE, DISTRIBUTION, MORTGAGE, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT AND STOCK OPTION AGREEMENT. THE HOLDER OF THIS OPTION, BY ACCEPTANCE HEREOF, AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SUCH STOCKHOLDERS AGREEMENT AND STOCK OPTION AGREEMENT, INCLUDING RESTRICTIONS RELATING TO THE EXERCISE OF ANY VOTING RIGHTS GRANTED BY THE SECURITIES."

4.5  Rights of First Offer.

(a)     Subject to the provisions of Section 4.1 and except for Transfers pursuant to Sections 4.2, 4.6 and 4.7, prior to a Public Offering, no Stockholder or holder of Common Stock Equivalents (other than each of the Investors) shall Transfer any of its shares of Common Stock or Common Stock Equivalents to a Person (other than the Company and its Subsidiaries and the Affiliates of such Transferor) except as set forth below:

(i)     Prior to such Transfer as described above of shares of Common Stock or of Common Stock Equivalents by a Stockholder (the "Offering Holder")

19

the Offering Holder shall deliver to the Company and each of the Investors (collectively, excluding the Company, the "ROFO Recipients") written notice (the "Offer Notice"), stating such Offering Holder's intention to effect such a Transfer, the number of shares of Common Stock and/or Common Stock Equivalents subject to such Transfer (the "Offered Securities"), the price the Offering Holder proposes to be paid for the Offered Securities (the "First Offer Price"), and the other material terms and conditions of the proposed Transfer.

(ii)     Upon receipt of the Offer Notice, each of the ROFO Recipients shall have an irrevocable non-transferable option to purchase at the First Offer Price and otherwise on the terms and conditions described in the Offer Notice (the "First Offer"), all but not less than all, of the Offered Securities. Each of the ROFO Recipients shall, within 10 days from delivery of the Offer Notice, indicate to the Offering Holder and the Company if it has accepted the First Offer by sending irrevocable written notice of any such acceptance to the Offering Holder (the "Acceptance Notice") and, such ROFO Recipient shall then be obligated to purchase such number of Offered Securities on the terms and conditions set forth in the Offer Notice. In the event the ROFO Recipients elect not to purchase all of the Offered Securities, the Company shall have the option, (or at the Company's option, all or a part of the Management Stockholders to the extent that the Company has assigned its rights under this Section 4.5 to such Management Stockholders) to purchase at the First Offer Price all, but not less than all, of the Offered Securities with respect to which the ROFO Recipients have not exercised their option, and the Company shall, within 10 days from delivery of the Offer Notice, indicate to the Offering Holder and the ROFO Recipients if it has accepted the First Offer and, if so, the number of Offered Securities to be purchased and the Company shall then be obligated to purchase such number of Offered Securities on the terms and conditions set forth in the Offer Notice, subject to compliance with the FCC Requirements; provided that no purchase of Offered Securities shall take place pursuant to this Section 4.5(a)(ii) until such purchase complies with the FCC Requirements or if the Company would become subject to an FCC Limitation as a result of such purchase.

(b)     If the ROFO Recipients (individually or collectively) elect to purchase all of the Offered Securities, the number of shares that each ROFO Recipient shall be required to purchase upon the exercise of the right of first offer shall be equal to such ROFO Recipient's pro rata share (based on a fraction, the numerator of which is the number of shares of Common Stock and Common Stock Equivalents held by such ROFO Recipient and the denominator of which is the aggregate number of shares of Common Stock and Common Stock Equivalents held by all ROFO Recipients exercising their rights hereunder) of the Offered Securities; provided that no ROFO Recipient shall purchase Offered Securities pursuant to this Section 4.5(b) until the purchase does not cause a violation of the FCC Requirements by the ROFO Recipient or the Company or if the Company would become subject to an FCC Limitation as a result of such purchase.

(c)     If neither the Company nor the ROFO Recipients (in the aggregate) elect to purchase all of the Offered Securities pursuant to this Section 4.5, then the applicable Offering Holder shall be free for a period of 60 days from the date the Acceptance Notice from the Company

20

was due to be received by the applicable Offering Holder, to enter into definitive agreements to Transfer the Offered Securities as to which such options are not exercised to a Transferee on terms no less favorable than the terms in the Offer Notice delivered to the Company and the ROFO Recipients; provided that any such definitive agreement provides for the consummation of such Transfer to take place within 60 days from the date of such definitive agreement and is otherwise on other terms not more favorable to the transferee in any material respect than were contained in the Offer Notice; provided further that no Transfer shall take place pursuant to this Section 4.5(c) until the Transfer complies with the FCC Requirements or if the Company would become subject to an FCC Limitation as a result of such Transfer.

