**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEXTMEDIA GROUP, INC., et al., | ) | Case No. 09-14463 (PJW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

# MEMORANDUM OPINION

Paul N. Heath
Michael J. Merchant
Chun I. Jang
Robert C. Maddox
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801

Jason S. Brookner
Monica S. Blacker
ANDREWS KURTH LLP
1717 Main Street, Suite 3700
Dallas, Texas 75201

Counsel for the Reorganized
Debtors

Christopher D. Loizides
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, DE 19801

Claudio E. Iannitelli
Jonathan M. Levine
CHEIFETZ IANNITELLI
MARCOLINI, P.C.
111 West Monroe Street
17th Floor
Phoenix, AZ 85003

Counsel for CBS Outdoor, Inc.

Dated: November 5, 2010

**WALSH, J**

This opinion is with respect to the objection of NextMedia Group, Inc. (Doc. # 479) to the claim filed by CBS Outdoor, Inc. For the reasons stated below, I will sustain the objection.

## BACKGROUND

**The Parties' Agreements**

CBS Outdoor Inc. ("CBS") and NextMedia Outdoor, Inc. ("NextMedia") own and operate outdoor advertising businesses. On August 29, 2008, CBS and NextMedia entered into an asset purchase agreement (the "Agreement"), whereby CBS purchased certain site leases (the "Site Leases"), advertising displays, and other assets from NextMedia for $72 million. (Doc. # 508, ex. A.) The Agreement contained a purchase price adjustment mechanism to account for certain future circumstances affecting the profitability of the Site Leases. (See Doc. # 508, ex. A, § 6.15.) More specifically, section 6.15 of the Agreement ("Section 6.15") provides:

> On or prior to the date that is eighteen (18) months from the Closing Date, [CBS] shall provide to [NextMedia] a schedule of those Site Leases acquired by [CBS] hereunder effective as of the Closing Date (the "True-up Schedule") that, between the Closing Date and the first anniversary thereof, have been affected by [certain enumerated events] . . .

3

>    [NextMedia] agrees that [CBS] shall have a
>    right to payment for the Cash Flow
>    Differential for items that are appropriately
>    scheduled on the True-up Schedule as provided
>    in this Section 6.15.

(Doc. # 508, ex. A, § 6.15.)

Following the parties' entry into the Agreement, CBS encountered difficulty in obtaining governmental approvals for the transfer of Site Leases in certain geographical locations (the "Obstructed Assets"). (See Doc. # 508, ex. A.) To account for the delay in transferring the Obstructed Assets, the parties entered into that certain Acknowledgment and First Amendment to Asset Purchase Agreement, dated October 3, 2008 (the "Amendment"). (See Doc. # 508, ex. A.)

The Amendment generally provided that: (1) NextMedia would continue to own the Obstructed Assets until government approvals were obtained; and (2) the closing for the Obstructed Assets would be bifurcated from the closing for the remaining assets identified in the Agreement (the "Initial Closing"). (See Doc. # 508, ex. A.) The Amendment also provided that the parties agreed that "the references to the 'Closing' or the 'Closing Date' in . . . Article VI of the [Agreement] . . . shall . . . be deemed to mean the date of the Initial Closing." (Doc. # 508, ex. A, Amendment, ¶ 11.) Therefore, Section 6.15's "Closing Date," after which CBS had eighteen months to provide a True-up Schedule, means the Initial Closing date.

4

CBS contends that the Initial Closing occurred on or about November 1, 2008 and Section 6.15's eighteen month window lapsed on May 1, 2010.  (Doc. # 496, p. 2.)  NextMedia contends that the Initial Closing occurred on October 3, 2008 and Section 6.15's eighteen month window lapsed on April 3, 2010. (Doc. # 508, p. 2.)  As described below, this disagreement is inconsequential because CBS did not provide a True-up Schedule until August 24, 2010, a date that is indisputably beyond either calculation of the eighteen month window.