(d)     If neither the Company nor the ROFO Recipients (in the aggregate) exercise their respective options to purchase all of the Offered Securities at the First Offer Price and the applicable Offering Holder has not entered into a definitive agreement described in Section 4.5(c) within 60 days from the date an Acceptance Notice from the Company was due to be received by the applicable Offering Holder, or the Offering Holder has entered into such an agreement but has not consummated the sale of such Offered Securities within 60 days from the date of such definitive agreement, then the provisions of this Section 4.5 shall again apply, and such Offering Holder shall not Transfer or offer to Transfer such shares of Common Stock and Common Stock Equivalents not so Transferred without again complying with this Section 4.5.

(e)     Upon exercise by the Company and/or the ROFO Recipients, as the case may be of their respective rights of first offer under this Section 4.5, the Company and/or the ROFO Recipients, as the case may be, and the applicable Offering Holder shall be legally obligated to consummate the purchase contemplated thereby and shall use their commercially reasonable efforts to (i) secure any governmental authorization required, (ii) comply as soon as reasonably practicable with all applicable laws, including complying with the FCC Requirements and preventing the Company from becoming subject to an FCC Limitation and (iii) take all such other actions and to execute such additional documents as are reasonably necessary or appropriate in connection therewith and to consummate the purchase of the Offered Securities as promptly as practicable.

4.6  Tag-Along Rights.

(a)     Prior to a Public Offering, with respect to any proposed Transfer or Transfers (other than a mortgage, pledge or hypothecation or Transfer pursuant to Section 4.2) in one transaction or a series of related transactions of 25% or more of the outstanding Common Stock and Common Stock Equivalents (calculated on a Limited Converted Basis) by any Stockholder or two (2) or more Stockholders acting in concert with respect to such Transfer (in such capacity, a "Transferring Stockholder") to a third party (excluding the Company and its Subsidiaries and Affiliates of such Stockholder or Stockholders) (a "Third Party"), the Transferring Stockholder shall have the obligation, unless such Transferring Stockholder is entitled to give and does give a Drag-Along Notice pursuant to Section 4.7, and each other Stockholder, including, to the extent of the Vested Portion (as defined in the applicable Award Agreement) of the Options (as defined in the applicable Award Agreement) owned by them, Management Stockholders, shall have the right but not the obligation, to request the proposed Transferee to purchase from each Stockholder exercising such right (a "Tagging Stockholder") that number of shares of Common Stock and/or Common Stock Equivalents requested to be included by such Tagging Stockholder (such rights of the Tagging Stockholder to be referred to

as "tag-along rights"); provided that if the proposed Transferee is unwilling to purchase all of the shares of Common Stock and/or Common Stock Equivalents that the Tagging Stockholders have requested to be acquired by the proposed Transferee, then each Tagging Stockholder shall have the right to offer to the Transferee the same percentage of Common Stock and/or Common Stock Equivalents it owns as the percentage constituted by the Common Stock and/or Common Stock Equivalent that the Transferring Stockholder seeks to Transfer of the Common Stock and/or Common Stock Equivalents it owns, in each case calculated on a Limited Converted Basis. If the proposed Transferee is unwilling to purchase all of the shares of Common Stock and/or Common Stock Equivalents that the Tagging Stockholders are entitled to offer under this Section 4.6(a), then each of the Transferring Stockholders and Tagging Stockholders shall reduce the number of shares of Common Stock and/or Common Stock Equivalents they are proposing to Transfer on a *pro rata* basis among all of them, based on the ratio of shares of Common Stock and/or Common Stock Equivalents being offered by each such Transferring or Tagging Stockholder, as applicable, to the total number of shares of Common Stock and/or Common Stock Equivalents being offered by all Transferring and Tagging Stockholders, in each case on a Limited Converted Basis, such that the total number of shares of Common Stock and/or Common Stock Equivalents that the Transferring Stockholder and the Tagging Stockholders propose to Transfer are the same as the total number of shares of Common Stock and/or Common Stock Equivalents that the proposed Transferee is willing to purchase. Each Tagging Stockholder shall Transfer its shares of Common Stock and/or Common Stock Equivalents at the same price per share of Common Stock and/or price per Common Stock Equivalent and upon the same terms and conditions (including, without limitation, time of payment, form of consideration and option to elect form of consideration) as to be paid and given to the Transferring Stockholder; provided that in order to be entitled to exercise its right to sell its shares of Common Stock and/or Common Stock Equivalents to the proposed Transferee pursuant to this Section 4.6, a Tagging Stockholder must agree to make to the proposed Transferee the same representations, warranties, covenants, indemnities and agreements as the Transferring Stockholder agrees to make in connection with the proposed Transfer of the Common Stock and/or Common Stock Equivalents of the Transferring Stockholder (except that in the case of representations and warranties pertaining specifically to the Transferring Stockholder, a Tagging Stockholder shall make the comparable representations and warranties pertaining specifically to itself, and except that, in the case of covenants or agreements capable of performance only by certain Stockholders, such covenants or agreements shall be made only by such certain Stockholders); provided further that all representations, warranties, covenants, agreements and indemnities made by the Transferring Stockholder and the Tagging Stockholders pertaining specifically to themselves shall be made by each of them severally and not jointly; provided further that each Transferring Stockholder and each Tagging Stockholder shall be severally (but not jointly) liable for breaches of representations, warranties, covenants and agreements of or, in the case of representations and warranties, pertaining to the Company and its Subsidiaries, and for indemnification obligations arising out of or relating to any such breach or otherwise pertaining to the Company and its Subsidiaries, on a *pro rata* basis (based on the number of shares of Common Stock and/or Common Stock Equivalents Transferred by each Transferring Stockholder and each Tagging Stockholder), such liability of each such Stockholder not to exceed the proceeds actually received by such Stockholder (except in the case of indemnification obligations as to representations regarding title of the Common Stock and Common Stock Equivalents and authorization of Transfer and related representations wherein the Stockholder concerned is not