**NextMedia's Bankruptcy Filing and CBS's Claims**

On December 21, 2009, NextMedia and its affiliated debtors (together, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code.

On March 29, 2010, CBS filed a proof of claim, denominated as claim number 421 ("Claim 421"), asserting an unsecured unliquidated claim for amounts potentially due under Section 6.15. More specifically, by Claim 421, CBS stated that:

> Pursuant to Section 6.15 of the Agreement, Debtor may be liable to [CBS] for the Cash Flow Differential (as that term is defined in the Agreement), pursuant to a mathematical formula set forth in the Agreement. The extent of Debtor's liability to [CBS], if any, will not be known until July 2010. Accordingly, [CBS] makes this Proof of Claim to preserve its right to enforce its claim against Debtor's estate for any amounts owed in accordance with the terms of the Agreement, and will amend its claim, if required, once the amount owed by Debtor to [CBS] pursuant to the Agreement, if any, can be quantified.

(See Doc. # 508, ex. B.)

On August 10, 2010, the Debtors objected to Claim 421 on a "no liability" theory. (Doc. # 479.) Thereafter, CBS filed a response (Doc. # 496) and submitted an amended proof of claim, denominated as claim number 546 ("Claim 546" and together with Claim 421, the "Claims"). Claim 546 asserts an unsecured claim in the amount of $2,027,586.26 against NextMedia for amounts due to CBS pursuant to Section 6.15 and indicates that "[o]n August 24, 2010, [CBS] delivered a True-Up Schedule (as defined in the Agreement) to Debtor." (Doc. # 508, ex. B.)

The Debtors filed a reply (Doc. # 508), CBS responded with a sur-reply (Doc. #531), and the Debtors filed a further reply (Doc. # 533). The Court heard oral argument on the issues related to the Claims on October 12, 2010.

## **DISCUSSION**

Delaware contract law applies here[1] and provides that "when interpreting a contract, the court's ultimate goal is to determine the parties' shared intent." Sassano v. CIBC World Markets Corp., 948 A.2d 453, 462 (Del. Ch. 2008). In so doing, the Court looks first to the plain language of the contract and objectively considers not "what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." Rhone-Poulenc Basic

---

[1] The Agreement provides that "[t]his agreement shall be governed by and construed in accordance with the laws of the State of Delaware . . . ." (Doc. # 508, ex. A, § 9.4.)

6

<u>Chems. Co. v. Am. Motorists Ins. Co.</u>, 616 A.2d 1192, 1195 (Del. 1992). If the ordinary meaning of the contract language "is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties [did] not assent[]." <u>Id.</u> (internal quotations removed). In addition, "the burden of justifying a departure from a contract's written terms generally rests with the party seeking the departure." <u>UNUM Life Ins. Co of Am. v. Ward</u>, 526 U.S. 358, 371 (1999).

    Here, the Agreement provides, in relevant part, that "[o]n or prior to the date that is eighteen (18) months from the Closing Date, [CBS] shall provide to [NextMedia] a . . . True-up Schedule . . . [NextMedia] agrees that [CBS] shall have a right to payment for the Cash Flow Differential for items that are appropriately scheduled on the True-up Schedule as provided in this Section 6.15." (Doc. # 508, ex. A, § 6.15.)

    Although the parties agree that CBS did not provide a True-up Schedule within the specified eighteen month period, the parties disagree as to whether NextMedia's obligation to pay was conditioned upon CBS's timely submission of the True-up Schedule. For the reasons set forth below, based on the Agreement's language and applicable case law, I find that providing a True-up Schedule within the specified timeframe was a condition, and due to CBS's

7

inexplicable failure to comply with this condition, NextMedia has no liability for the Claims.