22

liable on a *pro rata* basis); provided further that none of the Stockholders shall be required to enter into a non-competition or non-solicitation covenant; provided further that no exercise of tag-along rights provided under this Section 4.6 may be permitted until such exercise does not cause a violation of the FCC Requirements by such Stockholder or the Company or if the Company would become subject to an FCC Limitation as a result of such exercise. Notwithstanding anything in this Section 4.6 to the contrary, if any Transfer of Common Stock and/or Common Stock Equivalents pursuant to this Section 4.6 is not permitted under an Other Agreement then such Transfer shall not be permitted hereunder.

(b)     The Transferring Stockholder shall give written notice to all other Stockholders, including each holder of Warrants, of each proposed Transfer giving rise to the rights of the Tagging Stockholders set forth in the first sentence of Section 4.6(a) at least 20 days prior to the consummation of such Transfer, setting forth the name of the Transferring Stockholder, the number of shares of Common Stock and/or Common Stock Equivalents proposed to be so Transferred, the name and address of the proposed Transferee, the proposed amount and form of consideration and other terms and conditions offered by the proposed Transferee, and a representation that the proposed Transferee has been informed of the tag-along rights provided for in this Section 4.6 and has agreed to purchase the Common Stock and/or Common Stock Equivalents from any Transferring Stockholder or Tagging Stockholders in accordance with the terms hereof. The tag-along rights provided by this Section 4.6 must be exercised by each Tagging Stockholder within 10 days following receipt of the notice required by the preceding sentence, by delivery of a written notice to the Transferring Stockholder indicating such Tagging Stockholder's election to exercise its rights pursuant to Section 4.6 and specifying the number of shares of Common Stock and/or Common Stock Equivalents it elects to sell. If the proposed Transferee fails to purchase Common Stock and/or Common Stock Equivalents from any Tagging Stockholder that has properly exercised its tag-along rights, then the Transferring Stockholder shall not be permitted to make the proposed Transfer, and any such attempted Transfer shall be void and of no effect, as provided in Section 4.3.

(c)     If any of the Tagging Stockholders exercises its rights under Section 4.6(a), the closing of the purchase of the Common Stock and/or Common Stock Equivalents with respect to which such rights have been exercised shall take place concurrently with the closing of the sale of the Transferring Stockholder's Common Stock and/or Common Stock Equivalents.

(d)     Subject to Section 4.1(d), any Transfer pursuant to this Section 4.6 shall occur within 90 days of delivery of the notice from the Transferring Stockholder to the other Stockholders and at a price of not more than the maximum price per share set forth in the notice and otherwise on terms and conditions in the aggregate not more favorable to the Transferring Stockholder and the Tagging Stockholders than were set forth in the notice. If, at the end of such 90 day period, the Transferring Stockholder and the Tagging Stockholders have not completed the sale or other disposition of the Common Stock and/or Common Stock Equivalents of the Transferring Stockholder and the Tagging Stockholders in accordance with the terms and conditions of the proposed Transfer, all the restrictions on Transfer contained in this Agreement with respect to Common Stock and/or Common Stock Equivalents owned by the Transferring Stockholder and the Tagging Stockholders shall again be in effect.