**CBS's Submission of a True-up Schedule Within the Eighteen Month Period is a Condition to NextMedia's Obligation to Pay.**

A condition is "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." Seaford Assocs. Ltd. P'ship v. Subway Real Estate Corp., No. Civ.A. 2248, 2003 WL 21254847, at *5 n.30 (Del. Ch. May 21, 2003). No particular words are required to create a condition; however, terms such as "if," "provided that," "on the condition that," or other phrases that restrict performance generally connote the parties' intention to create a condition, rather than a promise. SLMSoft.Com, Inc. v. Cross Country Bank, No. Civ.A. 00C09163JRJ, 2003 WL 1769770, at *12 (Del. Super. Ct. 2003). Although specific words are not necessary, courts have construed the absence of provisional language as probative of the parties' intention to create a promise, rather than a condition. Id. Delaware courts generally do not favor conditions and have stated that "[f]or a condition to effect a forfeiture, it must be unambiguous." Martin v. Hopkins, 2006 WL 1915555, at *6 (Del. Ch. 2006) (citing Old Time Petroleum Co. v. Turcol, 156 A. 501, 505 (Del. Ch. 1931)). Nevertheless, "if the language of a contract is plain and unambiguous, a court should construe the contract according to its terms." AES Puerto Rico, L.P. v. Alstom Power, Inc., 429 F.Supp.2d 713, 717 (D. Del. 2006).

8

Also, events may be made conditions in two ways, "either by the agreement of the parties or by a term supplied by the court." SLMSoft.Com, 2003 WL 1769770, at *12.  Express conditions are those agreed to by the parties and implied/constructive conditions are those imposed by a court. Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co., 660 N.E.2d 415, 418 (N.Y. 1995). The distinction is critical where a party does not precisely comply with the condition because "[e]xpress conditions must be literally performed, whereas constructive conditions . . . are subject to the precept that substantial compliance is sufficient." Id.; see also, 13 Lord, Williston on Contracts § 38:12 (4th ed. 2010).

The Restatement (Second) of Contracts has been relied upon by Delaware courts and explains that:

> If...the parties have made an event a condition of their agreement, there is no mitigating standard of materiality or substantiality applicable to the non-occurrence of that event. If, therefore, the agreement makes full performance a condition, substantial performance is not sufficient and if relief is to be had under the contract, it must be through excuse of the non-occurrence of the condition to avoid forfeiture.

Restatement (Second) of Contracts § 237, cmt. d (2010); Procek v. Hudak, No. C.A. 15279, 2000 WL 546079, at *5 (Del. Ch. Apr. 20, 2000) (citing Restatement (Second) of Contracts § 237, cmt. d).

**Applicable Case Law Shows that CBS's Failure to Provide a Timely True-up Schedule Results in Forfeiture.**

Vague v. Bank One Corp., No. 18741, 2006 WL 290299 (Del. Ch. Feb. 1, 2006) and Eastman Kodak Co. v. Bostic, No. 91-Civ-1797, 1991 WL 243378 (S.D.N.Y. Nov. 14, 1991) are examples of courts strictly construing express conditions and resulting forfeitures.

In Vague, the Delaware Court of Chancery held that plaintiff Vague was barred from exercising option rights that had expired pursuant to the plain language of unambiguous option agreements. Vague, 2006 WL 290299, at *11. The option agreements were conferred upon Vague by his employer, and provided that if Vague's employment was "terminate[d] by reason of . . . retirement, all [o]ptions . . . may . . . be exercised by [Vague] . . . at any time within six months . . . after the date of . . . retirement of [Vague]." Id. at *1.

Vague later resigned from his position, and, at various points, received incorrect information from his employer regarding the exercise date for the options. Id. at *2-*5. Following the inaccurate statements, however, Vague's prior employer sent him two quarterly option and award summaries that included the correct option exercise date. Id. at *5. Vague did not dispute his receipt of the summaries and admitted that he did not read the summaries, but forwarded them to his personal accountant. Id. The accountant did not inform Vague of the correct exercise period until after it had expired. Id. Approximately ten months after the exercise period lapsed, Vague attempted to exercise the options, but his efforts were rejected as untimely. Id. at *6.