4.7   Drag-Along Rights.

089904-0003-13090-Active.11878390.14

(a)    Prior to a Public Offering, if any Stockholder (excluding Management Stockholders), or two (2) or more Stockholders acting in concert with respect to the Transfer of their Common Stock and Common Stock Equivalents (the "Selling Stockholder(s)") that collectively own at least 66 ⅔ % of the outstanding Common Stock and Common Stock Equivalents (calculated on a Limited Converted Basis) receives an offer to purchase from, or otherwise desires to transfer to, a Third Party at least 66 ⅔ % of the Common Stock and Common Stock Equivalents (calculated on a Limited Converted Basis) (whether pursuant to a sale of stock, a merger or otherwise), and such offer is accepted by the Selling Stockholder(s) (the "Drag-Along Transaction"), then each Stockholder (including each Management Stockholder) hereby agrees that, if requested to do so by such Selling Stockholder(s) pursuant to a Drag-Along Notice, it will Transfer the Applicable Drag Percentage of its Common Stock and Common Stock Equivalents to such Third Party on the terms of the offer so accepted by the Selling Stockholder(s), including making the same representations, warranties, covenants, indemnities and agreements that the Selling Stockholder(s) agrees to make (except that, in the case of representations and warranties pertaining specifically to the Selling Stockholder(s), each other Stockholder shall make the comparable representations and warranties pertaining specifically to itself, and except that, in the case of covenants or agreements capable of performance only by certain Stockholders, such covenants or agreements shall be made only by such certain Stockholders, and provided that all representations, warranties, covenants, agreements and indemnities made by the Stockholders pertaining specifically to themselves shall be made by each of them severally and not jointly; provided further that each Stockholder shall be severally (but not jointly) liable for breaches of representations, warranties, covenants and agreements of or, in the case of representations and warranties, pertaining to the Company and its Subsidiaries, and for indemnification obligations arising out of or relating to any such breach or otherwise pertaining to the Company and its Subsidiaries, on a *pro rata* basis (based on the number of Common Stock and/or Common Stock Equivalents sold by each Selling Stockholder and each of the other Stockholders), such liability of each such Stockholder not to exceed such Stockholder's *pro rata* portion of the proceeds of the sale actually paid to all Stockholders; provided further that no such Stockholder shall be required to enter into a non-competition or non-solicitation covenant. If the Selling Stockholder(s) accepts such Drag-Along Transaction and desires that the other Stockholders Transfer their Common Stock and/or Common Stock Equivalents in the Drag-Along Transaction, such Selling Stockholder(s) shall give written notice to all other Stockholders of the proposed Drag-Along Transaction ("Drag-Along Notice") at least 30 days prior to the proposed consummation of such Drag-Along Transaction, which Drag-Along Notice shall specify the name and address of the Third Party, the form and amount of consideration to be paid to the Stockholders and any other material terms and conditions of the Drag-Along Transaction. Notwithstanding anything in this Section 4.7 to the contrary, (i) in connection with any Drag-Along Transaction, the treatment of options to acquire shares of Common Stock granted under any management equity plan or agreement or independent director equity plan or agreement shall be governed by the terms of such plans or agreements; (ii) if any Transfer of Common Stock and Common Stock Equivalents of the Company pursuant to this Section 4.7 is not permitted under an Other Agreement then such Transfer shall not be permitted or required hereunder; and (iii) until a Transfer pursuant to this Section 4.7 shall not cause a violation of the FCC Requirements by the Transferor, Transferee, or the Company and shall not subject the Company to an FCC Limitation such Transfer shall not be permitted or required hereunder. The term "Applicable Drag Percentage" means, in connection with any Drag-Along

089904-0003-13090-Active.11878390.14

Transaction, the percentage equal to (x) the total number of shares of Common Stock and Common Stock Equivalents (calculated on a Limited Converted Basis) proposed to be Transferred by the Selling Stockholder(s) in such Drag-Along Transaction divided by (y) the total number of shares of Common Stock and Common Stock Equivalents (calculated on a Limited Converted Basis) held by the Selling Stockholder(s) at the time of such Drag-Along Transaction.

(b)     Subject to Section 4.1(d), any Drag-Along Transaction pursuant to this Section 4.7 shall occur within 180 days of delivery of the notice from the Selling Stockholder(s) to the other Stockholders.  If, at the end of such 180 day period, the Selling Stockholder(s) and the other Stockholders have not completed the sale or other disposition of Common Stock and Common Stock Equivalents of the Selling Stockholder(s) and the other Stockholders in accordance with the terms and conditions of the proposed Drag-Along Transaction, all the restrictions on Transfer contained in this Agreement with respect to the Common Stock and Common Stock Equivalents owned by the Selling Stockholder(s) and the other Stockholders shall again be in effect; provided that if such sale or disposition is incomplete solely due to delays arising from obtaining approval from the FCC, the 180 day period shall be extended to (x) 15 days from date of receipt of FCC approval by the Selling Stockholder(s) or (y) 270 days from the delivery of the notice from the Selling Stockholder(s), whichever is earlier; provided further that if such sale or disposition has not been completed at the end of the extended time period, all the restrictions on Transfer contained in this Agreement with respect to the Common Stock and Common Stock Equivalents owned by the Selling Stockholder(s) and the other Stockholders shall again be in effect.