10

The parties did not dispute the clear language of the options or the fact that Vague did not timely comply with the options' exercise requirements. Id. at *7.

In deciding that Vague had no rights under the option agreements, the court took special notice that: (1) the right to exercise the options was set forth in an unambiguous contract, (2) the terms of the contract clearly established a date by which the options had to be exercised, (3) Vague was reasonably aware of the expiration date, and (4) Vague failed to timely exercise his rights. Id. at *11. Faced with these facts and Vague's inability to provide a justifiable reason for his delay, the court refused to "allow[] Vague to escape the clear terms of his option agreements and the consequences of missing the deadline for exercise of the options." Id. at *1, *11.

The United States District Court for the Southern District of New York reached a similar conclusion in Eastman Kodak Co. v. Bostic, 1991 WL 243378 (S.D.N.Y. Nov. 14, 1991). The Bostic court held that plaintiff Eastman Kodak ("Kodak") was not entitled to receive monies from defendants Steve and Alice Bostic (the "Bostics") under the unambiguous terms of a purchase and option agreement between the parties. Id. at *1.

The parties' agreement provided that Kodak would purchase an initial minority stake in PRC and NCP, two related companies owned by the Bostics, and granted the Bostics a put option whereby they could require Kodak to purchase all remaining shares of PRC

11

and NCP. Id. Following the Bostics' exercise of the put option, the agreement provided for a reconciliation of the purchase price with the consolidated net worth of PRC and NCP, as reflected in an auditor certified final balance sheet. Id. More specifically, section four of the agreement provided:

> As soon as possible following the . . . Put Closing . . . the parties shall cause a final balance sheet (the "Audited Final Balance Sheet") . . . to be certified by NCP's independent public accountants . . . Ten business days after delivery of the Audited Final Balance Sheet, there shall be paid to Kodak . . . or to the Bostics [70% of any decrease or increase, respectively,] in the consolidated net worth of NCP as reflected in the Audited Final Balance Sheet from that reflected in the Unaudited Final Balance Sheet.

Id. Approximately three years after the Bostics exercised the put option, Kodak sought to enforce the provisions of section four. Id. The Bostics opposed enforcement of the section arguing, inter alia, that timely delivery of an auditor-certified final balance sheet was a condition precedent to either parties' obligation to pay. Id.

The court agreed with the Bostics, stating that "[t]he contract provision at issue here could not express the parties' intent more clearly . . . The obvious intention of [section four] was to make certification of the final balance sheet a condition precedent to any obligation to pay." Id. at *2. The court went on to state that "[c]onditions precedent are strictly enforced, in order to implement the parties' express agreement. Strict

12

construction of the terms of such an express agreement is especially appropriate where, as here, two sophisticated parties are involved." Id. at *3. The court determined that the "as soon as possible" preamble to section four and the ten day period for payment after delivery of the auditor certified final balance sheet showed "the clear intent of these two sophisticated parties to 'wrap-up' any residual payment obligations soon after the closing." Id. at *4.

The court disagreed with Kodak's arguments that equity requires the avoidance of disproportionate forfeitures and that Kodak's failure to timely obtain a formal certification was immaterial under the substantial performance doctrine. Id. at *4. Instead, the court determined that because timely certification was an express condition of either party's duty to pay, Kodak's failure to strictly comply with the condition was not an "insignificant deviation" from the agreement and the "Bostics were entitled to the bargained-for certification." Id. The court found that Kodak's interpretation of the agreement "would not merely abrogate [Kodak's] compliance with clear, express terms of [the] commercial contract, but would in effect rewrite the agreement years later by excluding [a] material condition." Id. In addition, the court did not find Kodak's disproportionate forfeiture argument compelling because Kodak provided no explanation for its failure to act and could have easily prevented the alleged harm by acting expeditiously. Id.