4.8  Participation Rights.

(a)     Prior to a Public Offering neither the Company nor its Subsidiaries shall issue additional Common Stock and/or Common Stock Equivalents and/or any other equity interests (an "Issuance") to any Person (excluding the Company and its Subsidiaries) unless, prior to such Issuance, the Company notifies each Stockholder in writing of the proposed Issuance and grants to each Stockholder or, at such Stockholder's election, one or more of its Affiliates (in each case subject to Section 4.8(c) below and provided that no Transfer shall take place pursuant to this Section 4.8(a) until the Transfer does not cause a violation of the FCC Requirements by the Transferor, Transferee, or the Company or if the Company would become subject to an FCC Limitation as a result of such Transfer), the right (the "Right") to subscribe for and purchase, in whole or in part, at the same price and upon the same terms and conditions (including, if such additional Common Stock and/or Common Stock Equivalents are issued as a unit together with other securities, the purchase of such unit, but the Right shall not apply separately to any component of such unit) as set forth in the notice of such Issuance, a portion of such additional Common Stock and/or Common Stock Equivalents proposed to be issued in the Issuance up to:

(i)     in the case of an Issuance in which shares of Common Stock or Common Stock Equivalents are to be issued, that number of shares of Common Stock and/or Common Stock Equivalents such that, immediately after giving effect to the Issuance and exercise of the Right (including, for purposes of this calculation, the issuance of shares of Common Stock upon conversion, exchange

or exercise of any Common Stock Equivalent issued in the Issuance or subject to the Right), the shares of Common Stock and Common Stock Equivalents (calculated on a Limited Converted Basis) beneficially owned by such Stockholder and its Affiliates (rounded to the nearest whole share) shall represent the same percentage of the aggregate number of shares of Common Stock and Common Stock Equivalents (calculated on a Limited Converted Basis) outstanding as was beneficially owned by such Stockholder and its Affiliates immediately prior to the Issuance; provided that the holders of Limited Voting Common Stock or limited voting Common Stock Equivalents shall receive only Limited Voting Common Stock or limited voting Common Stock Equivalents, as applicable; and

      (ii)    in the case of an Issuance in which (A) equity securities of the Company other than Common Stock or Common Stock Equivalents ("Other Capital Stock") or (B) any securities exchangeable or exercisable for, or convertible into, such Other Capital Stock ("Other Capital Stock Equivalents") are to be issued, that percentage of shares of Other Capital Stock and/or Other Capital Stock Equivalents (calculated on an as exercised basis) equal to the percentage of shares of Common Stock and Common Stock Equivalents (calculated on a Limited Converted Basis) that was beneficially owned by such Stockholder and its Affiliates immediately prior to the Issuance; provided that the holders of limited voting equity securities shall receive only limited voting equity securities.

      (b)    If any Stockholder elects not to exercise its Right pursuant to Section 4.8 in full with respect to the Issuance of additional Common Stock and/or Common Stock Equivalents or Other Capital Stock and/or Other Capital Stock Equivalents, as applicable, then the other Stockholders may elect to subscribe for and purchase their *pro rata* share of such Common Stock and/or Common Stock Equivalents or Other Capital Stock and/or Other Capital Stock Equivalents, as applicable, that such Stockholder elected not to participate in and such other Stockholders shall receive the relevant number of newly issued shares of Common Stock and/or Common Stock Equivalents or Other Capital Stock and/or Other Capital Stock Equivalents, as applicable, that the non-electing Stockholder would have received had such non-electing Stockholder elected to participate in full.

      (c)    The Right may be exercised by each Stockholder, or, at such Stockholder's election, one or more of its Affiliates, as the case may be, provided that the Person exercising the Right must (i) be an Accredited Investor and (ii) deliver written notice to the Company of such exercise of the Right which is received by the Company within 20 Business Days after the date on which the Stockholder receives notice from the Company of the proposed Issuance. The closing of the purchase and sale pursuant to the exercise of the Right shall occur on the date scheduled by the Company for the Issuance, which may not be earlier than 10 Business Days and no later than 60 Business Days after the Company receives notice of the exercise of the Right.

      (d)    Nothing in this Section 4.8 shall be deemed to prevent any Person from purchasing for cash or the Company from issuing any additional Common Stock and/or

26

Common Stock Equivalents and/or Other Capital Stock and/or Other Capital Stock Equivalents without first complying with the provisions of this Section 4.8; provided that, in connection with such purchase, (i) the Board has determined in good faith that (A) the Company needs a prompt cash investment, (B) no alternative financing on terms as favorable to the Company in the aggregate as such purchase is available on an as timely basis, and (C) the delay caused by compliance with the provisions of this Section 4.8 in connection with such investment would be reasonably likely to adversely affect the Company, (ii) the Person making such purchase (for purposes of this Section 4.8, the "Purchasing Holder") or the Company gives prompt notice to the Stockholders as of such date of the Purchasing Holder's investment, which notice shall describe in reasonable detail the additional Common Stock and/or Common Stock Equivalents being purchased by the Purchasing Holder and the purchase price thereof, and (iii) the Purchasing Holder or the Company enables the Stockholders as of such date to effectively exercise their respective rights under this Section 4.8 with respect to their purchase of a *pro rata* share of the additional Common Stock and/or Common Stock Equivalents issued to the Purchasing Holder as promptly as practicable following the initial prompt cash investment after such purchase by the Purchasing Holder on the terms specified in Section 4.8(a).