The facts of <u>Vague</u> and <u>Bostic</u> resemble the facts of the present case and are helpful to the Court's analysis. The Agreement between CBS and NextMedia, like the contracts in <u>Vague</u> and <u>Bostic</u>, contains an unambiguous provision establishing a timeframe for a specific action that, in turn, gives rise to specific contract rights. (<u>See</u> Doc. # 508, ex. A, § 6.15.)

CBS argues that if the parties intended to make CBS's timely provision of a True-up Schedule a condition to NextMedia's payment obligations, the Agreement would have specifically stated that forfeiture would result from non-compliance. As explained below, however, Delaware courts' objective theory of contract interpretation does not demand drafting perfection in retrospect, but requires language that a reasonable person would understand to create obligations and rights. The Agreement's language meets this standard, and the fact that CBS apparently did not foresee a forfeiture resulting from its actions fails to show that the Agreement's plain language does not contemplate a forfeiture.

Section 6.15 begins by stating "[o]n or prior to the date that is eighteen (18) months from the Closing Date, [CBS] shall provide to [NextMedia] a . . . True-up Schedule." (Doc. # 508, ex. A.) The provision then outlines specific items for which NextMedia may be obliged to reimburse CBS. Notably, however, the allowable reimbursements are preceded by the eighteen month deadline to provide the True-up Schedule. In addition, the provision uses mandatory "shall" language, not permissive "may" language. Both

the ordering and mandatory language of the provision leads the Court to conclude that providing a True-up Schedule within the eighteen month window is a condition.

In addition, Section 6.15 goes on to state that "[NextMedia] agrees that [CBS] shall have a right to payment for . . . items that are appropriately scheduled on the True-up Schedule as provided in this Section 6.15." (Doc. # 508, ex. A.) The section does not provide that CBS has an unqualified right to payment for items listed in Section 6.15, but specifically limits CBS's rights to items that are "appropriately scheduled . . . as provided in this Section 6.15." (Doc. # 508, ex. A.) The plain meaning of this language would lead a reasonable person to understand that only items scheduled in the manner required by Section 6.15 would be paid. This language further confirms that providing a True-up Schedule within the eighteen month window was a condition to NextMedia's obligation to pay.[2]

---

[2] In addition to the plain language of the Agreement, NextMedia presented convincing testimonial evidence that the parties intended to create a limited window for resolution of any purchase price adjustments. At the October 12, 2010 hearing on the Debtors' objection to the Claims, attorney John Quattrocchi testified about the Agreement and the business relationship between NextMedia and CBS. (Hr'g Tr. 48, Oct. 12, 2010.) Quattrocchi testified that he represented NextMedia in its negotiation of the Agreement, the Amendment, and in prior agreements with CBS. (Hr'g Tr. 49-53.) He further testified that CBS was the party that bargained for Section 6.15 and that the eighteen month timeframe was specifically negotiated between the parties. (Hr'g Tr. 56.) In addition, Quattrocchi testified that when the Amendment was negotiated, the parties again specifically discussed Section 6.15 and agreed that the later closing for the Obstructed Assets would have no effect on the eighteen month timeframe in Section 6.15. (Hr'g Tr. 57-59.) He

Neither the contract provisions in <u>Vaque</u> and <u>Bostic</u>, nor the Agreement contain provisional phrases such as "conditioned upon," "provided that," or "in the event that"; however, the language of each contract clearly requires certain actions within a specific timeframe before an obligation to pay arises.

CBS is a sophisticated contract party that was aware of its contractual obligations. In fact, CBS specifically referenced Section 6.15 in the Claims.  (Doc. # 508, ex. B.)  CBS has further recognized that "[w]ithout question, CBS . . . had an obligation to deliver a True-up Schedule to [NextMedia] in order to exercise [its Section 6.15 payment] right" and that "CBS did not deliver its True-up Schedule within the time period set forth in Section 6.15 of the Agreement."  (Doc. # 531, p. 1, 4.)  CBS does not, however, accord any meaning to the Agreement's explicit eighteen month requirement and asks the Court to do the same. Unfortunately for CBS, the Court cannot rewrite the Agreement to provide CBS with contractual rights for which CBS itself did not bargain.