(e)     The Rights provided under this Section 4.8 shall not apply to any issuance (i) made in payment of the purchase price of assets (including the acquisition of stock) acquired by the Company or any of its Subsidiaries; (ii) (A) of options granted to Directors, officers or employees of the Company or its Subsidiaries, or issuance of Common Stock upon the exercise of such options; or (B) otherwise in accordance with the terms of a stock option plan or other equity-based compensation plan of the Company or its Subsidiaries, including any exercise or conversion related thereto; (iii) pursuant to a Public Offering; (iv) of equity interests issued as dividends or distributions to holders of Common Stock, generally, on a *pro rata* basis; (v) of other capital stock or capital stock equivalents issued as dividends or distributions to holders of other capital stock or capital stock equivalents, generally, on a *pro rata* basis; or (vi) pursuant to the exchange, exercise or conversion of any equity interest that is either (A) outstanding on the date hereof or (B) outstanding after the date hereof so long as the Stockholders have had an opportunity to exercise the Rights granted to such Stockholders with respect to the underlying equity interest, or such equity interest was issued pursuant to clause (i), (ii), (iii), (iv), or (v). For the avoidance of any confusion it is specified that the Rights shall not apply to any Issuance made pursuant to the exercise of any Stockholder's rights under Sections 2.5, 2.6 and 2.8 or its exercise of a Warrant.

4.9     Reservation of Shares.  For the purpose of enabling the Company to satisfy any obligation to issue Voting Common Stock upon the conversion of Limited Voting Common Stock and Limited Voting Common Stock upon the conversion of Voting Common Stock and Common Stock upon the conversion of Warrants, the Company shall reserve and keep available at all times out of its authorized but unissued or treasury shares (i) of Voting Common Stock the number of shares of Voting Common Stock deliverable upon the conversion of all outstanding shares of Limited Voting Common Stock, (ii) of Limited Voting Common Stock the number of shares of Limited Voting Common Stock deliverable upon the conversion of all outstanding shares of Voting Common Stock and (iii) of Common Stock the number of shares of Common Stock deliverable upon exercise of the Warrants.

089904-0003-13090-Active.11878390.14

4.10 <u>Other Media Related Transactions</u>. Each Stockholder agrees that prior to consummating a transaction resulting in its acquisition of an attributable interest in a Media Property that (a) will or is reasonably likely to result in a violation by the Stockholder of an FCC Requirement caused by such Stockholder's interest in the Company; (b) will or is reasonably likely to result in a violation by the Company of an FCC Requirement; or (c) will or is reasonably likely to subject the Company to an FCC Limitation, such Stockholder will with due promptness inform the Company about the proposed transaction and shall not consummate such transaction until the Company is reasonably satisfied that such transaction (i) shall comply with the FCC Requirements and (ii) shall not cause a violation of the FCC Requirements by the Stockholder or the Company; <u>provided</u> that the Company shall use commercially reasonable efforts to relieve any FCC Limitation that would otherwise arise or be likely to arise as a result of any such transaction, including by taking any action pursuant to Section 2.6.

4.11 <u>Public Offerings, etc</u>. The provisions of Sections 4.6 and 4.7 shall not be applicable to offers and sales of shares of Common Stock in a Public Offering or pursuant to Rule 144A under the Securities Act.

SECTION 5.  MISCELLANEOUS

5.1 <u>Additional Securities Subject to Agreement.</u> Each Stockholder agrees that any other Common Stock and/or Common Stock Equivalents which it shall hereafter acquire by means of a stock split, stock dividend, distribution, exercise of warrants or options, purchase or otherwise shall be subject to the provisions of this Agreement to the same extent as if held on the date hereof.

5.2 <u>Termination</u>. This Agreement shall terminate upon the first to occur of (a) a Change of Control (including in connection with a Drag-Along Transaction); (b) the liquidation of the Company; or (c) a Public Offering; <u>provided</u> that Sections 3.3, 5.3, 5.7, 5.11, 5.12 and 5.15 shall survive the termination of this Agreement.

5.3 <u>Injunctive Relief</u>. The Stockholders, their Permitted Transferees and the Company acknowledge and agree that a violation of any of the terms of this Agreement will cause the Stockholders and their Permitted Transferees and the Company irreparable injury for which adequate remedy at law is not available.  Accordingly, it is agreed that each of the Company, the Stockholders and their Permitted Transferees shall be entitled to seek an injunction, restraining order or other equitable relief to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof in any New York federal or state court residing in the Borough of Manhattan, in addition to any other remedy to which it may be entitled at law or equity.

5.4 <u>Other Stockholders Agreements</u>. None of the Stockholders shall enter into any agreement or other arrangement of any kind with any Person (other than the Company) with respect to Common Stock and/or Common Stock Equivalents which is inconsistent with the provisions of this Agreement or which would reasonably be considered to impair its ability to comply with this Agreement.