In addition, CBS, like Vague and Kodak, has not offered a sufficient explanation for its non-compliant actions.  To the extent that excusable neglect or a similar doctrine may be relevant, CBS has not provided sufficient information regarding its delayed actions.  More specifically, CBS's written submissions provide no explanation for the delayed True-up Schedule and CBS's

---

further testified that "the deadline was important because NextMedia likes to have certainty in terms of its liability." (Hr'g Tr. 61.)

16

counsel at oral argument vaguely indicated that CBS had a misconception of the applicable time periods, perhaps resulting from a clerical error.  (See Hr'g Tr. 25-26, Oct. 12, 2010.)  CBS did not provide further explanation for its non-compliance and did not argue excusable neglect.  As a result, there is no basis for allowing CBS to "escape the clear terms" of the Agreement.  Vaque, 2006 WL 290299, at *1; see also Bostick, 1991 WL 243378, at *4. CBS forfeited any right to obtain payment under Section 6.15.

**CBS's Other Arguments are Unavailing.**

The parties heavily debate whether CBS's untimely submission resulted in waiver or forfeiture.  CBS argues that its actions cannot operate as a waiver because section 9.3 of the Agreement ("Section 9.3") states, in relevant part:

> No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

(Doc. # 508, ex. A, § 9.3.)  CBS argues that courts have interpreted similar "no-waiver" provisions to operate as a plain waiver of time limitations on the exercise of contractual rights. (Doc. # 531, p. 3.)

NextMedia argues that the concept of waiver and Section 9.3 are irrelevant because, as a result of CBS's non-compliance with Section 6.15, CBS did not have any contractual rights to

17

waive. NextMedia contends that CBS could not waive its own obligations under Section 6.15, and that by failing to act, CBS forfeited any opportunity to seek, or obtain, payment pursuant to Section 6.15.

Delaware courts define waiver as "the intentional relinquishment of a known right, either in terms or by such conduct as clearly indicates an intention to renounce a known privilege or power." Nathan Miller, Inc. v. Northern Ins. Co. of New York, 39 A.2d 23, 25 (Del. Super. Ct. 1944). Forfeiture, on the other hand, has been defined as the "deprivation of some estate or right because of the failure to perform some contractual obligation or condition." Black's Law Dictionary 772 (9th ed. 2009).

Waiver is inapplicable because Section 6.15 contains a condition and, absent timely action, CBS never had any payment right to waive. In addition, even if the Agreement's general "no-waiver" provision, Section 9.3, was somehow applicable, it would not obliterate the specific requirements of Section 6.15. See DCV Holdings, Inc. v. ConAgra, Inc., 889 A.2d 954, 961 (Del. Super. Ct. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

CBS also argues that the Agreement's lack of a "time of the essence" clause means that prompt compliance with Section 6.15 is not required. This argument is unavailing in light of the

explicit eighteen month time limitation included in Section 6.15. Parties need not include "time of the essence" clauses in their contracts to ensure enforcement of specifically-negotiated unambiguous contractual provisions.

Equally unavailing is CBS's argument that NextMedia breached the covenant of good faith and fair dealing inherent in all contracts by its failure to warn CBS that if it submitted a True-up Schedule after the Agreement's explicit deadline, NextMedia would not pay.  NextMedia clearly did not have a duty to tip its hand and provide CBS with legal advice or to otherwise interpret the Agreement for CBS.  In any event, CBS's good faith and fair dealing argument was untimely raised for the first time in its reply brief and need not be considered. <u>See In re Catholic Diocese of Wilmington, Inc.</u>, Case No. 09-13560 (CSS), 2010 WL 2907428, at *2 n.19 (Bankr. D. Del. July 21, 2010).

## **CONCLUSION**

For the reasons set forth above, the objection by NextMedia of the CBS claim is sustained.  The CBS claim is disallowed.