089904-0003-13090-Active.11878390.14

5.5 <u>Amendments and Waivers</u>. The provisions of this Agreement may be amended, modified or waived only by a written instrument signed by (a) the Company; (b) for so long as it owns at least 5% of the outstanding Common Stock, SVP; (c) for so long as it owns at least 5% of the outstanding Common Stock, AG; and (d) Stockholders beneficially owning a majority of the then outstanding Common Stock beneficially owned by all Stockholders; <u>provided</u>, <u>however</u>, that no such amendment or waiver shall materially adversely affect the rights or obligations of any Stockholder differently than the other Stockholders party to this Agreement without the written approval of such affected Stockholder; <u>provided further</u> that no such amendment or waiver shall, without the prior written approval of each affected Stockholder, terminate, modify or waive a Stockholder's rights or obligations in respect of the conversion of Limited Voting Common Stock into Voting Common Stock, or vice versa or the conversion of Common Stock into Warrants or the exercise of Warrants. Notwithstanding the foregoing, the Company may from time to time add additional holders of shares of Common Stock as parties to this Agreement. In order to become a party to this Agreement, such Person must execute a joinder agreement, in form and substance satisfactory to the Company, evidencing such Person's agreement to become a party hereto and to be bound hereby as a Stockholder, and upon the Company's receipt of any such Person's executed joinder agreement, such Person shall be deemed to be a party hereto and bound hereby.

5.6 <u>Successors, Assigns and Transferees; No Third Party Beneficiaries</u>. The provisions of this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, each of whom shall agree in writing in form and substance reasonably satisfactory to the Company, to become a party hereto and be bound hereby to the same extent as the party such successor is succeeding or the assignor, as applicable. Except as otherwise expressly provided in this Agreement and for assignments by operation of law, no party hereto may assign its rights or obligations hereunder. This Agreement is not intended to confer upon any Person other than the parties hereto any rights or remedies hereunder, except as expressly provided in this Agreement.

5.7 <u>Notices</u>. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile or e-mail), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or two (2) Business Days after being delivered to a recognized courier (whose stated terms of delivery are two (2) Business Days or less to the destination of such notice), or five (5) calendar days after being deposited in the mail, postage prepaid, or, in the case of facsimile or e-mail, when receipt is confirmed, addressed as set forth on Schedule A hereto to the parties hereto, or to such other address as may be hereafter notified by the respective parties hereto.

5.8 <u>Integration</u>. This Agreement, the amended and restated certificate of incorporation and by-laws of the Company, the Subscription Agreements, the Registration Rights Agreement, (i) in the case of a Management Stockholder, the Management Stockholders Agreement and all option, subscription, restricted stock, employment and other agreements entered into by such Management Stockholder and any of the Company and its Subsidiaries (the "Other Agreements") and (ii) in the case of the holders of Warrants, the Warrant Agreements (and the certificate evidencing the Warrants) contain the entire understanding of the parties with respect to the subject matter hereof and thereof. There are no agreements, representations, warranties, covenants or undertakings with respect to the subject matter hereof and thereof other

29

than those expressly set forth herein and therein. This Agreement, the amended and restated certificate of incorporation and the by-laws of the Company, the Subscription Agreements, the Registration Rights Agreement, the Warrant Agreements, the Management Stockholders Agreement and the Other Agreements supersede all prior agreements and understandings between the parties with respect to such subject matter hereof and thereof; provided that in case of conflict between the provisions of this Agreement and the provisions of the amended and restated certificate of incorporation and by-laws of the Company, this Agreement shall prevail.

5.9 Severability. If one or more of the provisions, paragraphs, words, clauses, phrases or sentences contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision, paragraph, word, clause, phrase or sentence in every other respect and of the remaining provisions, paragraphs, words, clauses, phrases or sentences hereof shall not be in any way impaired, it being intended that all rights, powers and privileges of the parties hereto shall be enforceable to the fullest extent permitted by law.

5.10 Counterparts. This Agreement may be executed in two or more counterparts, and by different parties on separate counterparts each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

5.11 Governing Law, Etc. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to contracts made and to be performed therein. The parties executing this Agreement hereby (i) agree to submit to the exclusive jurisdiction of the New York federal and state courts residing in the Borough of Manhattan in any action or proceeding arising out of or relating to this Agreement, (ii) waive any objection to the laying of venue of any actions or proceedings brought in any such court and any claim that such actions or proceedings have been brought in an inconvenient forum, and (iii) agree that service of any process, summons, notice or document by U.S. registered mail to the address for such party specified in Section 5.7 shall be effective service of process for any action or proceeding in New York with respect to any matter specified above.

5.12 Waiver of Jury Trial. EACH PARTY ACKNOWLEDGES THAT ANY DISPUTE THAT MAY ARISE OUT OF OR RELATING TO THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE SUCH PARTY HEREBY EXPRESSLY WAIVES ITS RIGHT TO JURY TRIAL OF ANY DISPUTE BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OTHER AGREEMENTS RELATING HERETO OR ANY DEALINGS AMONG THEM RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY. THE SCOPE OF THIS WAIVER IS INTENDED TO ENCOMPASS ANY AND ALL ACTIONS, SUITS AND PROCEEDINGS THAT RELATE TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY REPRESENTS THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT IN THE EVENT OF ANY ACTION, SUIT OR PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) SUCH PARTY UNDERSTANDS AND WITH THE ADVICE OF COUNSEL HAS

30

CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND REPRESENTATIONS IN THIS SECTION 5.12.

5.13 <u>Management Stockholders</u>. Each Management Stockholder on the date hereof has executed this Agreement and is bound hereby. After the date hereof, the Company shall not issue, and shall cause its Subsidiaries not to issue, any Common Stock and/or Common Stock Equivalents to an employee of the Company or any of its Subsidiaries, including any Affiliate of such employee, unless he or she first delivers to the Company a joinder agreement, in form and substance satisfactory to the Company, agreeing that he or she is bound by the terms hereof as a Management Stockholder.

5.14 <u>Lender Relationship</u>. Notwithstanding anything herein to the contrary, nothing contained in this Agreement shall affect, limit or impair the rights and remedies of any lender or any of its Affiliates in their capacity as lenders to the Company or any of its Affiliates pursuant to any agreement under which the Company or such Affiliate has borrowed money. Without limiting the generality of the foregoing, no such Person, in exercising its rights as a lender, including making its decision on whether to foreclose on any collateral security, will have any duty to consider (a) its status as a direct or indirect stockholder of the Company and its Subsidiaries, (b) the interests of the Company or any of its Affiliates or (c) any duty it may have to any other direct or indirect stockholder of the Company and its Subsidiaries, except as may be required under the applicable loan documents.

5.15 <u>Representations of the Company</u>. All shares of Common Stock issued upon conversion pursuant to this Agreement or exercise of the Warrants shall be duly authorized, fully paid and non-assessable. All Warrants issued upon exchange of Common Stock for Warrants pursuant to this Agreement shall be duly authorized.

5.16 <u>Operation of Indemnification</u>. The Company hereby acknowledges and agrees that the obligation of the Company under its amended and restated certificate of incorporation or by-laws to indemnify or advance or pay expenses to any Director designated under Section 2.1 shall be the primary source of indemnification and advancement of such Director in connection therewith and any obligation on the part of any Investor to indemnify or advance expenses to such Director shall be secondary to the Company's obligation and shall be reduced by any amount that the Director may collect as indemnification or advancement from the Company. In the event that the Company fails to indemnify or advance or pay expenses to such Director as required or contemplated by the amended and restated certificate of incorporation or by-laws (such amounts, the "<u>Unpaid Director Indemnity Amounts</u>") and any Investor makes any payment to such Director in respect of indemnification or advancement or payment of any expenses under the amended and restated certificate of incorporation or by-laws of the Company on account of such Unpaid Director Indemnity Amounts, such Investor shall be subrogated to the rights of such Director under the amended and restated certificate of incorporation or by-laws of the Company in respect of such Unpaid Director Indemnity Amounts.

31

[Remainder of this page intentionally left blank.]

089904-0003-13090-Active.11878390.14

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement or caused this Agreement to be executed on its behalf as of the date first written above.

NEXTMEDIA GROUP, INC.


By:_____
    Name:
    Title:

[ANGELO GORDON & CO., L.P.]

By:_____
    Name:
    Title:

SVP I LLC

By: Milbrook Holdings II LLC

By:_____
    Name:  Victor Khosla
    Title: Managing Member

**CREDITOR STOCKHOLDERS**

By:_____
    Name:
    Title:

**ROLLOVER EQUITY STOCKHOLDERS**

By:_____
    Name:
    Title:

MANAGEMENT STOCKHOLDERS
(Each of the undersigned signing individually, and
not on behalf of any other Management
Stockholder)

By: _____
    Name:

## NOTICES

If to the Company, to:

NextMedia Group, Inc.
6312 S. Fiddlers Green Circle, Suite 205E
Greenwood Village, Colorado 80111
Attention: Eric W. Neumann
Facsimile: (303) 694-4940
Telephone: (303) 694-4511
E-mail: eneumann@nextmediagroup.net

with a copy to:

Andrews Kurth LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201
Attention: John E. Quattrocchi
Facsimile: (214) 659-4401
Telephone: (214) 659-4400
E-mail: johnquattrocchi@andrewskurth.com

If to the Stockholders, to:

Such Stockholder, at such Stockholder's address or to such Stockholder's facsimile number
reflected in the Company's books and records.

With respect to SVP, AG and their respective Permitted Transferees,
with a copy to:

Simpson Thacher & Bartlett LLP
Attention: Gary Horowitz, Esq.
          Ken Ziman, Esq.
425 Lexington Avenue
New York, New York 10017
Facsimile: (212) 455-2502
E-mail: ghorowitz@stblaw.com
        kziman@stblaw.com

## FORM OF WARRANT AGREEMENT